# EXHIBIT D



G. William Kennedy, Ph.D., CPA/ABV
FTI Consulting, Inc.
200 State Street, 2nd Floor
Boston, MA 02109
(617) 747–1807

April 15, 2010

Mr. Darrell C. Valdez
Assistant United States Attorney
U.S Department of Justice
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

RE:  Ascom Hasler Mailing Systems, Inc. v. United States Postal Service (No. 00-1401)
     Neopost, Inc. v. United States Postal Service (No. 00-20089)
     United States District Court for the District of Columbia

Dear Mr. Valdez:

<u>**Overview of Assignment**</u>

FTI Consulting has been retained by the Department of Justice to assist it and its client, the United States Postal Service ("USPS"), in a litigation matter involving Neopost, Inc. ("Neopost") and Ascom Hasler Mailing Systems, Inc.[1]  Specifically, FTI Consulting has been asked to review and comment on the May 27, 2009 damages report ("Abramson Report") prepared by Bruce D. Abramson for the above referenced cases. I reserve the right to update our analysis and conclusions regarding the Abramson Report as additional information is made available to us, if the Abramson Report of May 27, 2009 is amended or updated, or if I am asked to perform additional review and analysis. The following sections discuss my observations and conclusions regarding the Abramson Report:

Neopost is seeking "to recover damages it has sustained and continues to sustain as a consequence of the Postal Service's unlawful misappropriation of revenues rightfully belonging to Neopost".[2]  Ascom Hasler Mailing Systems, Inc. ("Ascom") is seeking "damages suffered as a result of the Postal Service's unlawful misappropriation of the revenue stream earned or which would have been earned by Ascom from its Computerized Meter Resetting System ("CMRS"),

---

[1] Ascom Hasler Mailing Systems, Inc. was acquired by Neopost in 2001.
[2] Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089



which enables postage meters to be reset electronically through a host computer rather than mechanically at a post office or on-site".[3]

The stated purpose of the Abramson Report was "to opine about the economic damages that Neopost/Ascom has incurred, and will continue to incur, from the United States Postal Service's ("USPS") diversion of certain funds relating to the Computerized Meter Resetting System ("CMRS") out of accounts maintained by independent CMRS vendors such as Neopost and Ascom into USPS accounts".[4]

The following is a summary of the assumptions and conclusions presented in the Abramson Report:

1. The damage period for "past damages" is January 1, 1996 through December 31, 2008.[5]
2. The damage period for "future damages" is January 1, 2009 through December 31, 2025.[6]
3. The applicable rate of return to use is a risk-free rate of return measured by the market yield on U.S. Treasury securities at 1-year constant maturity.[7]
4. In order to calculate simple daily interest, the 1-year U.S. Treasury rate was divided by 365 (or 366) and then multiplied by the daily closing balance of the CMRS trust fund.[8]
5. In order to calculate simple monthly interest, the 1-year U.S. Treasury rate was divided by 12 and then multiplied by the simple average of the monthly opening and closing balance of the CMRS trust fund.[9]
6. Interest was assumed to accumulate and compound daily (or monthly when only monthly data was available) throughout the calendar year and be paid in a lump sum on December 31.[10]
7. Per Neopost/Ascom, there were no avoided costs to be subtracted from the lost revenues. Thus, it was assumed that lost profits were equal to lost revenues.[11]
8. The Plaintiffs' cost of raising capital was assumed to be 8.2%, equal to companies rated by Moody's as Baa (the lowest investment grade rating).[12]
9. Future damages were calculated by extrapolating the nominal values recorded in 2008 in a straight-line manner.[13]
10. Interest from January 1, 1996 through the present was calculated using a 1-year U.S. Treasury rate.[14]

---

[3] Complaint dated June 13, 2000 in the matter of Ascom Hasler Mailing Systems, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV01401
[4] Abramson Report at pg. 2
[5] Ibid. at pg. 13
[6] Ibid.
[7] Ibid. at pg. 8
[8] Ibid.
[9] Ibid. at pg. 9
[10] Ibid.
[11] Ibid.
[12] Ibid. at pg. 11
[13] Ibid. at pg. 12
[14] Ibid. at pg. 14



## Summary Conclusions Regarding the Abramson Report

Based on my review of the Abramson Report, its accompanying schedules, and other evidence presented in this case, I have determined that the Abramson Report is sufficiently flawed in its assumptions, analysis and conclusions as to render the conclusions set forth therein unreliable and to be disregarded by the court. The sections below summarize my analysis of the Abramson Report:

1) **Abramson failed to verify or determine the accuracy of the underlying data used to calculate his damages.**

The Abramson report does not discuss performing any independent review or auditing of third-party source documents to corroborate the underlying data used in preparing the damage calculation. Specifically, the Abramson Report did not provide information that Abramson performed an audit or other verification of the daily or monthly trust fund cash balances that were the basis of his damages calculations, to determine if the amounts were reliable and could provide a basis for such calculations. The Abramson Report simply states that "Neopost/Ascom informs me that all of these data are accurate".[15]

Abramson failed to perform any audit or verification of the underlying deposit balances that are the basis of his damages calculation and, therefore, failed to make a determination of the accuracy and reliability of the underlying data used in the reported damages calculations. Failing to establish the reliability or accuracy of the underlying data used in the damages calculations renders his damages conclusion without foundation. Abramson effectively simply performed arithmetic.

As of the date of this report, I have not been provided with copies of the documents that were used to prepare the Abramson Report. Thus, I have been unable to determine the accuracy of the underlying data used in the Abramson Report. I understand that the defendants have or will be stipulating as to the closing balances of cash on deposit in accounts that are attributed to customers of Neopost and Ascom. Notwithstanding that, Abramson did not perform an independent and objective analysis of the underlying data as should have been performed to meet the generally accepted standards of a properly conducted analysis by a financial expert.

2) **Abramson performed no analysis on the appropriateness of using a 1-Year U.S. Treasury Rate to calculate damages.**

First, regarding the use of the 1-Year U.S. Treasury Rate, the Abramson Report failed to perform any analysis as to the historical actual or benchmark rate of return the Plaintiffs were realizing on funds in the CMRS trust account. Given that the rate of return is a "critical component" of the Abramson damages calculations, a review of the historical actual rate of return should have been performed to properly determine the amount of damages, if any, the Plaintiffs sustained.

Additionally, the Abramson Report contains no analysis regarding the Plaintiffs' ability to invest the CMRS trust account in 1-Year U.S. Treasury securities. According to 144.975(f) of the United States Postal Service Domestic Mail Manual, "the manufacturer must not have access to funds on deposit at trustee banks except for refunding trust account deposits to customers and

---

[15] Ibid. at pg. 8



transferring payments for postage to USPS accounts".[16] Based on these regulations, the Plaintiffs would not have had the ability to invest the CMRS trust account in "long-term" investments such as a 1-Year U.S. Treasury security and thus could not have realized such rates of return.

It is clear from a careful analysis of the Plaintiffs' financial statements and other financial information that is evidence in the case that the Plaintiffs were using the interest income generated from the postage-on-call ("POC") deposits to fund operations and not allowing the interest income to remain on deposit. The Abramson Report failed to analyze the Plaintiffs' financial statements or financial information. Because the Plaintiffs consumed the interest income from the POC deposits to fund operations, Abramson's assumption that funds would be generating interest income at a 1-year deposit rate is unreasonable and unsupported.

The use of the 1-Year U.S. Treasury Rate in the Abramson damage calculations rather than a more appropriate shorter term (and lower) rate has the effect of overstating the calculated interest and, therefore, overstating the damages claimed in the Abramson Report.

### 3) The Abramson Report assumption that interest would accumulate (be compounded) and be withdrawn only once a year is inconsistent with the facts and overstates the calculated damages.

The Abramson Report assumes that the interest income compounds throughout the year and was paid in a lump sum at the end of the calendar year.

> "For the purposes of my damage assessment, I assumed that interest would accumulate (and thus compound) throughout each calendar year, and be paid in a lump sum on December 31."[17]

Review of the Plaintiffs' financial information indicates that the interest income was used by the Plaintiffs to offset general operating costs of the Plaintiffs' business and, therefore, should not be assumed to have been compounded and withdrawn once at the end of the year. There was no evidence presented in this case to support Abramson's unrealistic assumption that any interest income generated on POC deposits would be allowed to remain in the deposit account to accumulate compound interest over the course of a year and only be withdrawn once per year. The effect of this unrealistic assumption is the overstatement of the calculated damages contained in the Abramson Report.

Neopost's monthly financial statements for the years ending January 31, 1994, 1995, and 1996 reveal that the interest income earned related to the POC program was not increasing month to month, indicating that the interest was being withdrawn, used in operations, and not accumulating throughout the year.

The Abramson Report failed to document any analysis performed by Abramson regarding the Plaintiffs' historical withdrawal pattern of the interest from the CMRS trust account. Contrary to evidence, the Abramson Report has simply assumed daily compounding with a single withdrawal of interest at the end of the year. The assumption that the interest was compounding and being withdrawn at the end of the calendar year has the effect of overstating the calculated damages amount.

---

[16] Deposition of Neil Mahlstedt on October 21, 2008 – Exhibit #2 "USPS Domestic Mail Manual"
[17] Abramson Report at pg. 9



FTI

4) **The discount rate used in the Abramson Report damages calculation was inappropriate, failed to follow generally accepted methods for determining such a discount rate, was too low, and resulted in an unreliable and overstated estimation of damages. This error occurred because Abramson failed to analyze or determine the Plaintiffs' cost of capital.**

The Abramson Report utilized a discount rate of 8.2% as follows:

> "This second framing of the hypothetical points to a common source of appropriate discount rates: the ***Plaintiff's cost of raising capital*** [emphasis added]. For the purposes of this damage calculation, I turned to historical data for corporate lending as of the end of 1995. According to Federal Reserve records, companies that Moody's rated Baa (the lowest investment grade rating) were paying 8.2% at that time. I thus applied an 8.2% annual discount rate to collapse each revenue stream into a single but-for payment on January 1, 1996."[18]

The Abramson Report clearly states that a common source for the appropriate discount rate is the "Plaintiff's cost of raising capital". However, instead of determining "the Plaintiff's cost of raising capital", the Abramson Report simply turns to historical corporate lending rates as of the end of 1995 and concludes that companies that Moody's rated Baa were paying 8.2% at the time and that this rate was applicable to the Plaintiffs.

In estimating a discount rate for the type of calculations presented in the Abramson Report, I would agree that the Plaintiffs' cost of capital would be an appropriate rate to use; however:

a) Abramson failed to analyze the Plaintiffs' actual cost of capital to determine what discount rate amount would be appropriate to use in his damages calculations,
b) Abramson failed to properly estimate the Plaintiffs' cost of capital using accepted methods for estimating a company's cost of capital, and
c) the Moody's Baa rate is not a relevant or proper measure or proxy for the Plaintiffs' cost of capital.

The proper measure of a company's cost of capital for use as a discount rate in the type of calculations performed by Abramson would be a company's weighted average cost of capital ("WACC"). A company's WACC is a blend of a company's cost of long-term debt financing (adjusted for taxes) and its cost of equity capital. The average cost of equity of companies in the S&P 500 is approximately 10% - 12%, with an additional 600 basis points of risk premium historically reported for smaller companies. A reasonable estimate of the Plaintiffs' cost of equity (excluding any additional industry or company specific risk premiums which would further increase the rate) would be 16% - 18%. A proper determination of the Plaintiffs' cost of capital to be used as a discount rate in the Abramson damages calculations should have considered the Plaintiffs' cost of equity capital as a component of the Plaintiffs' WACC. The properly calculated cost of capital for the Plaintiffs would have been higher (potentially substantially so) than Moody's Baa interest rate of 8.2% because such a rate would have been a blend of the Plaintiff's borrowing costs and higher costs of equity funds.

[18] Ibid. at pgs. 10-11



Although I could recalculate the Abramson analysis using a more appropriate discount rate that reflects the Plaintiffs' cost of capital, because of all of the other errors and issues of the Abramson's damages calculations noted herein, a determination of revised damages cannot be calculated with any reasonable degree of accounting certainty.

**5) Abramson overstated damages by failing to include a determination of incremental costs associated with lost interest income.**

The Abramson Report does not take into consideration incremental costs associated with lost interest income in the damages calculation, and, therefore, Abramson's resulting damages are overstated. Proper determination of lost profits for a business would include the determination of costs that were avoided as a result of lost revenues. Per the Abramson Report, damages should be based on lost profits, which should include a careful consideration of costs that are avoided associated with the claimed lost revenues; however, Abramson failed to conduct such an analysis of avoided costs and instead chose to ignore them and assume any lost revenues were equivalent to lost profits. Consequently, this has the effect of overstating his calculated lost profits.

Based on my review of the financial information and bank agreements that are part of the evidence in this case, there are costs associated with the management of the trust account that the Plaintiffs are no longer incurring as a result of the new regulations. Bank fees, fund management fees, and surety bond premiums all appear to have been costs associated with the maintenance of the POC deposits that the Plaintiffs were previously incurring and would no longer incur (avoided costs). Abramson, however, failed to offset his damages amount with these avoided costs and, therefore, overstated the calculated damages amount.

**6) The Abramson Report does not take into account factors that would have affected amounts contained in the interest bearing accounts.**

Regarding the damage period, the Abramson Report does not mention Neopost's No Deposit Postage-On-Call service.  The No Deposit Postage-On-Call service was "a brand new, money saving way to reset the company postage meter, by phone, without advance deposits".[19] According to statements made by Mr. Mahlstedt at a hearing for the House of Representatives Committee on Government Reform and Oversight, as of June 12, 1995, only Neopost "…offers its customers a direct debit payment method in conjunction with its Postage On Call remote resetting system.  Its customers do not have to maintain expensive escrow accounts to purchase postage over the phone".[20]

Among the many benefits being provided by the No Deposit Postage-On-Call service were the following:[21]

- No advance deposits required
- A simple toll-free call – instant postage…no deposits to make…no checks to write
- Postage money stays in your regular bank account until actually needed – preserves interest

---

[19] Deposition of Neil Mahlstedt on October 21, 2008 – Exhibit #6 "Postage-On-Call"
[20] Deposition of Neil Mahlstedt on October 21, 2008 – Exhibit #4 "Testimony Before House of Representatives, 6/12/95"
[21] Deposition of Neil Mahlstedt on October 21, 2008 – Exhibit #6 "Postage-On-Call"



- Customer continues to earn interest
- Improves customer cash flow
- Monies that would have been tied up for postage are now available for other non-postage applications
- No deposit Postage-On-Call works for all kinds of companies – regardless of mail volume

The No Deposit Postage-On-Call service was a brand new service Neopost was offering beginning in December 1994.[22] However, the Abramson Report does not mention the No Deposit Postage-On-Call service, nor does it appear that any analysis was conducted as to the impact such a service would have on the amount of deposits within the CMRS trust account nor to the trend of customers to switch to this new service.  It could reasonably be assumed that if and when all of Neopost's customers switched to the No Deposit Postage-On-Call service, the deposits within the CMRS trust account would be reduced to $0 and thus the damages period would end. With the trends in e-commerce and online banking over the past 10 years, a damage period out to 2025 is highly speculative and not supportable.

## Alternative Damages Calculation

In September 1978, Pitney Bowes and the USPS executed a Statement of Understanding ("SOU") that gave Pitney Bowes the right to operate the CMRS system.[23]  By letter dated June 20, 1995, the USPS stated that it was terminating the SOU with Pitney Bowes effective December 20, 1995.[24]  In December 1997, Pitney Bowes brought legal action against the USPS asserting claims for monetary damages for the interest lost as a result of the alleged wrongful termination and breach of the SOU.[25]

The USPS and Pitney Bowes entered into a settlement agreement dated July 30, 1999 in which the USPS expressly agreed to pay Pitney Bowes for the financial loss it sustained (and the resulting financial benefit the USPS obtained) as a consequence of the new postal regulations.[26]

According to complaints filed by the Plaintiffs, the following statements are true and accurate regarding Pitney Bowes:

"…Pitney Bowes dominates the CMRS market, accounting for approximately 89% of the 1.161 million CMRS meters outstanding as of February 1998."[27] [28]

---

[22] Ibid.
[23] Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089
[24] Settlement Agreement and Release between Pitney Bowes, Inc. and USPS dated July 30, 1999 attached to the Complaint.
[25] Ibid.
[26] Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089
[27] Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089
[28] Complaint dated June 13, 2000 in the matter of Ascom Hasler Mailing Systems, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV01401



"Moreover, Pitney Bowes controls, upon information and belief, in excess of approximately 85% of the entire postage meter and related machine market in the United States."[29]

At the time of the regulatory change in 1995, the only companies authorized by the USPS to manufacture and distribute postage meters are Neopost; Pitney Bowes; Ascom Hasler Mailing Systems, Inc.; and Francotyp-Postalia, Inc.[30]  With Pitney Bowes controlling a market share of approximately 85% to 89%, the remaining market share of approximately 11% to 15% would be divided among the other three postage meter suppliers, including the Plaintiffs. Since the filing of the complaint, one other meter manufacturer has been approved to provide postage meter leasing similar to plaintiffs. Additionally, as an alternative to postage meters, three internet postage providers have been approved by the United States Postage Service.[31]

To accept the Abramson Report damages claims without consideration of all meter manufacturers including Pitney Bowes would result in unequal and disproportionate favorable treatment to the Plaintiffs and unfavorable treatment to Pitney Bowes. Assuming the Defendants are found liable and damages are awarded to the Plaintiffs, a proper consideration by a damages expert as to the amount of damages for the Plaintiffs should be limited by the relative market shares of each of the companies that are authorized by the USPS to supply postage meters in the United States and the final damages if any should not exceed the relative market share.

## Qualifications of Expert

I am a Managing Director of FTI Consulting working out of its Boston office. I have a Bachelor's degree and a Master's degree in accounting from the University of Illinois and a Ph.D. in Finance from Saint Louis University. I am a Certified Public Accountant and a member of the American Institute of Certified Public Accountants, the national professional organization for practicing CPAs. I hold the designation "Accredited in Business Valuation" (ABV) granted by the American Institute of Certified Public Accountants (AICPA) to CPA members who demonstrate experience in the business valuation profession and pass a rigorous eight-hour examination administered by the AICPA.

I have over thirty years of professional experience working with two of the Big Four CPA firms, serving in corporate management positions, and holding various academic positions including the rank of Associate Professor of Finance (with tenure). For the past fifteen years I have been active in the practice of valuation and litigation support services. I have testified in State and Federal courts as an expert witness on various matters related to valuation issues, economic damages and lost profits, and accountant's professional liability.

---

[29] Ibid.
[30] Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089.
[31] Domestic Mail Manual, section 604-4.0



I am a frequent speaker at AICPA National Conferences and State CPA Society conferences on valuation related topics, including valuation of intellectual properties and on the use of statistics and econometrics in valuation and litigation engagements. In addition to my teaching and continuing professional educational seminar presentations, I regularly attend AICPA national conferences on valuation and litigation support services.

Additionally, I have been recognized by my professional peer group for my work in the business valuation profession by being inducted into the AICPA Business Valuation Hall of Fame, which granted recognition to fewer than twenty individuals. I serve on the Editorial Review Board of the Business Valuation Review, published by the American Society of Appraisers (ASA) of which I am a member. I also serve on the Editorial Advisory Board for the Journal of Accountancy, published by the AICPA. I am currently a member and former Chairman of the AICPA's Business Valuation Examination Committee, the committee of business valuation experts responsible for preparation of the ABV examination for the AICPA. I am also a current member of the AICPA's M&A Dispute Resolution Taskforce. I have previously served on the AICPA Business Valuation committee, the committee responsible for establishing all policies and developing supporting programs for all AICPA member CPAs who perform valuation services. A copy of my C.V. follows as an exhibit to this report.

### Signature of the Expert

The undersigned and the firm of FTI Consulting have no past, present, or contemplated future interest in, and have no personal interest or bias with respect to, the parties involved. Our fees are solely based upon our hourly rate for professional services provided by me and other members of our firm working on this engagement (hourly rates for our professionals working on this engagement range from $165 - $365 per hour; my current billing rate for litigation support engagements is $365 per hour) plus any out-of-pocket expenses incurred. Our fees are in no way contingent on the nature of our findings or any analyses, testimony, or the outcome of any proceeding.

Respectfully submitted,

FTI CONSULTING

G. William Kennedy, Ph.D., CPA/ABV
Managing Director



**List of Documents Reviewed**

1) Complaint dated August 30, 2000 in the matter of Neopost, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV02089.

2) Complaint dated June 13, 2000 in the matter of Ascom Hasler Mailing Systems, Inc. v. United States Postal Service, filed in the United States District Court for the District of Columbia, Civil Action No. 1:00CV01401.

3) Memorandum of Opinion by Judge John M. Facciola dated March 6, 2007 for the consolidated matter filed in the United States District Court for the District of Columbia.

4) Report of Bruce D. Abramson dated May 27, 2009.

5) Deposition, including exhibits, of Mr. Neil Mahlstedt dated October 21, 2008.

6) Deposition of Mr. Robert Hillegass dated July 28, 2009

7) Deposition of Mr. Michael Allocca dated July 29, 2009

8) Plaintiff's Responses To Defendant's Supplemental Request For The Production Of Documents dated July 10, 2009.

9) Agreement between The Continental Insurance Company and F.M.E. Corporation and related documentation (Bates No. NH000298-NH000300, NH001327-1330)

10) Letter from the USPS to John Hughes, Vice President of Research & Development for Friden Alcatel dated January 11, 1990 (Bates No. NH000307-NH000308)

11) Agreement between Bank of America and Friden Alcatel and related documentation Bates No. NH000309-NH000319, NH003677-NH003681)

12) Ascom Hasler Mailing Systems, Inc. Analysis of Telephone Meter Setting Account (includes bank agreements) (Bates No. NH002752-NH002781)

13) Ascom Hasler Mailing Systems, Inc. TMS P&L 1992 through 1997 (Bates No. NH002791-NH002792)

14) Comerica Bank Institutional Cash Investment Accounts agreement and related documentation (Bates No. NH003699-NH003748)

15) Consolidated financial statements for F.M.E. Corporation and Subsidiary prepared by Arthur Andersen LLP for the fiscal years ended January 31, 1993 through January 31, 1998 (Bates No. NH006474-NH006547).



16) Consolidated financial statements for Neopost, Inc. and Subsidiary prepared by Arthur Andersen LLP for the fiscal years ended January 31, 1999 and January 31, 2000 (Bates No. NH006548-NH006562).

17) Miscellaneous financial records for Ascom Hasler Mailing Systems, Inc. (Bates No. NH006563-NH006707).

18) Daily TMS Executive Report for the following dates:   12/29/94, 12/28/95, 01/31/96, 02/29/96,  03/29,96,  04/30/96,  05/31/96,  06/28/96,  07/31/96,  08/30/96,  09/26/96, 10/31/96,  11/29/96,  12/30/96,  12/31/96,  12/30/97,  01/03/98,  12/31/98,  and  12/31/99 (Bates No. NH006708-NH006726).

19) Miscellaneous financial records for Neopost, Inc. (Bates No. NH006727-NH007199).

20) Neopost, Inc. Income Statement Comparison 1993 through 1996 (Bates No. NH008680-NH008688)

21) Press Release titled "Neopost announces the acquisition of Ascom Hasler, the Ascom Mailing Systems Division" dated October 2, 2001.

22) Letter dated September 22, 2006 from Mr. Benjamin S. Boyd of DLA Piper to Mr. Darrell C. Valdez of the United Stated Attorney's Office.

23) Interest rate data obtained from the Federal Reserve, www.federalreserve.gov



### Professional Qualifications
### G. WILLIAM KENNEDY, PH.D., CPA/ABV

#### EDUCATION AND PROFESSIONAL CERTIFICATION

- Ph.D. in Finance, Saint Louis University, Dissertation title: *Cross Sectional Analysis of the Effect on Shareholder Returns of Capital Expenditure Announcements.*
- M.A.S. (Master of Accounting Science), University of Illinois
- BS in Accountancy, University of Illinois
- Certified Public Accountant
- ABV (Accredited in Business Valuation) awarded by the AICPA
- AICPA Certificate of Educational Achievement in Business Valuation

#### PROFESSIONAL RECOGNITIONS AND AFFILIATIONS

- AICPA Business Valuation Hall of Fame, Inducted November 2003
- American Institute of Certified Public Accountants (AICPA)
- Business Valuation, Forensic & Litigation Services Section of the AICPA
- American Accounting Association
- Financial Management Association

#### PROFESSIONAL EXPERIENCE

- **Managing Director**, Forensic and Litigation Consulting, FTI Consulting, Boston, MA. 2010 – Present.

- **Partner and Co-Director Valuation and Litigation Support Services**, Anders Minkler & Diehl LLP, St. Louis, Missouri. 2004 – Present.

- **Director of Business Valuation and Litigation Support Services**, Reilly Consulting Group, Inc., Milton, Massachusetts. 1995 – 2004.

- **Manager of Financial Reporting**, Edison Brothers Stores, Inc., St. Louis, Missouri. 1987-1990.

- **Audit Manager** and member of the Privately Held Business and Mergers & Acquisitions service groups, KPMG Peat Marwick, St. Louis, Missouri. 1986-1987.

- **Officer and Assistant Controller**, United Cable Television Corporation, Denver, Colorado. 1984-1985.

- **Audit Staff - Manager**, Ernst & Young, Denver, Colorado, and Springfield, Illinois. 1975-1984.

#### PROFESSIONAL ACTIVITIES

- **AICPA Business Valuation Examination Committee**. Member of the six-person committee of business valuation experts responsible for preparation of the Accredited in Business Valuation (ABV) specialty examination for the AICPA. Immediate Past Chairman,



2002-2005, Member 1998 – Present.

- **AICPA M&A Dispute Resolution Taskforce.** Newly formed Taskforce responsible for establishing continuing education training material, conference presentations and journal articles to train CPA's to practice in the area of M&A dispute resolutions as accountant arbitrators and consulting and testifying experts. 2007 – Present.

- **Editorial Advisor,** AICPA *Journal of Accountancy.* 2005 – Present.

- **Member of the Editorial Review Board** of the *Business Valuation Review,* The Quarterly Journal of the Business Valuation Committee of the American Society of Appraisers (ASA). 2004 – Present.

- **AICPA Business Valuation Committee.** Member of the committee responsible for establishing all policies and developing supporting programs for all CPAs who perform valuation services. 1999 – 2003.

- **AICPA Business Valuation Credentials Committee.** Inaugural members of the Business Valuation Credentials Committee. 1997 – 1998.

### SELECTED PRESENTATIONS AND PUBLICATIONS

- *The CPA's Role in Quantifying Post Acquisition Dispute Damages.* Journal of Accountancy, March 2010. Published by the American Institute of Certified Public Accountants.

- Missouri State Forensic Accounting Conference: *Dissecting A Business Valuation Report and Panel Discussion on Expert Witness Cross Examination.* St. Louis, Missouri December 1, 2009.

- Missouri State Business Valuation Conference: *Using Statistical Measures in Business Valuation Engagements, Panel Discussion on Valuation Discounts and Premiums.* St. Louis, Missouri, December 4, 2009.

- *Pitfalls to Avoid When Assessing Damages in M&A Disputes.* AICPA National Forensic Accounting Conference, September 23-25, 2009 Orlando, FL.

- *AICPA National Business Valuation School,* Instructor, August 17-21, 2009, Dallas, TX.

- *Using Statistical Measures in Business Valuation and Litigation Service.* Financial Consulting Group Webinar, July 15, 2009.

- *Use of Monte Carlo Simulation in Valuation and Litigation Support Engagements.* NACVA's Fifteenth Annual Consultants' Conference. June 10, 2008. Las Vegas, NV.

- *Statistical Analysis of Executive Compensation – Case Studies.* California Education Foundation, 2008 Business Valuation Conference. May 28, 2008. Los Angeles, CA.

- *Dissecting a Business Valuation Report.* AICPA-AAML Conference. May 8, 2008. Las Vegas, NV.



- *Use of Statistics In BV Engagements: Duff & Phelps Size Risk Premiums and Using Regression to Fit Pricing Multiples:* Florida Institute of CPA's Valuation, Forensic Accounting & Litigation Services Conference. January 10-11, 2008. Fort Lauderdale, FL.

- *Using Statistics in Litigation Support Engagements:* Florida Institute of CPA's Valuation, Forensic Accounting & Litigation Services Conference. January 10-11, 2008. Fort Lauderdale, FL.

- *Issues in Determining Cost of Equity – Duff & Phelps Size Risk Premiums and Beta Coefficient Risk Measures:* 25th Annual National CLE Conference, Law Education Institute. January 6, 2008. Vail, CO.

- *Using Statistical Measures in BVFLS Engagements:* 25th Annual National CLE Conference, Law Education Institute. January 7, 2008. Vail, CO.

- *Quantitative Applications in Valuation:* AICPA National Business Valuation Conference, December 3, 2007. New Orleans, LA.

- *Discount Rates used in Lost Profit Cases: The Key Issues.* AICPA National Conference on Fraud and Litigation Services. September 28, 2006. Las Vegas, NV.

- *Advanced Statistical Applications for BV Engagements.* AICPA-ASA National Business Valuation Conference. November 15, 2005. Las Vegas, NV.

- *Judging Valuation Experts and their Reports: A View from the Bench.* (joint presentation). AICPA-ASA National Business Valuation Conference. November 15, 2005. Las Vegas, NV.

- *The Use and Misuse of Statistics.* AICPA Webcast for the members of the Business Valuation, Forensic and Litigation Services (BV-FLS) Section members. October 26, 2005.

- *Lost Profits vs. Loss of Business Value.* AICPA National Litigation and Fraud Conference. September 29, 2005. Dallas, TX.

- *Advanced Workshop on Discount Rates.* AICPA National Litigation and Fraud Conference. September 29, 2005. Dallas, TX.

- *Intellectual Property Valuation.* CPA Associates National Business Valuation Conference. August 23, 2005. Chicago, IL.

- *Valuing Intellectual Property: Applying Real Option Analysis.* St. Louis Daily Record. January 21, 2005, Volume 295, No. 14.

- *Financial Statement Analysis: Insights into Company Strategy and Risks* AICPA National Business Valuation Conference, November 2004, Orlando, FL.

- *Using Statistical Applications to perform Market Approach – Guideline Public Company Approach calculations and other applications of statistical techniques in Business Valuation engagements.* Three hour pre-conference workshop, AICPA National Business Valuation Conference, November 2003, Phoenix, AZ.



- *Real Options Overview and Theory,* and a second session: *Advanced Case Application Using Real Options for Business Valuation Engagements.* AICPA National Business Valuation Conference, November 2003, Phoenix, AZ.

- *Statistical Applications in Auditing* and *Statistical Applications in Business Valuations.* Two separate four hour continuing educational seminars for the auditing and consulting staff of Anders, Minkler, Diehl. St. Louis, Missouri and Clifton Gunderson LLP, Indianapolis, IN. July and August 2003.

- *Statistics You Can Use – In Plain English.* Three-hour pre-conference workshop on the application of statistics and regression techniques in Business Valuation engagements. AICPA National Business Valuation Conference, November 2002, New Orleans, LA.

- *Real Option Theory and Practice, A Powerful Valuation Tool.* AICPA National Business Valuation Conference, November 2002, New Orleans, LA.

- *Applications of Statistical Techniques in Valuation Engagements.* AICPA National Business Valuation Conference, December 2001, Las Vegas, NV.

- *Using Option Pricing Models to Estimate Discount for Lack of Marketability.* Financial Consulting Group Annual Meeting, September 2001, New Orleans, LA.

- *Career Opportunities in Business Valuation.* Also session on: *Merger and Acquisition Pricing.* Beta Alpha Psi National Accounting Honor Society Annual Meeting, August 2001, Atlanta, GA.

- *Business Valuation Update – Marketability Discounts, Recent Tax Court Decisions.* Moore Stephens North America, Inc. National Tax Conference, October 2000, Washington D.C.

- *Know The Right Asking Price, Get The Right Selling Price.* Mergers and Acquisitions Seminar sponsored by Reilly Consulting Group, Inc. May 2000, Boston, MA.

- *Business Valuation Technical Update – Recent Supreme Court Decisions Affecting Expert Witness Testimony.* And *Building a Business Valuation Practice.* Moore Stephens North America, Inc. National Tax Conference, October 1999, San Diego, CA.

- *Marketability and Minority Discounts and Control Premiums.* 1998 AICPA National Conference on Business Valuation. November 1998, Miami, FL.

- *Using Statistical Techniques in Business Valuation Engagements.* 1998 National Business Valuation Conference of the CPA Associates International. Selected to present a Continuing Educational Seminar to the national directors of Business Valuation from member firm practice offices. August 1998, Atlanta, GA.

- *The Fundamentals of Modern Portfolio Theory.* Investment Management for Institutional Investors National Conference. Professional Education Seminar, June 1998, Boston, MA.



- *IRS Code Chapter 14 – Overview of Estate and Gift Tax Valuation Issues.* Presented to the Norfolk & Plymouth Estate and Business Planning Council at their opening meeting for the 1996-1997 program year.

- *Valuation Issues in Family Limited Partnerships*, Presented to the Bristol County Estate Planning Council at the final meeting of their 1995-1996 program year.

## ACADEMIC EXPERIENCE

- **Associate Professor of Finance and Accounting (with Tenure)**, Stonehill College, Easton, Massachusetts. 1993-2004.

- **Instructor of Finance**, School of Business and Administration, Saint Louis University, St. Louis, Missouri. 1990-1993.

## PROFESSIONAL CONFERENCES AND CONTINUING EDUCATION

- ABA 25th Annual Intellectual Law Property Law Conference, April, 2010, Arlington, VA.

- AICPA National Business Valuation Conference, November 2009, San Francisco, CA.

- AICPA National Forensic Accounting Conference, September 2009, Orlando, FL.
- AICPA National Business Valuation Conference, Las Vegas, NV, December 2008.

- AICPA National Business Valuation Conference, December 2007, New Orleans, LA.

- American Bar Association 22nd Annual Intellectual Property Law Conference, April 2007, Arlington, VA.

- AICPA National Business Valuation Conference, December 2006, Austin, TX.

- AICPA National Conference on Fraud and Litigation Services, September 2006, Las Vegas, NV.

- American Bar Association 21st Annual Intellectual Property Law Conference, April 2006, Arlington, VA.

- AICPA National Business Valuation Conference, November 2005, Las Vegas, NV.

- AICPA National Conference on Fraud and Litigation Services, September 2005, Dallas, TX.

- AICPA National Business Valuation Conference, November 2004, Orlando, FL.

- AICPA National Business Valuation Conference, November 2003, Phoenix, AZ.

- AICPA National Business Valuation Conference, November 2002, New Orleans, LA.

- AICPA National Business Valuation Conference, December 2001, Las Vegas, NV.



- Financial Consulting Group Annual Meeting, September 2001, New Orleans, LA.

- AICPA National Business Valuation Conference, November, 2000.

- Financial Consulting Group Annual Meeting, June 2000, Denver, CO

- AICPA National Business Valuation Conference, December, 1999.

- AICPA National Business Valuation Conference, November, 1998.

- Institute of Business Appraisers National Business Valuation Conference, January 1998.

- AICPA Business Valuation Examination Review Course, October 1997.

- AICPA Business Valuation Certificate of Educational Achievement Courses NBV1-8, 1996.



### TESTIMONY IN TRIAL OR BY DEPOSITION

- *Zenith Glass Australia PTY. LTD and Zenith Glass PTY. LTD v. Solutia, Inc.* Before the American Arbitration Association, Cse No: 50 181 T 001158 09. Retained by Claimants to provide an opinion of lost profits and lost business value.

- *Secure Energy, Incorporated et al. v. Coal Synthetics, LLC et al.,* United States District Court for the Eastern District of Missouri, Case No. 4:08-cv-1719 JCH. Retained by Plaintiff to provide an opinion as to the value of trade secrets and intellectual properties.

- *ICEM S.P.A. and Aurora Assicurazioni S.P.A. v. Harvey Industries, Inc. et al.,* United States District Court for the District of Massachusetts, Civil Action No.: 1:07-cv-10819-RCL.   Retained by defendants to provide analysis and opinion regarding economic damages and lost profits suffered by the plaintiff.

- *Mary D. Young v. Drury Inns, Inc.*, Circuit Court of the County of St. Louis, State of Missouri, Cause No. 07SL-CC00298. Retained by defendants to provide an opinion regarding lost income suffered by the plaintiff.

- *Jim Brown et al. v. Brett C. Brewer et al.* United States District Court, Central District of California, Western Division, Class Action Suit, Case No. CV-06-03731-GHK.

- *Robert L. Pryor, Chapter 7 Trustee of the bankruptcy estate of TC Liquidations, LLC, et al., v. Steve Tiffen, et al., The Tiffen Company, LLC debtor.* United States Bankruptcy Court, Eastern District of New York at Central Islip. Case No. 803-81231-478.

- *Renaissance Learning, Inc. v. Metiri Group LLC Case No. 07-0413-CV-W-SWH United States District Court, Western District of Missouri.* Retained by Plaintiff to provide statistical analysis of customer buying patterns and provide testimony regarding quantification of lost sales and profits.

- *Randy Blount Automotive Group, Inc., et al. v. Suntrup Real Estate Partnership, L.P, et al.* In the Circuit Court of the County of St. Louis, State of Missouri. Retained by Plaintiff to provide expert analysis and testimony regarding economic damages and purchase price adjustments.

- *Board of Trustees, North Naples Fire Control & Rescue District Firefighter Pension Plan v. City of Naples and Board of Trustees, City of Naples Firefighters Retirement Trust Fund.* In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida. Retained by the Plaintiff to perform analysis and provide expert opinion and testimony as to econometric and statistical analysis of tax property tax receipts.

- *Sizzler v. Excel, et al. Consolidation E.coli 0157:H7 Cases.* In the Circuit Court of Milwaukee County, State of Wisconsin. Retained by the defendant to provide an expert opinion and testimony as to lost profit damages.

- *ASi Industries, GmbH v. MEMC Electronic Materials, Inc. and MEMC Pasadena, Inc.,* United States District Court, Eastern District of Missouri, Eastern Division.  Case No. 4:06-CV-00951-CDP. Retained by the defendant to provide an expert opinion and testimony as to lost profit damages.



- *Dr. Juan Carlos Parodi v. Cordis Corporation,* American Arbitration Association, International Centre for Dispute Resolution. Case No. 50 133 T 00108 06. Retained by the Plaintiff to provide an expert opinion and testimony as to the value of certain patent rights and intellectual property.

- *Dennis Nadler v. Merlin International , Inc. f/k/a Merlin Software Corporation d/b/a Merlin Technical Solutions, Inc.,* United States District Court, Southern District of Illinois. Case No. 3:06-CV-00907-JPG-PMF. Retained by Plaintiff to provide an expert opinion and testimony as to the value of certain ownership interests.

- *Central Garden & Pet Company v. AT&H Co., Inc., American Tack and Hardware Co., Inc., Heritage Fund I Limited Partnership, and Amertac Holdings, Inc.* Commonwealth of Massachusetts, Suffolk, SS. Superior Court, Department of the Trial Court. Case No. 05-2066. Retained by defendants to provide expert opinion as to the valuation of certain business interests.

- *Detroit & Canada Tunnel Corporation vs. Ernst & Young LLP,* Circuit Court for the County of Wayne, State of Michigan. Retained by Plaintiff to provide expert report and testimony in mediation conference regarding adherence to AICPA professional standards.

- *The Huff Alternative Income Fund, L.P. vs. PriceWaterhouseCoopers LLP,* Superior Court of New Jersey Law Division, Bergen County, Docket No. 9204-03. Retained by Plaintiffs to provide expert opinion as to the reliability and use of certain business valuation methods in a financial reporting context.

- *Synergetics, Inc. vs. Charles Richard Hurst, Jr. and Michael McGowan,* United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:04CV318DDN. Retained by defendants to provide expert opinion on economic damages related to trade secrets.

- *Buntzman vs. Buntzman.* Supreme Court State of New York, County of Westchester, Index No. 8098 / 03. Retained by respondent to submit rebuttal expert report and provide testimony on the proper application of "event study" methodology to determine the potential impact on the stock price of a NASDAQ traded corporation of certain management actions.

- *Siti-Sites.Com, Inc. vs. Charles M. Leedom, Jr.; Eric Robinson; Salvatore Marino; MLR Partners; MLR, LLC.; Harry O'Sullivan; Joseph Sainton; Sixbey, Friedman, Leedom & Ferguson, P.C. and Nixon Peabody, LLP.* Supreme Court of the State of New York, County of New York, Commercial Division. Index No. 04600927. Retained by Plaintiff to submit expert's affidavit and provide expert testimony on the value of certain patent properties.

- *Geoffrey H. Rowley and Richard R. Downey vs. Associates for International Research, Inc., et al.,* Commonwealth of Massachusetts, Middlesex Superior Court, Civil Action No. 01-03955-D. Retained by Plaintiffs to provide expert opinion as to the value of a minority ownership interest in a corporation.