1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
     ------------------------X
3    ASCOM HASLER MAILING SYSTEMS,  Docket No. CA 00-1401
     INC.            Plaintiff,
4         v.                        Washington, D.C.
                                    **March 27, 2012**
5                                   9:30 a.m.
     UNITED STATES POSTAL SERVICE,
6                    Defendant.
     ------------------------X
7    NEOPOST, INC., ET AL         Docket No. CA 00-2089
                     Plaintiff,
8         v.
     U.S. POSTAL SERVICE,
9                    Defendant.
     ------------------------X
10
                       ***BENCH TRIAL – DAY 5***
11          *BEFORE THE HONORABLE PAUL L. FRIEDMAN*
                *UNITED STATES DISTRICT JUDGE*
12
     APPEARANCES:
13   For the Plaintiffs:   DLA PIPER
                           By:  Mr. Benjamin S. Boyd
14                              Ms. Sara Z. Moghadam
                                Ms. Michelle L. Schaefer
15                         500 8th Street, N.W.
                           Washington, D.C.  20004
16                         202.7994502
                           *benjamin.boyd@dlapiper.com*
17                         *sara.moghadam@dlapiper.com*
                           *michelle.schaefer@dlapiper.com*
18
                           NEOPOST USA
19                         By:  Joseph M. Bonassar
                           478 Wheelers Farms Road
20                         Milford, CT  06461
                           203.301.3607
21                         *j.bonassar@neopost.com*

22   For the Defendant:    U.S. ATTORNEY'S OFFICE
                           By:  Mr. Darrell C. Valdez
23                              Mr. Carl E. Ross
                           555 Fourth Street, N.W.
24                         Washington, D.C.  20003
                           202.307.6059
25                         *darrell.valdez@usdoj.gov*
                           *carl.ross@usdoj.gov*

```
 1   APPEARANCES:  (CONT'D.)
                             UNITED STATES POSTAL SERVICE
 2                           By:  Mr. Walter Alesevich
                             475 L'Enfant Plaza, S.W.
 3                           Washington, D.C.  20260
                             202.268.3016
 4                           walter.c.alesevich@usps.gov

 5                           UNITED STATES POSTAL SERVICE
                             By:  Mr. Mark T. Corbly
 6                           8 Griffin Road North
                             Windsor, CT  06006
 7                           860.285.7371
                             mark.t.corbly@usps.gov
 8
     Court Reporter:         Catalina Kerr, RPR, CRR
 9                           U.S. District Courthouse
                             Room 6509
10                           Washington, D.C.  20001
                             202.354.3258
11                           catykerr@msn.com

12   Proceedings recorded by mechanical stenography, transcript

13   produced by computer.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        C O N T E N T S

2     CLOSING STATEMENT BY MR. BOYD......................... 113

3     CLOSING STATEMENT BY MR. ROSS......................... 139

4     CLOSING STATEMENT BY MR. BOYD......................... 156

5     COURT REPORTER'S CERTIFICATE......................... 163

6     WITNESSES:                DIRECT   CROSS   REDIRECT   RECROSS

7     G. William Kennedy
         By Mr. Valdez              5
8        By Mr. Boyd                        66

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P-R-O-C-E-E-D-I-N-G-S

2         (9:30 A.M.; OPEN COURT.)

3         THE DEPUTY CLERK:  Civil Action 00-1401, Ascom

4    Hasler Mailing Systems, Incorporated versus the United States

5    Postal Service, and Civil Action 00-2089, Neopost,

6    Incorporated, et al versus U.S. Postal Service.

7         Counsel, would you please approach the podium

8    and identify yourselves for the record.

9         THE COURT:  I think we'll dispense with that this

10   morning.  After five days of trial, if I don't know who they

11   are by now.  You okay with that?

12        COURT REPORTER:  Yes.

13        THE COURT:  All right.  As I understand where we --

14   Well, are there any preliminary matters?

15        MR. BOYD:  None from the Plaintiff, Your Honor.

16        MR. VALDEZ:  None from the Government, Your Honor.

17        THE COURT:  All right.  Then I think we can proceed

18   with the next and presumably the last witness.

19        MR. VALDEZ:  Correct, Your Honor.  United States

20   Postal Service calls Dr. William Kennedy to the stand, please.

21        THE DEPUTY CLERK:  I would ask you to please raise

22   your right hand.

23        (WITNESS SWORN BY THE DEPUTY CLERK.)

24        THE DEPUTY CLERK:  Please be seated.

25        THE COURT:  You want to just move the microphone to

1    you.

2                      G. WILLIAM KENNEDY,

3    having been duly sworn, testified as follows:

4                      DIRECT EXAMINATION

5    BY MR. VALDEZ:

6    Q    Good morning, sir.

7    A    Good morning.

8    Q    Could you please state your full name.

9    A    Yes, it's G. William Kennedy.

10   Q    And Mr. Kennedy, what do you do for a living?

11   A    I'm sorry?

12   Q    What do you do for a living?

13   A    I'm a managing director with FTI Consulting in their

14   Boston office.

15   Q    Who is FTI Consulting?

16   A    FTI Consulting is a New York Stock Exchange traded, about

17   1.6 billion in revenue, a public company that's a global

18   consulting firm, includes consulting in the areas of

19   litigation support, technology, corporate communication,

20   corporate finance.

21   Q    Okay.  And let me ask you, Doctor, can you tell us, what

22   is your education and background, please.

23   A    Yes.  I have a bachelor's degree in accounting from the

24   University of Illinois, Class of 1974.  I have a master's

25   degree in accounting from the University of Illinois, 1975.

1   And I have a Ph.D. in finance from St. Louis University in

2   1994.

3   Q    All right.  And sir, do you hold any professional

4   licenses or designations?

5   A    Yes, I do.  I'm a licensed certified public accountant.

6   I've been that since graduating from the University of

7   Illinois, so approximately 35 years.  I also hold

8   the Accredited in Business Valuation, the initials ABV, which

9   is the designation that CPAs can earn from the American

10  Institute of Certified Public Accountants by taking a rigorous

11  day long examination and meeting certain experience criteria

12  that then grants that specialty designation to practicing

13  CPAs.

14  Q    Okay.  Sir, can you please explain to His Honor what is

15  your professional -- can you give us your professional work

16  history.

17  A    Yes.  It breaks down into approximately three decades.

18  For the first decade of my career, I was an auditor with two

19  of the big four CPA firms, Ernst & Young and KPMG.  I spent

20  three years at the end of that -- after that decade, I spent

21  three years as a corporate financial officer with two

22  different New York Stock Exchange traded corporations, and

23  then I did a midlife career change, got the Ph.D. in finance

24  and became a full-time professor at a college in Boston where

25  I was teaching finance and accounting.

1          And rose to the rank of associate professor with

2   tenure during that time period, became affiliated with a

3   regional CPA firm in St. Louis in the mid -- I'm sorry, in the

4   Boston area in the mid '90s and practiced in -- actually I

5   started up their valuation and litigation practice, and then

6   was recruited by a regional CPA firm in St. Louis and I moved

7   there and became a partner in that firm for five years as the

8   co-director of their valuation and litigation practice before

9   being recruited two years ago to join FTI in their Boston

10  office.

11  Q    Do you have any -- are you a member of any professional

12  organizations?

13  A    Yes, I am.  I'm a member of the American Institute of

14  CPAs, and we speak of that as the AICPA, we use those

15  initials.  I'm also a member of the forensic and litigation

16  consulting section of the AICPA.  I'm a member of the American

17  Society of Appraisers and I'm also a member of the Finance

18  Management Association.

19  Q    Now, do any of these organizations or associations have

20  any codes of conducts or professional standards?

21  A    They do.  The American Institute of Certified Public

22  Accountants has a code of professional conduct that all CPAs

23  in the United States are obligated to follow.  The AICPA is

24  the CPA profession's equivalent of the American Bar

25  Association for attorneys or the American Medical Association

for physicians.  The AICPA is the standard setting body for

CPAs that they issue standards that govern the practice of

CPAs in this country, and among the standards that I'm

obligated to follow would be their code of professional

conduct.  And in engagements like this, their statement on

standards for consulting services, and both of which impose on

me the obligation of, in the conduct of these kinds of

engagements, independence, objectivity and due professional

care.

Q    All right, sir.  Now, have you received any awards or

honors from your professional organizations?

A    I have.  I was inducted in the AICPA's Hall of Fame, I

think it was in 2003.  That award or designation has been

given to approximately 30 of the 360,000 members of the AICPA.

Q    Do you hold any leadership positions in those

organizations?

A    Yes, I do.  I'm currently the chairman of the AICPA's

business valuation credential committee.  Previously I served

as chair of the AICPA's Accredited and Business Valuation

Examination Committee.  That's the committee that's

responsible for drafting the ABV exam that CPAs must take in

order to get the specialty designation.

I've served on a AICPA Merger and Acquisition

Disputes Task Force.  We recently authored a practice aid that

will be distributed within the next month to practicing CPAs

1    to give them instruction on the conduct of engagements if

2    they're involved in a merger and acquisition dispute.

3    Q    How many times have you testified -- First of all, let me

4    ask you, have you testified as an expert witness before in

5    U.S. District Court?

6    A    Yes, I have.

7    Q    Can you tell us about how many times.

8    A    U.S. District Court, in at least two different courts,

9    one the Eastern District of Missouri and one in New York in

10   Long Island, it was a bankruptcy proceeding, and I've also

11   testified in a number of different state courts.

12   Q    Okay.  Do you know about how many times in state courts?

13   A    Two or three dozen times.  I mean, I have it on my Rule

14   26 resume.  I'm to the point where there's early testimonies

15   dropping off because they're beyond the time limit that you

16   need to list them.

17   Q    Do you know about how much the makeup is between the

18   times you testify for a defendant versus a plaintiff?

19   A    It's a fairly even balance in terms of being retained by

20   plaintiff's side or defendant's side.  I mean, I haven't

21   specifically done a count, but it's about an even blend.

22   Q    About how much of your time is spent being engaged in

23   areas of forensic- or litigation-type services?

24   A    The proportion is a little larger now that I'm with FTI

25   Consulting.  It's probably, you know, in the range of

 1  two-thirds, one-third.  My history as a practicing CPA, when I

 2  was with the firm in St. Louis as a partner for five years, it

 3  was more of an even distribution.

 4         There's a lot of non-litigation valuation matters

 5  that CPAs will be called on to do, including the fair value of

 6  financial reporting rules and then, you know, state and gift

 7  tax type planning, so there's non-litigation work that I do.

 8  Q    Have you had experience with reviewing and evaluating or

 9  looking through corporate financial statements?

10  A    Absolutely.  In fact, literally for my entire 35-year

11  career, as an auditor during the first decade of my career,

12  actually looking at the books of original entry of

13  corporations and performing audits in the second half of my

14  career, I characterize it as financial analysis where you're

15  actually looking at the financial statements and other

16  financial documents and discerning, you know, what's going on

17  in the company's operation or other, you know, particular

18  business-related questions that would spring from those

19  financial statements.

20  Q    How much experience have you had in areas such as

21  determining damages or looking at the factors involved in

22  determining damages?

23  A    That's pretty much what the last 15 years of my career

24  have been about in the area of valuation and damages.

25         MR. VALDEZ:  Your Honor, at this time I move

1    Dr. Kennedy as an expert in the area of valuation and damages.

2         MR. BOYD:  No objection, Your Honor.

3         THE COURT:  Okay.  He'll be recognized as an expert

4    in the area of valuation and damages.

5         MR. VALDEZ:  Thank you, sir.

6    Q    (BY MR. VALDEZ)  Dr. Kennedy, in this matter, what were

7    you retained to do?

8    A    I was retained to review the damages reports of

9    Dr. Abramson and provide critique and comment and prepare a

10   report, a rebuttal report on those reports that he has issued.

11   Q    And in doing those -- doing that function, what did you

12   do to do that?

13   A    Well, one of the first things that I did when you and I

14   were first put into contact with each other is a standard

15   request.  I asked for the complaint so I have an understanding

16   of what the case is about.  And we had -- in the complaint,

17   the issue was a financial issue, so I asked for all of the

18   financial documents and financial records that were -- that

19   had been submitted as part of the discovery process so that I

20   could cull through them and make a determination of what was

21   relevant or not.

22        And then having also gone through Dr. Abramson's

23   report and read it, bring it together with, you know, my own

24   critique of it.

25   Q    Did you review any of the supplement or any supporting

1   schedules that he had attached to his report?

2   A    The first report had a fairly large deck of what looked

3   like PDFs of Excel files.  I did go through those in detail,

4   and I issued a supplement report I believe in 2009 -- I'm

5   sorry, that 2009 was the original.  I issued a supplement

6   report I believe in February of this year, which merely

7   brought his original report up to date adding three more years

8   of what he was saying was data that had been made available to

9   him.

10        And then I did have an opportunity to review what I

11  believe has been marked as Exhibits 199 and 200, which were

12  the cost schedules that came in early, mid last week.

13  Q    And in your capacity and in your function as you were

14  retained in this case, were you asked whether or not you were

15  capable or able to perform a damages calculation with the

16  information that you had?

17  A    Yes, I was.

18  Q    And were you able to perform a damages calculation based

19  on the information that was provided?

20  A    The data that I received, which were boxes of financial

21  records with Bate stamps on them were incomplete and partial,

22  at best, in terms of the data that I might have needed to do a

23  full and complete analysis of what the damages that were

24  asserted in the complaint would have been.

25  Q    Okay.  Now, sir, you stated that when you first came on

1   you were also asked to review Dr. Abramson's report.

2   A    Yes.

3   Q    And based on your review, were you able to form an

4   opinion as to the validity, reliability or the findings of his

5   report?

6   A    Yes, I was.

7   Q    Okay.  What did you determine, based on your review of

8   his report, what is your determination?

9   A    I thought that there were significant or material flaws

10  in the applications of his methodology that would render any

11  conclusion of damages not supportable.

12  Q    Well, sir, this -- let me show you what is marked as --

13  I'm sorry.  Did you write up a written report?

14  A    Yes, I did.

15          MR. VALDEZ:  Exhibit 32.  Defense Exhibit 32, Your

16  Honor.

17          THE COURT:  Yes.

18  Q    (BY MR. VALDEZ)  Do you recognize Government Exhibit No.

19  132 -- or Defense Exhibit, I'm sorry, 32.

20          THE COURT:  32.

21  Q    (BY MR. VALDEZ)  Just 32.

22  A    Yes, this is a copy of the report that I issued in this

23  matter.

24  Q    Okay.

25          MR. VALDEZ:  Plaintiffs' 179.  Plaintiffs' 179, Your

 1   Honor.

 2   Q    (BY MR. VALDEZ)  Sir, I'm handing you what is marked as

 3   Plaintiffs' Exhibit No. 179.

 4   A    Yes.

 5   Q    Do you recognize Exhibit 179?

 6   A    This is the original report that Dr. Abramson issued in

 7   this matter, I believe, back in 2009.

 8   Q    And is that the report that you reviewed when you were

 9   first retained in this matter?

10   A    Yes, it is.

11   Q    Was that -- did you have any other report of Dr. Abramson

12   in front of you before you did your -- before you issued your

13   report?

14   A    This report that you just handed me, I think it's Exhibit

15   179, was the only report that was provided to me, and as I

16   understand the only report that he had issued at the time that

17   I prepared my rebuttal report.

18   Q    Okay.

19             MR. VALDEZ:  188, Your Honor.  For Plaintiffs' 188.

20             THE COURT:  188, yes.

21   Q    (BY MR. VALDEZ)  Dr. Kennedy, I'm handing you what is

22   marked as Plaintiffs' Exhibit No. 188.  Do you recognize

23   Plaintiffs' Exhibit 188?

24   A    Yes.  I believe this is the supplemental report that

25   Dr. Abramson issued in February of this year.

1    Q    And were there any differences in Dr. Abramson's

2    methodology or calculations between 179 and 188?

3    A    No.  And we spent some time auditing the numbers from one

4    report to the next to make that determination.  What he did

5    was add three more years of data from the original report and

6    proceed with the same calculation methods and approaches.

7    Q    In his initial report, though, did he stop only at the

8    current date in his calculations?

9    A    No.  In his original report, he had two categories, or

10   what he labeled as two categories of damages, past damages and

11   future damages, and in the future damages section, he was

12   forecasting lost interest income through I believe the year

13   2025.

14   Q    Okay.  And did that forecast of future damages appear in

15   the supplement report, which is Plaintiffs' 188?

16   A    No, it did not.  It dropped.

17             MR. VALDEZ:  Plaintiffs' 199, Your Honor.

18             THE COURT:  Plaintiffs' 199.

19             MR. VALDEZ:  Plaintiffs' 199 and Plaintiffs' 200.

20             Do you need another copy, Your Honor?

21             THE COURT:  I thought I knew where I put it.  Give

22   me one minute.  I have them.

23   Q    (BY MR. VALDEZ)  Dr. Kennedy, do you recognize Plaintiffs'

24   Exhibits 199 and 200?

25   A    Yes.  These were the schedules that I believe were

1   supplied last Tuesday night or thereabouts.

2   Q    Dr. Kennedy, let's go to your report that's Defense

3   Exhibit 32.  And sir, can we move to page 3 of your report.

4        Sir, this is the summary conclusions regarding Mr.

5   Abramson's report; is that correct?

6   A    Yes, it is.

7   Q    Can you first tell me what was the purpose of this

8   section on the summary conclusions regarding Dr. Abramson's

9   report?

10  A    Just to summarize and highlight what I thought were the

11  major, major flaws in his calculations and methodologies.

12  Q    Okay.  Well, let's start with the first one, No. 1.

13  (Reading)  Abramson failed to verify or determine the accuracy

14  of the underlying data used to calculate his damages.

15       What did you mean by that, sir?

16  A    Well, let's put this first in time context.  This report

17  I prepared, a little accountant's humor, but on April 15th

18  of 2010, and this was critiquing Dr. Abramson's first report.

19  At the time that he had issued his first report and I issued

20  my report in April of 2010, I saw no evidence in either his

21  report or any of the supporting schedules that he provided us

22  that he had done any work to determine the starting spot,

23  which was what the deposits in the trust fund, or at least

24  that's what he was labeling as the deposits in the trust fund,

25  I saw nothing that evidenced that he had done anything to

1    determine the validity or reliability of those numbers.

2    Q    Did anything occur subsequent to your report?

3    A    Subsequent to that, I understand that the Defense

4    stipulated to those balances as being the balances in the DBAR

5    system that the U.S. Postal Service maintains.

6    Q    Okay.  Did -- did that end your inquiry or your review at

7    that point?

8    A    Well, the question that Dr. Abramson was attempting to do

9    was to calculate a lost interest income based on what he

10   believed those balances to represent, but I've seen nothing in

11   his supplemental report and heard nothing in his testimony

12   that he did any inquiry as to what were those balances, what

13   were those balances comprised of, any questions about, you

14   know, whether there were any changes that should have been

15   taken into consideration before he used those as a starting

16   spot in his calculations.

17            THE COURT:  But after the stipulation was entered,

18   did that ameliorate your concerns completely or partly or

19   what?

20            THE WITNESS:  Partly, at best.  And the reason I say

21   that, I didn't see any evidence that he made a determination

22   whether or not these balances were in fact all

23   interest-bearing.  In other words, if the DBARs contained what

24   I've heard called the "daily resetting fees" that are moved

25   out of those balances and don't earn interest income, then to

1    the extent that those dollars are in the DBAR balances but are

2    not earning interest income, that would cause his interest

3    calculations to be overstated, my concern is that I didn't see

4    any -- any inquiry or any evidence of any investigation on

5    what those -- what were contained in those balances.

6    Q    You mean the average daily balance?

7         MR. BOYD:  Your Honor, I move to strike that last

8    answer.  And I think we can discuss this in front of

9    Dr. Kennedy, so I'll go forward.  It has to do with the

10   unopposed motion in limine, and as you may recall, you entered

11   an order limiting him to the four corners of the report,

12   basically.

13        Since that time, we have allowed, as a part of the

14   negotiations that we reached over the cost issues, to allow

15   him to go beyond the report as to the avoidable costs issue,

16   but that was the limitation on the lifting of your order.

17        And so this testimony that he just gave, that the

18   DBARs somehow don't represent all interest-bearing monies, he

19   never set forth in this report.  It has -- they've never told

20   us that was his opinion before just now, and I think the

21   unopposed motion, their agreement that they wouldn't go beyond

22   the four corners and your order should preclude him from

23   giving that testimony for the first time now.

24        MR. VALDEZ:  Your Honor, I believe that that order

25   was lifted because their -- their expert came in so late with

 1   his avoided costs.  We're now able to go into, as a result of

 2   that, not only any other avoided costs but any other expense

 3   that the postage meter companies, manufacturers were relieved

 4   of, so I don't know where the problem is here.

 5            THE COURT:  What do you mean "lifted"?

 6            MR. VALDEZ:  Your Honor, we'd ask you, remember when

 7   they brought in that -- those late calculations in the middle

 8   of trial, we said the first thing that's got to have to happen

 9   is that that order limiting his testimony has to be lifted

10   because now we have a whole new --

11            THE COURT:  Why don't we let Dr. Kennedy and

12   Dr. Abramson go to the witness room and you-all find me the

13   relevant parts of the transcript where I lifted the order.

14            MR. BOYD:  Your Honor, I --

15            THE COURT:  Why don't we let them go to the witness

16   room.

17            MR. BOYD:  Okay.

18            (DR. KENNEDY AND DR. ABRAMSON LEAVE COURTROOM.)

19            THE COURT:  While you're looking for the relevant

20   part of the transcript that took place in this courtroom, you

21   should also look at pages 7 and 8 of Dr. Abramson's deposition

22   and maybe 9 -- 7 through 9.  7 through 10 in which

23   Ms. Moghadam and Mr. Valdez put on the record what their

24   agreement was.  So, 7 through 10 of the Abramson deposition

25   transcript and whatever else you can find in the -- in the

1   transcript on the day we had the discussion in court.  I don't

2   have any of those transcripts.  You have daily copy.

3         MR. BOYD:  Your Honor, and that's what I was going

4   to rely on in regard to my argument.  In fact, at

5   Dr. Abramson's deposition we put the agreement on the record,

6   and I apologize for being so presumptuous that we agreed to

7   lift your order in regard to the avoidable costs without

8   informing you of that agreement, but as you see at the top of

9   page 8, starting at -- well, I'm sorry, if you do start on

10   page 7 at line 12, Ms. Moghadam, of course, puts on the

11   record, (reading)  So we just wanted to set forth -- beginning

12   at line 18 on page 7.  So we just wanted to set forth the

13   terms, what we understand the parties' agreement is with

14   respect to the taking of this deposition, and so for that

15   purpose I'm going to just read into the record Ben's e-mail to

16   you from yesterday evening which states:  Based on our e-mails

17   and telephone calls, our agreement related to the admission

18   into evidence of Dr. Abramson's charts provided to you on

19   Tuesday evening, and his related testimony is as follows.

20         And the one is the one that is relevant.

21         (Reading)  We agree to lift the order in regard to

22   Dr. Kennedy's testimony limited to testimony and documents

23   related to avoidable costs.  If you believe a broader lifting

24   of the order is called for, you agree to let us know by the

25   end of the day Friday, and any disagreement that remains may

1    be presented to the Court.

2              We were never notified of any desire by the other

3    side to lift -- have any broader lifting of the order.

4              MR. VALDEZ:  Well, first of all, Your Honor, I think

5    that this does go to his initial report as to what he says in

6    No. 1.  He talks about -- his testimony here has not gone

7    beyond the Subject No. 1 in his initial report.  Where he

8    talks about -- he says I understand there's going to be a

9    stipulation, but notwithstanding that, he didn't go further

10   and do an independent -- independent and objective analysis of

11   that underlying data.

12             So he's clearly still within his initial report.

13             THE COURT:  You're reading from Dr. Kennedy's

14   report?

15             MR. VALDEZ:  I'm looking at the last paragraph of

16   Section No. 1 on page 3.

17             THE COURT:  Okay.  (Reading)  Notwithstanding the

18   stipulation, Abramson did not perform an independent and

19   objective analysis of the underlying data as should have been

20   performed to meet the generally accepted standards.

21             Okay.

22             MR. VALDEZ:  In addition, Your Honor, the expert can

23   testify as to anything he heard in the courtroom as well that

24   reflects his opinion.  In this case it goes clearly to this

25   section, what's been talked about in this court about the

1    average daily resetting balances.

2             THE COURT:  Anything else, Mr. Valdez?

3             MR. VALDEZ:  Yes, Your Honor.  In addition, you've

4    also heard questions from Ms. Moghadam when she talked about

5    those, she phrased them as avoided costs, and that's

6    clearly --

7             THE COURT:  She talked about what?

8             MR. VALDEZ:  The average daily balances being part

9    of the avoided costs or the costs they were relieved of.  And

10   again, that falls within even our stipulation.  We believe the

11   testimony just still falls within the opinion that he gave as

12   well, the written report.

13            MR. BOYD:  Your Honor, just to be clear, I had a

14   specific objection to Dr. Kennedy's stating that the closing

15   balances that were stipulated to, attributable to customers of

16   Neopost and Ascom regarding their use of the CMRS system did

17   not -- some portion of it was not interest bearing.  That was

18   the specific testimony that I objected to and that's the

19   limitation of my objection, and there is nowhere in his report

20   that he makes any claim to that whatsoever.

21            In regard to the idea that there was some testimony

22   on that, I would say, Your Honor, to the extent this issue was

23   brought up at all, it was brought up during the

24   cross-examination of Dr. Abramson by Mr. Valdez when he made

25   some claim that there was a -- the average daily balance

1    resetting fee that had to be drawn out of this trust account.

2            So, that seems to me to blow a hole sort of in our

3    rule if he can raise something on cross-examination and then

4    use that to bulldoze through with his own expert.

5            THE COURT:  Let me ask a more basic question.  The

6    stipulation with respect to closing balances, when was that

7    reached?  Sometime ago or recently?

8            MR. BOYD:  The first one was reached sometime

9    around -- or right after, and I could check the date.

10            THE COURT:  Well, it's not important.

11            MR. BOYD:  Okay.

12            THE COURT:  Here's my question.  My question is, it

13    would seem to me, not having the stipulation or stipulations

14    in front of me and not being a party to the negotiation about

15    the stipulations, that when you stipulated as to the closing

16    balances of cash on deposit, both sides must have had in mind

17    only balances that were interest bearing.  I mean, why else

18    would you enter into a stipulation to take an issue out of a

19    case?

20            So, you know, why would careful negotiators leave

21    that question open?  He may have a question in his mind, but I

22    assume that the parties didn't have a question in their mind

23    when they stipulated as to the closing balances of cash on

24    deposit that are attributable -- that are attributed to

25    customers of Neopost and Ascom as they relate to this case.

1          So, does anybody believe that that was really an

2    open question when you entered into the stipulation?  If so,

3    why did you enter into the stipulation?

4          MR. VALDEZ:  Because that's only the starting point,

5    Your Honor, for determining damages.  The next thing you got

6    to do is you got to figure out is there anything that affects

7    that balance.

8          THE COURT:  Tell me the stipulations.  This doesn't

9    make any sense to me, Mr. Valdez.

10         MR. BOYD:  May I approach, Your Honor?

11         THE COURT:  I would think careful lawyers would have

12   dealt with this issue.

13         MR. BOYD:  This is the original stipulation.  I

14   believe you just read the supplemental one.

15         THE COURT:  No, I just read from Dr. Kennedy's

16   report.

17         MR. BOYD:  And then if you have -- Okay.  Then No.

18   26 of the stipulations attached to the Joint Pretrial

19   Statement, so there's two, Your Honor.  One covers the

20   supplemental numbers.

21         THE COURT:  All right.

22         MR. BOYD:  The later one.

23         (PAUSE.)

24         THE COURT:  Okay.  Does anybody else have anything

25   else to show me?

1      MR. VALDEZ:  I do, Your Honor.  If you also look at

2  the agreement by parties.

3      THE COURT:  Which agreement?

4      MR. VALDEZ:  I'm sorry, in the deposition of

5  Dr. Abramson.

6      THE COURT:  Yes.

7      MR. VALDEZ:  On the bottom of page 8 and through on

8  9, when we're talking about the deposition of Dr. Abramson,

9  there's the subject matter of the deposition would be limited

10  to the charts, which I believe is 199 to 200, documents

11  produced today of which we were promised documents but we did

12  not get all of them, and paragraphs 1 through 5 of

13  Dr. Kennedy's April 15th, 2010 report.

14      Then if you go to pages 87, there are questions

15  on -- starting on line 9 about the average daily meter

16  resetting balance, and there was no objection from the other

17  side as to that subject.

18      Go to page 93, starting on line 16 and continuing

19  all the way through page 95, you have a pretty lengthy

20  discussion about the average daily resetting balance, and

21  again, no objection as to going beyond the scope of the

22  agreement in the deposition.  So at the time of the

23  deposition, even Plaintiffs' counsel understood that the

24  average daily resetting balance is included within 1 through 5

25  of his report.

1          In addition, Your Honor, as we've shown through the

2     testimony of Dr. Abramson, many of the documents that he was

3     cited to but never looked at talked about the average daily

4     resetting balance.  And since Dr. Abramson's report is a

5     critique of those failures, we believe it is within the bounds

6     of the report.

7          THE COURT:  Okay.  Anything else?

8          MR. BOYD:  If I can respond, Your Honor.

9          THE COURT:  Yeah.

10          MR. BOYD:  Certainly I agree in regard to the point

11     about Dr. Abramson's deposition that they brought the issue up

12     and that it is subject matter that is covered by paragraphs 1

13     through 5 of Dr. Kennedy's report.  I mean, it's within the

14     bailiwick of the subject matter, but of course, my motion,

15     which was unopposed by the other side, was to prevent just

16     what's happening now, and that is for Mr. -- Dr. Kennedy to

17     have opinions that are not set forth on that subject matter

18     within the four corners of the report, and I think it's clear

19     that that -- this particular issue is not set forth therein.

20          I would again believe that the stipulation, as Your

21     Honor has suggested, covers this.  And then lastly, I'll bring

22     up one new issue, and that is, this idea that the average

23     daily resetting balance comes from the trust fund rather than

24     the meter manufacturers is one that has no foundation in the

25     evidence.  There is no one that has testified to that fact.

1   It has only been brought up on cross-examination of

2   Dr. Abramson.

3          THE COURT:  Okay.  Let me -- are you -- Go ahead.

4          MR. VALDEZ:  I'm sorry, just briefly.  Your Honor,

5   if he's agreeing that it's within the subject matter of his

6   report, your order only limits him to the subject matter of

7   his report, and that was actually one of the contentions why

8   the initially drafted proposed order was objected to by us,

9   and then it was expounded to be just subject matter.  If they

10  conceded it's within the subject matter, it's still within

11  even your order.

12         THE COURT:  Well, enough.

13         MR. BOYD:  Okay.

14         THE COURT:  No one can violate Rule 26.  Whatever

15  that means, no one can violate Rule 26, and if anybody is

16  going beyond the four corners of the report, we've had the

17  issue with both experts and then you negotiated something to

18  permit Dr. Abramson to go beyond the four corners of his

19  report, but as a quid pro quo for negotiating that, you also

20  gave up some things with respect to Dr. Kennedy.

21         I'm not sure what you gave up, but your stipulation

22  on pages 8 through 10 speaks for itself.

23         I have no idea whether, as I sit here today, whether

24  there is a factual basis for believing that closing balances

25  representing funds belonging to Plaintiffs' customers on

1    deposit with the United States Postal Service and the dates

2    referred to in Appendix B and C for purposes of said

3    customer's use of Plaintiffs' computerized meter resetting

4    system included or did not include any noninterest-bearing

5    portions to those accounts.

6            And it's your obligation not to ask questions about

7    things that have no basis in fact.  But, if there is some

8    basis in fact for believing that and if there is any evidence

9    in this record to support that, I don't think the stipulation

10   of April 19th, 2010, or whatever date it is, precludes the

11   questions that Mr. Valdez is asking.  It doesn't say "interest

12   bearing."

13           Now, either you-all thought you were limiting

14   yourselves to interest bearing and didn't say so, or you-all

15   thought you were limiting yourself to interest bearing because

16   as a matter of fact there are no noninterest-bearing portions

17   to this, and that's what I don't know.  And if there's a basis

18   in fact, Mr. Valdez can proceed, and if there's not a basis in

19   fact, he can't proceed.  And then I'll deal with it later.

20           I don't know what else -- I don't know -- I don't

21   know what else to do because it seems to be alluded to in the

22   last paragraph of No. 1 on page 3 of Dr. Kennedy's report.

23   And you-all know whether -- of all these hundreds of documents

24   that you've marked as exhibits and all the depositions you've

25   taken, there's any basis to believe whatsoever that any of the

1   accounts referred to by Dr. Abramson and in your stipulation

2   are noninterest bearing that are customer accounts, I just

3   don't know.

4           I've operated on the assumption throughout this

5   trial that there were not, and if there are documents or

6   testimony that leads to the opposite conclusion, I assume

7   they'll be cited in the Government's proposed findings of

8   fact.  I don't remember any testimony to that effect, but

9   maybe it's there.

10          So here, you can have this back and --

11          MR. VALDEZ:  May I call the witness back, Your

12  Honor?

13          THE COURT:  Yeah.

14          MR. BOYD:  May I make one statement before you do,

15  Your Honor.  I just want to clarify this issue about the

16  subject matter of the expert's report.  There is five or eight

17  different areas in which he commented on, and of course, the

18  purpose of my motion, which was unopposed in the order entered

19  by Your Honor, was to limit the testimony to the critique set

20  forth in the report, and I think that was clear.

21          And what I want to say, because you said that it was

22  alluded to in the report, I would say there is no discussion

23  of the DBARs or the balances or any of them being noninterest

24  bearing in the report, and again, that was the specific

25  limitation of my objection.

```
 1              THE COURT:  And you can ask him on

 2   cross-examination.  If this is not a post hoc rationalization,

 3   why didn't you say so?  So let's get Dr. Kennedy back.  And

 4   obviously, Dr. Abramson is welcomed back as well.  There he

 5   is.

 6              Okay.  Go ahead, Mr. Valdez.

 7              MR. VALDEZ:  Thank you, Your Honor.

 8              (DR. KENNEDY AND DR. ABRAMSON BACK IN THE

 9   COURTROOM.)

10   Q   (BY MR. VALDEZ)  Dr. Abramson, in your review of the doc-

11   --  Dr. Kennedy, in your review of the documents in this matter,

12   was there anything that caused you or anything you noticed in

13   which -- or is there anything in any of these documents that

14   demonstrated that there was some other factor or something that

15   was affecting the amount of the interest income that was being

16   earned on the customer trust funds?

17   A   There was a document introduced yesterday that had

18   interest expense on POS deposits, and I'm recalling a number

19   of around $66,000.  I believe it was a forecast by Ascom, if

20   memory serves.

21              MR. VALDEZ:  Defense Exhibit No. 147, Your Honor.

22   Q   (BY MR. VALDEZ)  Doctor, I handed you what has been marked

23   as Defense Exhibit No. 147.  Have you seen Defense Exhibit 147

24   before?

25   A   Yes, I have.
```

1  Q   Okay.  And Doctor, I'm going to direct you to page 10 of

2  your report where you cite your list of documents reviewed.

3  First of all, with respect to the first two pages, which are

4  entitled "Comerica Bank Institution Cash Investment Accounts,"

5  and the second page which appears to be a menu of fees for

6  available cash management funds, do those Bate stamp numbers

7  on the bottom appear within the documents you reviewed on No.

8  14 of your list on page 10?

9  A   Yes, it's within that range of what I listed on No. 14 on

10  my page 10.

11  Q   And directing your attention to page 3 of the 147, which

12  is Bate Stamp No. NH002754, was that also included in your

13  list of documents, and I guess I direct you to No. 12.

14  A   I was going to say No. 12, that Bate stamp is within the

15  range of the Bate stamps I've listed on No. 12 on my page 10.

16  Q   Okay.  Now, Dr. Abramson, you said there was something in

17  here that caused -- that made you --

18            THE COURT:  Dr. Kennedy.  Dr. Kennedy.

19            MR. VALDEZ:  Dr. Kennedy.  Sorry.  I have

20  Dr. Abramson's report here next to me.  I keep on seeing his

21  name.

22  Q   (BY MR. VALDEZ)  Dr. Kennedy, you testified that there's

23  something in this paper that caused you to, that raised your

24  attention regarding an effect on the interest earned on customer

25  funds.

1   A   Yes.   On the third page of this Exhibit 147 that you

2   handed me, which is Bate Stamp No. NH002754, there's a line

3   about two-thirds of the way down the page that says

4   "Financial:  Interest on Postal Deposit," and I see $66,000.

5   There's a typed number.  I also see it has a handwritten

6   number in what's the handwritten right-hand column here and a

7   handwritten notation to the left of the label of the line that

8   says "out."

9   Q   Okay.  And is this under "Revenue" or "Expenses"?

10  A   This is "Expenses."

11  Q   Why would this be under "Expenses" instead of "Revenue"

12  if we're talking about interest?

13  A   If the company's required this --

14          MR. BOYD:  Your Honor, I would object on the grounds

15  it calls for speculation.  He's offered no foundation as to

16  Mr. Kennedy's understanding of what this represents.

17          THE COURT:  Well, lay a foundation.

18  Q   (BY MR. VALDEZ)  Have you heard the phrase "postal deposit

19  accounts" before?

20  A   Yes.

21  Q   In what context did you hear that?

22  A   In discussion about the requirements for these meter

23  companies to have a daily resetting fee set aside with the

24  Postal Service.

25  Q   Okay.  And was that in itself in the DMM or the CMRS

1    regulations?

2    A    I believe it is, yes.

3    Q    Okay.  And in the DMM, did it state that the average

4    daily balance had to be paid into a postal deposit account?

5    A    Yes, it does.

6    Q    Okay.  Now, knowing that, Doctor, is there -- what about

7    that line raised your concern?

8    A    This would be a category of expenses that companies that

9    are maintaining these trust funds would be incurring.

10   Q    Okay.  Do you have -- I'm sorry.  As an expert, would you

11   have an obligation to go into and inquire about what that --

12   what that actually is or what the "interest on postal deposit

13   account" actually means?

14           MR. BOYD:  Your Honor, again, have him lay some sort

15   of foundation for that question.  I'm not sure what "as an

16   expert" means and what obligation he's talking about.

17           THE COURT:  Well, here's a question on the table,

18   right.  We're here to talk about Dr. Kennedy's criticism of

19   Dr. Abramson as laid out on the four corners of his report, so

20   where in your report do you talk about or allude to this,

21   about your concerns, since you reviewed these documents at the

22   time you prepared your report?

23           THE WITNESS:  In my report on page 6, Paragraph No.

24   5, where I discuss the failure on Dr. Abramson's part to do

25   any, or appeared to do no investigation of lost cost or

1    avoided cost that would have been associated with the interest

2    income that he's claiming the Plaintiffs have lost.

3            And I provide a list of suggestions of categories of

4    cost that would be directly associated with the maintenance of

5    the trust fund that generated the interest income, so this

6    would fall into that category of discussion, if these were

7    directly related to the generation of interest income from the

8    trust fund.

9    Q    (BY MR. VALDEZ)  And these would be one of the costs

10   associated with the management of the trust fund account?

11   A    Management or maintenance of the trust fund account.

12   Q    Okay.  So, going back to Defense Exhibit 147, page

13   NH2754, how would that be included in that topic, an Interest

14   on Postal Deposit Account?

15   A    Well, it -- it appears from this page as though this

16   would be a category of expenses that are being incurred

17   directly related to the maintenance of that trust fund

18   account.

19   Q    Okay.  What, if anything, as of -- as a forensic

20   accountant would you do to determine the source of this, of

21   this charge or this expense?

22   A    Well, I'd want to see what detail, supporting

23   documentation was available for these and every one of these

24   line items on this particular schedule and on the other

25   schedules as well as the notations in the footnotes.

1        You know, each line item may have a different set of

2   supporting documentation, or if it's a forecast assumption,

3   the rationale for the forecast assumption, and that should

4   have been investigated rather than just blindly accepted.

5   Q    Why?

6   A    Well, you need to establish -- as a forensic accountant,

7   you need to establish that there is in fact a basis or a

8   foundation for any and all of the numbers that you're using in

9   any kind of damage calculation.

10  Q    I mean, but why is that so important?  You just can't

11  take your client's word for it?

12  A    Well, in -- as I said, in my profession, it's the

13  obligation of independence, objectivity and due professional

14  care, and I see failing in all three, in failing to look at

15  what was the support, the rationale, or in making any

16  determination about the accuracy, the validity, the

17  reliability of the underlying data.  Merely just accepting it

18  puts you in a position of just doing arithmetic.

19  Q    Okay.  You said that you had read in the DMM a

20  requirement regarding the average daily resetting balance be

21  put in a postal deposit account.  What -- do you remember what

22  it was or what is required in that DMM or in that section?

23  A    To set aside the average daily resetting, and

24  calculations were specified, I think it was calculated redone

25  every quarter by the Postal Service, and for purposes of

1    ensuring the, you know, at least one day's float of resetting

2    was escrowed.

3    Q    Okay.  And who was to pay over that amount, that average

4    daily balance?

5    A    Would be the meter companies that were being regulated.

6    Q    Okay.  So while that average daily balance has been paid

7    over and sitting in a Postal Service account, did they have

8    control over it as to earn interest in it?

9    A    No, they did not.

10   Q    So how would that be an expense on a profit-and-loss type

11   statement?

12   A    The best I can decipher from these particular documents

13   and others that you had provided me, this appears to be a

14   forecast or an analysis of the operating revenues and expenses

15   of this particular line here, the TMS, and I can't tell you

16   because I don't have the underlying data.  It wasn't provided

17   to me on what was the basis for this calculation either

18   quantitatively or qualitatively, so I would infer that it's an

19   opportunity cost that money can't be invested.

20   Q    Okay.  Now, let's go to No. 2 of your report on page 3.

21   You stated that Abramson performed no analysis on the

22   appropriateness of using a 1-Year U.S. Treasury rate to

23   calculate damages.

24            What did you mean by that?

25   A    Well, first, he merely said, "I'm making this as an

assumption." He didn't provide any basis whatsoever for his choice of a 1-Year Treasury rate.  What we do know is that, particularly with respect to Neopost, they had instructions to Comerica Bank that the interest was to be distributed by Comerica -- the interest income on the trust was to be distributed to Neopost on a monthly basis, and the fact that those were coming on a monthly basis tells me that the time period that they potentially would have been invested was substantially shorter than one year, and I didn't see any evidence that he undertook to review that or make any determination about the length of time that the funds would be on deposit.

Q   Now, what other documents could you have reviewed to make a determination as to whether or not the interest was being retained and allowed to compound?

A   Well, the both -- both Plaintiffs, in part of the discovery documents that I had, had annual financial statements and other financial statements that were available, specifically for Neopost for the year ended January 31st, 1996 and '95, which would be effective in the '95 and '94 calendar years.

They reported earning interest on the trust fund of something like $644,000 in the '94 year and $1,080,000 in the '95 year.  So what -- knowing that that was the interest earned in those two years, if that interest were allowed to

remain on deposit and compound, then I should have seen on the
company's balance sheet a line item that said investment equal
to approximately that same amount.

What I saw in looking at the statement of cash flow
for Neopost is in the '94 year they begin the year with a zero
cash balance.  They ended the year with a zero cash balance,
which tells me that whatever receipts and disbursements that
they made during the year, it was in that year, from a cash
flow perspective, a break even, so they weren't accumulating
cash.  And for the '95 year, they started the year with zero
cash, because that's how they ended in '94, and they ended the
year with a little over 300-and -- I think 350-, $380,000 in
cash reported on their balance sheet, which is far less than
the $1,080,000 that they reported generating an interest
income, so that told me that it wasn't being retained and
accumulated.

And then the last thing, in looking at the balance
sheet, below the cash line I would have expected to have seen
a line labeled "investments," and it would have contained some
dollar amount approximately equal to those retained interest
dollars if in fact they were being held for the year and
compounding, and there was no -- no such amount reported on.

And for Neopost, those financial statements were
audited financial statements audited by one of the former Big
8 CPA firms, so there was some higher level of reliability to

1    those from my point of view.

2         For Ascom, they were unaudited financial statements

3    for the two years immediately prior to the change in the

4    regulation and they were reporting a line item that said

5    "financial income."  Their report wasn't an audited financial

6    statement, so it didn't contain the footnote disclosures that

7    gave detailed descriptions about what those amounts were, but

8    it was in the range of 1- to $2 million in each of the two

9    years preceding the regulation change, and I was seeing the --

10   and they also didn't produce a statement of cash flow, but

11   they did produce a balance sheet, and the cash balances at the

12   end of both of those two fiscal years were substantially less

13   than the interest, the financial income that they were

14   reporting on their income statement.

15   Q   Okay.  Well, now, Dr. Kennedy, okay, first of all, how

16   was that relevant to your -- his determination as to whether

17   to use a 1-Year Treasury bond as the basis or anything

18   different, shorter or longer?

19   A   Well, it's relevant because if they weren't holding those

20   funds for an entire year, a one-year rate wouldn't be

21   appropriate.  You want to match the whatever the holding

22   period is to the interest rate from an instrument that matches

23   that holding period, and from what I can see and what I've

24   heard in testimony, he undertook no investigation to make a

25   determination about a holding period.  He just merely assumed

1  it was one year.

2  Q    But you heard Dr. Abramson testify that it didn't matter

3  as to what they did historically with that money or with the

4  interest, that the 1-Year Treasury bond is a conservative use,

5  it's the shortest period you could use.  Can you explain that.

6  A    Well, first, in my opinion, it's a failure to make any

7  investigation to determine whether that one-year term was

8  appropriate or not.  What impact it had on the damage

9  calculation is a separate question, but since he didn't make a

10  determination about the proper holding period, he certainly

11  didn't make a determination about whether it was higher or

12  lower or more conservative or not.

13       You know, I -- he should have made that

14  investigation and matched the term of the instrument, and for

15  a period, if the instrument that's a shorter term instrument

16  had a higher rating, it may have been a higher earning.  For

17  years it was lower.  It may have been lower.

18       I heard him give testimony yesterday that he said

19  during the time period of his calculations, approximately a

20  third of the time we had what's called an inverted year curve.

21  Not to get into too much of a finance lecture here, but what

22  an inverted year curve means is that very short-term interest

23  rates, Government interest rates are higher than long-term

24  rates and generally due to federal reserve working on, you

25  know, the short-term of the year curve on interest rates.

1        But, you know -- and I didn't -- I didn't review to

2   see if that statement he made was true or not, but assuming it

3   is true that a third of the time short-term rates were higher

4   than long term, that means that two-thirds of the time the

5   opposite was true, and in fact, the short-term rates were

6   lower and he didn't take that into consideration.

7   Q    Okay.  And how would that have affected the calculations

8   or his calculation on damages?

9   A    Depends on the difference between how much higher and how

10  much lower as well as the amount of time they were higher or

11  lower, but the inverted year curve is generally an anomaly in

12  our market.  Short-term rates are almost always lower than

13  long-term rates, unless the Feds are trying to accomplish some

14  specific goal.

15        So, without having recalculated them, you know, my

16  instinct is that it probably would have resulted in a lower

17  amount.

18        MR. BOYD:  Your Honor, I move to strike that answer

19  on the grounds that it's speculation.

20        THE COURT:  I'll strike the "instinct" observation,

21  but I won't strike the short-term rates are usually lower than

22  long-term.

23        You did say in your report on page 4 in the last

24  paragraph of this No. 2 that the use of a 1-Year U.S. Treasury

25  rate, Dr. Abramson's damage calculations, rather than a

1    shorter term rate, has the effect of overstating the

2    calculated interest and therefore overstating the damages.

3    And is that based on what you now just testified to or is

4    there more to be said on that?

5              THE WITNESS:  That the fact that in general

6    short-term rates are lower than long-term rates is the basis

7    for that.

8              THE COURT:  Okay.

9    Q    (BY MR. VALDEZ)  I guess that leads us to No. 3,

10   Dr. Kennedy, that the Abramson report assumption that interest

11   would accumulate, be compounded, and be overdrawn only once a

12   year is inconsistent with the facts and overstates the

13   calculated damages.

14   A    And I think I've talked quite a bit about that a moment

15   ago when I was talking about reviewing Neopost and Ascom's

16   balance sheets and statements of cash flow.  And the footnote

17   disclosures, specifically, for Neopost, that what -- as what

18   we know as a fact is that the instructions to Comerica Bank

19   were to distribute the interest monthly, so it wasn't being

20   retained.

21             And I see from the detail review of the financial

22   statements of the Plaintiffs, for two years immediately

23   preceding the regulation change, there was no reporting of an

24   investment amount equal to the accumulated years' worth of

25   interest.  The cash balances for all four years, which would

1    be two years for each of the two Plaintiffs, cash balances

2    were substantially below what they were reporting as interest

3    income.

4           In Neopost's case, specifically identified as

5    related to the trust fund, and Ascom's case it wasn't

6    specifically delineated as that, but I did see a drop in the

7    interest income in the year subsequent to the change in that

8    same line item, so it's a reasonable assumption that's what

9    that was.

10          So, very clear, in review of the financial

11   statements of these companies, that this interest wasn't being

12   accumulated.

13          MR. VALDEZ:   Now, I'm sorry, if I can have just a

14   moment, Your Honor.

15          (PAUSE.)

16   Q   (BY MR. VALDEZ)  Did Dr. Abramson provide any support for

17   the assumption that you note on page 4 of your report that he

18   assumed interest accumulated?  Did he provide any documentary or

19   any other support for that?

20   A   Nothing that I've seen.  It was just heroic assumption on

21   his part.

22   Q   And what was the effect of -- I'm sorry, let me ask you

23   this.  You also heard him testify that again it didn't matter

24   whether they drew it out or not, that when they put the money

25   or when they -- as he characterized you're saying they

1  consumed the funds into their operations, that's an investment

2  in and of itself.  Do you have a response to that?

3  A    Well, I do.  And I noted yesterday in his testimony he

4  took exception to my use of the word "consumption," and I know

5  in Economics 101 classes we talk about income and consumption,

6  and that wasn't the way I meant it.

7        I meant it, as an accountant, were these funds being

8  used up in the operations as part of, if you will, subsidizing

9  some of the operating expenses of the business, and that

10 clearly was the case, and I can say that from the review of

11 the audited financial statements or the annual financial

12 statements and specifically the statements of cash flow and

13 the fact that there weren't investment or cash balances in

14 excess of those dollar amounts.

15       And the best example is in the Neopost 2004 year,

16 they started the year with zero cash.  They ended the year

17 with zero cash, which means that they would break even on a

18 cash flow basis, and any receipts that they would have

19 received during the year, whether it's cash payments from

20 customers or cash payments on interest, they were using to

21 fund their operations and wasn't available for investments.

22 Q    You said in 2004?

23 A    If I did, I meant the year ending January 31st, 1995.

24 Sorry.  I'm lost in a time warp.

25 Q    Okay.  So, how is that significant that they're using, as

1    you said, in accounting terms, consuming this money, how does

2    that affect Dr. Abramson's calculation or use of the

3    accumulating the interest rate?

4    A    In the calculations that he did and provided in his

5    original and supplementary report, he very specifically said

6    that he was making an assumption without a basis that I could

7    see, he was making an assumption that the interest would be

8    held and accumulate and compound for a year, and that's part

9    of the calculations and the schedules that he went over

10   yesterday.

11          The compounding means that you're earning interest

12   on interest, and that assumption of compounding, which I see

13   no support for, has the impact of increasing the amount of

14   interest income that he's ultimately opining on and

15   overstating it if compounding is not in fact what's going on.

16   Q    Let's go to No. 4 of your report, sir, that's on page 5

17   on Defense Exhibit 32.  The discount rate used -- I'll try and

18   say that slowly.  The discount rate used in the Abramson

19   report damages calculation was inappropriate, failed to follow

20   generally accepted methods and for determining such a discount

21   rate, was too low, and resulted in an unreliable and

22   overstated estimate -- estimation of damages.  This error

23   occurred because Abramson failed to analyze or determine the

24   Plaintiffs' cost of capital.

25          First of all, can you explain in a way that I would

1    understand or that I guess any of us would understand what is

2    the cost of capital?

3    A    Sure.  For a corporation, the cost of capital is the cost

4    for all of its different sources of funding.  And a

5    corporation may get funding from creditors or bondholders, and

6    a corporation also gets funding from its shareholders, and

7    part of that shareholder funding is the income that's

8    generated every year and then retained, so it's called

9    retained earnings.

10          It's all part of, from an accounting lingo, it's

11   part of the shareholder equity of the business, and a

12   company's cost of capital is the blended cost of all of those

13   different sources of money.  It's not just strictly the cost

14   of borrowed money, and that's the comment that I'm making

15   here.

16          If you're going to evaluate, as he said in his

17   report, the Plaintiffs' cost of capital, you need to consider

18   what were all of the sources of capital of the business and

19   what were the associated costs of each of those sources of

20   capital and in a way that's very well defined and professional

21   as well as the academic literature bring those two together

22   and calculate what's called a weighted average cost of

23   capital.

24   Q    Okay.  So what was Dr. Abramson's shortcomings with

25   respect to that calculation or that determination?

1    A    Well, as I mentioned two or three answers ago, I've

2    looked at the balance sheets and the income statements, I've

3    looked at the financial statements of both of the Plaintiffs

4    around the time of the regulation change, and on the balance

5    sheets of the Plaintiff -- each of the Plaintiffs' balance

6    sheets I note that there were liabilities reported and there

7    were shareholder equity reported, and the shareholder equity

8    included the normal categories within that common stock paid

9    in capital retained earnings, et cetera.

10          So -- and in fact, for both of the Plaintiffs it was

11   approximately 35- to $40 million of shareholder equity being

12   reported in each of the two years immediately prior to the

13   regulation change, so very clearly these companies had two

14   components of funding sources, debt financing and equity

15   financing, and it's a basic premise that if that's true, that

16   that's the what we call the capital structure of the business,

17   you need to consider all of the costs of all of those sources

18   of capital and he merely omitted one.

19   Q    So when you're saying they have the two, the two sources,

20   so for both Neopost and Ascom, they were financing their

21   business on one hand with debt or using their credit to get

22   money?

23   A    That's correct.

24   Q    And on the second hand they were using cash on hand

25   rev- -- and other type of monetary revenues or cash revenues?

1    A    They were using borrowed money and they were using

2    shareholders' money is probably a simpler way to say it.  It

3    isn't the cash on hand necessarily.  It's just the use of

4    shareholder money and borrowed money.

5    Q    All right.  So how do you then -- and which did

6    Dr. Abramson just use?

7    A    He only used the cost of -- Well, he used a debt rate

8    that he said he used a B double A rate that he looked up on

9    the internet, I think one of two items that he actually

10   independently looked for, but as far as I could see from his

11   report and his testimony, he didn't investigate what the

12   company's actual borrowing costs were.

13   Q    So, you're saying what he looked at was just the amount

14   that was the shareholders'?

15   A    No.  He only looked at the cost of borrowed funds.  He

16   didn't look at the cost of shareholder funds.

17   Q    Okay.

18   A    And the reason that this is important to me is that the

19   cost of shareholder funds are substantially higher than the

20   cost of debt or borrowed money, and there's treatises in my

21   profession on this.  It's widely written about.  There is data

22   sources that we can look to that are very objective.  Everyone

23   accepts them as the proper place to start when you're

24   developing the cost of equity for business, and readily

25   available.  So, I don't understand why he didn't do that.

```
1    Q    So, is that --

2              THE COURT:  Are these two separate points you're

3    making, one is that there are two sources of financing, equity

4    and debt, and he only looked at debt, not equity; and

5    secondly, that in looking at debt, he didn't investigate what

6    the actual cost of borrowing was but just made an assumption.

7              THE WITNESS:  Yes, Your Honor, that's correct.

8    Q    (BY MR. VALDEZ)  So, let me ask you, is it the generally

9    accepted practice in accounting or economics to look at the

10   weighted cost of average both of equity and the debt when you

11   determine the discount rate?

12   A    Yes, it is.

13   Q    Okay.  Okay.  So, he didn't take that into account.  What

14   effect does that have on the discount rate that he used?

15   A    Well, I know because I work with these public -- publicly

16   available data sources for the cost of equity.

17              Ibbotson's Stocks, Bonds, Bills and Inflation

18   Yearbook is the data source that everyone in my profession

19   goes to to get the basic building blocks of a company's cost

20   of equity, and cost of equity is higher than cost of

21   borrowing, and that's not a sometimes it is, sometimes it

22   isn't question.  It always is, and it is for a variety of

23   finance theories, but it is because that's the market

24   validating, in fact, equity costs are higher than debt costs.

25              If there's an extreme -- well, we'll let it go at
```

1   that.

2   Q    Okay.

3   A    And by not considering all of the company's Plaintiffs'

4   cost of financing, as he said, the company's cost of capital,

5   he has potentially dramatic -- materially understated this

6   discount rate as he's discounting back to January 1st of

7   1996, and in understating the discount rate -- I'm sorry,

8   yeah, in understating the discount rate, he has potentially

9   materially overstated the dollar accumulation of interest lost

10  at January 1st, 1996.

11         MR. BOYD:  Your Honor, I move to strike the last

12  response, notably on both occasions when he was talking about,

13  you know, what he thought about the subject.  He said

14  potentially this and potentially that, and the reason he said

15  that is because he did no such calculation on his own to

16  determine what the appropriate discount factor would be in his

17  report, and therefore, the entire line of question -- or the

18  entire answer is not only speculation but also beyond the four

19  corners of his report.

20         THE COURT:  Okay.  I'll overrule the objection.  Go

21  ahead.

22  Q    (BY MR. VALDEZ)  Okay.  Can you explain for me, please,

23  how is the discount rate used to calculate the present value of,

24  in this case, the damages?

25  A    I think a discount rate is a denominator in a fraction,

1    if you will.  You're taking a dollar, as Dr. Abramson was

2    bringing dollars from the end of each year through 2011 back

3    to a starting point of January 1st, 1996.  The discount rate

4    is the rate that, as he explained yesterday, equates a dollar

5    at a later date on a timeline to an amount on an earlier date

6    in a timeline.  Think of it as stripping out the -- in a

7    simple example, it would be stripping out your interest

8    earnings.  In the equity example, it would be stripping out

9    the equity growth component.

10   Q   Now --

11            MR. VALDEZ:  If I can have just a moment, Your

12   Honor.

13            THE COURT:  Sure.

14            MR. VALDEZ:  I am trying to move through quickly.

15            (PAUSE.)

16   Q   (BY MR. VALDEZ)  Now, let's go to No. 5 of your report on

17   page 6.  And that's where you state Dr. Abramson overstated

18   damages by failing to include a determination of incremental

19   costs associated with lost interest income.

20   A   Yes.

21   Q   Okay.  And you see his subsequent report of -- I'm sorry,

22   which is Exhibits 199 and 200.

23   A   Yes.

24   Q   Okay.  And in Dr. Abramson's 199 and 200, does he now

25   consider all the incremental costs associated with lost

1    interest income?

2    A    In Exhibits 199 and 200, he includes bank fees and cost

3    of bonds and then bases them on some assumptions that were

4    some other documents that I think we looked at a little

5    earlier.  We saw in the one document that there was the

6    financing cost of the interest on postal account deposits,

7    potentially could have been investigated by him; the sweep

8    account where there's documentation that the account balances

9    in excess I think originally was slated to be 1.5 million but

10   then changed to 3 million, and balances in excess of that

11   would be swept into overnight repo agreements.  There's a

12   separate rate or fee associated with that.

13   Q    Does that mean, though, then that the interest is either

14   five points or seven points?  How does that affect his

15   calculation?

16   A    There are two separate services the bank is providing.

17   They are providing the management of the funds service for $5

18   per thousand and they're providing this movement of funds in

19   excess of a certain cash balance to an overnight investment to

20   allow them to earn some additional interest income at $7 per

21   thousand.  Those are two separate services the bank's

22   providing.  It would be two separate fees.

23            THE COURT:  And you're referring in this last

24   testimony again to the numbers on Defendant's Exhibit 147?

25            THE WITNESS:  Yes.

1   Q     (BY MR. VALDEZ)  Let's go to the first page of Defense

2   Exhibit No. 147.

3          THE COURT:  First page of what?

4          MR. VALDEZ:  Of Defendant's Exhibit 147.

5   Q     (BY MR. VALDEZ)  Tell us where do you see these what you

6   call the repo fees?

7   A     Repurchase agreements.

8   Q     First of all, can you explain to His Honor what do you

9   mean when you describe a sweep account?

10  A     A sweep account, it would be a checking account where you

11  have an agreement with your money management firm or your bank

12  that cash balances in that account would be swept, if you

13  will, or moved overnight into some one-day type investment to

14  allow you to earn some additional interest income and then

15  replaced in your checking account the next morning with

16  whatever the interest income on that would be minus whatever

17  the fees the banks are charging you for that.

18          I mean, I see that on, you know, 401K statements.

19  Your mutual funds will pay a, you know, quarterly dividend or

20  interest and immediately your fund manager will invest that

21  in, you know, back in more shares of mutual funds, so it's

22  sweeping that cash that otherwise would be idle, so that's

23  what -- that's what that means.

24  Q     Okay.  So in this case, with respect to the Comerica Bank

25  agreement, the Comerica has a basic account where they're

1    keeping the trust funds; is that correct?

2    A    Yes.

3    Q    Okay.  And then -- then how is that then -- how is this

4    repurchased and used as a sweep account with respect to the

5    trust funds?

6    A    Well, I've seen documents and letters about when a

7    balance in the account exceeded, and as I said, it was

8    1.5 million in the typed version with a handwritten note that

9    changed it to $3 million.  When the balance exceeded that,

10   these excess cash in that particular account would be swept

11   into these repo agreements.

12   Q    Okay.  And then in the next -- then the next morning it's

13   then taken out of the repo agreement and back into the trust

14   account?

15   A    And put back.

16   Q    Okay.  So the .5 or the $5 per $1,000 of assets, how is

17   that computed on the trust funds?

18   A    That's dollars of money under management.

19   Q    Is it calculated on the entire amount in the trust fund

20   or the amount in there minus the 3 million that's -- of the

21   not over three million that's laid out.

22   A    Right now, this second, I'm not sure.  I would have to

23   see the documents to see how it was laid out.  I don't recall.

24   Q    Did you receive any documents that showed how that was to

25   be laid out?

1    A    I don't recall that I have.  It would have been helpful.

2    Q    Okay.  If the -- if the -- if the money always goes --

3    returns back to the trust account, is it reasonable to assume

4    that the point -- or the $5 per thousand is on the entire

5    amount that would be held in that trust account?

6    A    It would be reasonable to assume.

7    Q    Okay.  Would it also be reasonable to assume that the

8    money that is then being swept overnight into the repurchasing

9    agreements then incurs an additional $7 per 1,000 charge?

10   A    That's the way I'm reading this Exhibit 147.  These are

11   two different bank services and two different fees associated

12   with the two different services.

13   Q    Okay.  So how does that affect the validity or accuracy

14   of Dr. Abramson's high and low calculation on Neopost using

15   the low as a $5 per 1,000 and the high as the $7 per 1,000?

16   A    I think the simple way to say it, it's not "or," it's

17   "and."  It's not 5 or 7, it's 5 and 7 on a different bal- --

18   on different balances.

19   Q    Okay.

20        THE COURT:  So, is the bottom line on your paragraph

21   5 and your discussion of 147 and your elusions to Plaintiffs'

22   Exhibit 199, is it some of your criticism in No. 5 goes away

23   in that he is now included some of the avoided costs in 199

24   and 200 but not all of the avoided costs?

25        THE WITNESS:  That's correct.

1    Q    (BY MR. VALDEZ)  That actually takes me right to the

2    next -- that takes us into further questions about anything else

3    on 147, page NH 2754 that appears to be an avoided cost that he

4    did not take into account?

5    A    Well, I think we had some discussion about this earlier

6    under the financial cost category, this interest on postal

7    deposits with the notation out and then this 1993 year it was

8    sixty-six -- $66,000.

9    Q    And how does that relate in proportion to his

10   calculations with respect to the bank fees -- I'm sorry, the

11   trust management fees or the surety bond fees?

12   A    For Ascom, for the year 1993, bank fees of 33,000 and

13   bond costs of 13, so that's $46,000, compared with $66,000 on

14   this interest on postal deposit account, so it's more.

15   Q    Okay.  What if you used a number for his high estimate

16   where he used $72,000?

17   A    So that's about 85,000.  For the 1993 year, 72,000 in

18   bank fees and 13,000 of cost of bond.  66,000 is still about

19   40 percent or thereabouts, doing a quick math in my head.

20   Don't count on that being right.

21   Q    That's the amount that he's understated?

22   A    Yes.  That's understatement if he's omitted that and it

23   should have been included as an avoided cost.

24   Q    That's on his high calculation?

25   A    That's on the high calculation for Ascom.

1    Q    And that's Plaintiffs' 199?

2    A    Defendant's 199, Table B -- 4B.

3    Q    That's Plaintiffs' 199?

4    A    I'm sorry, Plaintiffs' 199.

5    Q    Okay.  What about forms and postage?  Let me ask you

6    this.  Did you hear any testimony in this trial that forms

7    were no longer -- that the cost of the forms were no longer

8    being borne by the meter manufacturer?

9    A    I did hear that testimony.  I believe it was one of the

10   two former treasurers of the Postal Service.  I can't recall

11   which one.

12   Q    Okay.  And is something equivalent to that number appear

13   to be in this Document 2754?

14              MR. BOYD:  Your Honor, I object on the grounds that

15   it calls for speculation.  There has been no testimony linking

16   this item on Exhibit 147 to any testimony in this case.

17              MR. VALDEZ:  I believe the testimony from

18   Dr. Kennedy is these are items that it should have drawn

19   Dr. Abramson's attention and further investigation into and

20   that his failure to do that shows that he missed incremental

21   costs.

22              THE COURT:  Well, I think that the answer is, and

23   maybe -- unless you're almost done, maybe we should take a

24   break, but I think that the answer is this.  If Kearney said

25   something about forms and if it is Dr. Kennedy's opinion that

1   Dr. Abramson should have explored forms and postage or at

2   least forms as potential avoided cost, if that's the limit of

3   his testimony, I think that's fine.

4         What I don't think is appropriate is to assume that

5   this number is the right number because the only basis is

6   Kearney or Pedersen's testimony and nobody talked about

7   numbers, they just talked about some generic form, so we don't

8   know for sure whether these are even the same forms that

9   Kearney was talking about, let alone if this is a number that

10  has any bearing on anything unless there's something else in

11  the record.

12        So I will accept Dr. Kennedy's testimony to the

13  extent that he is saying that this may be an avoidable cost or

14  some portion of forms may be an avoidable cost and

15  Dr. Abramson should have explored it, and that's the limit of

16  his testimony to the moment, unless there is something else in

17  the record that you want to draw his attention to.

18        MR. VALDEZ:  Yes.  You encapsulated where I wanted

19  to go.  My next question would have been is what if anything

20  Dr. Abramson should have done.  Hearing that --

21        THE COURT:  I just don't want this number to be

22  injected in the record unless there's more of a foundation for

23  it than I think we have at this point.

24        MR. VALDEZ:  I understand that.

25        THE COURT:  Do you agree with that at this point?

| | |
|---|---|
| 1 | THE WITNESS:  Yes, Your Honor, I do. |
| 2 | THE COURT:  As far as we've gotten? |
| 3 | Q   (BY MR. VALDEZ)  Right.  So my question is, what more |
| 4 | should he have done after seeing this on this report and hearing |
| 5 | the testimony that forms were no longer a cost being borne by |
| 6 | the meter manufacturers? |
| 7 | A   Well, I think, as an expert, he had an obligation to make |
| 8 | a determination, do an analysis, make inquiries, ask to see |
| 9 | documentation, what is this number, what does it mean, does it |
| 10 | in fact relate to the interest income that's no longer |
| 11 | available, and as far as I've seen and as far as I've heard in |
| 12 | testimony, he didn't do that. |
| 13 | Q   Okay.  And did you see the -- any documents that were |
| 14 | produced to the Plaintiffs that demonstrate or listed how much |
| 15 | the Postal Service was paying for forms? |
| 16 | A   In the box of documents, I've seen copies of invoices |
| 17 | that were invoices for forms. |
| 18 | Q   That were being paid by the Postal Service? |
| 19 | A   Yes. |
| 20 | THE COURT:  How much longer you going to be on |
| 21 | direct? |
| 22 | MR. VALDEZ:  Your Honor, I guess another 20 minutes. |
| 23 | THE COURT:  Then we ought to take a break. |
| 24 | MR. VALDEZ:  I'm at a change of subject right now, |
| 25 | too. |

1        THE COURT:  Okay.  Let's do that.

2        THE DEPUTY CLERK:  All rise.

3        (A BRIEF RECESS WAS TAKEN.)

4        THE COURT:  Okay.  Dr. Kennedy.

5   Q    (BY MR. VALDEZ)  Dr. Kennedy, we're going back to your

6   report again, Defense Exhibit 32, page 6.  Page 6.  I'm sorry,

7   let's go back.  No. 5, incremental costs.  Are there any other

8   incremental costs that you believe were not taken into account,

9   any that we did not cover yet?

10  A    I think of the list that we've gone through, potentially

11  forms and postage, bank service, cost of bonds, the interest

12  on the postal deposits, I think there were one -- maybe one or

13  two other, that's all I can think of, not having totality of

14  what I would have liked to have seen in terms of financial

15  records to be able to investigate it.

16  Q    What would you have liked to have seen?

17  A    Books of original entry would have been helpful.

18       THE COURT:  What did you say?

19       THE WITNESS:  Books of original entry.  Detail

20  account analysis supporting each of the various expense

21  accounts that potentially could have been an avoided cost, any

22  documents related to contracts or agreements that would be

23  governing or driving the incurring of those costs.

24  Q    (BY MR. VALDEZ)  Well, you heard Dr. Kennedy, or Dr.

25  Abramson's testimony that you may not have found the bank fees

1   cost in the bank agreements, for instance, in Ascom's bank

2   management agreements.  Do you have a response to that?

3   A    Well, those bank fees would certainly be in bank

4   statements, and if we had copies of bank statements associated

5   with those accounts, it would be a very easy process to

6   accumulate what the costs were associated with those accounts.

7   Those weren't available, or at least I didn't -- I have not

8   heard anyone say that they were.

9   Q    Okay.  Going to No. 6 of your report on page 6 is the

10  Abramson report does not take into account factors that would

11  have affected the amount contained in the interest bearing

12  accounts, and I believe you're specifically referencing the No

13  Deposit Postage-on-call for Neopost?

14  A    Yes.

15  Q    And you heard Dr. Abramson's criticism about your

16  including that in this -- in this -- in your report in light

17  of the fact that we agree on what the numbers are attributable

18  to each meter manufacturer's customers?

19  A    Well, this report, remember, was written in response to

20  his original damages report, and in his original damages

21  report he included not only what he called past cost, but also

22  future cost, and he was forecasting costs to continue, I think

23  it was to the year 2025.  And there was no analysis conducted

24  in that element, in that section of his report on what changes

25  might be taking place or could be expected to take place that

1   would drive the dollars of Postage-on-call in the trust fund,

2   and clearly if businesses go to a no deposit arrangement,

3   which I believe was only briefly in existence before the

4   regulation change, you know, it would rule his forecast to be

5   out to 2025 highly speculative that those balances would be

6   continuing into that time period.

7   Q    Okay.  So, does it have application to the -- to his

8   present calculation of damages that only take the damages up

9   to the present?

10  A    It's not the same relevance to those past damages if he's

11  using balances that have been stipulated to, so it does not.

12  Q    Okay.

13          MR. VALDEZ:  Your Honor, at this time I am going to

14  preserve my objection on the settlement of the Pitney-Bowes

15  matter and I'm not going to go into the alternative damages

16  calculation on page 7.

17          THE COURT:  Okay.

18  Q    (BY MR. VALDEZ)  Now, Dr. Kennedy, do you have any --

19  based on your experience and training in both economics,

20  business valuation, accounting, and in your experience as doing

21  forensic and legal accounting, do you have any conclusions or

22  observations with respect to the validity, reliability or the

23  accuracy of Dr. Abramson's calculations, damages calculations?

24  A    Well, I do have an opinion about that.

25  Q    Okay.  And what is that opinion?

A    Everything I've read, everything I've heard in terms of his testimony, he performed no analysis or no investigation to determine whether any of the inputs in his calculations were reliable or valid.  There was, in my view, a complete lack of independence or objectivity or due professional care on his part.

I've heard him indicate that he's done the arithmetic accepting each of the pieces of the calculation. Except for interest rates he looked up on the internet, he took them from counsel without any further inquiry or investigation.

Q    And as an expert in this field, is that necessary that you do that?

A    I think you have an obligation to, if you're putting yourself forward as an expert in a financial matter, to make sure that the underlying data that you are using, there's a foundation for it, that there is validity and reliability to the data that you're using or that you've made inquiries broader than merely just the acceptance of a few pieces of paper and bits of information counsel gives you.

Q    And what effect did that have upon Dr. Abramson's calculations?

A    Well, the general effect is that he can't say with any degree of reliability that his opinion is valid.  You know, more specifically, there were a number of cases, instances in

```
 1   the calculation that I pointed out that weren't matters of

 2   judgment.  These are matters of errors in methodology that

 3   each one of them caused, in my opinion, his calculations to be

 4   overstated.

 5   Q   Okay.

 6           MR. VALDEZ:  I have nothing further, Your Honor.

 7           THE COURT:  Mr. Boyd.

 8           MR. BOYD:  Your Honor, if I may, just for planning

 9   purposes, I'm prepared to start and proceed for perhaps until

10   noon.  I would like to be able to talk to Dr. Abramson about

11   issues and develop that, and so I'm ready to use some of the

12   time up to sort of the normal lunchtime if you'd like me to do

13   that, or we could stop now and go ahead and have lunch and

14   then come back, whichever you'd prefer.

15           THE COURT:  Well, my preference, in view of our

16   normal schedule, I've got a 1:00 o'clock conference call.  It

17   would be to keep going for as long as you can without

18   conferring with your expert so that we don't take an

19   inordinately long lunch hour.

20           MR. BOYD:  Would you mind then, Your Honor, if I

21   just took five minutes right now, or -- Dr. Abramson, is five

22   minutes or ten just to do a little planning, and then I think

23   that will help us out?

24           THE COURT:  Is it -- you have any objection to

25   proceeding this way, Mr. Valdez, that we would try to get in,
```

1   you know, 20 minutes or half an hour or so and then take our

2   lunch break?

3           MR. VALDEZ:  I guess I could be a hard case and say

4   no, no, no, but no, I have no objection, Your Honor.

5           THE COURT:  And then I guess the other thing, when

6   we see how long it takes with your cross-examination, then

7   when we conclude, I would then normally ask the Government

8   whether they had any additional witnesses and then I would ask

9   you if you had any rebuttal, and that may -- that may put the

10  kibosh on our original plan for this afternoon.

11          MR. BOYD:  I hope not, Your Honor.  And if we had

12  anything in rebuttal, I'm sure it would be very short, but

13  again, I would need to talk to Dr. Abramson and sort of make

14  that decision soon.

15          THE COURT:  Okay.  So you want to take five minutes

16  and then come back and go for 20 or 30 minutes and then take

17  lunch.

18          MR. BOYD:  Sure.  Yeah.  I'll try to go as long as I

19  can as you suggested to get sort of closer to 1:00 o'clock so

20  that doesn't interrupt your call.

21          THE COURT:  All right.  As long as I can be out of

22  here by five to 1:00, I'm fine, but if you need to stop

23  earlier because it makes more sense, we'll do that.

24          MR. BOYD:  Okay.  Thank you.

25          THE COURT:  Take five minutes.

1        THE DEPUTY CLERK:  All rise.  This honorable court

2   is in recess for five minutes.

3            (A BRIEF RECESS WAS TAKEN.)

4                      CROSS-EXAMINATION

5   BY MR. BOYD:

6    Q   Good morning, Dr. Kennedy.

7    A   Good morning, Mr. Boyd.

8    Q   For another five minutes.  Let's get out Exhibit 32,

9   please, your report.

10   A   I have it.

11   Q   Oh, great.  And it's dated, as you noted, April 15, 2010,

12  correct?

13   A   Yes.

14   Q   When were you retained in this case?

15   A   From recollection, it's not a strong one, sometime in

16  2009, shortly after Dr. Abramson's report was issued, I

17  believe.

18   Q   So I believe his report is dated May 2009; do you

19  understand that?

20   A   Yes.

21   Q   Okay.  And your testimony is you were retained during

22  that time period?

23   A   I don't have a specific recollection when I was retained.

24   Q   His deposition was taken, I believe, in August of 2009.

25  Did you attend that deposition?

1    A    No, I did not.

2    Q    Were you retained at the time of that deposition?

3    A    I don't recall if I was or not.

4    Q    My -- I recall that you came to a hearing where the

5    motion to disqualify Dr. Abramson was heard.  That was in

6    March, I believe, of 2010.  Do you recall that?

7    A    That I do remember attending, yes.

8    Q    Had you been retained -- do you know how long before that

9    hearing you had been retained?

10   A    I don't.  I can't recall.

11   Q    But again, your testimony is it was sometime in 2009?

12   A    Best recollection, but I don't have that as a strong

13   recollection.

14   Q    Does it seem more likely that you were retained closer to

15   the motion -- the hearing where Dr. Abramson, that motion to

16   disqualify him was heard in March of 2010, does that seem more

17   likely to you?

18   A    No, not necessarily, but again, no specific recollection

19   of when I was retained.

20   Q    Do you have any of your correspondence or any records

21   here today with you that would help refresh your recollection

22   as to when you were actually retained by the Government?

23   A    I don't have any records or files with me, no.

24   Q    Do you know at the time of Dr. Abramson's deposition

25   there was a Charles Ross and a person inside the Department of

1    Justice who attended that deposition and he was noted as a

2    internal financial expert; do you recall that?

3              MR. VALDEZ:  Objection, Your Honor, relevance.

4              THE COURT:  It may or may not be.  You can answer.

5    A    I never heard the name that I can think of.

6    Q    (BY MR. BOYD)  Sir, I'll represent to you that this

7    Mr. Charles Ross sat in on Dr. Abramson's deposition in August

8    of 2009.  Is it your testimony that you never talked to this

9    Mr. Ross about this case?

10   A    No, I have not.

11   Q    Never heard of him?

12   A    Not until just now, I have not.

13   Q    Okay.  And your deposition was never taken in this case,

14   was it?

15   A    No, it was not.

16   Q    You supplied this report on April 15th, 2010.  Were

17   there any prior drafts of this report that you provided to the

18   Government counsel that you discussed and amended before you

19   submitted this as a final draft or a final report?

20   A    No, not that I can recall.  It wouldn't be normal

21   practice for me anyway.

22   Q    To have the lawyers comment on your draft and suggest

23   edits?

24   A    I may go through, you know, concepts, maybe read a

25   paragraph, but I don't recall any prior drafts, no.

1    Q    Okay.  And so at the time you prepared this report, you

2    had reviewed the documents that's on your list of documents

3    reviewed at page 10 and 11, correct?

4    A    Yes.

5    Q    And you had reviewed Dr. Abramson's report and

6    methodology, correct?

7    A    Correct.

8    Q    Okay.  Is there anywhere in this report where you state

9    that you lack sufficient financial information to express the

10   opinions that you set forth in this report?

11            MR. VALDEZ:  Objection.

12   Q    (BY MR. BOYD)  Did I make sense?

13   A    That's a really confusing question.

14   Q    You have certain opinions set forth in this report,

15   correct?

16   A    Opinions with respect to...

17   Q    Dr. Abramson's report.

18   A    Correct.

19   Q    And of course his report deals with the damages that

20   Plaintiffs claim in this case; is that fair?

21   A    Yes, that's fair.

22   Q    Am I correct, when I read your April 15th, 2010 report,

23   that nowhere in this report do you say, "I am unable to

24   express an opinion because I lack certain financial

25   information"?

1    A    I don't believe I say that in this report.

2    Q    Okay.  So you made no claim at the time you wrote this

3    report that you needed any further information from the

4    Plaintiffs in this case in order to express your opinions,

5    correct?

6    A    No, because the opinions I was asked to express were

7    opinions as to Dr. Abramson's report opinion of damages and

8    calculations contained therein, so that was what I was asked

9    to do.

10   Q    And you needed no further documents in order to reach

11   those opinions or comments, correct?

12   A    Well, as I said earlier, there were certain deficiencies

13   in terms of the data available, and I pointed out with respect

14   to his calculations, he did no investigation to see what was,

15   you know, below the level of selected pieces of paper.  I had,

16   apparently, a lot more pieces of paper than he did on

17   financial records, and there is still some areas of

18   calculation that, you know, he did no investigation of and I

19   see no basis for.

20   Q    My point, Dr. Kennedy, is you filed a declaration or

21   affidavit at or about February 21st, 2012 in which you

22   stated that in order to do an appropriate damages analysis,

23   you needed certain further financial information that the

24   Plaintiffs had not provided.  Do you recall providing that

25   affidavit in this case?

1    A    Yes.  Or declaration?

2    Q    Or declaration.

3    A    Yes.

4    Q    And my point is, none of the points you raised in that

5    declaration only three weeks before the trial were raised in

6    your report of April 15th, 2010, correct?

7    A    They were two different documents making two different

8    points.

9    Q    Okay.  Do you know discovery in this case closed in

10   August of 2009?

11   A    I don't know specifically what date.

12   Q    Do you believe you were retained prior to the close of

13   discovery or after the close of discovery?

14   A    Well, you asked me a minute ago if I had any documents

15   with me that might refresh my memory, and I don't have any

16   documents with me.  What I do know is that I was originally

17   retained on this engagement when I was a partner with Anders,

18   Minkler, Diehl, a CPA firm in St. Louis.

19   Q    Okay.

20   A    Through a referral of a CPA colleague here in Washington,

21   and I was with the firm through the end of Calendar Year 2009.

22   Q    Okay.

23   A    And then I joined FTI in 2010, so I was working on this

24   out of my St. Louis office, so I was working on it in 2009.

25   Q    Thank you.

1   A   Where within that calendar year was the starting date, I

2   have no recollection.

3       THE COURT:   But we do know that you did not attend

4   Mr. -- Dr. Abramson's deposition in August of 2009.

5       THE WITNESS:   I didn't attend the deposition, no.

6   Q   (BY MR. BOYD)   Do you recall being asked to attend that

7   deposition or declining to attend that deposition?

8   A   No recollection of either.

9   Q   Okay.   And again, if I told you somebody named Mr. Ross,

10  who was identified as a financial expert for the DOJ attended

11  the deposition, you, again, have no recollection of ever

12  speaking to him or who he is?

13  A   Correct.   No idea of who he is and have not spoken to

14  him.

15  Q   Dr. Kennedy, I want to draw your attention to this point

16  about the trust fund balances that has been raised.   You

17  understand that the parties have stipulated and agreed in this

18  case that the closing balances set forth in Mr. -- or Dr.

19  Abramson's report represent funds belonging to Plaintiffs'

20  customers on deposit with the United States Postal Service on

21  the dates referred to in the Appendix B and C and above for

22  purposes of said customer's use of Plaintiffs' computerized

23  meter resetting systems.   Do you understand that?

24  A   What I understand is the balances were stipulated to.   If

25  you're reading from the stipulation, I don't know I've

1    actually seen the specific stipulation.

2    Q    Okay.  And you had some testimony earlier, I believe,

3    where if I can put it in the judge's words, are you under

4    some -- do you have some sort of opinion that some portion of

5    those balances are not interest earning accounts -- I'm sorry,

6    interest earning funds?

7    A    I testified to what I understood, which was that those

8    were DBAR balances and that there was the obligation or

9    requirement to set aside at least an average daily resetting

10   amount and that average daily resetting amount may or may not

11   necessarily be interest bearing.  And then you jumped up and

12   objected, so I'm not sure of that answer to your question.

13   Q    So is it your point that you think that set aside comes

14   from the customer's funds in the trust -- in the trust

15   account?

16   A    That's my belief, yes.

17   Q    What's that belief based on?

18   A    Conversation with counsel, listening to testimony,

19   general understanding of the way the CMRS system and process

20   works and the resetting, and then that number, that dollar

21   becomes U.S. Postal Service sale of postage.

22   Q    I just want to ask you, the testimony, what testimony are

23   you relying on, just so we're certain of that.

24   A    It's been a long week-and-a-half.  I'm not recalling

25   which one it is.

1    Q    You have no recollection of where that came from, as you

2    sit here today?

3    A    Correct.

4    Q    I'm going to put before you what we've marked as

5    Defendant's Exhibit 1.  And I've turned a couple of the last

6    pages sideways because I want to direct your attention to that

7    particular page, and it's 211 at the bottom of --

8         THE COURT:  This is the --

9    Q    (BY MR. BOYD)  DMM, the Domestic Mailing Manual effective

10   March 18, 1990, and at the bottom right-hand corner of the page

11   I'm interested in, it says "211," and it has "144.975" at the

12   top.

13   A    Yes, I'm there.

14   Q    Okay.  And let's look at the right-hand column and let's

15   look at the paragraph that says "144.971, deposit with Postal

16   Service."  Do you see that?

17   A    I do.

18   Q    And that says, (reading)  Each manufacturer leasing

19   meters equipped with computerized resetting equipment shall

20   maintain on deposit an amount to be held in a Postal Service

21   account which represents the average daily postage set on

22   these meters during the most recently concluded Postal Service

23   accounting quarter.

24        I'll stop right there.  This particular paragraph

25   says that the manufacturer shall maintain on deposit, correct?

1    A    Yes, it does.

2    Q    It does not say the customer shall maintain on deposit,

3    does it?

4    A    It says "manufacturer."

5    Q    Right.  And you understand, of course, under the CMRS

6    system, that the meter manufacturers have no access to the

7    funds that the customers put in the trust accounts other than

8    to pay for postage or to pay them a refund.  Do you understand

9    that?

10    A    I do.  That's part of these regulations, I believe.

11    Q    Okay.  So does this help you understand that any deposit

12    that must be set aside comes from the manufacturer and not

13    from customer funds?

14    A    Well, that's clearly what that says.

15    Q    Okay.  Let's go through your report, if we can.  Num- --

16    and I'm going to turn to page 3, and we'll just go through

17    each of the points.

18          And the first one is, Abramson failed to verify or

19    determine the accuracy of the underlying data used to

20    calculate his damages.  You noted in your direct testimony

21    that that's subject to stipulation, correct?

22    A    At the time that I prepared this report, which was

23    discussing his first report, he had done nothing to determine

24    the validity or reliability of those balances.

25    Q    Well, the balances have now been determined to be valid

 1   and reliable, would you agree?

 2   A    Well, there, what I understand to be DBAR balances and

 3   what is contained in that DBAR balance would still be a

 4   question that I would think as an expert he should have made

 5   inquiries about.

 6   Q    Do you have any inquiries or issues that any of the DBAR

 7   balances represent anything other than customers' funds on

 8   deposit with the United States Postal Service's for purposes

 9   of said customers use of Plaintiffs' computerized meter

10   resetting systems?

11   A    I don't know because I haven't seen the documentation to

12   know what comprises those DBAR balances.

13   Q    So you've made no inquiry, correct?

14   A    I have not.

15   Q    Okay.

16           THE COURT:  But again, this point has been

17   emphasized a couple of times, I guess.  These three paragraphs

18   under No. 1 were all written before the stipulation was

19   entered into between the parties.

20           THE WITNESS:  That's correct.  These were written --

21   I don't know when the stipulation, but a year or more before.

22           THE COURT:  Okay.

23   Q    (BY MR. BOYD)  And I understand that, and you understand

24   that I just asked you whether as you sit here today you have any

25   question about the reliability or validity of those balances,

1   and I believe your answer was not as you sit here today and

2   you've done no inquiry, correct?

3   A    And I've done no inquiry as to what's comprising those

4   balances.

5   Q    Right.  In your testimony, one of the things you said

6   was, you know, Dr. Abramson just performed some arithmetic,

7   right?

8   A    Yes.

9   Q    Okay.  So, let's look at his -- Well, let's go ahead and

10  look at his supplemental report if we can.

11            THE COURT:  Which is?

12            MR. BOYD:  That is Plaintiffs' Exhibit 188.

13  Q    (BY MR. BOYD)  And do you understand, Dr. Kennedy, that

14  Plaintiffs' theory of damages in this case is that it could have

15  earned interest off the balances of its customers in the trust

16  fund and that its calculation of damages is based on the

17  interest that could have been earned?

18  A    I would infer that from the reports Dr. Abramson has

19  prepared, but that's not quite consistent with what I read as

20  the language in the complaints of the two Plaintiffs.

21  Q    Well, let's take my statement as the theory of damages of

22  Plaintiff in this case, okay?

23            MR. VALDEZ:  Objection.

24  Q    (BY MR. BOYD)  For purposes of my questioning.

25            THE COURT:  Mr. Valdez.

1          MR. VALDEZ:  Lack of foundation if it's diverse from

2     the complaint in the case.

3          THE COURT:  Well, if it's diverse from the complaint

4     or any agreement that you-all have reached or any -- any -- I

5     can't remember what you-all -- you didn't reach an agreement,

6     but there was some representation made by the Plaintiff that

7     the damages sought are not exactly as set forth in the

8     complaint.

9          MR. BOYD:  Well, I mean, we have a disagreement

10    about how we read the complaint, and some of the things that

11    are set forth therein are not being sought at the end of the

12    day.  That's what I would say.

13         THE COURT:  The question is whether or not you're

14    asking Dr. Kennedy a hypothetical question or whether or not

15    you're asking him a question which really is based on the

16    damages that are being sought in the case, regardless of

17    whether it's directly from the complaint or as modified by

18    agreement or commitment on the part of the Plaintiff.

19         MR. VALDEZ:  Thank you for articulating it better

20    than I did, Your Honor.

21         MR. BOYD:  Let me try to rephrase then.

22    Q    (BY MR. BOYD)  I want you to go to the supplemental report

23    of Bruce Abramson.  And based on that supplemental report, do

24    you understand that his calculation of damages is at least in

25    part based on the interest that he believes could have been

 1  earned on the funds that Plaintiffs claim should have been in

 2  the trust account?

 3  A   You mean that's what he's doing in this?

 4  Q   Yes.  Right.

 5  A   Trying to calculate an interest number.

 6  Q   And you would agree that these balances, if they were in

 7  a trust fund that paid interest, that there should be some

 8  interest calculation that an accountant or an economist could

 9  do that would generate a figure based on that interest rate,

10  correct?

11  A   That's fairly simple, yes.

12  Q   That would be a simple way to do it.  And indeed, in this

13  case, wouldn't you agree that as part of Plaintiffs' damages,

14  they could simply take this stream of interest that was

15  generated through the application of an interest rate and

16  claim that as the revenue that was lost from the diversion of

17  the trust accounts?

18  A   Well, that's my understanding of what's being done.

19  Q   Well, my point is, Dr. Abramson takes it one step further

20  and he discounts the monies back to January 1st, 1996,

21  rather than simply calculating the interest that could have

22  been earned on the accounts and bringing them forward to I

23  think the last date he calculates is December 31st, 2011,

24  correct?

25  A   I'm in agreement on the dates.

1   Q   Okay.

2   A   I didn't hear a question, though, other than that.

3   Q   There was one way back.  Let me try to get -- move it

4   forward as I'm trying to do here.

5          My point is, as far as calculating the revenue

6   stream from these accounts, it's as simple as taking the

7   interest rate and figuring out what interest that would

8   generate and then applying that to the balances and you come

9   out with a total interest that could be generated on these

10  accounts.

11  A   The way you described it, as I understand the way you

12  described it, I would have to disagree with that.

13  Q   What is it you disagree with?

14  A   I'm not sure if it was the way you said it or the way you

15  were waving your hands implying moving dollars across a

16  timeline.

17  Q   I apologize, Dr. Kennedy.  I'm not distracting.  You want

18  me to try again?

19  A   Yeah, please do.

20  Q   Okay.  There were funds in the trust account, and you've

21  agreed that certainly one thing that would be appropriate, if

22  that was an interest bearing account, we could apply the

23  appropriate interest rate and you would agree that those funds

24  are going to generate interest?

25  A   That's fairly simple, yes.

1   Q   And those -- you simply can take the daily balance and

2   the applicable interest rate, generate the interest and you

3   can add those up and that is a figure that represents, given

4   that interest rate you applied, the revenue that would be

5   drawn from those accounts.

6   A   If you're merely adding them up after applying a daily

7   interest rate, that would be the interest total.

8   Q   Okay.  And my point in this case is that we could simply

9   take these balances, apply the appropriate interest rate,

10  whatever that might be, and take that revenue and just add

11  those amounts up from 1996 to December 2011, and that would

12  represent the revenue that could have been generated from

13  those funds under that applicable interest rate if they would

14  have been in the trust fund, correct?

15  A   There were a lot of "ifs," but that math would work, yes,

16  sir.

17  Q   Okay.  Very good.  And my then next point is that Dr.

18  Abramson took that one step further, at least.  And he,

19  instead of picking the December 2011 date as sort of the date

20  upon which the injury occurred, he chose a date back in the

21  past, January 1st, 1996, correct?

22  A   Yes.

23  Q   And when he did that, he -- that revenue stream that we

24  just discussed, that was reduced by the discount factor,

25  correct?

1    A    By what he described as the company's cost of capital.

2    Q    And no matter what discount factor he would have used,

3    that number is less than the number that would have been

4    calculated if you would have kept the money at

5    December 31st, 2011, because it's been discounted?

6    A    Well, keeping the money at 2011 is subtly different than

7    what we talked about just a couple of questions ago where you

8    asked me if you apply an interest rate and merely add them up.

9    I'm not sure which one of us said that first, but that's

10   different than compounding or accumulating to December 31st

11   of --

12   Q    No, I understand.

13   A    -- 2011.  Well, your question wasn't clear to me, and I'm

14   sorry --

15   Q    You could do that, too.  You could compound it as well as

16   just bring it forward if you decided to do that?

17   A    Well, compound it or calculate a future value of it.

18   Q    All right.  Okay.  So, my question is simple.  If you

19   would have done that and either compound it or not, whatever

20   you would have done, you would have had a number of as

21   December 31st, 2011 that represented a revenue stream,

22   correct?

23   A    It might have represented an aggregate revenue.

24   Q    Okay.  And my point is, if you apply a discount factor,

25   whatever that may be, to that number, to discount it back to

1   what it would have -- what the equivalent dollars would have

2   been in January -- on January 1st, 1996, that's going to --

3   that figure is going to be less than the December 31st, 2011

4   figure.

5   A   If you're applying a discount rate to a cash value.

6   Q   To a number.

7   A   To a number.  Better said.  Thank you.  You're applying a

8   discount rate to a number for purposes of expressing it as an

9   equivalent dollar value at an earlier point in time, then as

10  long as the discount rate is greater than zero, the number

11  that you've expressed at the earlier point in time would be

12  lower.

13  Q   Okay.  And as you sit here today as an economist, do you

14  understand why, other than it's a lower number, Dr. Abramson

15  choose January 1st, 1996 as the date of injury?

16  A   I heard his testimony around that date, plus or minus a

17  couple of months, is when the regulations changed and

18  Plaintiffs were no longer receiving interest from those trust

19  fund balances.

20  Q   Do you have any reason, as you sit here today, why the

21  Plaintiffs could not have chosen December 31st, 2011 as

22  their date of injury?

23  A   I would consider that a legal question.

24  Q   Okay.  You don't know any economic reason that would

25  require Dr. Abramson to discount these funds back to

1    January 1st, 1996, correct?

2    A    Well, what we're generally taught as valuation and

3    financial experts is that you look at in making the Plaintiffs

4    whole at the date of injury, so if the -- if you're claiming

5    that the date of injury was when the regulations changed, then

6    approximately taking place in January of 1996, then that would

7    be the day of the calculation to make whole, but that's what

8    we're trained as financial experts.  I don't know what the --

9    what the law is in terms of where you get to pick your date of

10   damages.

11   Q    So you think it's a legal question.  If the law says you

12   have to peg your damages to the date of injury, you need to do

13   so, but if the law says you can just simply put up what your

14   damages are as of X date, before a trial, then it's not in

15   your bailiwick, I guess is what I'm saying.

16            MR. VALDEZ:  I'm sorry, Judge.  Objection.

17            THE COURT:  I'm not sure that's what he said.

18            MR. BOYD:  I got lost.  I apologize.

19            THE COURT:  I think what he said was, your original

20   question was, do you have any idea why they chose January 1,

21   1996, and I think his answer was, you know, in his field, we

22   try to make the Plaintiffs whole as of the date of injury, and

23   that's why to him the date the regulations went into effect

24   made sense because that's what everybody's talking about is

25   the date of injury, so it makes sense to him.

1        He isn't saying that alternatives, either legal or

2   economic, might not also make sense.  Is that fair?

3        THE WITNESS:  Well said, Your Honor.  Thank you.

4   Q    (BY MR. BOYD)  Okay.  Okay.

5        THE COURT:  And we all know, from what Dr. Abramson

6   said, that he picked January 1, 1996, a date before the new

7   regulations went into effect just because it's easier to do

8   calculations on a year basis rather than, you know, a few

9   months in this year and then another year as well, and you

10  don't quibble with that as a judgment once you start it with

11  the regulations as a touchstone.

12       THE WITNESS:  No, I don't.  I don't.  You're right.

13  Q    (BY MR. BOYD)  Okay.  So, Dr. Kennedy, when I look at your

14  report, I don't see that you applied any interest rate to these

15  balances, did you?

16  A    That wasn't what my report was intended to do, that's

17  correct.

18  Q    And so despite your agreement that an interest rate could

19  be applied to these balances to generate the interest that

20  could have been earned on the trust account, you didn't select

21  any interest rate, such interest rate in your report, nor did

22  you try to calculate what that interest would be, correct?

23  A    That's correct.

24       THE COURT:  And you didn't pick a discount rate

25  either.

1          THE WITNESS:  There's a lot of language in my report

2     on the discount rate where I talk about the authoritative

3     sources that we used, which is the Ibbotson's Stocks, Bonds,

4     Bills & Inflation Yearbook, and the core cost of equity in

5     that data source for the S&P 500 is in the range of 10 to

6     12 percent for small cap companies.  There's another

7     approximately 600 basis points, so the starting spot for a

8     cost of equity would be, what's that going to be, 16 to

9     18 percent.

10         And then experts can add company specific risk

11    premiums on top of that.  I didn't include any discussion of

12    the company specific risk premiums in my report.

13    Q    (BY MR. BOYD)  So let's move on.  We're still on page 3

14    but we're going to move on to subsection 2 where you state,

15    "Abramson performed no analysis on the appropriateness of using

16    a 1-Year U.S. Treasury rate to calculate damages."  Do you see

17    that?

18    A    I do.

19    Q    Now, you understand that Dr. Abramson was constructing a

20    model here rather than something that happened in the real

21    world, correct?

22    A    I'm not sure I know what you mean by that.

23    Q    Well, he was modeling what would have happened in the

24    "but for" world had the trust funds not been diverted to the

25    Postal Service?

```
 1    A    Well, for a financial expert to do a proper analysis of
 2    damage in the "but for" world, all of the variables that
 3    you're using in the "but for" world should mirror some reality
 4    or should reasonably approximate what that "but for" world
 5    would actually look like, and that's the basis of this
 6    criticism here.  He didn't do that at all.
 7    Q    Well, I guess my point is, if you look at the second
 8    paragraph under subsection 2, you say, (reading)
 9    Additionally, the Abramson report contains no analysis
10    regarding the Plaintiffs' ability to invest the CMRS trust
11    account in 1-Year U.S. Treasuries.  According to 144.975(f) of
12    the United States Postal Service Domestic Mail Manual, you
13    quote, The manufacturer must not have access to funds on
14    deposit at trustee banks except for refunding trust account
15    deposits to customers and transferring payment for postage to
16    USP accounts.
17              Do you see that?
18    A    Yes, I do.
19    Q    And so -- and I'm sorry, then you go on to say, (reading)
20    Based on these regulations, the Plaintiffs would not have had
21    the ability to invest the CMRS trust account in, quote, long
22    term, quote, investments such as a 1-Year U.S. Treasury
23    security and thus could not have realized such rates of
24    return.
25              Do you see that?
```

1    A    I do.

2    Q    And my question is, do you understand that Dr. Abramson

3   was not saying in his report that they would actually invest

4   in 1-Year Treasuries but he was using that as a conservative

5   benchmark for the rate of return that they could have achieved

6   in with a private bank in a trust account?

7    A    Well, I heard him say lower bound, and you just asked me

8   conservative, but if the one-year term is too long and it

9   should have been a shorter term and he did no investigation in

10  terms of the churn of the balances in that account to

11  determine, then no, this wouldn't be conservative.  And in

12  fact, it may be too high and overstating it, and that's my

13  point of this section in my report.

14   Q    My point, Dr. Kennedy, is you don't know the answer to

15  those questions that you just raised, correct?

16   A    Well, I have other evidence that I've looked at,

17  including the instructions to Comerica Bank that they're to

18  distribute the interest on a monthly basis and the discussion

19  I got in the very next paragraph about review of the

20  Plaintiffs' financial statements where I'm not seeing those

21  funds being accumulated on their side of the ledger, if you

22  will, and invested for a year.  So, I'm just not seeing that

23  time horizon or that term, and that's my challenge to Dr.

24  Abramson's choice of that term.

25   Q    I understand that.  But let's go back to the interest

1    rate that was used.  I think your point is that he should have

2    used a shorter term interest rate and that that shorter term

3    interest rate would have been lower than this one-year rate

4    that he used; is that fair?

5    A    I'm suggesting that he should have used -- I think I even

6    say that.

7    Q    I agree.

8    A    Okay.

9    Q    And my point is, you, as you sit here today, you don't in

10   fact know that that shorter term rate was lower than this

11   longer term rate during the period in question, correct?

12             MR. VALDEZ:  Objection.  He's already testified to

13   that when we talked about the inversion.

14             THE COURT:  I think it's a fair question.  You can

15   answer it if you remember it.

16             THE WITNESS:  No, I do.  I do.

17   A    Yeah, it was the same discussion that I gave earlier

18   about Dr. Abramson's testimony about the inverted yield curve

19   occurring approximately a third of the time during the time

20   period that this was occurring.  And I'll add to my discussion

21   from this morning, you know, an inverted yield curve is a

22   snapshot on a particular day of what are the yields on

23   treasury, U.S. Treasury instruments of different maturities,

24   from 90-day bills, one year, five year, ten year, out to the

25   20 and the 30.  And so an inverted yield curve can occur when

1   the 20- and 30-year bonds are trading at a rate lower than the

2   short-term bonds, generally because of federal reserve

3   intervention on the short end of the yield curve.

4          But just to make a statement that the yield curve

5   was inverted doesn't -- still doesn't tell us if the one-year

6   rate was lower than the 90-day rate.  That doesn't tell us

7   that.  It tells us that the 90-day rate is higher than the 20-

8   and 30-year rate.  So even with his research that the yield

9   curve was inverted a third of the time doesn't give us

10  information to say that this one-year rate was in fact lower.

11  Q   Do you agree with him that the yield curve was inverted a

12  third of the time over this time period?

13  A   I don't agree --

14          MR. VALDEZ:  Over which -- I'm sorry, over which --

15  compared to which he talked about 20 years versus one year

16  versus five years.

17          THE COURT:  Yeah.

18  Q   (BY MR. BOYD)  As you described -- Well, I'm asking you

19  about Dr. Abramson's testimony, and you may use your

20  understanding of the inverted yield curve as you've just

21  described it.  Do you agree with his testimony that a third of

22  the time there was an inverted yield curve?

23  A   I'm not in a position to agree or disagree because I

24  didn't look at the yield curve over that span of time to know.

25  Q   And as you sit here today, do you know whether a third of

1  the time the one-year rates were in fact -- let me get this

2  right, lower than the short-term rates during this -- during

3  the applicable time period?

4  A   I didn't take a look at that.  I don't know.

5  Q   You don't know one way or the other?

6  A   That's correct.  As I said in my report, as a generality

7  that's true a majority of the time, the shorter the term of

8  the instrument, the debt instrument, the lower the rate.

9  Q   But you understand, and again, we can use your

10  definition, that sometimes, and certainly during this time

11  period that we're talking about, there was an inverted yield

12  curve, do you agree, 1996 to 2011?

13  A   Thank you.  I don't know that.

14  Q   You don't know one way or the other?

15  A   Right, I don't.

16          THE COURT:  Hold on one second, Mr. Boyd.

17          COURT REPORTER:  I have technical issues, Judge.

18          (PAUSE.)

19          MR. BOYD:  I had told the court reporter that I

20  would try to stop around 12:30.  I'm happy to stop now, Your

21  Honor, and come back in an hour or whenever you'd like us to

22  come back.

23          THE COURT:  You want to come back at 1:45?

24          MR. BOYD:  That's fine.

25          THE COURT:  Is that all right with everybody?

1          MR. VALDEZ:  Yes, sir.

2          THE COURT:  Okay.  So it's 12:35 now, so we'll try

3  to start up again at 1:45.

4          THE DEPUTY CLERK:  All rise.

5          (A LUNCH RECESS WAS TAKEN.)

6          THE COURT:  Okay, everyone.  Mr. Boyd.

7                CROSS-EXAMINATION (CONT'D.)

8  BY MR. BOYD:

9  Q   Dr. Kennedy, if we may, could we move to page 4 of your

10  report, and that's subsection 3 where you say, (reading)  The

11  Abramson report assumption that interest would accumulate, be

12  compounded, and be withdrawn only once a year is inconsistent

13  with the facts and overstates the calculated damages.

14          Do you see that?

15  A   Yes.

16  Q   And you base this on your review of the financial

17  statements of the company; is that right?

18  A   I think I talked about two different dimensions of this.

19  One was the instructions that the interest be paid out

20  monthly, and second, I did a fairly detailed description and

21  discussion of the financial statements of the two Plaintiff

22  companies.

23  Q   If the money is withdrawn from the account on a monthly

24  basis and put into operations, would you agree that that's an

25  investment in the business?

```
 1   A   No, not necessarily.

 2   Q   Why not?

 3   A   Well, an investment in the business would be, in my world

 4   as a CPA and financial expert, capital spending.

 5   Q   Careful?

 6   A   Capital.

 7   Q   Capital spending.

 8   A   Capital spending.  Capital budgeting, capital spending.

 9   What I can see from review of these financial statements is

10   this was used as part of the operation, working capital, if

11   you will.

12   Q   Does the company get a return on -- an internal rate of

13   return based on what it spends on operations or for working

14   capital, does it get a return on that?

15   A   It's just part of the operating expenses and income of

16   the business.  I'm not quite sure what you're asking me in

17   terms of return on working capital.

18   Q   Well, the income certainly is part of the internal rate

19   of return.  That's an element of it, correct, the income the

20   business makes?

21   A   Well, no.  You're really misusing or mismatching

22   terminology.

23   Q   I apologize.

24   A   The internal rate of return would be a return generated

25   on capital spending projects.  The return as in profit return
```

1   on sales or profit expressed as a percentage of the equity of

2   the company, return on equity, that's a very different concept

3   than internal rate of return.

4   Q   You say these -- these monies that were withdrawn monthly

5   were spent on operations.  Could they have been spent on

6   capital investments as well?

7   A   They perhaps could have been.  We didn't have sufficient

8   documents to know, to trace, which I would have liked to have

9   done, trace the cash in and cash out particularly on these

10  investment earnings.

11  Q   So, as you sit here today, you're not sure whether the

12  monies that were taken out of the account from interest income

13  was spent on operations or capital investments, as you called

14  them?

15  A   Well, what I can see by review of the statement of cash

16  flows is there's operating cash flow, investing cash flow and

17  financing cash flow.  I see that in particular in for Neopost

18  in the 2000 -- January 31st, 2004 year end, there was no

19  increase in cash at all, very little in 2005.

20  Q   I thought you corrected yourself earlier to refer to the

21  1994 and 1995 period.  Is that right, or you -- do you mean

22  2004 and 2005?

23  A   The fiscal years ended January 31st, 2005 and

24  January 31st, 2004, so the reference to '5 and '4 would be

25  11 months of calendar year preceding, so '4 and '3 would be

1   the calendar years.

2   Q   And certainly during both those years, Neopost did not or

3   Ascom did not receive the interest income that they're

4   claiming they should have received in this case, correct?

5   A   No.  Those are the two years that immediately preceded

6   the regulation change, so...

7   Q   You do mean 1994 and 1995?

8         THE COURT:  Are you saying 2003 and 2004?

9         THE WITNESS:  I do mean 19' -- Yes.

10  Q   (BY MR. BOYD)  I thought I was drawing your attention to

11  that.

12  A   I appreciate that.  I didn't take the signal from the

13  first base coach.

14  Q   All right.  Don't trust me, but I was trying to draw your

15  attention to the 1994, 1995.

16  A   1994, 1995.  I need to write that on the back of my hand.

17  Q   Okay.  So I apologize.  So my question was, I thought you

18  said, "I didn't have enough documentation to determine whether

19  these monies were spent on capital investments or on

20  operations."  Is that correct?

21  A   I've said a couple of things.  I can see from the

22  financial statements of the company that they clearly weren't

23  being retained in an investment account that would be earning

24  compounded interest for the entire year.  That's very clear

25  from the review of those financial statements.

1    Q    Okay.

2    A    In the statement of cash flow, as I said, there's

3    operating cash flow, investing cash flow and financing cash

4    flow.  Whether these receipts were applied to working capital

5    and operations, whether they were applied to capital spending,

6    whether they were applied in the financing category for some

7    subsidy of debt reduction, you need to have more detail level

8    of financial information below the level of those financial

9    statements to decipher that.

10   Q    Okay.  If they were spent on -- if they were spent on

11   capital investments, then would you agree that the internal

12   rate of return of the company would be a appropriate measure

13   of the return on that investment?

14   A    No.  And it's a standard premise in corporate finance,

15   you need to separate the financing decision from the investing

16   decision.  Those are two separate decisions, and that's why

17   when we look at any type of project for a company, you would,

18   you know, make sure that you're separating those, you're not

19   specifically identifying this dollar to that project, too.

20   Q    So what is the term you would use for the rate of return

21   if you're investing these monies in capital expenditures?

22   A    The return on investment.

23   Q    Return on investment, okay.  And do you know what the

24   return on investment was for Neopost during the time period?

25   A    I've seen some analysis in the documents that I've looked

1    at, and they were -- it looks like an analysis of what it

2    would take in terms of pricing to receive a specific return on

3    equity, and they were targeting a 20 percent return on equity.

4    Q    Okay.  And 20 percent -- Oh, I'm sorry.  Are you

5    finished?

6    A    Just to clarify.  Return on equity is a specific term

7    that would be net income divided by the book value of the

8    shareholder equity.  So this was the analysis that I was

9    seeing.  In terms of the return on investment, I don't know

10   that I -- I don't recall anything in the papers that I've seen

11   that they gave that.

12   Q    So you don't know what the return on investment was?

13   A    I don't recall seeing anything in the papers that talked

14   about that, in the documents.

15   Q    So certainly it could have been higher than the 1-Year

16   Treasury rate used by Mr. -- Dr. Abramson in his report,

17   correct?

18   A    Could have been higher, could have been -- I don't know

19   what that number was.  You know, the point that I was making

20   here was that he was assuming that it was compounding at a

21   treasury rate, and my point is, I don't see where there's any

22   basis for compounding because the money wasn't set aside and

23   held for a year.

24   Q    And my point is, if we instead considered that this money

25   was invested in the business, and trying to use your terms,

1   that it was invested for capital investments, that that rate

2   of -- rate of return -- Now, I've lost the term you just used.

3   You don't know -- I guess what I'm saying is you don't know

4   whether it's higher or lower than the treasury rate as used by

5   Dr. Abramson.  Whether it would have provided more return than

6   the compounded Treasury rates used by Dr. Abramson, you don't

7   know one way or the other, that's my point; is that correct?

8   A   I didn't do a calculation of their internal rates of

9   return on their capital projects, that's correct, nor did I do

10  a calculation of the return on their working capital, but I

11  can tell you that the return on working capital is

12  substantially lower if you're setting out to do those kinds of

13  calculations.

14  Q   You -- what was the 20 percent return on equity, is that

15  what you say they --

16  A   What I recall seeing was -- looks like it was some

17  scenario analysis possibly on different pricing strategies

18  that stated in the buildup that it was, you know, doing some

19  calculations to see based on those, as I recall, pricing

20  scenarios, what their -- what it would take to generate a

21  20 percent return on equity.

22  Q   And as you sit here today, if we compared a 20 percent

23  return on equity to the compounded treasury rates that

24  Mr. Abramson used, is that rate of return higher than the

25  compounded treasury rates that Dr. Abramson used?

1   A   Well, it's apples and oranges, but 20 percent is higher

2   than the treasury rate that he used, but that's not really

3   relevant to the comment that I made in my report.

4   Q   And as I look at your report, I don't see that you

5   provided any alternative calculation to be juxtaposed against

6   Dr. Abramson's accumulation of and compounding of the

7   interest; is that correct?

8   A   That's correct.

9   Q   Can we move on to paragraph 4 at the top of page 5,

10   please.   This is where you discuss the discount rate.

11         Do you see that?

12   A   Yeah.

13   Q   And I note, again, you don't provide an alternative

14   discount rate in on -- on page 5 or page 6 for the judge to

15   consider, correct?

16   A   Actually I do at the last paragraph of page 5.

17   Q   And what is that rate that you provide?

18   A   Well, this is a discussion about the company's weighted

19   average cost of capital, the concept that if you're

20   calculating a cost of capital, you need to consider both the

21   cost of borrowed funds and the cost of shareholder funds, and

22   I'm describing what was information taken out of the -- if

23   it's in stocks, bonds, bills and inflation yearbook, which is

24   where all valuation experts go to derive their cost of capital

25   for companies that aren't publicly traded.

1    Q    Right.

2    A    And the S&P average return, historically, for the S&P 500

3    is 10 to 12 percent.

4    Q    That's the cost of equity, correct?

5    A    Which would be the cost of equity, that's correct.

6         And what you do in developing a cost of equity for a

7    particular company that you're analyzing is the next step is

8    you take a look at its size, is it smaller than an S&P 500.

9    In other words, is it a small cap company, and the -- if it's

10   in -- data is divided into deciles, so you can actually look

11   at the market cap through ten deciles down to the smallest

12   public companies.  This is called public company data that are

13   being accumulated here, and for those smaller companies

14   there's another, what is it, about 600 basis points of

15   discount rate, if you will, that's added to the cost of equity

16   due to the size and what's implied or assumed to be the

17   additional risk of a smaller company versus a S&P 500 company.

18        And then I go on to say that when you bring that

19   together, that would give you an equity cost range of 16 to

20   18 percent, and applying those debt cost and the equity cost

21   to the capital structure of the business, which I've talked

22   about, you start with the balance sheets, there is equity on

23   those balance sheets.  And you blend them together and I make

24   the comment that they would be substantially higher than the

25   8.2 percent that he's used.

1   Q   Okay.  And my point is this, on the top of page 5, I

2   think contrary to your last statement, you actually say

3   explicitly, (reading)  Although I could recalculate the

4   Abramson analysis using a more appropriate discount rate that

5   reflects the Plaintiffs' cost of capital because of all the

6   other errors and issues of the Abramson's damages'

7   calculations noted herein, a determination of revised damages

8   cannot be calculated with any reasonable degree of accounting

9   certainty.

10          Do you see that?

11   A   I do.

12   Q   And so my point is -- I guess it's a little different

13   point, so let me go back to the paragraph, the bottom of page

14   5.  You say in the second sentence, a company's WACC is a

15   blend of a company's cost of long-term debt financing,

16   adjusted for taxes and its cost of equity capital, and then

17   you discuss what you believe the cost of equity capital are in

18   a general sense, not specifically for this company, but then

19   you provide no blend to determine and set forth what the

20   actual WACC is; is that correct?

21   A   That is correct.

22   Q   Okay.  And then since you didn't do that, you tell the --

23   I'm sorry.  The report states on page 6 that you say I could

24   have recalculated the Abramson analysis but I decided not to

25   because of all the other errors that I found.

1          Is that fair?

2     A    Yeah.  I mean, it would have been a simple mathematical

3     exercise if I accepted everything else he had done, including

4     the numbers that he had and merely applied a 16 percent

5     discount rate instead of an 8, that's a math exercise.

6     Q    So you provided no alternative discount rate in this

7     paper, correct?

8     A    That's correct.

9     Q    And you've provided no analysis of the trust fund

10    balances, applying that discount rate, correct?

11    A    That's correct.  I was asked to critique what he did, not

12    to do an alternative calculation.

13    Q    So let's go on to paragraph 5.  That's the cost

14    paragraph.  So I note in paragraph 5, you didn't cite to any

15    particular documents as setting forth any avoided costs, did

16    you?

17    A    I don't have any footnotes in section 5, right.

18    Q    And there's no reference to any documents in there,

19    correct?

20    A    In those two paragraphs, there's not.

21    Q    Okay.  And of course, if we look back at your list of

22    documents reviewed, you've been here at the trial and you've

23    seen the documents that Dr. Abramson used to provide a

24    analysis and a calculation of what those avoided costs would

25    be according to him, correct?

1    A    Just so I'm clear, are you referring to what exhibit that

2    he used?

3    Q    I think in 147 is the one we've used.  That's Defendant's

4    Exhibit 147 that has five pages, that's what we've referred to

5    as at least one of the bases for Dr. Abramson's damages -- I'm

6    sorry, avoided cost calculations, correct?

7    A    Okay.  That's what I wanted.  I wasn't clear on.

8    Q    I apologize.  And you had all those documents when you

9    wrote this report, didn't you?

10   A    Yes.

11   Q    And yet you provided no calculation that sets forth any

12   of the avoided costs that you claim should have been used by

13   Dr. Abramson, correct?

14   A    Well, I certainly gave him a roadmap on what to look for

15   two years ago when I wrote this report because I itemized

16   various categories of costs that would be directly associated

17   with the maintenance of the trust funds by the Plaintiffs, and

18   the documents that we're talking about are itemized in I

19   believe in my No. 12 and No. 14 on page 10, so the roadmap was

20   there.  I think the failure was his failure to look.

21   Q    My point was a little different, and that is that you

22   didn't cite to any of these documents, you didn't use any of

23   the figures in these documents to provide any sort of

24   calculation as to what the avoided costs were, correct?

25   A    Well, and in terms of the avoided cost calculation,

1  Defendant's Exhibit 147, there' still, with that information,

2  it's imprecise.

3  Q   But the cost data is not that good; is that fair?

4  A   That's fair.

5  Q   Okay.  But you even, despite its quality, you did nothing

6  with it, you made no calculations using those documents even

7  though you had them at the time you wrote your report?

8  A   That's right.  I didn't do a calculation.

9  Q   We've talked about this line item on page 3 of 147 that

10 says "Interest on Postal Deposit Account."  Do you see that?

11 A   I do.

12 Q   When you reviewed these documents and you wrote your

13 report, you did not identify that particular cost as one that

14 you believed was an avoided cost, correct?

15 A   That's right.  I said, bank fee, fund management fees,

16 and surety premiums all appear to have been costs, and then I

17 go on to say that he failed to -- failed to look, failed to do

18 any offset at the point that I published this report.

19 Q   My point is, the Interest on Postal Deposit Account is

20 not among the avoided costs that are itemized by you?

21 A   It's not among the list of examples of avoided cost that

22 I include in my narrative, that's correct.

23 Q   Well, apparently it did not appear to you, at the time,

24 that Interest of Postal Deposit Accounts was one of these

25 avoided costs because your sentence says, "bank fees, fund

1    management fees, and surety bond premiums all appear to have

2    been costs associated with the maintenance of the POC

3    deposits," and I'll stop there.

4              So, would it be fair that Interest on Postal Deposit

5    Accounts didn't appear to you at the time to be an avoided

6    cost?

7    A    I don't recall what appeared to me or was considering at

8    the time.  I provided a list of what I thought were very

9    obvious and direct avoidable costs.

10   Q    And you know Dr. Abramson submitted Exhibits 199 and 200.

11   You've seen those, correct?

12   A    I have.

13   Q    And just to make it short, I assume you have the same

14   problems with his methodology, his discount rate that you've

15   mentioned in the -- I guess it would just be the discount rate

16   that he used on these calculations as well?

17   A    And the compounding as well, the whole -- each criticism

18   I have of the calculation methodology would equally apply to

19   these Exhibits 199 and 200.

20   Q    Does he compound the cost?  Does he compound the cost?

21   A    I believe he does, and I thought that was his testimony

22   yesterday.

23   Q    Okay.  I'm just asking you.  You understand he compounded

24   the cost?

25   A    The gist of what I understood him to say was these

1  calculations were done in parallel with his original lost

2  revenue calculations.

3  Q   Let's look at the first page just to talk about the cost

4  for a moment.

5          THE COURT:  Of what?

6          MR. BOYD:  Exhibit 147.

7  Q   (BY MR. BOYD)  And I just want to direct -- I want to talk

8  about this testimony I believe you gave that these cost

9  estimates by Dr. Abramson were low because the Comerica Bank

10 would have charged a 5-dollar fee for managed funds and then it

11 would have also charged on some portion of those funds, I assume

12 is what you meant, $7 as well.  So it wouldn't have been 5 or

13 $7, it would have been 5, 7 or $12 charged, is that fair, per

14 thousand?

15 A   What I said was that they were -- it was an "and" and not

16 an "or," and 5 percent on -- $5 per thousand on money managed,

17 I'm just reading the document, and $7 per thousand on whatever

18 volume of repurchase agreement dollars were taking place.

19 Q   So, what would have happened at Comerica is these

20 funds -- the trust fund accounts, they would have been put in

21 some -- I think it says "Cash Management Fund" at the top, so

22 they would have been put into some -- one cash management

23 fund; is that fair?

24 A   I believe that's correct.  There's other documents.

25 Q   And I guess my point is, they can't be in two funds at

1   once.  They're going to be in one fund or another fund, maybe

2   they get moved around, but at any particular point in time,

3   they're going to be in one fund and the fees are going to be

4   charged pursuant to whatever the charges are on that fund,

5   correct?

6   A   The fees for money under management, $5 per thousand

7   would be on, if you will, the pot of money that's generating

8   the interest.  The repurchase agreement, $7 per thousand, you

9   could think of that as a transaction fee because they're

10  engaging in these transactions every day.

11  Q   Okay.  But let's go back to my point.  My point is,

12  they're going in one fund and maybe they are transferred to

13  another fund so they can get some repurchase agreements or

14  maybe they stay in the same fund, one way or the other, they

15  can only be in one fund at a time, correct?  You can't double

16  count your money in two separate funds.  You could split it

17  up, I guess.  Do you see my point?  Money can only be in one

18  place at any particular point in time.

19  A   No, I understand the question.  I'm trying to think

20  through how to explain it to you what I am trying to

21  articulate here.  I think you said it a minute ago that the

22  fees would either be 5, 7 or 12, and I would say the fees

23  would either be 5 or 12.

24  Q   Okay.  And so my point is, if they're in one fund at a

25  time, then they're going to be 5 or 7 and not 12, and I direct

1    your attention to the asterisk after the cash management

2    funds.  Do you see that at the top of the page?

3    A    I do.

4    Q    Goes to page 2, and there's the asterisk again, is it

5    not?

6    A    Yes, I see that.

7    Q    Okay.  And it says, "Available cash management funds."

8    Do you see that?

9    A    I do.

10   Q    And it has separate funds listed there that I guess we

11   can presume that the money is going to go into one of these

12   funds; is that fair?

13   A    That's what it appears to be, yes.

14   Q    And then when you look at the charges to the right-hand

15   column, it doesn't say 5, 7 or 12.  It says 5 or 7 in each of

16   the accounts, correct?

17   A    I see that.

18   Q    So it doesn't appear that there's any double charging as

19   in I'm going to charge you 5 and then I'm going to charge you

20   7 as well.  Is that a fair reading of that?

21   A    What I see on the second page with the menu of different

22   funds available, the first line is a Master Treasury

23   Repurchase Agreement, and I would tie that to the repurchase

24   agreement, $7 per thousand on the first page, and the general

25   descriptions I've heard and that I've given on the repurchase

1   agreement says these are swept overnight and then put back the

2   next day, so I would categorize that as a transaction fee.

3   Q   Okay.  Well, wouldn't it be fair if they're in that --

4   let's say they're in that repurchase agreement, Master

5   Treasury Repurchase agreement overnight and during that time

6   period, according to page 2, the charge is $7 per thousand of

7   assets; is that fair?

8   A   $7 per thousand for those assets, yes, okay.

9   Q   And then if the next morning they're, let's say, put in

10  the Dreyfus Government Cash Management fund at the bottom of

11  the page during from that next morning, as long as they stay

12  in that fund, the cost is $5 per thousand of assets?

13  A   I see that.

14  Q   Okay.  Do you agree -- I mean, is that a fair explanation

15  of how the funds are charged?

16  A   Well, okay.  The question of how the funds are charged,

17  we'd need to take a look at whatever the specific agreement

18  was with Comerica and make a determination as to when those

19  fees, at what point in time, what point in the day those fees

20  were calculated.

21         So if the fees for money under management were

22  calculated in the morning after the overnight investments had

23  been replaced, then you very well could have a 12 percent.

24  You need to look at the underlying agreement and the

25  underlying documents on how Comerica was charging those fees

1    and when they'd strike their balance and do their calculation.

2    Q    Okay.  Well, you do agree, though, that the fund -- that

3    the money can only be in one fund at any one point in time.

4    It can't be in two places; is that fair?

5    A    That's a fairly -- fairly basic.

6    Q    Okay.

7    A    I'll give you that.

8              THE COURT:  His question, I guess, is whether -- or

9    your answer, the issue is whether or not the money moves from

10   one of the four managed funds to one of these other things and

11   therefore -- I mean, what is the likelihood or -- either what

12   is the likelihood, in your experience, or what does the

13   evidence show, if any, about the frequency of movements

14   between one of the four managed funds to these other things,

15   thus generating more than one of these fees?

16             THE WITNESS:  Another set of documents, and I've

17   mentioned it a time or two, were some letters of instruction

18   or letters of agreement with Comerica that was talking about,

19   very specifically said any balances above $1.5 million, and

20   that was typed on the document, and then it was lined through

21   and someone had handwritten $3 million, then there were

22   initials by that.

23             So, I took that to mean that was part of the

24   operation of the sweep account that as the balances exceeded

25   that threshold of 3 million, then anything above that was

1    moved and that's why I'm calling it a transaction fee and it's

2    only there overnight and then back in the morning.  But

3    what -- what we don't know is when did Comerica strike the

4    balance and make the calculation for the 5 percent fee, and if

5    they did it after those funds are returned, then it is

6    additive.

7              THE COURT:  Okay.

8    Q    (BY MR. BOYD)  I just wanted one more point about Exhibit

9    147.  In regard to this issue you just raised, Comerica's fees,

10   if you look at that first paragraph under "Investment Management

11   Fee - Cash Management Funds" right at the top, Comerica's fees

12   are on the average daily balance and charged before income is

13   distributed.  It's not charged on a per transaction basis,

14   correct?

15   A    Well, what I'm characterizing as a transaction is the

16   repurchase agreement, so the dollars that are being moved at a

17   rate of $7 per thousand, so that was my -- my way of trying to

18   simplify the discussion.

19   Q    Okay.  So, when we look at your report, Dr. Kennedy, is

20   it fair to say that you don't provide any alternative damages

21   calculation that the judge can point to and review in trying

22   to determine, if he so chooses, the damages that are -- were

23   incurred in this case?

24   A    That's correct, I did not.

25             MR. BOYD:  That's all I have, Your Honor.

1           MR. VALDEZ:  No redirect, Your Honor.

2           THE COURT:  Yes.

3           MR. VALDEZ:  I have no redirect.

4           THE COURT:  No redirect.  Okay.  So then you have no

5    recross.

6           (LAUGHTER.)

7           MR. VALDEZ:  Your Honor.

8           THE COURT:  Yes.

9           MR. VALDEZ:  I'm sorry, can we go ahead and excuse

10   Dr. Kennedy?

11          THE COURT:  Yes.  Thank you, Dr. Kennedy.

12          MR. VALDEZ:  Can we take a five-minute break, Your

13   Honor?

14          THE COURT:  Pardon me?

15          MR. VALDEZ:  Can we take a five-minute break?

16          THE COURT:  Yeah.  Okay.  So when we come back in

17   five minutes, Mr. Valdez will tell us if he has any additional

18   witnesses and you will tell us if you have any additional

19   witnesses and --

20          MR. BOYD:  I'll say if he doesn't have any

21   additional witnesses, I don't have any additional witnesses.

22          MR. VALDEZ:  All right.  Then in that case I'll

23   spare us all because I don't have any further witnesses.

24          THE COURT:  Well, if that's the case and nobody has

25   any further witnesses, then what we were going to do next was

1    we were going to have brief, brief closing arguments, and then

2    agree upon a schedule for the filing of the proffering of

3    exhibits in writing and the filing of objections and the

4    filing of proposed findings of fact and conclusions of law.

5         So you want to take ten minutes and then do the

6    brief closing arguments; is that enough time?

7         MR. BOYD:  15, Your Honor, just to organize myself.

8         THE COURT:  15.  Sure.

9         MR. BOYD:  Thank you, Your Honor.

10        MR. VALDEZ:  Thank you Your Honor.

11        THE DEPUTY CLERK:  All rise.

12        (A BRIEF RECESS WAS TAKEN.)

13        THE COURT:  All right.  Anything before Mr. Boyd

14   begins?

15        MR. BOYD:  Nothing from the Plaintiffs, Your Honor.

16        MR. VALDEZ:  Nothing from the Defendant.

17        THE COURT:  Okay.

18        MR. BOYD:  May it please the Court, Benjamin Boyd on

19   behalf of the Plaintiffs.  On behalf of my colleagues and

20   Mr. Bonassar, we thank the Court for dedicating your time and

21   attention to this important matter.  We've come a long way to

22   get to this day and we're very thankful to be here.

23        Your Honor, the development of the computerized

24   meter resetting system was a transformational event for the

25   meter manufacturers, the Postal Service and postal customers.

No longer would customers have to carry their meters to the local post office to have them refilled with postage.  All they needed was a phone at first and now a computer.

It's beneficial to all involved.  The Postal Service saves manpower, customers have convenience and the meter manufacturers gained new lines of business with new revenue streams that they had not previously enjoyed.  One of those revenue streams was the collection of the interest income from the trust accounts.

Your Honor, the evidence has shown that Plaintiffs' CMRSes were developed and operated based on an offer or promise from the Postal Service that Plaintiffs would have the right to the collection of the interest income streams if they spent the millions necessary to develop and operate their CMRSes.

And they did so, Your Honor.  But after those systems were developed and in operation, the Postal Service changed its mind.  It needed revenue and it saw that this interest income had developed into a substantial revenue stream.  It determined that it should earn the interest income rather than the meter manufacturers and it changed the regulations to accomplish that goal and that changed a foundational part of the way the system was designed and operated up to that point.

Plaintiffs have asserted or Plaintiffs asserted at

1    the time that a contract with the Postal Service had been

2    breached.   The Postal Service denied that the contract

3    existed, and so we have, of course, come to Your Honor to

4    decide that and the other related claims.

5           A review of the evidence, Your Honor, makes plain

6    that the contracts existed, the terms of the contract -- what

7    the terms of the contract were and that Mr. Ganley was

8    authorized to make the offers and promises to the Plaintiffs

9    that formed those contracts.

10          So the way it works, Your Honor, I think, is that

11   the foundation of this case is the terms under which

12   Pitney-Bowes developed and operated its system because

13   Plaintiff, the unrebutted evidence -- because Plaintiffs were

14   offered those same terms as the unrebutted evidence shows.

15          The framework of the case on top of that foundation

16   are the authorized efforts of Mr. Ganley to encourage the

17   Plaintiffs to enter the CMRS market and the Plaintiffs'

18   understanding of those efforts and response to those efforts.

19          So what I'd like to do, Your Honor, is take you

20   through some of the documents that highlight the negotiating

21   points that Pitney-Bowes and the Postal Service discussed

22   during the negotiations for the development and operation of

23   the CMRS system, and so Mr. O'Neill, if you could put what I

24   think has been marked as Plaintiffs' Exhibit 1 up on the

25   screen.

1          And I'm going to have them on the screen, Your

2    Honor, and I've highlighted the brief portions that I would

3    like to direct your attention to.

4          And so Exhibit 1 is the very first document that was

5    identified from Pitney-Bowes to Mr. Darwin Sharp at the Postal

6    Service regarding the remote meter resetting system.

7          And so if we turn to page 2, we see at the bottom

8    that Pitney-Bowes states to the Postal Service, to provide an

9    overall perspective for these descriptions, it will be helpful

10   to understand the basic assumptions upon which the overall

11   system is built, and of course, one of those basic

12   assumptions, from the very first time they presented this

13   system, is an interest bearing deposit account.

14         Now, if we can go to the next page, I'm just showing

15   the Court a picture of what we've been talking about all this

16   time.  I think that little device on the side of the meter is

17   the remote meter resetting system and the rest of it is a

18   regular meter.

19         So then if we go to the next page, I think it's

20   interesting to note, Your Honor, that at the beginning, as

21   this highlighted paragraph shows, Pitney-Bowes proposed that

22   the customers would earn the interest, and that's in, I

23   believe, Your Honor, December 1971.

24         So let's go on to Exhibit 2.  The reason I put

25   Plaintiffs' Exhibit 2 in front of Your Honor is just to show

1    that as of January 28, 1972, Frederick W. Ganley, Jr. was in

2    the middle of the negotiations between Pitney-Bowes and the

3    USPS.

4            So let's move now to Plaintiffs' Exhibit 5, which is

5    a February 11th, 1972 memo.  This is to Darwin Sharp, who was

6    the recipient of the initial proposal by Pitney-Bowes, and

7    it's from the Assistant Postmaster General for the Product

8    Management Department, and here we see, Your Honor, for the

9    first time this monopoly concern that if we only allow

10   Pitney-Bowes to have this system, it would increase the

11   dominant position of Pitney-Bowes in the postage meter

12   business and that creates problems for us.

13           If you look at No. 4, Your Honor, you see that for

14   the very first time the Postal Service begins internal

15   discussions about whether they should own and develop their

16   own system.  If the meter customers are willing to spend the 5

17   to $6 per month to have a meter set, there may well be a

18   business opportunity here for us.  So, he is proposing that

19   the Postal Service do it themselves.

20           If we can move to the next document, Your Honor,

21   that's been marked as Plaintiffs' Exhibit 6, and these are

22   handwritten notes of a meeting that took place, according to

23   the date on the first page, on March 24th, 1972, and I note

24   that the persons attending included F. Ganley, and I

25   highlighted the last person because his signature is on the

1  bottom of the document, H. Altergott, so he appears to be the

2  one who wrote this note.

3          And so what I again want to point out is at the

4  bottom of the first page, there is again the suggestion that,

5  however, there were several responses that indicated that the

6  Postal Service should run the ADP system and own the software.

7  No reasons were provided and this meeting was called to find

8  out the reason for these comments and if they were indeed

9  reasons not to go ahead with tests of proposals.  That's on

10  page 2.

11          So, we have a brief on page 2, the same page, and at

12  the bottom there is the reasons given for why they want to own

13  the software, should run the network and own the software, and

14  again, I point your attention to No. 3.  PB was not given a

15  virtual monopoly of such -- and I can't read -- meters.  I'm

16  sorry, of meters.

17          And then you note that Mr. Ganley explained during

18  this meeting that Pitney-Bowes had an apprehension of being

19  subject to antitrust action.  We heard testimony that in the

20  1960s, Singer Friden had to file a complaint against

21  Pitney-Bowes and that had resulted in the release of several

22  patents.

23          So we go on to the next page of Mr. Altergott's

24  notes and here we see that the Postal Service, for the first

25  time, says it would probably be more cost-effective to have PB

1   run the system since it is unlikely that the USPS -- that USPS

2   could run it at a break even or profit basis.

3          And then there's an interesting comment, Your Honor,

4   about the interest.  Mr. Altergott says, Unless we provided

5   interest on metered trust accounts, mailers would be

6   discouraged from placing money in them.  And then he goes on

7   to say, providing interest would set an unwanted precedent

8   that might cause pressure for other trust accounts.  We would

9   not want this because of our added costs involved.

10          So we see that, if we can move on to Plaintiffs

11   Exhibit 8, Your Honor, there's a revised proposal from

12   Pitney-Bowes that was submitted in February of 1973.  And I

13   draw your attention to page 7 of that document, and I've

14   highlighted a paragraph that's entitled, "Bank Trust Fund

15   Management of Advance Deposits."

16          And at this time we see that Pitney-Bowes actually

17   states that the earnings are going to be shared.  So they

18   initially said they were given to the customer and now in 1973

19   they say they're going to be shared, so we're going to give

20   the customer some return on their deposited funds and then,

21   importantly, it says the interest will provide Pitney-Bowes

22   with certain income to help offset operating expenses

23   associated with the data center.

24          And this was given to the Postal Service, again it

25   was Mr. Sharp in February of 1973.

1          In July of 1973, Your Honor, Plaintiffs' Exhibit 9,

2    we see again a memo -- well, not again.  It's a memo to

3    Mr. William D. Cotter, Assistant Postmaster General.  And I

4    don't think I brought the last page or I'd tell you who it was

5    from, but the point is at the bottom of the first page, Your

6    Honor, I just wanted to say, again, the Pitney-Bowes monopoly

7    is discussed and this idea that the USPS would own the system

8    is on page 2 at the top.  They again say it should be owned

9    and operated by the Postal Service, and (c) under that is

10   important because they talk about the revenue that might be

11   generated.

12          The Postal Service -- the writer says to Mr. Cotter,

13   the Assistant Postmaster General, If the system is effective

14   and receives wide customer acceptance, it could become a large

15   revenue source for the Postal Service that would be lost under

16   Pitney-Bowes' ownership.  Potential revenue would come both

17   from the fees collected for resetting meters, so they

18   considered taking those fees as well, and from interest earned

19   on the funds held in the trust account.

20          So, Your Honor, if you go on to page 3, the

21   writer -- and I apologize.  Do you have -- do I have the last

22   page of exhibit 9, would you look, and I'll tell the Court

23   who wrote it if I could.  We looked -- the writer then starts

24   discussing these issues of the monopoly and whether they

25   should run the account.

1        And the second point -- I apologize, Your Honor.  It

2   is Richard F. Gould, the Assistant Postmaster General for the

3   Finance Department who was the author of Exhibit 9.

4        So Mr. Gould says in the middle of paragraph 3,

5   under that heading 4, (reading)  Second, it is highly

6   improbable that the Postal Service would ever undertake the

7   development of its own remote reset system.  The cost of

8   initial development and operation would be high, the

9   anticipated demand and profit questionable, and the workload

10  at the data centers would appear to preclude it.

11       So that's in July of '73.

12       In August of '73, Plaintiffs' Exhibit 10, Mr. James

13  J. Wilson, who's an Assistant General Counsel in the Contracts

14  and Property Division writes to Mr. Gould about the remote

15  meter resetting system, and I draw your attention to paragraph

16  3, Your Honor, because here for the first time the Postal

17  Service anticipates that the other meter manufacturers are

18  going to develop similar systems.

19       He says in that paragraph, (reading)  Pitney-Bowes

20  ultimately expects Postal Service approval and authorization

21  for them to offer their RMRS system service to USPS customers.

22  We should anticipate that other firms may also be in a

23  position to offer similar services.  Consequently, our

24  approval is, of course -- our approval to Pitney-Bowes should

25  not be an exclusive authorization.  There is, of course, the

1   question of how many arrangements for similar systems the USPS

2   will want to be tied into and that point will need to be dealt

3   with.

4            Your Honor, moving onto December of 1973, again,

5   Plaintiffs' Exhibit 12, this is to Mr. Gould as well as

6   Mr. Nicholson and Mr. Eden, and I apologize, I didn't get the

7   last page of this one either.  The writer, who I will tell

8   you in just a moment, is reviewing the report prepared by the

9   Office of Management Services on the Pitney-Bowes remote

10  meter resetting system, and again, Your Honor, I won't read

11  it, he says, Pitney-Bowes' dominance of the postage meter

12  market is the main concern, and then data center operation

13  also.

14           I do want to show at the top of page 2, there is a

15  detailed analysis of how much it would cost the Postal

16  Service, and this particular document was written by

17  Mr. Sharp, who of course received both the proposals from

18  Pitney-Bowes related to the RMRS.  And so at the top of page

19  2, Your Honor, Mr. Sharp says, (reading)  The Management

20  Information Systems Department has indicated that although it

21  has the capability to develop and operate a system of this

22  type, its resources are taxed with current and projected

23  workloads.  It estimates that between 15 and 18 months would

24  be required to develop such a system with a one-time

25  development cost in excess of 250,000, and an annual

1   operating cost of between 400- and 800,000.  In view of this,

2   it does not appear that the USPS operation is a reasonable

3   alternative.

4          Let's move on just briefly to Plaintiffs'

5   Exhibit 28, and again, Your Honor, you'll note that this is

6   from Fred to Gene, July 21st, 1977.  It says, (reading)  I

7   think customer services has concurred in the approval of the

8   RMRS system while providing an omnidirectional CYA on

9   everything else.  I read no problems with RMRS.  Go, Fred.

10         Well, I apologize, Your Honor.  It's from Gene, and

11  I actually don't know that that says "Fred" at the bottom, so

12  let me correct myself there.  It is to Fred.

13         Let's move on to Plaintiffs' Exhibit 29.  And I

14  won't read -- let's go to page 3 of it, and Your Honor, I

15  want to show as we get into September 15th, 1977, so now it

16  began in 1971, we're six years later, they're still

17  discussing this and this is a memo from Shirley McDonald

18  who's the General Manager of Retail Operations Division to

19  Mr. Ganley, and she's talking about the remote meter

20  resetting system, and I draw your attention to page 3,

21  paragraph 2, and again the monopoly concern is raised up to

22  September 15th, 1977.

23         She says, (reading)  In particular, Pitney-Bowes is

24  assumed to have a controlling 90 percent share of the market

25  for renting postage meters.  RMRS expansion should assure that

1    firm's market position -- should assure that firm's market

2    position until such time as competitive firms are able to

3    develop comparable systems attractive to large mailers.  There

4    is no indication that Singer Friden, Postalia or any other

5    firm will be willing or able to take up the challenge.

6            Again, below that, she says, (reading)  Again, the

7    USPS should consider whether it undertakes the system itself.

8            So, let's briefly go through Exhibit 30, which is

9    October 18th, 1977.  And here, Your Honor, we have the

10   controller sending a memo to the treasurer, Mr. Glassco,

11   specifically discussing the deposit funds in a trustee bank,

12   and he says, (reading)  While the monies are in a trust

13   account, Pitney-Bowes will draw interest on the balances.

14   Please review system and determine the feasibility and

15   practicality of fund deposits continuing to be maintained by

16   the USPS as an integral part of the Pitney-Bowes RMRS

17   program.

18           Two -- two weeks later, Your Honor, or I'm sorry,

19   now 11 days later, the treasurer writes the controller,

20   Mr. Glassco writes Mr. Del Guercio about that memo and he

21   says, (reading)  You request -- your request to review the

22   RMRS system with respect to USPS continuing to maintain the

23   trust account deposits erroneously implies that the Postal

24   Service now has trust fund deposits for meter setting.

25   Mailers do not predeposit funds for meter setting.

1          So Mr. Glassco goes through that proposal and he

2     says, and this is in the third paragraph, (reading)   In

3     comparison with the new approach in which the Postal Service

4     would accept prepayments for meter settings, I personally

5     have some reservations because of the cost of maintaining

6     records for such deposits and because it appears that the

7     Postal Service has not done a very good job in maintaining

8     the integrity of trust account records for other

9     applications.

10          (Reading)   In my view, this is the fourth

11     paragraph, the Postal Service does not have a claim to funds

12     prior to meter setting and the institution of a predeposit

13     would raise more problems than it would solve.

14          Your Honor, I'll just draw your attention to

15     Plaintiffs' Exhibit 34, and without going through it in

16     detail, again, Mr. Glassco writes to Mr. Del Guercio, the

17     treasurer writes to the controller, and they discuss in

18     detail what the effect of removing the interest income from

19     Pitney-Bowes' receipt -- not having Pitney-Bowes receive the

20     interest income, what that would mean, and what you see, Your

21     Honor, is there's a detailed calculation that the costs,

22     perhaps the meter resettings would be substantially more.

23          And I want to draw your attention to page 3 where

24     the control -- I'm sorry, the treasurer, Mr. Glassco tells the

25     controller, (reading)   The last point to be made is, as a

1  matter of business ethics, the Postal Service approved a test

2  of RMRS with the implicit assurance that if the test were

3  successful, we would approve RMRS.  The test was successful,

4  and I believe that it is unethical to change the rules unless

5  we can point to an adverse Postal Service consequence, such as

6  loss of revenue.

7           Let's skip Exhibit 35, Mr. O'Neill.

8           Your Honor, I would draw your attention to

9  Plaintiffs' Exhibit 40.  This is an internal Pitney-Bowes

10 memorandum that's dated June 8, 1978, and I'll tell Your Honor

11 that the SOU is dated September 18th and 28th, the two

12 signatures on it, of 1978.  So this is just a few months

13 before the SOU was signed, and Your Honor, I want to draw your

14 attention to the second paragraph where you see that

15 Mr. Glassco, the treasurer, is still talking to Pitney-Bowes

16 about the USPS' desire to own the trust.

17          And you see in the third paragraph, Mr. Fairbaugh of

18 Pitney-Bowes who wrote this memo says in response to that --

19 to that claim (reading)  We also refer to the purity of the

20 earnings of fund to offset cost of RMRS system, lockbox

21 expenses and trust manager expenses.  We explained our

22 proposal that the funds should be owned by the customers with

23 the agreement from the customers that generated earnings be

24 used to defray some of the system costs.  This is as the

25 system is now operating and has been explained to USPS many

1    times before.

2            And I'll go skip 43, please, Mr. O'Neill, and we'll

3    go to the SOU, Your Honor.  That's Plaintiffs' Exhibit 50,

4    and again, this was signed in September of 1978, and as we've

5    discussed before, this document does not mention the

6    discussions of the revenue streams that Pitney-Bowes clearly

7    negotiated with the Postal Service.

8            We know from these documents that I've just

9    reviewed that they discussed who was going to get the meter

10   resetting fees, who was going to collect the interest income,

11   and it was explained to the USPS on many times that those

12   revenue streams were necessary to offset operational costs.

13           And what we see, Your Honor, is that the SOU was set

14   up with a trust fund as a integral part of the SOU and it said

15   nothing about any interest that would be collected, although

16   both parties were clearly aware that that was the plan of

17   operation.  So that's September of 1978.

18           We go on, and I just want to tell Your Honor that

19   Plaintiffs' Exhibit 54, just to sort of set the stage, was

20   December 4th, 1978.  This is a letter from Mr. Ganley to

21   Mr. Krantz of Pitney-Bowes and just note the date that this

22   is the first time he sent out draft regulations to

23   Pitney-Bowes.  So that was in December of 1978.

24           So what we have, Your Honor, is an agreement

25   between Pitney-Bowes and the Postal Service that was not

1   reduced to writing.  There was clearly an agreement that they

2   would get the interest income from the trust accounts.  There

3   was clearly an agreement that they would get the meter

4   resetting fees.  Yet none of it appeared in the SOU.  As

5   Mr. Kearney testified, the Postal Service had a policy of

6   staying out of the meter manufacturer's business, so the

7   absence of any reference to these revenue plans can be

8   explained perhaps by that.  But, of course, that does not

9   mean that there was not an agreement between the parties.

10          So that's the foundation of the case, Your Honor.

11  PB bargained for and received the interest income for

12  developing and operating the CMRS.  We know the Postal Service

13  had on oftentimes during those negotiations repeated its

14  concerns that the other meter manufacturers needed to enter

15  the CMRS market or the PB monopoly concerns would be realized.

16          So who did the Postal Service turn to to accomplish

17  the task of encouraging the other meter manufacturers to

18  enter the CMRS market?  The evidence makes clear that the

19  Postal Service turned to Fred Ganley.

20          Your Honor was present for his *de bene esse*

21  deposition, and I would like to just highlight some of his

22  testimony for Your Honor.

23          If we can go to page 28 of his deposition, and I

24  also have this highlighted on the screen.

25          Your Honor, you see that Mr. Ganley testified that

1   as part of his duties he was encouraged to promote

2   competition within the industry.  (Reading)  The USPS always

3   intended to provide equal treatment to all meter

4   manufacturers, regardless of their individual market share,

5   so that the smallest manufacturer had the same opportunities

6   as the larger manufacturer -- the largest manufacturer.

7            So what did he recollect about the Pitney-Bowes

8   negotiations?  Let's turn to page 37 of his deposition.

9   Mr. Ganley testified, (reading)  PB stated that in order to

10  develop and operate the system at the appropriate cost to end

11  postage users and allow PB an acceptable profit, USPS must

12  agree that PB had the right to collect the interest to defray

13  development and operational costs.  USPS ultimately agreed to

14  allow PB to collect the interest income from the trust

15  accounts.

16           That's entirely consistent, Your Honor, with the

17  documents that we've just reviewed.

18           So what did he do as to the other manufacturers?

19  Well, turn to page 41 of his deposition, Your Honor, starting

20  at line 5 he testified, (reading)  After PB began operation

21  of its CMRS in the late 1970s, I was urged by my superiors at

22  the USPS, including the Director of the Office of Mail

23  Classification, to encourage other meter manufacturers to

24  enter the CMRS market.

25           And of course, Your Honor, what tools did he have

1  at his disposal to do that encouragement?  The revenue

2  treatments, the meter resetting fees and collection of the

3  interest income, and of course he makes that clear later in

4  his testimony.

5         If we can go to page 48.  I apologize I got a little

6  ahead of myself.  I did want to note what his answer at page

7  48 of the deposition, where he was talking about his basis for

8  a discussion that there was -- that he believed that there had

9  been discussions about the CMRS market and he said, (reading)

10 I think there was a consensus throughout that part of the

11 organization that CMRS was going to become an attractive

12 service for customers and that if only Pitney-Bowes were the

13 offeror of such a service that it might increase the share of

14 the market to Pitney-Bowes.

15        So at page 50 of his deposition, this is where

16 Mr. Ganley set forth what he did.  And Your Honor, I won't

17 read every line of page 50, but I think you can recall that

18 he stated that the licensing efforts, the paragraph 2 of the

19 SOU, had not gone forward as planned.  PB and the other

20 manufacturers could not agree on reasonable terms for

21 licensing of technologies, so the other meter manufacturers

22 were going to have to start from scratch, and Mr. Ganley

23 understood that there was going to be a large capital outlay

24 required, and he says he discussed that with all the meter

25 manufacturers and that they understood that if they developed

1  their own CMRS, that they would have the same terms that PB

2  enjoyed, and he specifically stated, including the right to

3  collect the interest income from the trust account.

4          And he said, (reading)  This understanding was

5  designed to allow the other meter manufacturers to recoup

6  costs related to the development and operation of the CMRS.

7  He discussed this understanding with the Director of Mail

8  Classification and they mutually agreed to offer the other

9  meter manufacturers the opportunity to develop and operate

10 their CMRS system on the same terms as Pitney-Bowes.

11         And Your Honor, it makes sense.  We know if we take

12 ourselves back to that time period, there would be no reason

13 for Mr. Ganley to limit the other meter manufacturers from

14 receiving the same benefits that Pitney-Bowes received.

15         So if we can go to page 53, Your Honor, I just want

16 to point out that on this page, as you may recall, Mr. Ganley

17 stated that he understood Robert Hillegass had testified that

18 he made statements to him that Neopost would have the right

19 to collect the interest income, and Mr. Ganley agreed

20 with those -- had no reason to disagree with those statements

21         Also, Your Honor, on page 54, he testified that he

22 understood Mr. Goggin had testified that Hasler understood

23 that if Hasler determined that it would develop and operate

24 the CMRS, that USPS would treat it equal to PB -- to

25 Pitney-Bowes and that Hasler would have the right to collect

1   the interest income.  And again, Mr. Ganley said he believes

2   he encouraged Hasler to consider entering the CMRS market and

3   develop their own CMRS under the same terms and conditions

4   applicable to Pitney-Bowes.

5          So, Your Honor, I thought it was interesting, after

6   we -- I got finished examining Mr. Ganley, Mr. Valdez

7   examined him, and I thought some of the answers were

8   instructive.  And Your Honor, I'm turning your attention to

9   page 122 of the deposition transcript, and Mr. Valdez is

10  questioning Mr. Ganley as to Mr. Hillegass' affidavit, so at

11  line 16 he says, (reading)  Let's go to Paragraph No. 10.

12  I'm going to start with the sentence, it's about in the

13  middle of paragraph 10 that begins "Both Mr. Ganley and

14  Mr. Gardener continued to encourage development and again

15  offered that Neopost would have the right to earn interest on

16  customer accounts to recoup costs and earn a profit."  Do you

17  see that sentence?

18          Mr. Ganley said, "I do."

19          (Reading)  And did you offer them that as a right?

20  The question is asked.

21          And Mr. Ganley says, (reading)  I would have told

22  them that they could operate their -- any system they

23  developed similar to what we had allowed Pitney-Bowes to do.

24          And Your Honor, I'm going to now take you to page

25  140, and this is a little difficult to do, but there's a

1   question at the top of page 40.

2              THE COURT:  40 or 140?

3              MR. BOYD:  Pardon me?

4              THE COURT:  40 or 140?

5              MR. BOYD:  140.  Mr. Valdez asked a question at the

6   top of the page.  (Reading)  Did you ever promise or agree

7   with Neopost or Ascom that they could operate their CMRS under

8   the 1978 Pitney-Bowes statement of understanding no matter

9   what the regulations allowed?

10             And there's a long discussion about the question and

11  an objection, Your Honor, and if we move over to page 141, the

12  reporter rereads the question and Mr. Ganley says, "no," and

13  then you, Your Honor, say, (reading)  All right.  Objection is

14  noted.  And you turn to Mr. Ganley, Is there anything further

15  you'd like to say about that, Mr. Ganley?

16             And Mr. Ganley said as follows, (reading)  I would

17  suspect at that time other meter manufacturers were asking,

18  inquiring about CMRS and the regulations.  This is between the

19  time the regulations -- between the time the statement of

20  understanding had been issued and before the regulations had

21  been written, and they were asking questions about it and I

22  sus- -- I would probably have discussed with other meter

23  manufacturers the way the system was going to operate and I

24  wouldn't have gone no farther than to have said that this is

25  the way it's going to evolve, it appears, and you can go

1   there, too.

2           And Your Honor, my final excerpt from Mr. Ganley's

3   deposition starts at page 164, and down at the bottom on line

4   19 we start at the bottom of page 3 of his affidavit, and I

5   read to him, you know the "I" is on the last page of 3, and

6   then we go to page 4, it says, (reading)  I discussed with all

7   of the other meter manufacturers and they understood that if

8   they developed their own CMRS, that they would have the same

9   terms that PB enjoyed, including the right to collect the

10  interest income from the trust accounts.  And would you agree,

11  setting aside this authority to contract, that you were

12  authorized to go out and make those statements to the meter

13  manufacturers?  And he said "yes."

14          After that, I go to the last sentence of paragraph

15  11, and I say, (reading)  You say I discussed this

16  understanding with the Director of Mail Classification and we

17  mutually agreed to offer the other meter manufacturers the

18  opportunity to develop and operate their CMRS on the same

19  terms as Pitney-Bowes or PB.  Do you see that?

20          He said, "I do."

21          (Reading)  And given that you discussed it with the

22  Director of Mail Classification, would you agree that you were

23  authorized to go out and provide that opportunity to the meter

24  manufacturers?

25          And Your Honor, as you may recall, Mr. Ganley was

1    somewhat reluctant to say certain words because he thought

2    they had legal meaning, and so he answers, (reading)  I don't

3    think I was in a position to offer or provide.  I could

4    discuss and I could communicate them the opportunity to

5    develop and operate their -- on the same terms as

6    Pitney-Bowes.

7            And so I asked him, (reading)  Okay.  Well, if

8    the -- are you saying that you have a problem with "offer"

9    because it might have a legal meaning that you don't

10   understand; is that fair?

11           And he says, (reading)  Well, yeah, that's fair.

12           So I asked him, (reading)  Okay.  Well, let's change

13   the word to "tell" them, I told the other meter manufacturers

14   about the opportunity to develop and operate their CMRS on the

15   same terms as PB.

16           He answers "Yeah."

17           I asked him, (reading)  You were authorized to do

18   that, correct?

19           And he says, (reading)  Oh, certainly.

20           So, Your Honor, I think it's clear from the

21   testimony of Mr. Ganley that he was authorized by his

22   superiors to go out and make these efforts, that the

23   centerpiece of his efforts was the offering of the same terms

24   as Pitney-Bowes, and those terms explicitly included

25   collection of the interest income.

1          THE COURT:  Okay.  You know, I don't -- we're done

2    with the documents that were not introduced in the last week

3    and we're done with Mr. Ganley.  I don't know that I need to

4    hear anymore.  I remember what happened the last week.

5          MR. BOYD:  Okay.

6          THE COURT:  And you know, unless there's any

7    particular point that, you know, I need other than the

8    documents that were not marked for identification over the

9    last week, I think I'm fine.  I was here and I heard

10   everything.

11         MR. BOYD:  Okay.  I apologize for wasting your time,

12   Your Honor.

13         THE COURT:  I'm not saying you're wasting my time.

14   I think that it was important to go through the documents that

15   you think are important that were not highlighted by or

16   referenced by any of the witnesses in this past week.

17         MR. BOYD:  Well, Your Honor, and I will sort of sum

18   it up as best I can in just a couple of minutes.

19         And so I was going to now go through the Hillegass

20   and Goggin testimony and I'll take it that you recall what

21   they said was very similar to the -- or my argument is it was

22   very similar to what Mr. Ganley said, and both Hillegass and

23   Goggin testified that Ganley made statements to them.

24         On Mr. Goggin, I know there's a motion to strike,

25   Your Honor, and I don't want to argue that during my closing,

1    but I would ask, if you're considering that motion, that there

2    at least be some briefing on it.

3         If we go past that, Your Honor, we get to the

4    regulation changes and you, of course, heard what Mr. Kearney

5    said.  He was, I think, the main individual that was driving,

6    besides Mr. Grant, whose testimony was designated as

7    deposition testimony was designated, but it really came out

8    through Mr. Kearney.  And the important thing I think there,

9    Your Honor, was that it was just a revenue driven decision.

10   That was the character of the decision.

11        There was no problems with the CMRS accounts.  There

12   were certainly other ways to address any revenue protection

13   issues, other than elimination of the account.  And what we

14   see, Your Honor, was that they didn't look at any document

15   other than the SOU, and of course, all the documents that we

16   reviewed just now really sort of set forth what the entire

17   agreement was with PB, and of course, they never talked to

18   Mr. Ganley about his statements to the other manufacturers.

19        You just heard about the damages.

20        THE COURT:  When you say they never talked to

21   Mr. Ganley, you mean Kearney and Pedersen.

22        MR. BOYD:  Kearney, Pedersen and Riley.

23        THE COURT:  Right.

24        MR. BOYD:  Right.  And I just want to say one thing

25   about the authority to contract, Your Honor, and just draw

1    your attention to Plaintiffs' Exhibit 132, which is this

2    memorandum from Mr. Riley to Mr. Wilkerson.  We all heard

3    people come in and say, "I don't have the authority to

4    contract.  I don't have the authority to contract."  That of

5    course is their mantra, but when they were considering this

6    and the lawsuit wasn't pending on December 15th, 1993, I

7    just want to point out that Mr. Riley wrote to Mr. Wilkerson

8    and told him not to sign any contracts.

9           So, Your Honor, you heard the damages issue, so I

10   won't go over that again.  I think they're very reasonable.

11   As we pointed out, the net present value calculation tends to

12   suppress the damages, according to Dr. Abramson, by more than

13   $34 million by taking the damages back to July 1996.

14          And, you know, there's a reason why Neopost is being

15   reasonable in this case, Your Honor, and that is because the

16   Postal Service is a business partner of theirs.  They're still

17   in business with the Postal Service.  They make meter

18   manufacturers.  And it really has been difficult for Neopost

19   to bring this case and maintain it for 12 years and, you know,

20   the face of the denials of the Postal Service.

21          You know, it took a lot of courage for them to do

22   that, but they do believe firmly in their claims, and they

23   don't believe that the Postal Service delivered a level

24   playing field that had been promised to them.

25          Instead, Your Honor, the Postal Service played

1   favorites and awarded the goliath of the industry,

2   Pitney-Bowes, with the benefits of compensation for diversion

3   of the interest stream and ignored all the smaller

4   manufacturers.

5           So Neopost, Your Honor, it's the David in this

6   fight.  I believe it's shown the necessary courage and

7   produced a preponderance of the evidence that it entitles it

8   to prevail on its claims.  So we ask you, Your Honor, to

9   review the evidence and make a determination that the evidence

10  shows, by a preponderance, that Neopost's claims are valid and

11  that the Postal Service is liable for breaching its contracts

12  with Plaintiffs and has taken its property without just

13  compensation in violation of the Fifth Amendment and that it

14  has proved damages in the amount of $74,710,131.67 as set

15  forth by Dr. Abramson.  Thank you, Your Honor.

16          THE COURT:  Thank you very much, Mr. Boyd.

17          Mr. Valdez.

18          MR. VALDEZ:  Good afternoon, Your Honor.

19          Your Honor, what the Plaintiffs want to do in this

20  case is they want to convert a policy of treating the meter

21  manufacturers fairly and communicating with them on a level

22  playing field into an enforceable contract for millions of

23  dollars.

24          In essence, they argue that what it took the

25  Postmaster General to do with Pitney-Bowes in entering into a

1    contract, they can do by mere casual conversations with a

2    midlevel management employee.

3          It must be pointed out, Your Honor, with respect to

4    the Pitney-Bowes' statement of understanding, Plaintiffs rely

5    extensively on communications that occurred internally in the

6    Postal Service, internally in Pitney-Bowes.  And between

7    Pitney-Bowes and the Postal Service prior to the -- into the

8    entry of the 1978 Statement of Understanding, and they assert

9    that those are the terms of the agreements that they have with

10   Pitney-Bowes.

11         The problem is, is that what was agreed upon between

12   Pitney-Bowes and the Postal Service was placed in the

13   Statement of Understanding, and at no time did any of

14   Plaintiffs' witnesses ever testify that they were aware of

15   those negotiations in pre-SOU discussions or letters or

16   communications, and at no time did they present any evidence

17   that any of those -- any of that information as well as any of

18   those letters was conveyed to them.

19         We, of course, preserve our objection to the

20   introduction of any of those matters, but we believe that as

21   an evidentiary issue, they just -- they have failed to lay any

22   type of foundation for their inclusion as even a part of a

23   contract.

24         A contract required -- I feel like I'm going to

25   first year law school, Your Honor.  It requires an

1   understanding of the terms and a mutual agreement of what

2   those terms are.  If terms are never conveyed to the other

3   party, they cannot be a part of the contract, and there's no

4   evidence that any of that information was conveyed to them.

5           The only thing that they have that was conveyed to

6   the Plaintiffs was Mr. Ganley telling them, this is the thing

7   of the future, you guys probably should get in it for your own

8   business benefit.  And when they said we can't afford it right

9   now, he said, look to what we're establishing with

10  Pitney-Bowes and the system we are establishing, and he says,

11  and he even testified that he told them, I think this is the

12  way it's going to be from now on.  This is the way it was

13  going to be incorporated in the regulations, and that is that

14  the manufacturer holds the trust account and when you hold the

15  trust account, you get the interest.

16          That was the only information that was conveyed to

17  them.  And Your Honor, still going back to Contracts 101, when

18  Mr. Ganley supposedly made this offer to them in 1978 and

19  early 1979, they said, We can't do it.  If you are to even

20  consider this a contract, you have an offer and a refusal.

21  Offer's done.  There are no terms.  There's no contract.

22          The only time that they allege they accepted this

23  offer from Mr. Ganley was in 1985, several years, what's that,

24  six years after the regulations were promulgated.  And if you

25  listen to the testimony of Mr. Hillegass, who was supposedly

1    the person talking to Mr. Ganley, the statements were "Look to

2    the regulations.  It's in there.  You can earn the interest on

3    the trust account."

4            And the reason why it's in there, again, as I said,

5    is because the regulations placed the trust account in the

6    hands of the meter manufacturer.  So what they did with it was

7    their business, but that's all.  That is the -- that is the

8    fact is that it was the regulations that created this interest

9    income.

10           Further, you will see, Your Honor, we'll point it

11   out in our Statement of Facts or Conclusions of Facts, is that

12   Statement of Facts, Findings of Facts that the SOU, every

13   single provision that has to do with the management of the

14   trust accounts and the management of funds is taken and put

15   word-for-word into the regulations, with the exception of

16   "Pitney-Bowes" is changed to "Meter Manufacturers," and I

17   believe there's some further explanations, but every single

18   sentence that is in that SOU is in the regulations.

19           Okay.  But what's more important than anything else

20   is the basic and fundamental rule.

21           THE COURT:  Let me just -- let me just make sure

22   what we're talking about.

23           The language of the SOU went into the regulations in

24   19' --

25           MR. VALDEZ:  '79.

1          THE COURT:  -- '79.

2          MR. VALDEZ:  Correct.

3          THE COURT:  So when the SOU existed first.

4          MR. VALDEZ:  Yes.

5          THE COURT:  Hillegass was told, look at the

6     regulations; your argument being there's no contract, there's

7     a regulation.

8          MR. VALDEZ:  Correct.

9          THE COURT:  And then, and those were the '78

10    regulations which took virtually verbatim the language of the

11    Pitney-Bowes' SOU, and that's what the regulations were until

12    1995.

13         MR. VALDEZ:  That is correct.

14         THE COURT:  And then in 1995, when the Postal

15    Service made a change, your argument obviously is, they didn't

16    unilaterally change a contract, they changed regulations,

17    which they have the right to do.

18         MR. VALDEZ:  Correct.

19         THE COURT:  Okay.

20         MR. VALDEZ:  And what that did, all they did when

21    they changed the regulations in '95, Your Honor, was they just

22    said, "From now on your customers do not pay you, they pay us

23    first," and they removed the requirement for the trust fund.

24    That's all.  They redirected funds intended for postage to the

25    postal office directly.  All right.

1    But let us go back -- I'm getting ahead of myself,

2  Your Honor, so let's go back real quick to this alleged

3  contract back in 19-whenever, we don't know.  Offers were made

4  apparently from '78 through '85 and they didn't accept till

5  then, but what is alleged in the complaint and what it seems

6  to be agreed upon by their own witnesses was that as to

7  whatever this contract was, is that -- I'm sorry, if I can go

8  to the Elmo real quick.  That -- and this is the -- this is

9  Ascom's complaint, No. 22.  (Reading)  In connection with

10  encouraging Ascom and other authorized manufacturers to

11  undertake the costly development and implementation of a CMRS,

12  the Postal Service promised and assured Ascom and other

13  authorized manufacturers that it would not seek to deprive

14  Ascom and the other authorized manufacturers of their right to

15  recoup their substantial capital outlays or reap the rewards

16  of their individual labors.

17    So again, from the outset, everybody says that they

18  told us we could recover our development costs, and that's

19  part of the contract.

20    And the Pitney-Bowes -- I'm sorry, and the Neopost

21  complaint on paragraph 28 states, (reading)  Prior to its

22  promulgation of the 1995 regulations, paren, described further

23  below, close paren, the Postal Service never sought to impose

24  restrictions upon Neopost's, paren, or other authorized

25  manufacturers, close paren, receipt of the interest earned on

1    advance deposits.  To the contrary, for many years Neopost and

2    other manufacturers continued with the standard and accepted

3    industry practice, paren, in accordance with the

4    above-described agreements, understandings and contracts,

5    close paren, of recouping a portion of their CMRS investment

6    via this interest income.

7           And if you read also the preamble to their

8    complaints, they talk about that was the contract.

9           Okay.  Now, but let's go to fundamental Government

10   contracts issues.  In order to have a contract with the

11   Government, it must be in writing or evidenced by writing and

12   it must be with a person who is authorized to enter into

13   contracts on behalf of the Government.

14          You heard the testimony from Mr. Ganley himself.  He

15   is not authorized and never has been to enter into contracts.

16   And in fact, on page 77 of his testimony, Mr. Boyd asks him on

17   line 16, (reading)  Question:  And in regard to your efforts

18   to encourage the meter manufacturers to enter the CMRS market,

19   as you've already testified here today, in regard to their

20   right to collect the interest income, do you, as you sit here

21   today, understand that in reaching that agreement you

22   obligated the Postal Service to incur any costs in carrying

23   out that agreement?

24          And his answer was, (reading)  No, I didn't obligate

25   the Postal Service at all.

1          That's on top of page 78.  And on page 86 is his

2   statements where he said that he never had authority to enter

3   into contracts.  That's page 86, lines 12 through 18.

4          And I think, more importantly, Your Honor, and

5   Mr. -- it was, I think, Mr. Boyd kind of highlighted part of

6   it out but then kind of bolded it.  On page 165 and 166 he

7   said, (reading)  I didn't tell them -- I didn't offer them a

8   right.  I told them there was an opportunity to get into this

9   market, and that is the way he explained his testimony.  It's,

10  I didn't promise anything.  I couldn't promise anything.  I

11  merely was pointing out that it would be a beneficial business

12  decision on their part, and I had tried to explain to them as

13  best I could how it was going to work so that they could get

14  into it.

15         Now, there is, I don't know if you can call it an

16  exception, but a tiny explanation with respect to the -- I

17  don't know if it's called not implied, actual authority, but

18  to contract, but there's one where the only exception was if

19  the person who makes the promise has actual authority to enter

20  into contracts or as a part of their duties, as a major part

21  of their duties, I think the word is substantial part of their

22  duties they enter into contracts on behalf of the agency, and

23  although this contract may fall out of it, it -- because they

24  had this authority, kind of give the perception that this was

25  a lawful contract.  We don't even have that here.

1          As you heard Mr. Ganley testify, as I said, he never

2    had authority and meters was only 10 percent of anything he

3    did.  He had a broad responsibility, so this could no way,

4    even with respect to meters, have been a substantial part of

5    his duties with the Postal Service.

6          With respect to Mr. Hillegass, again, Mr. Hillegass

7    said that he never remembered the exact words that were used

8    by Mr. Ganley.  He could only somehow think or theorize the

9    intent of Mr. Ganley.  The interesting part of Mr. Hillegass'

10   testimony is, first of all, he didn't know that other people

11   in his company were already looking into getting into the CMRS

12   market.  There was a letter in 1980 from Mr. Goldman, the

13   president of Neopost to the president of Pitney-Bowes where he

14   says that we understand that RMRS is a threat to our viability

15   and that they need to get into it, into this market.

16         So whether or not, whatever discussions were going

17   on between Mr. Ganley and Mr. Hillegass, they already had

18   decided they needed to get into this market and they needed to

19   figure out how.

20         The other thing that's important, I think, Your

21   Honor, from Mr. Hillegass' testimony is that he testified that

22   although Mr. Ganley told him this information, he didn't tell

23   it to anybody else.  He kept it in his head until marketing

24   and engineering came to him and said, We are developing a CMRS

25   or a remote resetting meter.  What do we need to do?  So it is

already started, and his testimony was that the idea probably

began in marketing, they took it to engineering where they

started to work on the practicality of it, they started

putting it together, and then they came to him and said, "What

do we need to do to get this to comply with the regulations?"

And it was only at that point that he said, "Oh,

yeah, look at the regulations."

And he said to them, he says, "We looked in the DMM

and it was right there that we could earn the interest on the

trust account."

So, again, there was no reliance, there was no

contract, there was no offer, there was no acceptance, there's

almost absolutely no element of a contract, Your Honor.

Especially no element of a Government contract.

With respect to Mr. Goggin, again, as you know, Your

Honor, we did move that it be struck.  There is absolutely no

mention of his knowledge of any of the conversations that

occurred between Ganley.  There was no evidence or any

information that was given to us that he was in on those

conversations, and in fact, as you saw and as you noted, it

varies his -- his declarations were very cryptic to hide that

throughout the whole proceeding, until he gets up on the stand

and testifies.  And much to everybody's surprise, that he all

of a sudden had these conversations with Ganley, we think

that, one, that's not only a serious violation of discovery

1  rules, but even if it is, and I think, Your Honor, that that

2  should go very much to his credibility, that he has none.

3          And especially in light of the fact that we had made

4  constant noise about how Ascom had nothing, nothing to tie

5  them into a contract or any discussions with Mr. Ganley, they

6  had never, never proven a contract or any discussions in any

7  way, and it isn't until the trial that, whoa, all of a sudden

8  he pops up and there he's got that -- he's filling that gap in

9  for the Plaintiffs.

10          The other funny part is, is that anything about him

11  being involved kind of goes against what Mr. Hillegass said

12  because Mr. Hillegass himself testified that -- I'm sorry,

13  Mr. Allocca in his deposition testified that he didn't know

14  who if anyone else had conversations with the Postal Service

15  regarding the CMRS development and he didn't know of anyone

16  who was involved in the development and implementation of the

17  CMRS system and yet he was the president of Ascom at the time

18  that they decided or at the time that the regulations were

19  changed.

20          So, if nobody in Ascom knew that there was a

21  contract or that there was any discussions, then apparently

22  there was no contract.  The other funny part, Your Honor, is

23  that Mr. Ganley was so careful to document every authorization

24  he gave and the Plaintiffs were so conscious of making sure

25  that they documented every single request that they made and

1   yet there is not a single document that shows that there is a

2   contract or any of these discussions or any promises by the

3   Postal Service to them.  There is no confirmation letter or

4   anything in any respect, that is, this record is completely

5   devoid of any of that.

6           Then in 1993, it became known to the Postal Service

7   that there were serious breaches in some of the meters that

8   were out there from some of the postage meter manufacturers

9   and resulted in hundreds of millions of dollars of losses to

10  the Postal Service.  And as Ms. Pam Gibert testified, that was

11  a wake-up call to the Postal Service and it sent shock waves

12  through the entire organization.

13          You heard Mr. Wayne Wilkerson testify that they had

14  actually tested -- they had a person on their staff who was an

15  expert who actually tested the meters and that every single

16  one of those meters could have been compromised, including the

17  CMRS meters with the exception of one meter from Postalia that

18  he -- with the time he was given, he couldn't break into.  But

19  the question of meter fraud became a big concern, and as a

20  result of that, so did the issue of cash management.

21          Currently, with all the meter fraud that went on,

22  you heard about what is the called the AMPLEX incident, and

23  how it's discovered that AMPLEX, who was selling stamps on

24  consignment, was actually holding -- was -- had a contract and

25  were amending the contract so they could hold the money longer

```
 1   and longer and longer, and they were investing this money in

 2   long-term yields which created high risk of Government -- of

 3   Postal Service funds, and it was determined that they

 4   needed -- that a whole revamping of the system needed to be

 5   done.

 6           You saw that letter from Michael Riley to

 7   Mr. Wilkerson telling him don't enter into anymore agreements,

 8   but you heard the testimony that, first of all, that letter

 9   went out even before Mr. Grant's grandiose e-mail about how

10   much interest Pitney-Bowes is earning on their accounts, but

11   they already decided they were going to relook at it and make

12   a decision on this.

13           But secondly, you also heard the testimony from

14   Mr. Kearney that they're just finance guys, they're just

15   dollar guys, so when it came to them that they needed to do

16   something, they didn't know about the regulations.  They had,

17   in fact, had to be sit down and be educated by Ms. Gibert and

18   Mr. Wilkerson as to the regulations, so whatever language --

19   inartful language they used doesn't show that there is a

20   contract.  It only goes to show that they didn't quite

21   understand how the whole system was regulated and controlled.

22           But another thing that's very important, though,

23   Your Honor, is there was -- you heard a lot of testimony about

24   where they never found anything wrong with it.  There was

25   never any loss of revenues caused by our system.  But as you
```

1    also heard, Your Honor, the Postal Service does not need to

2    wait until they're ripped off before they can institute

3    protections of revenue.

4            There was a study by Carnegie Mellon that found that

5    their computer system was very vulnerable.  In fact, they

6    said -- I think they said it -- if I recall -- I'm sorry.

7    Just a moment, Your Honor.

8            I am sorry, I don't have it here, but they describe

9    their computer system is very much at risk from being stolen

10   and hacked into or even just going to a programmer's desk and

11   getting into their system which contained all information

12   about CMRS, both financial and operational.  But you know, the

13   funny thing is, is that one of the -- Ascom probably did the

14   one thing that sealed the whole fate of the whole thing is

15   when they came to Michael Riley and Robert Pedersen and said

16   the bankers have come to us and said they have a whole idea of

17   how we can make more money, get higher interest on these trust

18   funds.  And they spelled it out, and the first -- and what

19   came to Mr. Pedersen's mind was, oh, my God, we got to get the

20   money out of these guys' hands.  They were a risk.  They were

21   being taken in by these bankers.

22           And as it turns out, Your Honor, at least Ascom had

23   the -- asked.  Neopost didn't.  In 1994 they changed their

24   system from the Bank of America, which was limited to only

25   investing in Government securities, everything was insured,

 1   everything was secure, to entering into a contract with

 2   Comerica that specifically advises them that none of their

 3   money is insured or protected.

 4          So, if those repo securities or any of these other

 5   investment vehicles that they were putting that money into

 6   went south, where do you think those postal meter customers

 7   would be coming for their postage?  They wouldn't be going to

 8   them.  They'd be coming to the Postal Service saying we paid

 9   our money, we want our postage.

10          THE COURT:  Okay.  Are you almost done?

11          MR. VALDEZ:  I'm sorry?

12          THE COURT:  Are you almost done?

13          MR. VALDEZ:  I am, Your Honor, I am.

14          Finally, Your Honor, you're going to see with

15   respect to whatever their second contract and request is, they

16   said this -- it first started out as claims they wanted fair

17   treatment, and then you'll see through the correspondence that

18   it went from fair treatment to equal treatment, and then it

19   went from equal treatment to compensation.  It kind of morphed

20   over time here.

21          I think Neil Mahlstedt, when he talked about equal

22   treatment, kind of summed it up best in his letter, which is

23   Defense Exhibit 67 where he said, Equal -- what we want is

24   equal treatment and then, i.e., if we lose our trust account,

25   everybody does, and now it's on terms that I think are

1    favorable to Neopost.

2         Well, Your Honor, everybody did lose it, and you

3    heard testimony that Neopost offered to do it all in one fell

4    swoop.  They, when they sat down with Mr. Kearney and

5    Mr. Kearney asked them how they wanted to do it and told them

6    that -- that they had the option, they could either do it all

7    at once or they could break it up and kind of, you know, let

8    the trust account go down and extend it over six months, much

9    like Ascom did, they declined.  They said, no, we want to do

10   it now, we want to do it at all once, we're ready to do it,

11   and they set the time.  They asked for extensions.  They were

12   given every extension that they asked for, so they were

13   treated well.

14        In addition, Your Honor, you heard testimony from

15   all of those people that testified that none of them had any

16   authority to give them compensation or to agree to give them

17   compensation.  That decision in and of itself had to come from

18   the Postmaster General or the Board of Governors.

19        Finally, Your Honor, on the takings issue.  Again,

20   as I started off, Your Honor, the entire CMRS system and the

21   Trust Fund Management System was a creation of the regulation.

22   They only got -- the manufacturers only got the interest

23   income because the trust account was, by regulation, placed in

24   their hands.  All the 1995 regulation did was eliminate the

25   trust account created by the earlier regulation and directed

1   that meter postage be paid directly to U.S. Postal Service and

2   they had every good reason for doing so.  It was not a money

3   grab, as you heard Mr. Pedersen say, that irrespective of

4   Mr. Grant's memo saying that there is -- over 20 years they

5   could realize 200- -- I'm sorry, $300 million in interest.  He

6   told you, if it you took 20 years to earn only a

7   day-and-a-half of revenue, that's really not worth it because

8   this wasn't an issue of grabbing money.  It was an issue of

9   cash management.

10          Finally, Your Honor, I think Mr. Abramson suffered

11  from the same thing that Mr. Ganley's initial declaration or

12  affidavit did, and that was that it was limited only to

13  information that was given to him by Mr. Boyd.

14          As you heard Mr. Ganley testify in the initial --

15  with respect to his affidavit, he was only told what

16  Mr. Hillegass said.  He never saw any of it.  He never saw any

17  of these statements, and it sounded reasonable to him, but

18  when he saw those individual statements, he disagreed with

19  many of them.  With Mr. -- Mr. Abramson, he was very much

20  limited, unless Mr. Boyd or Ms. Moghadam put it in front of

21  him, highlighted it, starred and told him that was a cost, he

22  didn't know.  No matter what other documents were put in front

23  of him, including the Comerica trust account that had a whole

24  schedule of fees, including any of the documents that he

25  later -- that were later brought to his attention and

1    highlighted and starred, he didn't know.

2           Well, you heard -- you heard Dr. Kennedy testify

3    that he's got a duty to look.  He's got a duty to ask.  He

4    knows that there's costs and there's going to be costs avoided

5    but yet he didn't push, he didn't say, well, what about

6    Kennedy's assertion about bank fees or about all these other

7    fees?  He didn't.

8           So, Your Honor, I think that with respect to

9    Mr. Abramson's opinion on his damages calculations, he

10   considered only what Plaintiffs' counsel gave him and he gave

11   Plaintiffs only what they wanted to hear.

12          So, Your Honor, we believe that there is no contract

13   at all, there's no takings at all and that you should rule in

14   favor of Defendant.

15          THE COURT:  Thank you.

16          MR. BOYD:  Your Honor, again, thank you.  I'll be

17   brief.  I'm taking my cue from my reading of the body language

18   and, I mean -- I'm not saying anything wrong, but I will say I

19   heard a different case than Mr. Valdez did, and I think it's

20   all there in the evidence and you heard it and I will save my

21   rebuttal for the findings of fact and conclusions of law.

22          But I do want to say that the things that Mr. Valdez

23   discussed regarding the testimony of the witnesses, I think,

24   will be contradicted quite substantially when you look at the

25   evidence.  And again, Your Honor, the case really, I think,

1    turns to a large extent on Mr. Ganley's testimony.  And

2    contrary to what Mr. Valdez has just said, I did not hear

3    Mr. Ganley back off that affidavit in any material respect

4    during his deposition.

5           And Your Honor, if he was authorized, if he was

6    encouraged by his superiors to go out and offer the same terms

7    as Pitney-Bowes, even before the regulations came out, then

8    that is integral to his job duties to do so.  He testified

9    that he was told to do it and that he went out and did it.

10          So, Your Honor, with that, thank you for your time

11   and we again request that you enter verdict or judgment in

12   favor of the Plaintiffs.

13          THE COURT:  Well, if the case turns so much on

14   Mr. Ganley, then I guess you're happy that rumors of his death

15   were premature.

16          MR. BOYD:  Your Honor, that was some very good news

17   that we got in February.

18          THE COURT:  And for him, too, I'm sure.

19          (LAUGHTER.)

20          THE COURT:  So, there are three things on my mind.

21   One is that I think we agreed that what's going to happen next

22   is each side is going to submit a list of exhibits that they

23   are offering in evidence and they will put an asterisk next to

24   the ones that were identified by a witness in court so that I

25   can be clear on what there was a -- what there was a

 1   foundation for and what there wasn't.

 2          Now, even if they -- even if a witness testified

 3   about it, doesn't mean that you may not have a legitimate

 4   objection, but at least we'll know that we saw it and we heard

 5   testimony about it during.  And then Mr. Boyd has identified

 6   at least some of the exhibits that were not identified in

 7   court that he wants me to consider.  There may be others.  The

 8   Defense may also have some that they want me to consider.

 9          So, we should either agree now or you should agree

10   on a day by which that will be done, and then shortly

11   thereafter, a day by which the opposing side will file

12   objections which hopefully will say we don't have an objection

13   to most of these, but we do have an objection to the

14   following, and sort of really brief, you know, is it lack of

15   foundation, is it hearsay, is it double hearsay, we don't need

16   a whole brief on it, and -- or if there's a particular rule of

17   evidence that you think does the job.

18          And then maybe I'll want to have a conference call

19   or a status to talk about it, maybe I won't.  It may also

20   depend on whether I want to wait till after I see the proposed

21   findings of fact and conclusions of law to see what you're

22   relying on them for, but let's get the list of exhibits filed

23   and the objections filed.

24          Second thing is, early on, the Plaintiffs identified

25   deposition excerpts.  The Defendants identified entire

depositions, and so there are one or two ways to do it, and it

seems to me, one is that the Defendants can now identify the

excerpts they want me to rely on and do that in a writing, and

then the Plaintiffs can say either we object, or we don't

object but for the rule of completeness consider these

additional pages, or we can wait till the proposed findings of

fact but then we're going to be debating stuff later, so if it

can be done earlier, that's probably fine.

And then the final thing is, proposed findings of

fact and conclusions of law, which obviously will have law and

citations to cases and so forth.  And to the extent that it

relies on testimony or exhibits, particularly since you spent

the money for daily copy, you ought to cite to exactly what

you're relying on so nobody's -- nobody's forcing Al and me to

go searching, and we've all sat here, but it should be easy to

identify by document or the witness and the transcript cite.

So those were the three things on my mind.  I don't

know if either side had anything else, other than the dates by

which each of these three things ought to be done.

MR. BOYD:  Your Honor, I would just say the only

other issue would be that if the motion to strike, and there

may be something else pending, I'm not sure, but if that --

THE COURT:  Motion for sanctions, there's

exfoliation and all of that.

MR. BOYD:  That was briefed, but the motion to

1  strike was just made orally, so I'm not -- on the motion for

2  exfoliation, unless somebody wants to do something else, I

3  have no problem with the way that stands.

4        But on the motion to strike, I did want that to be

5  submitted in writing.  We were requesting that it be briefed

6  if they're pursuing it.

7        MR. VALDEZ:  Well, Your Honor, I think we argued it

8  pretty extensively.  I think that would take -- the whole

9  thought of that is to try and detract the Defendant from

10  getting its statements of fact and conclusions of law into the

11  Court, so I think we argued it thoroughly before Your Honor

12  and I think Your Honor has it under consideration, so...

13        THE COURT:  The question is whether I need --

14  there's any case law or rule citation that --

15        MR. BOYD:  And I don't believe I argued it

16  thoroughly.

17        THE COURT:  All right.  Well, maybe one way to do it

18  then is you can find in the transcript where he argued it

19  thoroughly and you can --

20        (LAUGHTER.)

21        MR. BOYD:  I'm happy to submit a brief in opposition

22  to the motion.

23        THE COURT:  You can file a brief in opposition to

24  oral motion and then he can file a reply, but the reply

25  shouldn't be a sandbag, it shall be a reply.  But what may

happen, since Mr. Boyd is going to have a little more time to

research it than you did in the middle of trial, you may come

upon some cases and some things that you either disagree with

or find some cases on the other side or whatever.

So, you can sit here and figure out when you're

going to do each of these things or you can talk to each other

and file in the next few days a stipulation or something

saying here's the dates on which each of these things are

going to be done.  I don't care.

MR. VALDEZ:  Can we do that, Your Honor?  I think

that will be fine.  I think there's actually going to be very

little disagreement, except for some documents.  I think the

depositions, I think we can basically put those together and

cull them into one exhibit for you and we would put both of

ours together, and I just think the only issue is on some of

the documents but that's about it.

THE COURT:  Okay.  So why don't you, you know, get

together and file some of these things.  On this date we're

doing this, on that date we're doing that, on that date we're

doing that.  I know that generally you've been speaking about

filing the proposed findings of fact and conclusions of law in

30 days.  That's fine, but if you need a little more time,

particularly since there are some of these other things to do,

that's fine.  If you can't agree, then I'll deal with it, but

you should be able to agree, and then if it's slightly longer

1    than 30 days, I would hope.

2         MR. BOYD:  Again, just to make a pitch for 30 days,

3    Your Honor.  The transcripts are pretty much all already.

4    We've already received them from the wonderful court

5    reporters, and so, you know, we're -- we know you have a busy

6    schedule and I think I heard perhaps secondhand that, you

7    know, your summer is -- you're somewhere else.  I don't know

8    what that means for your work.

9         THE COURT:  No.  I'm starting an eight-week trial on

10   April the 10th or something like that.  Yeah, April the 10th,

11   but that doesn't mean there aren't evenings and weekends.

12        MR. BOYD:  That's true.

13        MR. VALDEZ:  You really want to do that?

14        MR. BOYD:  Anyway we --

15        MR. VALDEZ:  We're doing it to him.

16        THE COURT:  Do that all the time.

17        MR. BOYD:  We will talk with Mr. Valdez, but I'm

18   interested in keeping it 30 days.

19        THE COURT:  Roughly 30 days, which would get us to

20   the end of April and, you know, if you negotiate a little

21   longer than that, then you'll negotiate a little longer than

22   that.  If you can't reach an agreement on any of these dates,

23   then we'll -- you have a conference call or you can file

24   something.  I'll be back next Wednesday.  I'll be back in

25   chambers next Wednesday.

1          MR. VALDEZ:  Thank you, Your Honor.

2          THE COURT:  All right.  It's been a pleasure.

3          MR. BOYD:  Thank you, Your Honor.

4          THE COURT:  In some ways.

5          (LAUGHTER.)

6          THE DEPUTY CLERK:  All rise.

7          (PROCEEDINGS END AT 4:10 P.M.)

8                          *-*-*-*

9                **CERTIFICATE OF REPORTER**

10         I, Catalina Kerr, certify that the foregoing is a

11    correct transcript from the record of proceedings in the

12    above-entitled matter.

13

14

15

16    _____   _____
      Catalina Kerr                      Date
17

18

19

20

21

22

23

24

25

**$**

**$1,000 [1]** 54/16
**$1,080,000 [2]** 37/23 38/14
**$1.5 [1]** 110/19
**$1.5 million [1]** 110/19
**$12 [1]** 106/13
**$2 [1]** 39/8
**$2 million [1]** 39/8
**$3 [2]** 54/9 110/21
**$3 million [2]** 54/9 110/21
**$300 [1]** 155/5
**$300 million [1]** 155/5
**$34 [1]** 138/13
**$34 million [1]** 138/13
**$380,000 [1]** 38/12
**$40 [1]** 47/11
**$40 million [1]** 47/11
**$46,000 [1]** 56/13
**$5 [7]** 52/17 54/16 55/4 55/15 106/16 107/6 109/12
**$6 [1]** 117/17
**$644,000 [1]** 37/23
**$66,000 [4]** 30/19 32/4 56/8 56/13
**$7 [11]** 52/20 55/9 55/15 106/12 106/13 106/17 107/8 108/24 109/6 109/8 111/17
**$72,000 [1]** 56/16
**$74,710,131.67 [1]** 139/14

**'**

**'3 [1]** 94/25
**'4 [2]** 94/24 94/25
**'5 [1]** 94/24
**'73 [2]** 121/11 121/12
**'78 [2]** 143/9 144/4
**'79 [2]** 142/25 143/1
**'85 [1]** 144/4
**'90s [1]** 7/4
**'94 [4]** 37/20 37/23 38/5 38/11
**'95 [5]** 37/20 37/20 37/24 38/10 143/21

**-**

**---------------------------X [2]** 1/6 1/9
**---------------------------X [1]** 1/2

**.**

**.5 [1]** 54/16

**0**

**00-1401 [2]** 1/3 4/3
**00-2089 [2]** 1/7 4/5
**06006 [1]** 2/6
**06461 [1]** 1/20

**1**

**1,000 [3]** 55/9 55/15 55/15
**1-Year [10]** 36/22 37/2 39/17 40/4 41/24 86/16 87/11 87/22 88/4 97/15
**1.5 million [2]** 52/9 54/8
**1.6 billion [1]** 5/17
**10 [14]** 19/22 19/24 27/22 31/1 31/8 31/10 31/15 69/3 86/5 100/3 103/19 121/12 132/11 132/13
**10 percent [1]** 147/2
**101 [2]** 44/5 141/17
**10th [2]** 162/10 162/10
**11 [4]** 69/3 94/25 124/19 134/15
**113 [1]** 3/2
**11th [1]** 117/5
**12 [12]** 20/10 31/13 31/14 31/15 103/19 107/22 107/23 107/25 108/15 122/5 138/19 146/3
**12 percent [3]** 86/6 100/3 109/23

**12.1 [1]** 132/9
**12.9th [1]** 91/20
**12:35 [1]** 92/2
**13 [1]** 56/13
**13,000 [1]** 56/18
**132 [2]** 13/19 138/1
**139 [1]** 3/3
**14 [3]** 31/8 31/9 103/19
**140 [4]** 132/25 133/2 133/4 133/5
**1401 [2]** 1/3 4/3
**141 [1]** 133/11
**144.971 [1]** 74/15
**144.975 [2]** 74/11 87/11
**147 [19]** 30/21 30/23 30/23 31/11 32/1 34/12 52/24 53/2 53/4 55/10 55/21 56/3 57/16 103/3 103/4 104/1 104/9 106/6 111/9
**15 [5]** 10/23 66/11 113/7 113/8 122/23
**156 [1]** 3/4
**15th [8]** 16/17 25/13 68/16 69/22 71/6 123/15 123/22 138/6
**16 [5]** 25/18 86/8 100/19 132/11 145/17
**16 percent [1]** 102/4
**163 [1]** 3/5
**164 [1]** 134/3
**165 [1]** 146/6
**166 [1]** 146/6
**179 [6]** 13/25 13/25 14/3 14/5 14/15 15/2
**18 [4]** 20/12 74/10 122/23 146/3
**18 percent [2]** 86/9 100/20
**188 [8]** 14/19 14/19 14/20 14/22 14/23 15/2 15/15 77/12
**18th [2]** 124/9 126/11
**19 [1]** 134/4
**19' [2]** 95/9 142/24
**19-whenever [1]** 144/3
**1960s [1]** 118/20
**1970s [1]** 129/21
**1971 [2]** 116/23 123/16
**1972 [3]** 117/1 117/5 117/23
**1973 [5]** 119/12 119/18 119/25 120/1 122/4
**1974 [1]** 5/24
**1975 [1]** 5/25
**1977 [4]** 12/6 123/15 123/22 124/9
**1978 [9]** 126/10 126/12 127/4 127/17 127/20 127/23 133/8 140/8 141/18
**1979 [1]** 141/19
**1980 [1]** 147/12
**1985 [1]** 141/23
**199 [17]** 12/11 15/17 15/18 15/19 15/24 25/10 51/22 51/24 52/2 55/22 55/23 57/1 57/2 57/3 57/4 105/10 105/19
**1990 [1]** 74/10
**1993 [5]** 56/7 56/12 56/17 138/6 150/6
**1994 [6]** 6/2 94/21 95/7 95/15 95/16 152/23
**1995 [9]** 44/23 94/21 95/7 95/15 95/16 143/12 143/14 144/22 154/24
**1996 [15]** 37/20 50/7 50/10 51/3 79/20 81/11 81/21 83/2 83/15 84/1 84/6 84/21 85/6 91/12 138/13
**19th [1]** 28/10
**1:00 [1]** 65/22
**1:00 o'clock [2]** 64/16 65/19
**1:45 [2]** 91/23 92/3
**1st [8]** 50/6 50/10 51/3 79/20 81/21 83/2 83/15 84/1

**2**

**20 [9]** 59/22 65/1 65/16 89/25 90/1 90/7 90/15 155/4 155/6
**20 percent [6]** 97/3 97/4 98/14 98/21 98/22 99/1
**200 [11]** 12/11 15/19 15/24 25/10 51/22

**51/24 52/2 55/24 105/10 105/19 155/5
2000 [5]** 95/9 95/18
**20001 [1]** 2/10
**20003 [1]** 1/24
**20004 [1]** 1/15
**2003 [2]** 8/13 95/8
**2004 [6]** 44/15 44/22 94/18 94/22 94/24 95/8
**2005 [3]** 94/19 94/22 94/23
**2009 [12]** 12/4 12/5 14/7 66/16 66/18 66/24 67/11 68/8 71/10 71/21 71/24 72/4
**2010 [11]** 16/18 16/20 25/13 28/10 66/11 67/6 67/16 68/16 69/22 71/6 71/23
**2011 [11]** 51/2 79/23 81/11 81/19 82/5 82/6 82/13 82/21 83/3 83/21 91/12
**2012 [2]** 1/4 70/21
**202.268.3016 [1]** 2/3
**202.307.6059 [1]** 1/24
**202.354.3258 [1]** 2/10
**202.7994502 [1]** 1/16
**2025 [3]** 15/13 61/23 62/5
**20260 [1]** 2/3
**203.301.3607 [1]** 1/20
**2089 [1]** 1/7 4/5
**211 [2]** 74/7 74/11
**21st [2]** 70/21 123/6
**22 [1]** 144/9
**24th [1]** 117/23
**250,000 [1]** 122/25
**26 [4]** 9/14 24/18 27/14 27/15
**27 [1]** 1/4
**2754 [2]** 56/3 57/13
**28 [4]** 117/1 123/5 128/23 144/21
**28th [1]** 126/11
**29 [1]** 123/13

**3**

**3 million [3]** 52/10 54/20 110/25
**30 [9]** 8/14 65/16 89/25 124/8 161/22 162/1 162/2 162/18 162/19
**30-year [2]** 90/1 90/8
**300-and [1]** 38/12
**31st [11]** 37/19 44/23 79/23 82/5 82/10 82/21 83/3 83/21 94/18 94/23 94/24
**32 [9]** 13/15 13/15 13/19 13/20 13/21 16/3 45/17 60/6 66/8
**33,000 [1]** 56/12
**34 [1]** 125/15
**35 [3]** 6/7 47/11 126/7
**35-year [1]** 10/10
**350 [1]** 38/12
**360,000 [1]** 8/14
**37 [1]** 129/8

**4**

**40 [4]** 126/9 133/1 133/2 133/4
**40 percent [1]** 56/19
**400 [1]** 123/1
**401K [1]** 53/18
**41 [1]** 129/19
**43 [1]** 127/2
**475 [1]** 2/2
**478 [1]** 1/19
**48 [2]** 130/5 130/7
**4:10 [1]** 163/7
**4B [1]** 57/2
**4th [1]** 127/20

**5**

**5 percent [2]** 106/16 111/4
**5-dollar [1]** 106/10
**50 [3]** 127/3 130/15 130/17
**500 [5]** 1/15 86/5 100/2 100/8 100/17

**5**

**53** [1]  131/15
**54** [2]  127/19 131/21
**555** [1]  1/23

**6**

**600** [2]  86/7 100/14
**6509** [1]  2/9
**66** [1]  3/8
**66,000** [1]  56/18
**67** [1]  153/23

**7**

**72,000** [1]  56/17
**77** [1]  145/16
**78** [1]  146/1

**8**

**8.2 percent** [1]  100/25
**800,000** [1]  123/1
**85,000** [1]  56/17
**86** [2]  146/1 146/3
**860.285.7371** [1]  2/7
**87** [1]  25/13
**8th** [1]  1/15

**9**

**90 percent** [1]  123/24
**90-day** [3]  89/24 90/6 90/7
**93** [1]  25/18
**95** [1]  25/19
**9:30** [2]  1/5 4/2

**A**

**a.m** [2]  1/5 4/2
**ability** [2]  87/10 87/21
**able** [9]  12/15 12/18 13/3 19/1 60/15 64/10
124/2 124/5 161/25
**about** [124]  5/16 9/7 9/12 9/17 9/21 9/22
10/24 11/16 17/13 21/6 21/8 21/25 21/25
22/4 22/7 23/14 25/8 25/15 25/20 26/3 26/11
28/6 29/15 32/3 32/12 32/22 33/6 33/11
33/16 33/18 33/20 33/21 35/16 37/11 39/7
39/25 40/10 40/11 42/14 42/15 44/5 48/21
50/12 50/13 54/6 56/2 56/5 56/17 56/18 57/5
57/25 58/6 58/7 58/9 61/15 62/2 64/10 68/9
70/21 72/16 76/5 76/25 78/10 82/7 84/24
86/2 88/19 89/13 89/18 90/14 90/15 90/19
91/11 92/18 97/14 99/18 100/14 100/22
103/18 104/9 106/3 106/8 110/13 110/18
111/8 116/15 117/15 119/4 120/10 121/14
123/19 124/20 126/16 127/15 129/7 130/7
130/9 132/12 133/10 133/15 133/18 133/21
135/14 137/18 137/19 137/25 142/22 145/8
149/4 149/10 150/22 151/9 151/16 151/23
152/12 153/21 156/5 156/9 156/6 158/3
158/5 158/19 161/5 161/22
**above** [5]  72/21 110/19 110/25 145/4 163/12
**above-described** [1]  145/4
**above-entitled** [1]  163/12
**Abramson** [69]  11/9 14/6 14/11 14/25 16/13
17/8 19/12 19/18 19/24 21/18 22/24 25/5
25/8 26/2 27/2 27/18 29/1 30/4 30/8 30/10
31/16 33/19 36/21 40/2 42/10 43/16 45/18
45/23 48/6 51/1 51/17 58/1 58/15 58/20
61/10 64/10 64/21 65/13 67/5 67/15 75/18
77/6 77/18 78/23 79/19 81/18 83/14 83/25
85/5 86/15 86/19 87/9 88/2 92/11 97/16 98/5
98/6 98/24 98/25 101/4 101/24 102/23
103/13 105/10 106/9 138/12 139/15 155/10
155/19
**Abramson's** [38]  11/22 13/1 15/1 16/5 16/8

16/18 19/21 20/5 20/18 26/4 26/1 33/20
33/24 41/25 43/24 52/4 57/2 59/3 77/19
60/25 61/15 62/23 63/21 66/16 67/24 68/7
69/5 69/17 70/7 72/4 72/19 88/24 89/18
90/19 99/6 101/6 103/5 156/9
**absence** [1]  128/7
**absolutely** [3]  10/10 148/13 148/16
**ABV** [2]  6/8 8/21
**academic** [1]  46/21
**accept** [3]  58/12 125/4 144/4
**acceptable** [1]  129/11
**acceptance** [3]  63/19 120/14 148/12
**accepted** [7]  21/20 35/4 45/20 49/9 102/3
141/22 145/2
**accepting** [2]  35/17 63/8
**accepts** [1]  48/23
**access** [2]  75/6 87/13
**accomplish** [3]  41/13 114/22 128/16
**accordance** [1]  145/3
**according** [5]  87/11 102/25 109/6 117/22
138/12
**account** [65]  23/1 33/4 33/13 34/10 34/11
34/14 34/18 35/21 36/7 49/13 52/6 52/8 52/8
53/9 53/10 53/10 53/12 53/15 53/25 54/4
54/7 54/10 54/14 55/3 55/5 56/4 56/14 60/8
60/20 61/10 73/15 74/21 79/2 80/20 80/22
85/20 87/11 87/14 87/21 88/6 88/10 92/23
94/12 95/23 104/10 104/19 110/24 116/13
120/19 120/25 124/13 124/23 125/8 131/3
137/13 141/14 141/15 142/3 142/5 148/10
153/24 154/8 154/23 154/25 155/23
**accountant** [5]  6/5 34/20 35/6 44/7 79/8
**accountant's** [1]  16/17
**Accountants** [2]  6/10 7/22
**accounting** [10]  5/23 5/25 6/25 45/1 46/10
49/9 62/20 62/21 74/23 101/8
**accounts** [31]  28/5 29/1 29/2 31/4 32/19
60/21 61/5 61/6 75/4 75/7 79/17 79/22
80/6 80/10 81/5 87/16 104/24 105/5 106/20
108/16 114/9 119/5 119/8 128/2 129/15
132/16 134/10 137/11 142/14 151/10
**Accredited** [2]  6/8 8/19
**accumulate** [4]  42/11 45/8 61/6 92/11
**accumulated** [6]  38/16 42/24 43/12 43/18
88/21 100/13
**accumulating** [3]  38/9 45/3 82/10
**accumulation** [2]  50/9 99/6
**accuracy** [5]  16/13 35/16 55/13 62/23 75/19
**achieved** [1]  88/5
**acquisition** [2]  8/23 9/2
**across** [1]  80/15
**action** [3]  4/3 4/5 118/19
**actual** [5]  48/12 49/6 101/20 146/17 146/19
**actually** [21]  7/4 10/12 10/15 27/7 33/12
33/13 48/9 56/1 67/22 73/1 87/5 88/3 99/16
100/10 101/2 119/16 123/11 150/14 150/15
150/24 161/11
**add** [6]  15/5 81/3 81/10 82/8 86/10 89/20
**added** [2]  100/15 119/9
**adding** [2]  12/7 81/6
**addition** [4]  21/22 22/3 26/1 154/14
**additional** [10]  52/20 53/14 55/9 65/8
100/17 112/17 112/18 112/21 112/21 159/6
**Additionally** [1]  87/9
**additive** [1]  11/6
**address** [1]  137/12
**adjusted** [1]  101/16
**admission** [1]  20/17
**ADP** [1]  118/6
**advance** [2]  119/15 145/1
**adverse** [1]  126/5
**advises** [1]  153/2

**affect** [3]  45/2 52/14 55/13
**affected** [2]  14/7 61/10
**affecting** [1]  30/15
**affects** [1]  24/6
**affidavit** [7]  70/21 70/25 132/10 134/4
155/12 155/15 157/3
**affiliated** [1]  7/2
**afford** [1]  141/8
**after** [17]  4/10 6/20 17/17 23/9 59/4 66/16
71/13 81/6 108/1 109/22 111/5 114/16
129/20 132/5 134/14 141/24 158/20
**afternoon** [2]  65/10 139/18
**again** [48]  22/10 25/21 26/20 29/24 33/14
43/23 52/24 60/6 65/13 67/11 67/18 72/9
72/11 76/16 80/18 91/9 92/3 99/13 108/4
118/3 118/4 118/14 119/24 120/2 120/2
120/6 120/8 122/4 122/10 123/5 123/21
124/6 124/6 125/16 127/4 132/14 132/14
138/10 142/4 144/17 147/6 148/11 148/15
154/19 156/16 156/25 157/11 162/2
**against** [3]  99/5 118/20 149/11
**agency** [1]  146/22
**aggregate** [1]  82/23
**ago** [8]  7/9 23/7 42/15 47/1 71/14 82/7
103/15 107/21
**agree** [30]  20/21 20/24 26/10 58/25 61/17
76/1 79/6 79/13 80/23 89/7 90/11 90/13
90/21 90/23 91/12 92/24 96/11 109/14 110/2
113/2 129/12 130/23 130/4 134/6 134/12 134/22
154/16 158/9 158/9 161/24 161/25
**agreed** [10]  20/6 72/17 80/21 129/13 131/8
131/19 134/17 140/11 144/6 157/21
**agreeing** [1]  27/5
**agreement** [38]  18/21 19/24 20/5 20/8 20/13
20/17 25/2 25/3 25/22 53/11 53/25 54/13
78/4 78/5 78/18 79/25 85/18 106/18 107/8
108/23 108/24 109/1 109/4 109/5 109/17
109/24 110/18 111/16 126/23 127/24 128/1
128/3 128/9 137/17 141/1 145/21 145/23
162/22
**agreements** [11]  52/11 53/7 54/11 55/9
60/22 61/1 61/2 107/13 140/9 145/4 151/7
**ahead** [9]  27/3 30/6 50/21 64/13 77/9 112/9
118/9 130/6 144/1
**AICPA** [6]  7/14 7/16 7/23 8/1 8/14 8/23
**AICPA's** [3]  8/12 8/17 8/19
**aid** [1]  8/24
**al** [3]  1/7 4/6 159/14
**Alesevich** [1]  2/2
**all** [100]  4/13 4/17 6/3 7/22 8/10 9/3 11/17
17/22 18/18 19/12 21/4 22/23 24/21 25/12
25/19 28/13 28/14 28/23 28/23 28/24 31/3
35/8 35/14 39/15 42/25 45/25 46/4 46/10
46/12 46/18 47/17 47/17 48/5 50/3 51/25
53/8 55/24 60/2 60/13 65/21 66/1 76/18 78/4
78/5 82/18 85/5 87/2 87/6 91/25 92/4 94/19
95/14 99/24 101/5 101/25 103/8 104/16
105/1 111/25 112/22 112/23 113/11 113/13
114/2 114/4 116/15 129/3 130/24 133/13
134/6 137/15 138/2 139/3 142/7 143/20
143/24 143/25 145/25 147/10 148/23 149/7
150/21 151/8 152/11 154/3 154/6 154/10
154/15 154/24 156/6 156/13 156/13 156/20
159/15 159/24 160/17 162/3 162/16 163/2
163/6
**allege** [1]  141/22
**alleged** [2]  144/2 144/5
**Allocca** [1]  149/13
**allow** [7]  18/14 52/20 53/14 117/9 129/11
129/14 131/5
**allowed** [5]  18/13 37/15 37/25 132/23 133/9
**allude** [1]  33/20

A    Case 1:00-cv-02089-PLF

H2/23 112/25 124/4 127/15 128/7 132/23
Document 74 Filed 02/23/13    Page 166 of 188

**A**    Case 1:00-cv-02089-PLF

**alluded [2]** 28/21 29/22
**almost [5]** 41/12 57/23 148/13 153/10 153/12
**alone [1]** 58/9
**already [8]** 89/12 145/19 147/11 147/17 148/1 151/11 162/3 162/4
**also [30]** 6/7 7/15 7/17 9/10 11/22 13/1 19/21 22/4 25/1 27/19 31/12 32/5 39/10 43/23 46/6 50/18 55/7 61/21 85/2 106/11 121/22 122/13 126/19 128/24 131/21 145/7 151/13 152/1 158/8 158/19
**Altergott [2]** 118/1 119/4
**Altergott's [1]** 118/23
**alternative [7]** 62/15 99/5 99/13 102/6 102/12 111/20 123/3
**alternatives [1]** 85/1
**although [5]** 101/3 122/20 127/15 146/23 147/22
**always [4]** 41/12 49/22 55/2 129/2
**am [9]** 7/13 51/14 62/13 69/22 69/23 107/20 152/8 153/13 153/15
**ameliorate [1]** 17/18
**amended [1]** 68/18
**amending [1]** 150/25
**Amendment [1]** 139/13
**America [1]** 152/24
**American [6]** 6/9 7/13 7/16 7/21 7/24 7/25
**among [3]** 8/3 104/20 104/21
**amount [20]** 30/15 36/3 38/3 38/20 38/22 41/10 41/17 42/24 45/13 48/13 51/5 54/19 54/20 55/5 56/21 61/11 73/10 73/10 74/20 139/14
**amounts [3]** 39/7 44/14 81/11
**AMPLEX [2]** 150/22 150/23
**analysis [23]** 10/14 12/23 21/10 21/19 36/14 36/21 59/8 60/20 61/23 63/2 70/22 86/15 87/1 87/9 96/25 97/1 97/8 98/17 101/4 101/24 102/9 102/24 122/15
**analyze [1]** 45/23
**analyzing [1]** 100/7
**and identify [11]** 4/8
**Anders [1]** 71/17
**annual [3]** 37/17 44/11 122/25
**anomaly [1]** 41/11
**another [10]** 15/20 59/22 66/8 85/9 86/6 100/14 107/1 107/13 110/16 151/22
**answer [14]** 18/8 41/18 50/18 57/22 57/24 68/4 73/12 77/1 84/21 88/14 89/15 110/9 130/6 145/24
**answers [4]** 47/1 132/7 135/2 135/16
**anticipate [1]** 121/22
**anticipated [1]** 121/9
**anticipates [1]** 121/17
**antitrust [1]** 118/19
**any [151]** 4/14 6/3 7/11 7/11 7/19 7/20 8/10 8/15 11/25 11/25 13/10 14/11 15/1 16/21 16/22 17/12 17/13 17/14 17/21 18/4 18/4 18/4 18/4 19/2 19/2 20/2 20/25 21/2 21/3 22/20 24/9 28/4 28/8 28/25 28/25 29/8 29/23 30/13 33/25 35/8 35/9 35/15 37/1 37/9 37/10 40/6 43/16 43/18 43/19 44/18 46/1 54/24 57/6 57/16 58/10 59/13 60/7 60/9 60/21 62/18 62/21 63/3 63/10 63/23 64/24 65/8 65/9 67/20 67/20 67/23 68/17 68/25 70/3 71/14 71/15 75/11 76/8 76/24 78/4 78/4 78/4 83/20 83/24 84/20 85/14 85/21 86/11 96/17 97/21 99/5 101/8 102/14 102/15 102/17 102/18 103/11 103/22 103/22 103/23 104/18 107/2 107/18 108/18 110/3 110/13 110/19 111/20 112/17 112/18 112/20 112/21

140/16 140/17 140/17 140/17 140/20 140/21 141/4 145/22 148/17 148/18 149/5 149/6 149/25 149/21 150/2 150/2 150/4 150/5 151/25 153/4 154/15 155/16 155/16 155/24 157/3 160/14 162/22
**anybody [4]** 24/1 24/24 27/15 147/23
**anymore [2]** 136/4 151/7
**anyone [3]** 61/8 149/14 149/15
**anything [31]** 16/25 17/2 21/23 22/2 24/6 24/24 26/7 30/12 30/12 30/13 34/19 39/17 56/2 58/10 58/19 65/12 76/7 97/10 97/13 110/25 113/13 133/14 142/19 146/10 146/10 147/2 149/10 150/4 151/24 156/18 159/18
**anyway [2]** 68/21 162/14
**anywhere [1]** 69/8
**apologize [12]** 20/6 80/17 84/18 93/23 95/17 103/8 120/21 121/1 122/6 123/10 130/5 136/11
**apparently [4]** 70/16 104/23 144/4 149/21
**appear [10]** 15/14 31/7 57/12 104/16 104/23 105/1 105/5 108/18 121/10 123/2
**APPEARANCES [2]** 1/12 2/1
**appeared [3]** 33/25 105/7 128/4
**appears [8]** 31/5 34/15 36/13 56/3 108/13 118/1 125/6 133/25
**Appendix [2]** 28/2 72/21
**apples [1]** 99/1
**applicable [4]** 81/2 81/13 91/3 132/4
**application [2]** 62/7 79/15
**applications [2]** 13/10 125/9
**applied [7]** 81/4 85/14 85/19 96/4 96/5 96/6 102/4
**apply [5]** 80/22 81/9 82/8 82/24 105/18
**applying [6]** 80/8 81/6 83/5 83/7 100/20 102/10
**Appraisers [1]** 7/17
**appreciate [1]** 95/12
**apprehension [1]** 118/18
**approach [3]** 4/7 24/10 125/3
**approaches [1]** 15/6
**appropriate [11]** 39/21 40/8 50/16 58/4 70/22 80/21 80/23 81/9 96/12 101/4 129/10
**appropriateness [2]** 36/22 86/15
**approval [4]** 121/20 121/24 121/24 123/7
**approve [1]** 126/3
**approved [1]** 126/1
**approximate [1]** 87/4
**approximately [10]** 6/7 6/17 8/14 38/3 38/20 40/19 47/11 84/6 86/7 89/19
**April [11]** 47/1 16/20 25/13 28/10 66/11 68/16 69/22 71/6 162/10 162/10 162/20
**April 15 [1]** 66/11
**April 15th [5]** 16/17 25/13 68/16 69/22 71/6
**April 19th [1]** 118/20
**are [97]** 4/11 4/14 7/11 7/23 17/24 18/1 18/1 23/24 23/24 25/14 26/17 27/23 29/2 29/2 29/5 31/3 33/9 34/16 40/23 41/12 41/13 41/21 42/6 48/19 48/22 49/2 49/3 49/24 52/16 52/17 52/21 53/17 55/10 57/18 58/8 60/7 61/17 63/16 64/2 73/3 73/5 73/22 78/7 78/11 78/11 78/16 80/24 84/14 89/22 90/1 95/5 95/8 96/16 97/4 100/12 101/17 103/1 103/18 104/20 107/3 107/4 107/12 109/1 109/5 109/16 111/5 111/12 111/16 111/22 115/16 117/16 117/21 119/17 121/17 121/22 124/2 124/12 135/8 136/15 139/10 140/9 141/2 141/2 141/10 141/19 141/21 147/24 153/10 153/12 153/25 157/20 157/23 159/1 161/8 161/23 162/3
**area [4]** 7/4 10/24 11/1 11/4

**area [5]** 5/18 9/23 10/20 29/17 70/17
**aren't [2]** 99/25 162/11
**argue [2]** 136/25 139/24
**argued [4]** 160/7 160/11 160/15 160/18
**argument [2]** 20/4 136/21 143/6 143/15
**arguments [2]** 113/1 113/6
**arithmetic [3]** 35/18 63/8 77/6
**around [6]** 23/9 30/19 47/4 83/16 91/20 107/2
**arrangement [1]** 62/2
**arrangements [1]** 122/1
**articulate [1]** 107/21
**articulating [1]** 78/19
**as [258]**
**ASCOM [20]** 1/3 4/3 22/16 23/25 30/19 39/2 47/20 56/12 56/25 95/3 133/7 144/10 144/12 144/14 149/4 149/17 149/20 152/13 152/22 154/9
**Ascom's [4]** 42/15 43/5 61/1 144/9
**aside [7]** 32/23 35/23 73/9 73/13 75/12 97/22 134/11
**ask [17]** 4/21 5/21 9/4 19/6 23/5 28/6 30/1 43/22 49/8 57/5 59/8 65/7 65/8 73/22 137/1 139/8 156/3
**asked [21]** 11/15 11/17 13/1 70/6 70/8 71/14 72/6 76/24 82/8 88/7 102/11 132/20 133/5 135/7 135/12 135/17 152/23 154/5 154/11 154/12
**asking [8]** 28/11 78/14 78/15 90/18 93/16 105/23 133/17 133/21
**asks [1]** 145/16
**assert [1]** 140/8
**asserted [3]** 12/24 114/25 114/25
**assertion [1]** 156/6
**assets [4]** 54/16 109/7 109/8 109/12
**Assistant [5]** 117/7 120/3 120/13 121/2 121/13
**associate [1]** 7/1
**associated [13]** 34/1 34/4 34/10 46/19 51/19 51/25 52/12 55/11 61/4 61/6 103/16 105/2 119/23
**Association [3]** 7/18 7/25 7/25
**associations [1]** 7/19
**assume [8]** 23/22 29/6 55/3 55/6 55/7 58/4 105/13 106/11
**assumed [4]** 39/25 43/18 100/16 123/24
**assuming [2]** 41/2 97/20
**assumption [13]** 29/4 35/2 35/3 37/1 42/10 43/8 43/17 43/20 45/6 45/7 45/12 49/6 92/11
**assumptions [3]** 52/3 116/10 116/12
**assurance [1]** 126/2
**assure [2]** 123/25 124/1
**assured [1]** 144/12
**asterisk [3]** 108/1 108/4 157/23
**attached [2]** 12/1 24/18
**attempting [1]** 17/8
**attend [5]** 66/25 72/3 72/5 72/6 72/7
**attended [2]** 68/1 72/10
**attending [2]** 67/7 117/24
**attention [22]** 31/11 31/24 57/19 58/17 72/15 74/6 95/10 95/15 108/1 113/21 116/3 118/14 119/13 121/15 123/20 125/14 125/23 126/8 126/14 132/8 138/1 155/25
**ATTORNEY'S [1]** 1/22
**attorneys [1]** 7/25
**attractive [2]** 124/3 130/11
**attributable [3]** 22/15 23/24 61/17
**attributed [1]** 23/24
**audited [4]** 38/24 38/24 39/5 44/11
**auditing [1]** 15/3
**auditor [2]** 6/18 10/11
**audits [1]** 10/13

**A**    Case 1:00-cv-02089-PLF

**August [5]** 66/24 68/7 71/10 72/4 121/12
**author [1]** 121/3
**authored [1]** 8/24
**authoritative [1]** 86/2
**authority [10]** 134/11 137/25 138/3 138/4 146/2 146/17 146/19 146/24 147/2 154/16
**authorization [3]** 121/20 121/25 149/23
**authorized [13]** 115/8 115/16 134/12 134/23 135/17 135/21 144/10 144/13 144/14 144/24 145/12 145/15 157/5
**available [12]** 12/8 31/6 34/23 37/18 44/21 48/25 49/16 59/11 61/7 70/13 108/7 108/22
**average [22]** 18/6 22/1 22/8 22/25 25/15 25/20 25/24 26/3 26/22 33/3 35/20 35/23 36/3 36/6 46/22 49/10 73/9 73/10 74/21 99/19 100/2 111/12
**avoidable [6]** 18/15 20/7 20/23 58/13 58/14 105/9
**award [1]** 8/13
**awarded [1]** 139/1
**awards [1]** 8/10
**aware [2]** 127/16 140/14
**away [1]** 55/22

**B**

**bachelor's [1]** 5/23
**back [42]** 14/7 29/10 29/11 30/3 30/4 30/8 34/12 50/6 51/2 53/21 54/13 54/15 55/3 60/5 60/7 64/14 65/16 79/20 80/3 81/20 82/25 83/25 88/25 91/21 91/22 91/23 95/16 101/13 102/21 107/11 109/1 111/2 112/16 131/12 138/13 141/17 144/1 144/2 144/3 157/3 162/24 162/24
**background [1]** 5/22
**bailiwick [2]** 26/14 84/15
**bal [1]** 55/17
**balance [33]** 9/19 18/6 22/25 24/7 25/16 25/20 25/24 26/4 26/23 33/4 35/20 36/4 36/6 38/2 38/6 38/6 38/13 38/17 39/11 42/16 47/2 47/4 47/5 52/19 54/7 54/9 76/3 81/1 100/22 100/23 110/1 111/4 111/12
**balances [52]** 17/4 17/4 17/10 17/12 17/13 17/22 17/25 18/1 18/5 22/1 22/8 22/15 23/6 23/16 23/17 23/23 27/24 29/23 39/11 42/25 43/1 44/13 52/8 52/10 53/12 55/18 62/5 62/11 72/16 72/18 75/4 75/24 75/25 75/2 76/2 76/7 76/12 76/25 77/4 77/15 79/6 80/8 81/9 83/19 85/15 85/19 88/10 102/10 110/19 110/24 124/13
**bank [27]** 31/4 37/4 42/18 52/2 52/16 53/11 53/24 55/11 56/10 56/12 56/18 60/11 60/25 61/1 61/1 61/3 61/3 61/4 88/6 88/17 104/15 104/25 106/9 119/14 124/11 152/24 156/6
**bank's [1]** 52/21
**bankers [2]** 152/16 152/21
**bankruptcy [1]** 9/10
**banks [2]** 53/17 87/14
**Bar [1]** 7/24
**bargained [1]** 128/11
**base [2]** 92/16 95/13
**based [17]** 12/18 13/3 13/7 17/9 20/16 42/3 62/19 73/17 77/16 78/15 78/23 78/25 79/9 87/20 93/13 98/19 114/11
**bases [2]** 52/3 103/5
**basic [8]** 23/5 47/15 49/19 53/25 110/5 116/10 116/11 142/20

**basically [2]** 18/12 161/12
**basis [21]** 7/24 28/7 28/8 28/9 28/18 28/23 35/7 36/17 37/1 37/6 37/7 39/17 42/6 44/18 45/6 58/5 70/19 85/8 86/7 87/5 88/18 92/24 97/22 100/14 111/13 119/2 130/7
**Bate [6]** 12/21 31/6 31/12 31/14 31/15 32/2 97/22 100/14 111/13 119/2 130/7
**be [200]**
**bearing [16]** 17/23 18/18 22/17 23/17 28/4 28/12 28/14 28/15 28/16 29/2 29/24 58/10 61/11 73/11 80/22 116/13
**became [5]** 6/24 72/2 7/7 150/6 150/19
**because [49]** 9/15 18/25 19/10 24/4 28/15 28/21 29/21 36/16 38/11 39/19 45/23 49/15 49/23 50/15 58/5 65/23 69/24 70/6 74/6 76/11 82/5 84/24 85/7 90/2 90/23 97/22 101/5 101/25 103/15 104/25 106/9 107/9 112/23 115/12 115/13 117/25 119/9 120/10 121/16 125/5 125/6 135/1 135/9 138/15 142/5 146/23 149/12 154/23 155/7
**become [2]** 120/14 130/11
**becomes [1]** 73/21
**been [76]** 5/3 5/6 8/13 10/24 11/19 12/8 12/11 12/24 17/14 21/19 21/25 27/1 30/22 34/1 35/4 36/6 37/8 40/16 40/17 52/7 55/1 56/23 57/15 58/9 60/17 60/21 62/11 67/8 67/9 72/16 73/24 75/25 76/16 77/17 78/25 79/1 79/22 81/12 81/14 82/3 82/5 83/2 85/20 86/24 88/9 89/3 94/5 94/7 97/15 97/18 97/18 102/2 102/22 103/12 104/16 105/2 106/12 106/13 106/20 106/22 109/23 115/1 115/24 116/15 117/21 126/25 130/9 133/20 133/21 138/18 138/24 145/15 145/13 146/22 160/12 163/2
**before [29]** 1/11 7/8 9/4 14/12 14/12 17/15 18/20 29/14 30/24 32/19 62/3 67/8 68/18 71/5 74/4 76/18 76/21 84/14 85/6 111/12 113/13 126/13 127/1 127/5 133/20 151/9 152/2 157/7 160/11
**began [3]** 123/16 129/20 148/2
**begin [1]** 38/5
**beginning [2]** 20/11 116/20
**begins [3]** 113/14 117/14 132/13
**behalf [4]** 9/13 113/19 145/13 146/22
**being [37]** 7/9 9/19 9/22 17/4 20/6 22/8 23/14 29/23 30/15 34/16 36/5 37/14 38/15 38/21 42/19 43/11 44/7 47/11 55/8 56/20 57/8 59/5 59/18 72/6 78/11 78/6 79/18 88/21 95/23 100/13 111/16 118/18 138/14 143/6 149/11 152/9 152/21
**belief [2]** 73/16 73/17
**believe [46]** 12/4 12/6 12/11 14/7 14/24 15/12 15/25 18/24 20/23 22/10 24/1 24/14 25/10 26/5 26/20 28/25 30/19 33/2 57/9 57/17 60/8 61/12 62/3 66/17 66/18 66/24 67/6 70/1 71/12 73/2 75/10 77/1 101/17 103/19 105/21 106/8 106/24 116/23 126/4 138/22 138/23 139/6 140/20 147/12 156/12 160/15
**believed [3]** 17/10 104/14 130/8
**believes [2]** 78/25 132/1
**believing [2]** 27/24 28/8
**belonging [2]** 27/25 72/19
**below [6]** 38/18 43/2 70/15 96/8 124/6 144/23
**Ben's [1]** 20/15
**BENCH [1]** 1/10
**benchmark [1]** 88/5
**bene [1]** 128/20
**beneficial [2]** 114/4 146/11
**benefit [1]** 141/8
**benefits [2]** 131/14 139/2
**Benjamin [2]** 1/13 113/18

**benjamin_boyd [1]** 2/16
**besides [1]** 137/6
**best [8]** 12/22 17/20 36/12 44/15 67/12 136/18 146/13 153/22
**better [2]** 78/19 83/7
**between [16]** 9/17 15/2 41/9 76/19 110/14 117/2 122/23 123/1 127/25 128/9 133/18 133/19 140/6 140/11 147/17 148/18
**beyond [8]** 9/15 18/15 18/21 21/7 25/21 27/16 27/18 50/18
**big [5]** 6/19 38/24 150/19
**billion [1]** 5/17
**bills [4]** 49/17 86/4 89/24 99/23
**bit [1]** 42/14
**bits [1]** 63/20
**blend [4]** 9/21 100/23 101/15 101/19
**blended [1]** 46/12
**blindly [1]** 35/4
**blocks [1]** 49/19
**blow [1]** 23/2
**Board [1]** 154/18
**body [2]** 8/1 156/17
**bolded [1]** 146/6
**Bonassar [2]** 1/19 113/20
**bond [6]** 39/17 40/4 56/11 56/13 56/18 105/1
**bondholders [1]** 46/5
**bonds [7]** 49/17 52/3 60/11 86/3 90/1 90/2 99/23
**book [1]** 97/7
**books [3]** 10/12 60/17 60/19
**borne [2]** 57/8 59/5
**borrowed [6]** 46/14 48/1 48/4 48/15 48/20 99/21
**borrowing [3]** 48/12 49/6 49/21
**Boston [4]** 5/14 6/24 7/4 7/9
**both [21]** 8/6 23/16 27/17 37/16 37/16 39/12 47/3 47/10 47/20 49/10 50/12 62/19 95/2 99/20 120/16 122/17 127/16 132/13 136/22 152/12 161/14
**bottom [15]** 25/7 31/7 55/20 74/7 74/10 101/13 109/10 116/7 118/1 118/4 118/12 120/5 123/11 134/3 134/4
**bound [1]** 88/7
**bounds [1]** 26/5
**Bowes [55]** 62/14 115/12 115/21 116/5 116/8 116/21 117/2 117/6 117/10 117/11 118/18 118/21 119/12 119/16 119/21 120/6 121/9 121/24 122/9 122/18 123/23 124/13 124/16 125/19 126/9 126/15 126/18 127/6 127/21 127/23 127/25 129/7 130/12 130/14 131/10 131/14 131/25 132/4 132/23 133/8 134/19 135/6 135/24 139/2 139/25 140/6 140/7 140/10 140/12 141/10 142/16 144/20 147/3 151/10 157/7
**Bowes' [5]** 120/16 122/11 125/19 140/4 143/11
**box [1]** 59/16
**boxes [1]** 12/20
**Boyd [17]** 1/13 3/2 3/4 3/8 64/7 66/7 91/16 92/6 113/13 113/18 139/16 145/16 146/5 155/13 155/20 158/5 161/1
**breached [1]** 115/2
**breaches [1]** 150/7
**breaching [1]** 139/11
**break [10]** 38/9 44/17 57/24 59/23 65/2 112/12 112/15 119/2 150/18 154/7
**breaks [1]** 6/17
**brief [13]** 60/3 66/3 113/1 113/1 113/6 113/12 116/2 118/11 156/17 158/14 158/16 160/21 160/23
**briefed [2]** 159/25 160/5
**briefing [1]** 137/2

**B**

**briefly [4]** 27/4 62/3 123/4 124/8
**bring [6]** 11/23 26/21 46/21 82/16 100/18 138/19
**bringing [2]** 51/2 79/22
**broad [1]** 147/3
**broader [3]** 20/23 21/3 63/19
**brought [8]** 12/7 19/7 22/23 22/23 26/11 27/1 120/4 155/25
**Bruce [1]** 78/23
**budgeting [1]** 93/8
**building [1]** 49/19
**buildup [1]** 98/18
**built [1]** 116/11
**bulldoze [1]** 23/4
**business [27]** 6/8 8/18 8/19 10/18 44/9 46/11 46/18 47/16 47/21 48/24 62/20 92/25 93/3 93/16 93/20 97/25 100/21 114/6 117/12 117/18 126/1 128/6 138/16 138/17 141/8 142/7 146/11
**business-related [1]** 10/18
**businesses [1]** 62/2
**busy [1]** 162/5

**C**

**CA [2]** 1/3 1/7
**calculate [10]** 16/14 17/9 36/23 46/22 50/23 75/20 79/5 82/17 85/22 86/16
**calculated [9]** 35/24 42/2 42/13 54/19 82/4 92/13 101/8 109/20 109/22
**calculates [1]** 79/23
**calculating [3]** 79/21 80/5 99/20
**calculation [39]** 12/15 12/15 15/6 35/9 36/17 40/9 41/8 45/2 45/19 46/25 50/15 52/15 55/14 56/24 56/25 62/8 62/16 63/8 64/1 70/18 77/16 78/24 79/8 84/7 98/8 98/10 99/5 102/12 102/24 103/11 103/24 103/25 104/8 105/18 110/1 111/4 111/21 125/21 138/11
**calculations [30]** 15/2 15/8 16/11 17/16 18/3 19/7 35/24 40/19 41/7 41/25 45/4 45/9 56/10 62/23 62/23 63/3 63/22 64/3 70/8 70/14 85/8 98/13 98/19 101/7 103/6 104/6 105/16 106/1 106/2 156/9
**calendar [5]** 37/21 71/21 72/1 94/25 95/1
**call [11]** 29/11 47/16 53/6 61/13 62/1 64/16 65/20 146/15 150/1 158/18 162/23
**called [12]** 10/5 17/24 20/24 40/20 46/8 46/22 61/21 94/13 100/12 118/7 146/17 150/22
**calling [1]** 111/1
**calls [4]** 4/20 20/17 32/15 57/15
**came [12]** 12/12 12/25 18/25 67/4 74/1 137/7 147/24 148/4 151/15 152/15 152/19 157/7
**can [91]** 4/17 5/21 6/9 6/14 6/15 9/7 16/3 16/7 18/8 19/25 21/22 23/3 26/8 27/14 27/15 28/19 29/10 30/1 36/12 39/23 40/5 43/13 44/10 45/25 48/22 50/22 51/11 53/8 60/13 64/17 65/19 65/21 68/4 68/5 68/20 73/3 75/15 77/10 81/1 81/3 84/13 86/10 89/14 89/25 91/9 93/9 94/15 95/21 98/11 99/19 100/10 107/13 107/15 107/17 108/11 110/3 111/21 112/9 112/12 112/15 116/14 117/20 119/10 126/5 128/7 128/23 130/5 130/17 131/15 133/25 136/18 140/1 142/2 144/7 146/15 152/2 152/17 157/25 159/2 159/4 159/6 159/8 160/18 160/19 160/23 160/24 161/5 161/6 161/10 161/13 162/23
**can't [16]** 28/19 35/10 36/15 36/19 57/10 63/23 67/10 78/5 106/25 107/15 110/4 118/15 141/8 141/19 161/24 162/22
**cannot [2]** 101/8 141/3

**cep [13]** 86/6 100/8 100/11
**capability [1]** 12/21
**capable [1]** 12/15
**capacity [1]** 12/13
**capital [43]** 45/24 46/2 46/3 46/12 46/17 46/18 46/20 46/23 47/9 47/16 47/18 50/4 82/1 93/4 93/6 93/7 93/8 93/8 93/8 93/10 93/14 93/17 93/25 94/6 94/13 95/19 96/4 96/5 96/11 96/21 98/1 98/9 98/10 98/11 99/19 99/20 99/24 100/21 101/5 101/16 101/17 130/23 144/15
**care [4]** 8/9 35/14 63/5 161/9
**career [6]** 6/18 6/23 10/11 10/11 10/14 10/23
**careful [2]** 23/20 24/11 93/5 149/23
**Carl [1]** 1/23
**carl.ross [1]** 1/25
**Carnegie [1]** 152/4
**carry [1]** 114/1
**carrying [1]** 145/22
**case [40]** 11/16 12/14 21/24 23/19 23/25 43/4 45/5 44/10 50/24 53/24 57/16 65/3 66/14 68/9 68/13 69/20 70/4 70/25 71/9 72/18 77/14 77/22 78/2 78/16 79/13 81/8 95/4 111/23 112/22 112/24 115/11 115/15 128/10 138/15 138/19 139/20 156/19 156/25 157/13 160/14
**cases [14]** 63/25 159/11 161/3 161/4
**cash [51]** 23/16 23/23 31/4 31/6 38/4 38/6 38/6 38/8 38/10 38/11 38/13 38/18 39/10 39/11 42/16 42/25 43/1 44/12 44/13 44/16 44/17 44/18 44/19 44/20 47/24 47/25 48/3 52/19 53/12 53/22 54/10 83/5 94/9 94/15 94/16 94/16 94/17 94/19 96/2 96/3 96/3 96/3 106/21 106/22 108/1 108/7 109/10 111/11 150/20 155/9
**casual [1]** 140/1
**Catalina [3]** 2/8 163/10 163/16
**categories [5]** 15/9 15/10 34/3 47/8 103/16
**categorize [1]** 109/2
**category [5]** 33/8 34/6 34/16 56/6 96/6
**catykerr [1]** 2/11
**cause [1]** 18/2 119/8
**caused [5]** 30/12 31/17 31/23 64/3 151/25
**center [2]** 119/23 122/12
**centerpiece [1]** 135/23
**centers [1]** 121/10
**certain [9]** 61/1 52/19 69/14 69/24 70/12 70/23 73/23 119/22 135/1
**certainly [11]** 26/10 40/10 61/3 80/21 91/10 93/18 95/2 97/15 103/14 135/19 137/12
**certainty [1]** 101/9
**CERTIFICATE [2]** 3/5 163/9
**certified [3]** 6/5 6/10 7/21
**certify [1]** 163/5
**cetera [1]** 47/9
**chair [1]** 8/19
**chairman [1]** 8/17
**challenge [2]** 88/23 124/5
**chambers [1]** 162/25
**change [14]** 6/23 39/3 39/9 42/23 43/7 47/4 47/13 59/24 62/4 95/6 126/4 135/12 143/15 143/16
**changed [12]** 52/10 54/9 83/17 84/5 114/18 114/21 114/22 142/16 143/16 143/21 149/19 152/23
**changes [3]** 17/14 61/24 137/4
**character [1]** 137/10
**characterize [1]** 10/14
**characterized [1]** 43/25
**characterizing [1]** 111/15
**charge [5]** 34/21 55/9 108/19 108/19 109/6
**charged [8]** 106/10 106/11 106/13 107/4

**108/15 109/4 111/12 116/13**
**charging [3]** 53/17 108/18 109/25
**Charles [2]** 67/25 68/7
**charts [2]** 20/18 25/10
**check [1]** 23/9
**checking [2]** 53/10 53/15
**choice [2]** 37/2 88/24
**choose [1]** 83/15
**chooses [1]** 111/22
**chose [2]** 81/20 84/20
**chosen [1]** 83/21
**churn [1]** 88/10
**citation [1]** 160/14
**citations [1]** 159/11
**cite [5]** 31/2 102/14 103/22 159/13 159/16
**cited [2]** 26/3 29/7
**Civil [2]** 1/1 7/7
**claim [9]** 22/20 22/25 69/20 70/2 79/1 79/16 103/12 125/11 126/19
**claiming [3]** 34/2 84/4 95/4
**claims [5]** 115/4 138/22 139/8 139/10 153/16
**clarify [2]** 29/15 97/6
**Class [1]** 5/24
**classes [1]** 44/5
**Classification [4]** 129/23 131/8 134/16 134/22
**clear [12]** 22/13 26/18 29/20 43/10 82/13 95/24 103/1 103/7 128/18 130/3 135/20 157/25
**clearly [12]** 21/12 21/24 22/6 44/10 47/13 62/7 75/14 95/22 127/6 127/16 128/1 128/3
**CLERK [1]** 4/23
**client's [1]** 35/11
**close [5]** 71/12 71/13 144/23 144/25 145/5
**closed [1]** 71/9
**closer [2]** 65/19 67/14
**closing [12]** 3/2 3/3 3/4 22/14 23/6 23/15 23/23 27/24 72/18 113/1 113/6 136/25
**CMRS [37]** 22/16 32/25 73/19 75/5 87/10 87/21 115/17 115/23 128/12 128/15 128/18 129/21 129/24 130/9 130/11 131/1 131/6 131/10 131/24 132/2 132/3 133/7 133/18 134/8 134/18 135/14 137/11 144/11 145/5 145/18 147/11 147/24 149/15 149/17 150/17 152/12 154/20
**CMRSes [2]** 114/11 114/15
**co [1]** 1/8
**co-director [1]** 7/8
**coach [1]** 95/13
**code [2]** 7/22 8/4
**codes [1]** 7/20
**colleague [1]** 71/20
**colleagues [1]** 113/19
**collect [8]** 127/10 129/12 129/14 131/3 131/19 131/23 134/9 145/20
**collected [2]** 120/17 127/15
**collection [4]** 114/8 114/13 130/2 135/25
**college [1]** 6/24
**COLUMBIA [1]** 1/1
**column [3]** 32/6 74/14 108/15
**come [14]** 64/14 65/16 80/8 91/21 91/22 91/23 112/16 113/21 115/3 120/16 138/3 152/16 154/17 161/2
**Comerica [15]** 31/4 37/4 37/5 42/18 53/24 53/25 88/17 106/9 106/19 109/18 109/25 110/18 111/3 153/2 155/23
**Comerica's [1]** 111/9 111/11
**comes [3]** 26/23 73/13 75/12
**coming [3]** 37/7 153/7 153/8
**comment [1]** 11/9 46/14 68/22 99/3 100/24 119/3

**C** Case 1:00-cv-02089-PLF

**commented [1]** 29/17
**comments [2]** 70/11 118/8
**commitment [1]** 78/18
**committee [3]** 8/18 8/20 8/20
**common [1]** 47/8
**communicate [1]** 135/4
**communicating [1]** 139/21
**communication [1]** 5/19
**communications [2]** 140/5 140/16
**companies [11]** 19/3 32/23 33/8 36/5 43/11 47/13 86/6 92/22 99/25 100/12 100/13
**company [16]** 5/17 86/10 86/12 92/17 93/12 94/2 95/22 96/12 96/17 100/7 100/9 100/12 100/17 100/17 101/18 147/11
**company's [12]** 10/17 32/13 38/2 46/12 48/12 49/19 50/3 50/4 82/1 99/18 101/1 101/15
**comparable [1]** 124/3
**compared [3]** 56/13 90/15 98/22
**comparison [1]** 125/3
**compensation [5]** 139/2 139/13 153/19 154/16 154/17
**competition [1]** 129/2
**competitive [1]** 124/2
**complaint [12]** 11/15 11/16 12/24 78/2 78/3 78/8 78/10 78/17 118/20 144/5 144/9 144/21
**complaints [2]** 77/20 145/8
**complete [2]** 12/23 63/4
**completely [2]** 17/18 150/4
**completeness [1]** 159/5
**comply [1]** 148/5
**component [1]** 51/9
**components [1]** 47/14
**compound [8]** 37/15 38/1 45/8 82/15 82/17 82/19 105/20 105/20
**compounded [7]** 42/11 92/12 95/24 98/6 98/23 98/25 105/23
**compounding [9]** 38/22 45/11 45/12 45/15 82/10 97/20 97/22 99/6 105/17
**comprised [1]** 17/13
**comprises [1]** 76/12
**comprising [1]** 77/3
**compromised [1]** 150/16
**computed [1]** 54/17
**computer [4]** 2/13 114/3 152/5 152/9
**computerized [5]** 28/3 72/22 74/19 76/9 113/23
**conceded [1]** 27/10
**concept [2]** 94/2 99/19
**concepts [1]** 68/24
**concern [6]** 18/3 33/7 117/9 122/12 123/21 150/19
**concerns [4]** 17/18 33/21 128/14 128/15
**conclude [1]** 65/7
**concluded [1]** 74/22
**conclusion [2]** 13/11 29/6
**conclusions [10]** 16/4 16/8 62/21 113/4 142/11 156/21 158/21 159/10 160/10 161/21
**concurred [1]** 123/7
**conditions [1]** 132/3
**conduct [4]** 7/22 8/5 8/7 9/1
**conducted [1]** 61/23
**conducts [1]** 7/20
**conference [3]** 64/16 158/18 162/23
**conferring [1]** 64/18
**confirmation [1]** 150/3
**confusing [1]** 69/13
**connection [1]** 144/9
**conscious [1]** 149/24
**consensus [1]** 130/10
**consequence [1]** 126/5
**Consequently [1]** 121/23
**conservative [5]** 40/4 40/12 88/4 88/8 88/11
**consider [12]** 46/17 47/17 51/25 83/23 99/15 99/20 124/7 132/2 141/20 158/7 158/8 159/5
**consideration [3]** 17/15 41/6 160/12
**considered [3]** 97/24 120/18 156/10
**considering [4]** 50/3 105/7 137/1 138/5
**consignment [1]** 150/24
**consistent [2]** 77/19 129/16
**constant [1]** 149/4
**constructing [1]** 86/19
**consulting [8]** 5/13 5/15 5/16 5/18 5/18 7/16 8/6 9/25
**consumed [1]** 44/1
**consuming [1]** 45/1
**consumption [2]** 44/4 44/5
**CONT'D [2]** 2/1 92/7
**contact [1]** 11/14
**contain [1]** 39/6
**contained [7]** 17/23 18/5 38/19 61/11 70/8 76/3 152/11
**contains [1]** 87/9
**contentions [1]** 27/7
**context [2]** 16/16 32/21
**continue [1]** 61/22
**continued [2]** 132/14 145/2
**continuing [4]** 25/18 62/6 124/15 124/22
**contract [39]** 115/1 115/2 115/6 115/7 134/11 137/25 138/4 138/4 139/22 140/1 140/23 140/24 141/3 141/20 141/21 143/6 143/16 144/3 144/7 144/19 145/8 145/10 146/18 146/23 146/25 148/12 148/13 148/14 149/5 149/6 149/21 149/22 150/2 150/24 150/25 151/20 153/1 153/15 156/12
**contracts [14]** 60/22 115/6 115/9 121/13 138/8 139/11 141/17 145/4 145/10 145/13 145/15 146/3 146/20 146/22
**contradicted [1]** 156/24
**contrary [3]** 101/2 145/1 157/2
**control [2]** 36/8 125/24
**controlled [1]** 151/21
**controller [4]** 124/10 124/19 125/17 125/25
**controlling [1]** 123/24
**convenience [1]** 114/5
**Conversation [1]** 73/18
**conversations [5]** 140/1 148/17 148/20 148/24 149/14
**convert [1]** 139/20
**conveyed [5]** 140/18 141/2 141/4 141/5 141/16
**copies [2]** 59/16 61/4
**copy [4]** 13/22 15/20 20/2 159/13
**Corbly [1]** 2/5
**core [1]** 86/4
**corner [1]** 74/10
**corners [7]** 18/11 18/22 26/18 27/16 27/18 33/19 50/19
**corporate [5]** 5/19 5/20 6/21 10/9 96/14
**corporation [3]** 46/3 46/5 46/6
**corporations [2]** 6/22 10/13
**correct [75]** 4/19 16/5 47/23 49/7 54/1 55/25 66/12 69/13 69/6 69/7 69/15 69/18 69/22 70/5 70/11 71/6 72/13 74/3 74/25 75/21 76/13 76/20 77/2 79/10 79/24 81/14 81/21 81/25 82/22 84/1 85/17 85/22 85/23 86/21 88/15 89/11 91/6 93/19 95/4 95/20 97/17 98/7 98/9 99/7 99/8 99/15 100/4 100/5 101/20 101/21 102/7 102/8 102/10 102/11 102/19 102/25 103/6 103/13 103/24 104/14 104/22 105/11 106/24 107/5 107/15 108/16 111/14 111/24 123/12 135/18 143/2 143/8 143/13 143/18
**consequence [1]** 126/5

**corrected [1]** 94/20
**correspondence [2]** 67/20 153/17
**cost [87]** 12/12 18/14 33/25 34/1 34/4 36/19 45/24 46/2 46/3 46/3 46/12 46/12 46/13 46/17 46/22 48/7 48/15 48/16 48/19 48/20 48/24 49/6 49/10 49/16 49/19 49/20 49/20 50/4 50/4 52/2 52/6 56/3 56/6 56/18 56/23 57/7 58/2 58/13 58/14 59/5 60/11 60/21 61/1 61/21 61/22 82/1 86/4 86/8 99/19 99/20 99/21 99/21 99/24 100/4 100/5 100/6 100/15 100/19 100/20 100/20 100/21 101/15 101/16 101/17 102/13 103/6 103/25 104/3 104/13 104/14 104/21 105/6 105/20 105/24 106/3 106/8 109/12 118/25 121/7 122/15 122/25 123/1 125/5 126/20 129/10 155/21
**cost-effective [1]** 118/25
**costly [1]** 144/11
**costs [46]** 18/15 19/1 19/2 20/7 20/23 22/5 22/9 22/9 34/9 46/19 47/17 48/12 49/24 49/24 51/19 51/25 55/23 55/24 56/13 57/21 60/7 60/8 60/23 61/6 61/22 102/15 102/24 103/12 103/16 103/24 104/16 104/20 104/25 105/2 105/9 119/9 125/21 126/24 127/12 129/13 131/6 132/16 144/18 145/22 156/4 156/4
**Cotter [2]** 120/3 120/12
**could [60]** 5/8 11/20 23/9 37/13 40/5 45/6 48/10 52/7 60/21 61/25 64/13 65/3 77/14 77/17 78/25 79/8 79/14 79/21 80/9 80/22 81/8 81/12 82/15 82/15 83/21 85/18 85/20 87/23 88/5 92/9 94/5 94/7 97/15 97/18 97/18 101/3 101/23 107/9 107/16 109/23 115/23 119/2 120/14 120/23 130/20 132/22 133/7 135/3 135/4 144/18 146/13 146/13 147/13 147/8 148/9 150/16 150/25 154/6 154/7 155/5
**couldn't [2]** 146/10 150/18
**counsel [8]** 4/7 25/23 63/10 63/20 68/18 73/18 121/13 156/10
**count [3]** 9/21 56/20 107/16
**country [1]** 8/3
**couple [6]** 74/5 76/17 82/7 83/17 95/21 136/18
**courage [2]** 138/21 139/6
**course [19]** 20/10 26/14 29/17 69/19 75/5 102/21 115/3 116/11 121/24 121/25 122/17 128/8 129/25 130/3 137/4 137/15 137/17 138/5 140/19
**court [19]** 1/1 2/8 3/5 4/2 9/5 9/8 20/1 21/1 21/25 66/1 91/19 113/18 113/20 116/15 120/22 157/24 158/7 160/11 162/4
**Courthouse [1]** 2/9
**courtroom [4]** 19/18 19/20 21/23 30/9
**courts [3]** 9/8 9/11 9/12
**cover [1]** 60/9
**covered [1]** 26/12
**covers [2]** 24/19 26/21
**CPA [9]** 6/19 7/3 7/6 7/24 10/1 38/25 71/18 71/20 93/4
**CPAs [9]** 6/9 6/13 7/14 7/22 8/2 8/3 8/21 8/25 10/5
**created [3]** 142/8 151/2 154/25
**creates [1]** 117/12
**creation [1]** 154/21
**credential [1]** 8/18
**credibility [1]** 149/2
**credit [1]** 47/21
**creditors [1]** 46/5
**criteria [1]** 6/11
**criticism [5]** 33/18 55/22 61/15 87/6 105/17
**critique [5]** 11/9 11/24 26/5 29/19 102/11

**C**

critiquing **[1]** 16/18
cross **[8]** 3/6 22/24 23/3 27/1 30/2 65/6 66/4 92/7
cross-examination **[7]** 22/24 23/3 27/1 30/2 65/6 66/4 92/7
CRR **[1]** 2/8
cryptic **[1]** 148/21
CT **[2]** 1/20 2/6
cue **[1]** 156/17
cull **[2]** 11/20 161/14
current **[2]** 15/8 122/22
currently **[2]** 8/17 150/21
curve **[15]** 40/20 40/22 40/25 41/11 89/18 89/21 89/25 90/3 90/4 90/9 90/11 90/20 90/22 90/24 91/12
customer **[10]** 29/2 30/16 31/24 75/2 75/13 119/18 119/20 120/14 123/7 132/16
customer's **[3]** 28/3 72/22 73/14
customers **[21]** 22/15 23/25 27/25 44/20 61/18 72/20 75/7 76/9 77/15 87/15 113/25 114/1 114/5 116/22 117/16 121/21 126/22 126/23 130/12 143/22 153/6
customers' **[1]** 76/7
CYA **[1]** 123/8

**D**

D.C **[5]** 1/4 1/15 1/24 2/3 2/10
daily **[24]** 17/24 18/6 20/2 22/1 22/8 22/25 25/15 25/20 25/24 26/3 26/23 32/23 35/4 35/20 35/23 36/4 36/6 73/9 73/10 74/21 81/1 81/6 111/12 159/13
damage **[4]** 35/9 40/8 41/25 87/2
damages **[58]** 10/21 10/22 10/24 11/1 11/4 11/8 12/15 12/18 12/23 13/11 15/10 15/10 15/11 15/11 15/14 16/14 24/5 36/23 41/8 42/2 42/13 45/19 45/22 50/24 51/18 61/20 61/20 62/8 62/8 62/10 62/15 62/23 69/19 70/7 70/22 75/20 77/14 77/16 77/21 78/7 78/16 78/24 79/13 84/10 84/12 84/14 86/16 92/13 101/7 103/5 111/20 111/22 137/19 138/9 138/12 138/13 139/14 156/9
damages' **[1]** 101/6
Darrell **[1]** 1/22
darrell.valdez **[1]** 1/25
Darwin **[2]** 116/5 117/5
data **[23]** 12/8 12/20 12/22 15/5 16/14 21/11 21/19 35/17 36/16 48/21 49/16 49/18 63/16 63/18 70/13 75/19 86/5 100/10 100/12 104/3 119/23 121/10 122/12
date **[30]** 12/7 15/8 23/9 28/10 51/5 51/5 71/11 72/1 79/23 81/19 81/19 81/20 83/15 83/16 83/22 84/4 84/5 84/9 84/12 84/14 84/22 84/23 84/25 85/6 117/23 127/21 161/18 161/19 161/19 163/16
dated **[4]** 66/11 66/18 126/10 126/11
dates **[6]** 28/1 72/21 79/25 159/18 161/8 162/22
David **[1]** 139/5
day **[18]** 1/10 6/11 20/1 20/25 53/13 78/12 84/7 89/22 89/24 90/6 90/7 107/10 109/2 109/19 113/22 155/7 158/10 158/11
day's **[1]** 36/1
day-and-a-half **[1]** 155/7
days **[8]** 4/10 124/19 161/7 161/22 162/1 162/2 162/18 162/19
DBAR **[7]** 17/4 18/1 73/8 76/2 76/3 76/6 76/12
DBARs **[3]** 17/23 18/18 29/23
de **[1]** 128/20
deal **[2]** 28/19 161/24

deals **[1]** 69/19
dealt **[2]** 121/6 122/2
death **[1]** 157/14
debating **[1]** 159/7
debt **[13]** 47/14 47/21 48/7 48/20 49/4 49/4 49/5 49/10 49/24 91/8 96/7 100/20 101/15
decade **[2]** 6/18 6/20 10/11
decades **[1]** 6/17
December **[13]** 79/23 81/11 81/19 82/5 82/10 82/21 83/3 83/21 116/23 122/4 127/20 127/23 138/6
December 15th **[1]** 138/6
December 1971 **[1]** 116/23
December 2011 **[2]** 81/11 81/19
December 31st **[6]** 79/23 82/5 82/10 82/21 83/3 83/21
December 4th **[1]** 127/20
decide **[1]** 115/4
decided **[5]** 82/16 101/24 147/18 149/18 151/11
deciles **[2]** 100/10 100/11
decipher **[2]** 36/12 96/9
decision **[8]** 65/14 96/15 96/16 137/9 137/10 146/12 151/12 154/17
decisions **[1]** 96/16
deck **[1]** 12/2
declaration **[5]** 70/20 71/1 71/2 71/5 155/11
declarations **[1]** 148/21
declined **[1]** 154/9
declining **[1]** 72/7
dedicating **[1]** 113/20
defendant **[4]** 1/6 1/9 1/22 9/18 113/16 156/14 160/9
defendant's **[7]** 9/20 52/24 53/4 57/2 74/5 103/3 104/1
Defendants **[2]** 158/25 159/2
Defense **[13]** 13/15 13/19 16/2 17/3 30/21 30/23 30/23 34/12 45/17 53/1 60/6 153/23 158/8
deficiencies **[1]** 70/12
defined **[1]** 46/20
definition **[1]** 91/10
defray **[2]** 126/24 129/12
degree **[4]** 5/23 5/25 63/24 101/8
Del **[2]** 124/20 125/16
delineated **[1]** 43/6
delivered **[1]** 138/23
demand **[1]** 121/9
demonstrate **[1]** 59/14
demonstrated **[1]** 30/14
denials **[1]** 138/20
denied **[1]** 115/2
denominator **[1]** 50/25
Department **[4]** 67/25 117/8 121/3 122/20
depend **[1]** 158/20
Depends **[1]** 41/9
deposit **[28]** 23/16 23/24 28/1 32/4 32/18 33/4 33/12 34/14 51/25 37/12 38/1 56/14 61/13 62/2 72/20 74/11 74/20 74/25 75/2 75/11 76/8 87/14 104/10 104/19 104/24 105/4 116/13 124/11
deposited **[1]** 119/20
deposition **[34]** 19/21 19/24 20/5 20/14 25/4 25/8 25/9 25/22 25/23 26/11 66/24 66/25 67/2 67/24 68/1 68/7 68/13 72/4 72/5 72/7 72/7 72/11 128/21 128/23 129/8 129/19 130/7 130/15 132/9 134/3 137/7 149/13 157/4 158/25
depositions **[3]** 28/24 159/1 161/13
deposits **[14]** 16/23 16/24 30/18 52/6 56/7 60/12 87/15 105/3 119/15 124/15 124/23 124/24 125/6 145/1

depsive **[1]** 141/13
DEPPPPP **[1]** 1/23
derive **[1]** 99/24
describe **[2]** 53/9 152/8
described **[7]** 80/11 80/12 82/1 90/18 90/21 144/22 145/4
describing **[1]** 99/22
description **[1]** 92/20
descriptions **[3]** 39/7 108/25 116/9
designated **[2]** 137/6 137/7
designation **[4]** 6/9 6/12 8/13 8/22
designations **[1]** 6/4
designed **[2]** 114/23 131/5
desire **[2]** 21/2 126/16
desk **[1]** 152/10
despite **[2]** 85/18 104/5
detail **[7]** 12/3 34/22 42/21 60/19 96/7 125/16 125/18
detailed **[4]** 39/7 92/20 122/15 125/21
determination **[17]** 11/20 13/8 15/4 17/21 35/16 37/11 37/14 39/16 39/25 40/10 40/11 46/25 51/18 59/8 101/7 109/18 139/9
determine **[17]** 13/7 16/13 16/22 17/1 34/20 40/7 45/23 49/11 50/16 63/3 75/19 75/23 88/11 95/18 101/19 111/22 124/14
determined **[4]** 75/25 114/20 131/23 151/3
determining **[4]** 10/21 10/22 24/5 45/20
detract **[1]** 160/9
develop **[14]** 64/11 114/14 117/15 121/18 122/21 122/24 124/3 129/10 131/9 131/23 132/3 134/18 135/5 135/14
developed **[7]** 114/11 114/17 114/19 115/12 130/25 132/23 134/8
developing **[4]** 48/24 100/6 128/12 147/24
development **[12]** 113/23 115/22 121/7 121/8 122/25 129/13 131/6 132/14 144/11 144/18 149/15 149/16
device **[1]** 116/16
devoid **[1]** 150/5
did **[100]** 6/23 11/11 11/13 11/25 12/3 12/10 13/7 13/13 13/14 14/11 14/12 15/4 15/7 15/14 15/16 16/15 17/2 17/6 17/6 17/12 17/18 21/18 22/16 24/3 25/11 28/4 32/11 33/3 36/7 36/9 36/24 39/11 40/3 41/23 43/6 43/16 43/18 44/23 45/4 48/5 50/5 54/24 56/4 57/6 57/9 59/13 60/9 60/18 63/21 66/25 67/1 69/12 70/14 70/16 70/18 72/3 80/18 81/23 85/15 85/21 88/9 92/20 95/2 95/3 98/9 102/11 102/15 104/5 104/23 111/3 111/5 111/24 114/16 128/6 129/7 129/18 129/25 130/6 130/16 132/19 133/6 140/13 140/16 142/6 143/20 143/20 147/13 148/16 150/20 152/13 154/2 154/9 154/24 155/12 156/19 157/2 157/9 159/4 161/2
didn't **[64]** 17/21 18/3 21/9 23/22 28/14 30/3 37/1 37/9 39/6 39/10 40/2 40/9 40/11 41/1 41/1 41/6 43/23 48/11 48/16 48/25 49/5 49/13 59/12 61/4 71/5 72/5 78/5 80/2 85/20 85/24 86/11 87/6 90/24 91/4 94/7 95/1 95/18 98/8 101/22 102/14 103/9 103/22 103/22 104/8 105/5 122/6 137/14 143/15 144/4 145/24 146/7 146/7 146/10 147/10 147/22 149/13 149/15 151/16 151/20 152/23 155/22 156/1 156/5 156/7
Diehl **[1]** 71/18
difference **[1]** 41/9
differences **[1]** 15/1
different **[25]** 6/22 9/8 9/11 29/17 35/1 39/18 46/4 46/13 55/11 55/11 55/12 55/17 55/18 71/7 71/7 82/6 82/10 89/23 92/18 94/2 98/17 101/12 103/21 108/21 156/19
difficult **[2]** 132/25 138/18

**dimensions [1]** 92/18
**direct [11]** 3/6 5/4 31/1 31/13 59/21 74/6 75/20 105/9 106/7 107/25 116/3
**directed [1]** 154/25
**directing [1]** 31/11
**directly [7]** 34/4 34/7 34/17 78/17 103/16 143/25 155/1
**director [6]** 5/13 7/8 129/22 131/7 134/16 134/22
**disagree [5]** 80/12 80/13 90/23 131/20 161/3
**disagreed [1]** 155/18
**disagreement [3]** 20/25 78/9 161/12
**disbursements [1]** 38/7
**discerning [1]** 10/16
**disclosures [2]** 39/6 42/17
**discount [31]** 45/17 45/18 45/20 49/11 49/14 50/6 50/7 50/8 50/16 50/23 50/25 51/3 81/24 82/2 82/24 82/25 83/8 83/10 83/25 85/24 86/2 99/10 99/14 100/15 101/4 102/5 102/6 102/10 105/14 105/15
**discounted [1]** 82/5
**discounting [1]** 50/6
**discounts [1]** 79/20
**discouraged [1]** 119/6
**discovered [1]** 150/23
**discovery [6]** 11/19 37/17 71/9 71/13 71/13 148/25
**discuss [6]** 18/8 33/24 99/10 101/17 125/17 135/4
**discussed [13]** 68/18 81/24 115/21 120/7 127/5 127/9 130/24 131/7 133/22 134/6 134/15 134/21 156/23
**discussing [4]** 75/23 120/24 123/17 124/11
**discussion [16]** 20/1 25/20 29/22 32/22 34/6 55/21 56/5 86/11 88/18 89/17 89/20 92/21 99/18 111/18 130/8 133/10
**discussions [9]** 117/15 127/6 130/9 140/15 147/16 149/5 149/20 149/21 150/2
**dispense [1]** 4/9
**disposal [1]** 130/1
**dispute [1]** 9/2
**Disputes [1]** 8/24
**disqualify [2]** 67/5 67/16
**distracting [1]** 80/17
**distribute [2]** 42/19 88/18
**distributed [4]** 8/25 37/4 37/6 111/13
**distribution [1]** 10/3
**DISTRICT [7]** 1/1 1/1 1/11 2/9 9/5 9/8 9/9
**diverse [1]** 78/1 78/3
**diversion [2]** 79/16 139/2
**diverted [1]** 86/24
**divided [2]** 97/7 100/10
**dividend [1]** 53/19
**Division [2]** 121/14 123/18
**DLA [1]** 1/13
**dlapiper.com [3]** 1/16 1/17 1/17
**DMM [6]** 32/25 33/3 35/19 35/22 74/9 148/8
**do [192]**
**doc [1]** 30/10
**Docket [2]** 1/3 1/7
**Doctor [4]** 5/21 30/22 31/1 33/6
**document [15]** 30/17 52/5 57/13 106/17 110/20 116/4 117/20 118/1 119/13 122/16 127/5 137/14 149/23 150/1 159/16
**documentary [1]** 43/18
**documentation [6]** 34/23 35/2 52/8 59/9 76/11 95/18
**documented [1]** 149/25
**documents [57]** 10/16 11/18 20/22 25/10 25/11 26/2 28/23 29/5 30/11 30/13 31/2 31/7 31/13 32/21 36/12 37/13 37/17 52/4 51/6 54/22 54/24 58/1 59/6 60/22 60/2 69/23/13 70/10 71/7 71/14 71/16 94/8 96/25 97/14 102/15 102/18 102/22 102/23 103/8 103/18 103/22 103/23 104/6 104/12 106/24 109/25 110/16 115/20 127/8 129/17 136/2 136/8 136/14 137/15 155/22 155/24 161/9 161/10 161/20
**does [35]** 21/5 24/1 24/24 33/5 45/1 49/14 51/24 52/13 52/14 53/13 56/9 59/9 59/9 61/10 62/7 62/11 67/14 67/16 75/1 75/2 75/3 75/11 93/12 93/14 105/20 105/20 105/21 110/12 123/2 125/11 127/5 128/8 152/1 153/25 158/17
**doesn't [13]** 24/8 28/11 65/20 90/5 90/5 90/6 90/9 108/15 108/18 112/20 151/19 158/3 162/11
**doing [12]** 11/11 11/11 35/18 56/19 62/20 79/3 98/18 155/2 161/19 161/19 161/20 162/15
**DOJ [1]** 72/10
**dollar [10]** 38/20 44/14 50/9 51/1 51/4 73/20 83/9 96/19 106/10 151/15
**dollars [11]** 18/1 38/21 51/2 54/18 62/1 80/15 83/1 106/18 111/16 139/23 150/9
**Domestic [2]** 74/9 87/12
**dominance [1]** 122/11
**dominant [1]** 117/11
**don't [91]** 4/10 17/25 18/18 19/4 19/11 19/15 20/1 28/9 28/17 28/20 28/20 28/20 29/3 29/8 36/16 48/25 54/23 55/1 56/20 58/4 58/7 58/21 64/18 66/23 67/3 67/10 67/12 67/23 68/25 70/1 71/11 71/15 72/25 76/11 76/21 83/24 84/8 85/10 85/12 85/14 88/14 89/9 90/13 91/4 91/5 91/13 91/14 91/15 95/14 97/9 97/10 97/12 97/13 97/18 97/21 98/3 98/3 98/6 99/4 99/13 102/17 105/7 111/3 111/20 112/21 112/23 120/4 123/11 135/2 135/9 136/1 136/3 136/25 138/3 138/4 138/23 144/3 146/15 146/17 146/25 151/7 152/8 158/12 158/15 159/4 159/17 160/15 161/9 161/17 162/7
**done [27]** 9/21 16/22 16/25 57/23 58/20 59/4 63/7 75/23 77/7 77/3 79/18 82/19 82/20 94/9 102/3 106/1 125/7 136/1 136/3 141/21 151/5 153/10 153/12 158/10 159/8 159/19 161/9
**double [4]** 48/8 107/15 108/18 158/15
**down [7]** 6/17 32/3 100/11 134/3 151/17 154/4 154/8
**dozen [1]** 9/13
**Dr [59]** 16/2 19/18 60/4 60/5 60/24 60/24 61/15 62/18 62/23 63/21 64/10 64/21 65/13 66/6 67/5 67/15 67/24 68/7 69/5 69/17 70/7 70/20 72/4 72/15 72/18 77/6 77/13 77/18 78/14 79/19 80/17 81/17 83/14 83/25 85/5 85/13 86/19 88/2 88/14 88/23 89/18 90/19 92/9 97/16 98/5 98/6 98/9 99/2 102/23 103/5 103/13 105/10 106/9 111/19 112/10 112/11 138/12 139/15 156/2
**Dr. Abramson [27]** 11/9 14/6 14/11 14/25 17/8 19/12 19/18 22/24 25/5 25/8 26/2 27/2 27/18 29/1 30/4 30/8 30/10 31/16 33/19 40/2
43/16 48/6 51/4 51/17 58/15 58/20
**Dr. Abramson's [9]** 13/1 15/1 16/8 16/18 19/21 20/5 20/18 26/4 26/11 31/20 33/24 41/25 45/2 46/24 51/24 55/14 57/19 66/16
**Dr. Kennedy [18]** 11/1 11/6 14/21 15/23 18/9 19/11 26/16 27/20 30/3 30/8 30/11 31/18 31/18 31/19 31/22 39/15 42/10 57/18
**Dr. Kennedy's [10]** 20/22 21/13 22/14 24/15 25/13 26/13 28/22 33/18 57/25 58/12
**Dr. William [1]** 4/20
**draft [3]** 68/19 68/22 127/22
**drafted [1]** 27/8
**drafting [1]** 8/21
**drafts [2]** 68/17 68/25
**dramatic [1]** 50/5
**draw [12]** 58/17 72/15 95/14 119/13 121/15 123/20 124/13 125/14 125/23 126/8 126/13 137/25
**drawing [1]** 95/10
**drawn [3]** 23/1 57/18 81/5
**drew [1]** 43/24
**Dreyfus [1]** 109/10
**drive [1]** 62/1
**driven [1]** 137/9
**driving [2]** 60/23 137/5
**drop [1]** 43/6
**dropped [1]** 15/16
**dropping [1]** 9/15
**due [5]** 8/8 35/13 40/24 63/5 100/16
**duly [1]** 5/3
**during [23]** 7/2 10/11 22/23 38/8 40/19 44/19 66/21 74/22 89/11 89/19 91/2 91/2 91/10 95/2 96/24 109/5 109/11 115/22 118/17 128/13 136/25 157/4 158/5
**duties [6]** 129/1 146/20 146/21 146/22 147/5 157/8
**duty [2]** 156/3 156/3

**E**

**e-mail [2]** 20/15 151/9
**e-mails [1]** 20/16
**each [21]** 11/14 35/1 39/8 43/1 46/19 47/5 47/12 51/2 60/20 61/18 63/8 64/3 74/18 75/17 105/17 105/17 157/22 159/19 161/6 161/6 161/8
**earlier [12]** 51/5 52/5 56/5 65/23 70/12 73/2 83/9 83/11 89/17 94/20 154/25 159/8
**early [4]** 9/14 12/12 141/19 158/24
**earn [12]** 6/9 17/25 36/8 52/20 53/14 114/20 116/22 132/15 132/16 142/2 148/9 155/6
**earned [10]** 30/16 31/24 37/25 77/15 77/17 79/1 79/22 85/20 120/18 144/25
**earning [8]** 18/2 37/22 40/16 45/11 73/5 73/6 95/23 151/10
**earnings [7]** 46/9 47/9 51/8 94/10 119/17 126/20 126/23
**easier [1]** 85/7
**Eastern [1]** 9/9
**easy [2]** 61/5 159/15
**economic [2]** 83/24 85/2
**economics [3]** 44/5 49/9 62/19
**economist [2]** 79/8 83/13
**Eden [1]** 122/6
**edits [1]** 68/23
**educated [1]** 151/17
**education [1]** 5/22
**effect [10]** 29/8 31/24 42/1 43/22 49/14 63/21 63/23 84/23 85/7 125/18
**effective [4]** 37/20 74/9 118/25 120/13
**efforts [7]** 115/16 115/18 115/18 130/18 135/22 135/23 145/17

**E**

**eight [2]** 29/16 162/9
**eight-week [1]** 162/9
**either [17]** 16/20 28/13 36/17 52/13 72/8 82/19 85/1 85/25 107/22 107/23 110/11 122/7 154/6 158/9 159/4 159/18 161/3
**element [4]** 61/24 93/19 148/13 148/14
**eliminate [1]** 154/24
**elimination [1]** 137/13
**Elmo [1]** 144/8
**else [20]** 19/25 22/2 23/17 24/24 24/25 26/7 28/20 28/21 56/2 58/10 58/16 102/3 123/9 142/19 147/23 149/14 159/18 159/22 160/2 162/7
**elusions [1]** 55/21
**emphasized [1]** 76/17
**employee [1]** 140/2
**encapsulated [1]** 58/18
**encourage [4]** 115/16 129/23 132/14 145/18
**encouraged [3]** 129/1 132/2 157/6
**encouragement [1]** 130/1
**encouraging [2]** 128/17 144/10
**end [12]** 6/20 17/6 20/25 39/12 51/2 71/21 78/11 90/3 94/18 129/10 162/20 163/7
**ended [6]** 37/19 38/6 38/11 38/11 44/16 94/23
**ending [1]** 44/23
**enforceable [1]** 139/22
**engaged [1]** 9/22
**engagement [1]** 71/17
**engagements [3]** 8/5 8/8 9/1
**engaging [1]** 107/10
**engineering [2]** 147/24 148/2
**enjoyed [3]** 114/7 131/2 134/9
**enough [3]** 27/12 95/18 113/6
**ensuring [1]** 36/1
**enter [14]** 23/18 24/3 115/17 128/14 128/18 129/24 145/12 145/15 145/18 146/2 146/19 146/22 151/7 157/11
**entered [5]** 17/17 18/10 24/2 29/18 76/19
**entering [3]** 132/2 139/25 153/1
**entire [11]** 10/10 39/20 50/17 50/18 54/19 55/4 95/24 137/16 150/12 154/20 158/25
**entirely [1]** 129/16
**entitled [3]** 31/4 119/14 163/12
**entitles [1]** 137/7
**entry [4]** 10/12 60/17 60/19 140/8
**equal [10]** 38/2 38/20 42/24 129/3 131/24 153/18 153/19 153/21 153/23 153/24
**equally [1]** 105/18
**equates [1]** 51/4
**equipment [1]** 74/19
**equipped [1]** 74/19
**equity [35]** 46/11 47/7 47/7 47/11 47/14 48/24 49/3 49/4 49/10 49/16 49/20 49/20 49/24 51/8 51/9 86/4 86/8 94/1 94/2 97/3 97/3 97/6 97/8 98/14 98/21 98/23 100/4 100/5 100/6 100/15 100/19 100/20 100/22 101/16 101/17
**equivalent [4]** 7/24 57/12 83/1 83/9
**Ernst [1]** 6/19
**erroneously [1]** 124/23
**error [1]** 45/22
**errors [3]** 64/2 101/6 101/25
**escrowed [1]** 36/2
**especially [2]** 148/14 149/3
**esse [1]** 128/20
**essence [1]** 139/24
**establish [2]** 35/6 35/7
**establishing [2]** 141/9 141/10
**estimate [2]** 45/22 56/15

**estimates [2]** 106/9 122/23
**estimation [1]** 45/22
**et [3]** 1/7 4/6 47/9
**ethics [1]** 126/1
**evaluate [1]** 46/16
**evaluating [1]** 10/8
**even [25]** 9/19 9/21 10/3 22/10 25/23 27/11 38/9 44/17 58/8 89/5 90/8 104/5 104/6 119/2 140/22 141/11 141/19 146/25 147/4 149/1 151/9 152/10 157/7 158/2 158/2
**evening [2]** 20/16 20/19
**evenings [1]** 162/11
**event [1]** 113/24
**ever [12]** 72/11 121/6 133/6 140/14
**every [12]** 34/23 35/25 46/8 107/10 130/17 142/12 142/17 149/23 149/25 150/15 154/12 155/2
**everybody [4]** 91/25 144/17 153/25 154/2
**everybody's [2]** 84/24 148/23
**everyone [3]** 48/22 49/18 92/6
**everything [7]** 63/1 63/1 102/3 123/9 136/10 152/25 153/1
**evidence [24]** 16/20 17/21 18/4 20/18 26/25 28/8 37/10 88/16 110/13 114/10 115/5 115/13 115/14 128/18 139/7 139/9 139/9 140/16 141/4 148/18 156/20 156/25 157/23 158/17
**evidenced [2]** 16/25 145/11
**evidentiary [1]** 140/21
**evolve [1]** 133/25
**exact [1]** 147/7
**exactly [2]** 78/7 159/13
**exam [1]** 8/21
**examination [10]** 5/4 6/11 8/20 22/24 23/3 27/1 30/2 65/6 66/4 92/7
**examined [1]** 132/7
**examining [1]** 132/6
**example [1]** 44/15 51/7 51/8
**examples [1]** 104/21
**exceeded [3]** 54/7 54/9 110/24
**Excel [1]** 12/3
**except [3]** 63/9 87/14 161/12
**exception [5]** 44/4 142/15 146/16 146/18 150/17
**excerpt [1]** 134/2
**excerpts [2]** 158/25 159/3
**excess [6]** 44/14 52/9 52/10 52/19 54/10 122/25
**Exchange [2]** 5/16 6/22
**exclusive [1]** 121/25
**excuse [1]** 112/9
**exercise [2]** 102/3 102/5
**exfoliation [1]** 159/24 160/2
**exhibit [54]** 13/15 13/15 13/18 13/19 14/3 14/5 14/14 14/22 14/23 16/3 30/21 30/23 30/23 32/1 34/12 45/17 52/24 53/2 53/4 55/10 55/22 57/16 60/6 66/8 74/5 77/12 103/1 103/4 104/1 106/6 111/8 115/24 116/4 116/24 116/25 117/4 117/21 119/11 120/1 120/22 121/3 121/12 122/5 123/5 123/13 124/8 125/15 126/7 126/9 127/3 127/19 138/1 153/23 161/14
**Exhibit 1 [1]** 74/5
**Exhibit 12 [1]** 122/5
**Exhibit 132 [1]** 138/1
**Exhibit 147 [3]** 52/24 103/4 104/1
**Exhibit 188 [1]** 77/12
**Exhibit 199 [1]** 55/22
**Exhibit 2 [1]** 116/25
**Exhibit 28 [1]** 123/5
**Exhibit 29 [1]** 123/13
**Exhibit 34 [1]** 125/15

**Exhibit 40 [1]** 126/9
**Exhibits [1]** 117/21
**Exhibit 54 [1]** 127/19
**Exhibit 8 [1]** 119/11
**exhibits [12]** 12/11 15/24 28/24 51/22 52/2 105/10 105/19 113/3 157/22 158/6 158/22 159/12
**existed [3]** 115/3 115/6 143/3
**existence [1]** 62/3
**expansion [1]** 123/25
**expected [2]** 38/18 61/25
**expects [1]** 121/20
**expenditures [1]** 96/21
**expense [5]** 19/2 30/18 34/21 36/10 60/20
**expenses [11]** 32/9 32/10 32/11 33/8 34/16 36/14 44/9 93/15 119/22 126/22 146/21
**experience [6]** 6/11 10/8 10/20 62/19 62/20 110/12
**expert [18]** 9/4 11/1 11/3 18/25 21/22 23/4 33/10 33/16 59/7 63/12 63/15 64/18 68/2 72/10 76/4 87/1 93/4 150/15
**expert's [1]** 29/16
**experts [5]** 27/17 84/3 84/8 86/10 99/24
**explain [7]** 6/14 40/5 45/25 50/22 53/8 107/20 146/12
**explained [7]** 51/4 118/17 126/21 126/25 127/11 128/8 146/9
**explanation [2]** 109/14 146/16
**explanations [1]** 142/17
**explicitly [2]** 101/3 135/24
**explored [2]** 58/1 58/15
**expounded [1]** 27/9
**express [4]** 69/9 69/24 70/4 70/6
**expressed [2]** 83/11 94/1
**expressing [1]** 83/8
**extend [1]** 154/8
**extension [1]** 154/12
**extensions [1]** 154/11
**extensively [2]** 140/5 160/8
**extent [5]** 18/1 22/22 58/13 157/1 159/11
**extreme [1]** 49/25

**F**

**face [1]** 138/20
**fact [39]** 10/10 17/22 20/4 26/25 28/7 28/8 28/16 28/18 28/19 29/8 35/7 37/6 38/21 41/5 42/5 42/18 44/13 45/15 47/10 49/24 59/10 61/17 88/12 89/10 90/10 91/1 113/4 142/8 145/16 148/20 149/3 151/17 152/5 156/21 158/21 159/7 159/10 160/10 161/21
**factor [5]** 30/14 50/16 81/24 82/2 82/24
**factors [2]** 10/21 61/10
**facts [6]** 42/12 92/13 142/11 142/11 142/12 142/12
**factual [1]** 27/24
**failed [8]** 16/13 45/19 45/23 75/18 104/17 104/17 104/17 140/21
**failing [3]** 35/14 35/14 51/18
**failure [5]** 33/24 40/6 57/20 103/20 103/20
**failures [1]** 26/5
**fair [23]** 10/5 69/20 69/21 85/2 89/4 89/14 102/1 104/3 104/4 105/4 106/13 106/23 108/12 108/20 109/3 109/7 109/14 110/4 111/20 135/10 135/11 153/16 153/18
**Fairbaugh [1]** 126/17
**fairly [8]** 9/19 12/2 79/11 80/25 92/20 110/5 110/5 139/21
**fall [2]** 34/6 146/23
**falls [2]** 22/10 22/11
**Fame [1]** 8/12
**far [6]** 38/13 48/10 59/2 59/11 59/11 80/5
**Farms [1]** 1/19

**F** Case 1:00-cv-02089-PLF

farther [1] 133/24
fate [1] 152/14
favor [2] 156/14 157/12
favorable [1] 154/1
favorites [1] 139/1
feasibility [1] 124/14
February [7] 12/6 14/25 70/21 117/5 119/12 119/25 157/17
February 11th [1] 117/5
February 21st [1] 70/21
federal [2] 40/24 90/2
Feds [1] 41/13
fee [10] 23/1 32/23 52/12 104/15 106/10 107/9 109/2 111/1 111/4 111/11
feel [1] 140/24
fees [36] 17/24 31/5 52/2 52/22 53/6 53/17 55/11 56/10 56/11 56/11 56/12 56/18 60/25 61/3 104/15 104/25 105/1 107/3 107/6 107/22 107/22 109/19 109/19 109/21 109/25 110/15 111/9 111/11 120/17 120/18 127/10 128/4 130/2 155/24 156/6 156/7
fell [1] 154/3
few [4] 63/19 85/18 126/12 161/7
field [4] 63/12 84/21 138/24 139/22
Fifth [1] 139/13
fight [1] 139/6
figure [7] 24/6 79/9 81/3 83/3 83/4 147/19 161/5
figures [1] 103/23
figuring [1] 80/7
file [7] 118/20 158/11 160/23 160/24 161/7 161/18 162/23
filed [3] 70/20 158/22 158/23
files [2] 12/3 67/23
filing [4] 113/2 113/3 113/4 161/21
filling [1] 149/8
final [4] 68/19 68/19 134/2 159/9
Finally [3] 153/14 154/19 155/10
finance [10] 5/20 6/1 6/23 6/25 7/17 40/21 49/23 96/14 121/3 151/14
financial [47] 6/21 10/6 10/9 10/14 10/15 10/16 10/19 11/17 11/18 11/18 12/20 32/4 37/17 37/18 38/23 38/24 39/2 39/5 39/5 39/13 42/21 43/10 44/11 44/11 47/3 56/6 60/14 63/15 68/2 69/24 70/17 70/23 72/10 84/3 84/8 87/1 88/20 92/16 92/21 93/4 93/9 95/22 95/25 96/8 96/8 152/12
financing [11] 47/14 47/15 47/20 49/3 50/4 52/6 94/17 96/3 96/6 96/15 101/15
find [5] 19/12 19/25 118/7 160/18 161/4
findings [9] 13/4 29/7 113/4 142/12 156/21 158/21 159/6 159/9 161/21
fine [8] 58/3 65/22 91/24 136/9 159/8 161/11 161/22 161/24
finished [2] 97/5 132/6
firm [9] 5/18 7/3 7/6 7/7 10/2 53/11 71/18 71/21 124/5
firm's [2] 124/1 124/1
firmly [1] 138/22
firms [4] 6/19 38/25 121/22 124/2
first [52] 6/18 9/3 10/11 11/13 11/24 12/2 12/25 14/9 16/7 16/12 16/16 16/18 16/19 18/23 19/8 21/4 23/8 31/3 31/3 36/25 39/15 40/6 45/25 53/1 53/3 53/8 75/18 75/23 82/9 95/13 106/3 108/22 108/24 111/10 114/3 116/4 116/12 117/9 117/14 117/23 118/4 118/24 120/5 121/16 127/22 140/25 143/3 143/23 147/10 151/8 152/18 153/16
fiscal [2] 39/12 94/23
five [18] 4/10 7/7 10/2 29/16 52/14 64/21

five-minute [2] 112/12 112/15
flaws [2] 13/9 16/11
float [1] 36/1
flow [13] 38/4 38/9 39/10 42/16 44/12 44/18 94/16 94/16 94/17 96/2 96/3 96/3 96/4
flows [1] 94/16
follow [3] 7/23 8/4 45/19
following [1] 158/14
follows [3] 5/3 20/19 133/16
footnote [2] 39/6 42/16
footnotes [2] 34/25 102/17
Force [1] 8/24
forcing [1] 159/14
forecast [6] 15/14 30/19 35/2 35/3 36/14 62/4
forecasting [2] 15/12 61/22
foregoing [1] 163/10
forensic [5] 7/15 9/23 34/19 35/6 62/21
form [2] 13/3 58/7
formed [1] 115/9
former [2] 38/24 57/10
forms [12] 57/5 57/6 57/7 57/25 58/1 58/2 58/8 58/14 59/5 59/15 59/17 60/11
forth [18] 18/19 20/11 20/12 26/17 26/19 29/20 69/10 69/14 72/18 78/7 78/11 101/19 102/15 103/11 130/16 137/16 139/15 159/11
forward [6] 18/9 63/15 79/22 80/4 82/16 130/19
found [4] 60/25 101/25 151/24 152/4
foundation [14] 26/24 32/15 32/17 33/15 35/8 58/22 63/17 78/1 115/11 115/15 128/10 140/22 158/1 158/15
foundational [1] 114/23
four [11] 6/19 18/11 18/22 26/18 27/16 27/18 33/19 42/25 50/18 110/10 110/14
fourth [2] 1/23 125/10
fraction [1] 50/25
framework [1] 115/15
fraud [2] 150/19 150/21
Fred [5] 123/6 123/9 123/11 123/12 128/19
Frederick [1] 117/1
frequency [1] 110/13
Friday [1] 20/25
Friden [2] 118/20 124/4
FRIEDMAN [1] 1/11
front [6] 14/12 18/8 23/14 116/25 155/20 155/22
FTI [6] 5/13 5/15 5/16 7/9 9/24 71/23
full [3] 5/8 6/24 12/23
full-time [2] 11/11 12/13
function [2] 11/11 12/13
fund [45] 16/23 16/24 26/23 34/5 34/8 34/10 34/11 34/17 37/22 43/5 44/21 53/20 54/19 62/1 72/16 77/16 79/7 81/14 83/19 102/9 104/15 104/25 106/20 106/21 106/23 107/1 107/1 107/3 107/4 107/12 107/13 107/14 107/15 107/24 109/10 109/12 110/2 110/3 119/14 124/15 124/24 126/20 127/14 143/23 154/21
fundamental [2] 142/20 145/9
funding [5] 46/4 46/5 46/6 46/7 47/14
funds [62] 27/25 30/16 31/6 31/25 33/9 37/11 39/20 44/1 44/7 48/15 48/16 48/19 52/17 52/18 53/19 53/21 54/1 54/5 54/17 72/19 73/6 73/14 75/7 75/13 76/7 79/1 80/20 80/23 81/13 83/25 86/24 87/13 88/21 99/21 99/21 103/17 106/10 106/11 106/20 106/25 107/10 108/2 108/7 108/10 108/12 108/22 109/15 109/16 110/10 110/14 111/5 111/11 119/20 120/19 124/11 124/25 125/11 126/22

funny [3] 149/10 149/23 152/13
further [16] 21/9 56/2 57/19 63/10 64/6 70/3 70/10 70/23 79/19 81/18 112/23 112/25 133/14 142/10 142/17 144/22
future [6] 15/11 15/11 15/14 61/22 82/17 141/7

**G**

gained [1] 114/6
Ganley [49] 115/7 115/16 117/1 117/24 118/17 123/19 127/20 128/19 128/25 129/9 130/16 130/22 131/13 131/16 131/19 132/1 132/6 132/10 132/13 132/18 132/21 133/12 133/13 133/15 133/16 134/25 135/21 136/3 136/22 136/23 137/18 137/21 141/6 141/18 141/23 142/1 145/14 147/1 147/8 147/9 147/17 147/22 148/18 148/24 149/5 149/23 155/14 157/3 157/14
Ganley's [3] 134/2 155/11 157/1
gap [1] 149/8
Gardener [1] 132/14
gave [12] 18/17 22/11 27/20 27/21 39/7 89/17 97/11 103/14 106/8 149/24 156/10 156/10
Gene [2] 123/6 123/10
general [13] 42/5 63/23 73/19 101/18 108/24 117/7 120/3 120/13 121/2 121/13 123/18 139/25 154/18
generality [1] 91/6
generally [8] 21/20 40/24 41/11 45/20 49/8 84/2 90/2 161/20
generate [6] 79/9 80/8 80/24 81/2 85/19 98/20
generated [8] 34/5 46/8 79/15 80/9 81/12 93/24 120/11 126/23
generating [3] 38/14 107/7 110/15
generation [1] 34/7
generic [1] 58/7
get [36] 8/22 25/12 30/3 40/21 46/5 47/21 49/19 64/25 65/19 66/8 80/3 84/9 91/1 93/12 93/14 107/2 107/13 113/22 122/6 123/15 127/9 128/2 128/3 137/3 141/7 141/15 146/8 146/13 147/15 147/18 148/5 152/17 152/19 158/22 161/17 162/10
gets [2] 46/6 148/22
getting [4] 144/1 147/11 152/11 160/10
Gibert [2] 150/10 151/17
gift [1] 10/6
gist [1] 105/25
give [11] 6/15 9/1 15/21 40/18 90/9 100/19 110/7 119/19 146/24 154/16 154/16
given [12] 8/14 81/3 108/25 118/12 118/14 119/18 119/24 134/21 148/19 150/18 154/12 155/13
gives [1] 63/20
giving [1] 18/23
Glassco [6] 124/10 124/20 125/1 125/16 125/24 126/15
global [1] 5/17
go [78] 12/3 16/2 18/9 18/15 18/21 19/1 19/12 19/15 21/5 21/9 25/14 25/18 27/3 27/18 30/6 33/11 36/20 45/16 49/25 50/20 51/16 53/1 58/19 60/7 62/2 62/15 64/13 65/16 65/18 68/24 75/15 75/16 77/9 78/22 87/19 88/25 99/24 100/18 101/13 102/13 104/17 107/11 108/11 112/9 116/14 116/9 116/24 118/9 118/23 120/20 123/9 123/14 124/8 127/2 127/3 127/18 128/23 130/5 131/15 132/11 133/25 134/6 134/12 134/14 134/23 135/22 136/14 136/19 137/3 138/10 144/1 144/2 144/7 145/9 149/2 154/8 157/6

**go... [1]** 159/15
**goal [2]** 41/14 114/22
**God [1]** 152/19
**goes [9]** 21/24 49/19 55/2 55/22 108/4 119/6 125/1 149/11 151/24
**Goggin [5]** 131/22 136/20 136/23 136/24 148/15
**going [68]** 10/16 20/3 20/15 21/8 25/21 27/16 31/1 31/14 34/12 45/15 46/16 59/20 60/5 61/9 62/13 62/15 64/17 74/4 75/16 80/24 83/2 83/3 86/8 86/14 107/1 107/3 107/3 107/12 107/25 108/11 108/19 108/19 112/25 113/1 116/1 119/17 119/19 119/19 121/18 125/15 127/9 127/10 130/11 130/22 130/23 132/12 132/24 133/23 133/25 136/19 140/24 141/12 141/13 141/17 146/13 147/16 151/11 152/10 153/7 153/14 156/4 157/21 157/22 159/7 161/1 161/6 161/9 161/11
**Goldman [1]** 147/12
**goliath [1]** 139/1
**gone [5]** 11/22 21/6 60/10 130/19 133/24
**good [10]** 5/6 5/7 66/6 66/7 81/17 104/3 125/7 139/18 155/2 157/16
**got [16]** 6/23 19/8 24/5 24/6 64/16 84/18 88/19 130/5 132/6 149/8 152/19 154/22 154/22 156/3 156/3 157/17
**gotten [1]** 59/2
**Gould [4]** 121/2 121/4 121/14 122/5
**govern [1]** 8/2
**governing [1]** 60/23
**Government [13]** 4/16 13/18 40/23 65/7 67/22 68/18 109/10 145/9 145/11 145/13 148/14 151/2 152/25
**Government's [1]** 29/7
**Governors [1]** 154/18
**grab [1]** 155/3
**grabbing [1]** 155/8
**graduating [1]** 6/6
**grandiose [1]** 151/9
**Grant [1]** 137/6
**Grant's [2]** 151/9 155/4
**grants [1]** 6/12
**great [1]** 66/11
**greater [1]** 83/10
**Griffin [1]** 2/6
**grounds [3]** 32/14 41/19 57/14
**growth [1]** 51/9
**Guercio [2]** 124/20 125/16
**guess [17]** 31/13 42/9 46/1 59/22 65/3 65/5 76/17 84/15 87/7 98/3 101/12 105/15 106/25 107/17 108/10 110/8 157/14
**guys [3]** 141/7 151/14 151/15
**guys' [1]** 152/20

## H

**hacked [1]** 152/10
**had [97]** 10/8 10/20 11/16 11/19 12/1 12/2 12/8 12/16 14/16 15/9 16/19 16/22 16/25 20/1 22/13 23/1 23/16 27/16 30/17 33/4 35/19 36/13 37/3 37/17 37/17 40/8 40/16 40/20 47/13 56/5 59/7 61/4 65/8 65/9 65/11 67/8 67/9 69/2 69/5 70/15 70/24 71/14 73/2 75/23 82/20 86/24 87/20 91/19 102/3 102/4 103/8 104/7 109/22 110/21 114/7 114/19 115/1 118/18 118/20 118/21 128/5 128/13 129/5 129/12 130/8 130/19 131/17 131/20 131/22 132/23 133/20 133/20 135/2 138/24 146/2 146/12 146/24 147/2 147/3 147/17 148/24 149/3 149/4 149/6 149/14 150/13 150/14 150/24 151/16 151/17 152/22 154/6

**Hall [1]** 8/12
**hand [10]** 4/22 32/6 47/21 47/24 47/24 48/3 74/10 74/14 95/16 108/14
**handed [3]** 14/14 30/22 32/2
**handing [2]** 14/2 14/21
**hands [4]** 80/15 142/6 152/20 154/24
**handwritten [6]** 32/5 32/6 32/7 54/8 110/21 117/22
**happen [3]** 19/8 157/21 161/1
**happened [4]** 86/20 86/23 106/19 136/4
**happening [1]** 26/16
**happy [3]** 91/20 157/14 160/21
**hard [1]** 65/3
**has [48]** 7/22 8/13 11/10 12/11 18/9 18/19 19/9 21/6 26/21 26/24 26/25 27/1 30/22 32/5 36/6 42/1 45/13 50/5 50/8 53/25 57/15 58/10 72/16 74/11 76/16 77/18 103/4 108/10 112/17 112/24 114/10 115/24 122/20 122/21 123/7 124/24 125/7 126/25 138/18 139/12 139/14 142/13 145/15 146/19 149/2 157/2 158/5 160/12
**HASLER [6]** 1/3 4/4 131/22 131/23 131/25 132/2
**have [254]**
**haven't [2]** 9/20 76/11
**having [6]** 5/3 11/22 23/13 41/15 60/13 125/19
**he [243]**
**He'll [1]** 11/3
**he's [18]** 21/12 27/5 32/15 33/16 34/2 45/14 50/6 56/21 56/22 62/10 63/7 79/3 89/12 100/25 149/8 149/8 156/3 156/3
**head [2]** 56/19 147/23
**heading [1]** 121/5
**hear [7]** 32/21 57/6 57/9 80/2 136/4 156/11 157/2
**heard [46]** 17/11 17/24 21/23 22/4 32/18 39/24 40/2 40/18 43/23 59/11 60/24 61/8 61/15 63/1 63/7 67/5 67/16 68/5 68/11 83/16 88/7 108/25 118/19 136/9 137/4 137/19 138/2 138/9 145/14 147/1 150/1 150/22 151/8 151/11 151/23 152/1 154/3 154/14 155/3 155/14 156/2 156/2 156/19 156/20 158/4 162/6
**hearing [5]** 58/20 59/4 67/4 67/9 67/15
**hearsay [1]** 158/15 158/15
**held [6]** 38/21 45/8 55/5 74/20 97/23 120/19
**help [4]** 64/23 67/21 75/11 119/22
**helpful [3]** 55/1 60/17 116/9
**here [46]** 19/4 21/6 27/23 29/10 31/17 31/20 32/6 33/18 36/15 40/21 46/15 65/22 67/21 71/20 74/2 76/2 77/1 80/4 83/13 83/20 86/20 87/6 89/9 90/25 94/11 97/20 98/22 100/13 102/22 107/21 113/22 117/8 117/18 118/24 121/16 124/9 136/9 145/19 145/20 146/25 152/8 153/20 159/15 161/5
**here's [3]** 23/12 33/17 161/8
**herein [1]** 101/7
**heroic [1]** 43/24
**hide [1]** 148/21
**high [8]** 55/14 55/15 56/15 56/24 56/25 88/12 121/8 151/2
**higher [19]** 38/25 40/11 40/16 40/16 40/23 41/3 41/9 41/10 48/19 49/20 49/24 90/7 97/15 97/18 98/4 98/24 99/1 100/24 152/17
**highlight [3]** 16/10 115/20 128/21
**highlighted [9]** 116/2 116/21 117/25 119/14 128/24 136/15 145/6 155/21 156/1
**highly [2]** 62/5 121/5
**Hillegass [11]** 131/17 136/19 136/22 141/25

**Hillegass' [3]** 132/10 147/9 147/21
**him [44]** 12/9 18/11 18/15 18/22 27/6 30/1 33/14 40/18 43/23 52/7 63/7 67/16 68/11 72/12 72/14 78/15 84/23 84/25 88/7 90/11 102/25 103/14 105/25 131/18 132/7 134/5 135/7 135/12 135/17 138/8 145/16 147/22 147/24 148/4 149/10 151/7 155/13 155/17 155/21 155/23 156/10 157/18 162/15
**himself [2]** 145/14 149/12
**his [127]** 6/14 12/1 12/7 13/4 13/8 13/10 15/7 15/8 15/9 16/11 16/14 16/19 16/20 17/11 17/11 17/16 18/2 18/20 19/1 19/9 20/19 21/5 21/6 21/7 21/12 21/24 22/9 23/4 23/21 25/25 27/5 27/7 27/18 31/20 33/19 37/1 39/16 40/19 41/8 43/21 44/3 45/4 46/16 48/10 48/11 50/5 50/16 50/19 51/21 52/14 53/8 56/9 56/15 56/24 57/20 58/3 58/16 58/17 61/20 61/20 61/24 62/4 62/7 63/2 63/3 63/5 63/24 64/3 66/18 66/24 69/19 70/14 75/20 75/23 77/9 77/10 78/24 83/16 84/21 84/21 88/3 90/8 90/21 97/16 103/20 105/14 105/4 105/21 106/1 110/8 117/25 128/20 128/21 128/23 129/1 129/8 129/19 130/1 130/4 130/6 130/7 130/15 134/4 135/21 135/23 137/18 145/16 145/24 146/1 146/9 147/5 147/11 147/23 148/1 148/17 148/21 148/21 149/14 149/23 153/22 155/15 155/25 156/9 157/4 157/16 157/8 157/14
**historically [2]** 40/3 100/2
**history [2]** 6/16 10/1
**hoc [1]** 30/2
**hold [6]** 6/3 6/7 8/15 91/16 141/14 150/25
**holding [6]** 39/19 39/21 39/23 39/25 40/10 150/24
**holds [1]** 141/14
**hole [1]** 23/2
**Honor [173]**
**honorable [2]** 1/11 66/1
**honors [1]** 8/11
**hope [2]** 65/11 162/1
**hopefully [1]** 158/12
**horizon [1]** 88/23
**hour [3]** 64/19 65/1 91/21
**how [44]** 9/3 9/7 9/12 9/17 9/22 10/20 34/13 36/10 38/11 39/15 41/7 41/9 41/9 44/25 45/1 48/5 50/23 52/14 54/3 54/3 54/16 54/23 54/24 55/13 56/9 59/14 59/20 65/6 67/8 78/10 107/20 109/15 109/16 109/25 122/1 122/15 146/13 147/19 149/4 150/23 151/9 151/21 152/17 154/5
**however [1]** 118/5
**humor [1]** 16/17
**hundreds [2]** 28/23 150/9
**hypothetical [1]** 78/14

## I

**I'd [3]** 34/22 115/19 120/4
**I'll [24]** 18/9 26/21 28/19 41/20 45/17 50/20 65/18 68/6 74/24 89/20 105/3 110/7 112/20 112/22 120/22 125/14 126/10 127/2 136/20 136/25 138/18 161/24 162/24 162/24
**I'm [111]** 5/11 5/13 6/5 7/3 7/13 7/15 7/16 7/17 8/3 8/17 9/14 9/24 12/4 13/13 13/19 14/2 14/21 20/9 20/15 21/15 25/4 27/4 27/21 30/18 31/1 33/10 33/15 36/25 43/13 43/22 44/24 46/14 50/7 51/21 54/22 55/10 56/10 57/4 59/24 60/6 62/15 64/9 64/11 65/12 65/22 73/5 73/12 73/24 74/4 74/11 74/13 75/16 79/25 80/4 80/14 80/17 82/9 82/13 84/15 84/16 84/17 86/22 87/19 88/20 88/22

**I'm... [46]** 89/5 90/14 90/18 90/23 91/20
93/16 97/4 98/3 99/22 101/23 103/1 103/5
105/23 106/17 107/19 108/19 108/19 111/1
111/15 112/9 116/1 116/14 118/15 124/18
125/24 132/8 132/12 132/24 136/9 136/13
140/24 144/1 144/7 144/20 149/12 152/6
153/11 155/5 156/17 156/18 157/18 159/22
160/1 160/21 162/9 162/17
**I've [36]** 6/6 8/23 9/10 17/10 17/24 29/4
31/15 39/23 42/14 43/20 47/1 47/2 54/6
59/11 59/11 59/16 63/1 63/1 63/7 64/16
72/25 74/5 77/3 88/16 95/21 96/25 96/25
97/10 98/2 100/21 108/25 108/25 110/16
116/2 119/13 127/8
**i.e [1]** 153/24
**Ibbotson's [2]** 49/17 86/3
**idea [8]** 22/21 26/22 27/23 72/13 84/20 120/7
148/1 152/16
**identification [1]** 136/8
**identified [8]** 43/4 72/10 116/5 157/24 158/5
158/6 158/24 158/25
**identify [4]** 4/8 104/13 159/2 159/16
**identifying [1]** 96/19
**idle [1]** 53/22
**ifs [1]** 81/15
**ignored [1]** 139/3
**Illinois [3]** 5/24 5/25 6/7
**immediately [5]** 39/3 42/22 47/12 53/20 95/5
**impact [2]** 40/8 45/13
**implementation [2]** 144/11 149/16
**implicit [1]** 126/2
**implied [2]** 100/16 146/17
**implies [1]** 124/23
**implying [1]** 80/15
**important [11]** 23/10 35/10 48/18 113/21
120/10 136/14 136/15 137/8 142/19 147/20
151/22
**importantly [2]** 119/21 146/4
**impose [2]** 8/6 144/23
**imprecise [1]** 104/2
**improbable [1]** 121/6
**inappropriate [1]** 45/19
**inartful [1]** 151/19
**INC [2]** 1/3 1/7
**incident [1]** 150/22
**include [4]** 28/4 51/18 86/11 104/22
**included [10]** 25/24 28/4 31/12 34/13 47/8
55/23 56/23 61/21 117/24 135/24
**includes [2]** 5/18 52/2
**including [10]** 10/5 61/16 88/17 102/3
129/22 131/2 134/9 150/16 155/23 155/24
**inclusion [1]** 140/22
**income [53]** 15/12 17/9 17/25 18/2 30/15
34/2 34/5 34/7 37/5 38/15 39/5 39/13 39/14
43/3 43/7 44/5 45/14 46/7 47/2 51/19 52/1
52/20 53/14 53/16 59/10 93/15 93/18 93/19
94/12 95/3 97/7 111/12 114/8 114/13 114/9
114/20 119/22 125/18 125/20 127/10 128/2
128/11 129/14 130/3 131/3 131/19 132/1
134/10 135/25 142/9 145/6 145/20 154/23
**incomplete [1]** 12/21
**inconsistent [2]** 42/12 92/12
**incorporated [3]** 4/4 4/6 141/13
**increase [3]** 94/19 117/10 130/13
**increasing [1]** 45/13
**incremental [5]** 51/18 51/25 57/20 60/7 60/8
**incur [1]** 145/22
**incurred [2]** 34/16 111/23
**incurring [2]** 33/6 60/23
**incurs [1]** 55/9

**indeed [2]** 79/12 118/8
**independence [5]** 88/35/13 96/5
**independent [3]** 21/10 21/10 21/18
**independently [1]** 48/10
**indicate [1]** 63/7
**indicated [2]** 118/5 122/20
**indication [1]** 124/4
**individual [4]** 129/4 137/5 144/16 155/18
**inducted [1]** 8/12
**industry [3]** 129/2 139/1 145/3
**infer [2]** 36/18 77/18
**inflation [3]** 49/17 86/4 99/23
**information [19]** 12/16 12/19 63/20 69/9
69/25 70/3 70/23 90/10 96/8 99/22 104/1
122/20 140/17 141/4 141/16 147/22 148/19
152/11 155/13
**informing [1]** 20/8
**initial [8]** 15/7 21/5 21/7 21/12 117/6 121/8
155/11 155/14
**initially [2]** 27/8 119/18
**initials [3]** 6/8 7/15 110/22
**injected [1]** 58/22
**injury [8]** 81/20 83/15 83/22 84/4 84/5 84/12
84/22 84/25
**inordinately [1]** 64/19
**inputs [1]** 63/3
**inquire [1]** 33/11
**inquiries [4]** 59/8 63/18 76/5 76/6
**inquiring [1]** 133/18
**inquiry [7]** 17/6 17/12 18/4 63/10 76/13 77/2
77/3
**inside [1]** 67/25
**instance [1]** 61/1
**instances [1]** 63/25
**instead [5]** 32/11 81/19 97/24 102/5 138/25
**instinct [2]** 41/16 41/20
**institute [4]** 6/10 7/13 7/21 152/2
**institution [2]** 31/4 125/12
**instruction [2]** 9/1 110/17
**instructions [4]** 37/3 42/18 88/17 92/19
**instructive [1]** 132/8
**instrument [6]** 39/22 40/14 40/15 40/15 91/8
91/8
**instruments [1]** 89/23
**insured [2]** 122/5 153/3
**integral [3]** 124/16 127/14 157/8
**integrity [1]** 125/8
**intended [3]** 85/16 129/3 143/24
**intent [1]** 147/9
**interest [155]** 15/12 17/9 17/23 17/25 18/2
18/2 18/18 22/17 23/17 28/11 28/14 28/15
30/15 30/18 31/24 32/4 32/12 33/12 34/1
34/5 34/7 34/13 36/8 37/4 37/5 37/14 37/22
37/24 37/25 38/14 38/20 39/13 39/22 40/4
40/22 40/23 40/25 42/2 42/10 42/19 42/25
43/2 43/7 43/11 43/18 44/20 45/3 45/7 45/11
45/12 45/14 50/9 51/7 51/19 52/1 52/6 52/13
52/20 53/14 53/18 54/6 56/14 59/10
60/11 61/11 63/9 73/5 73/6 73/11 77/15
77/17 78/25 79/5 79/7 79/8 79/9 79/14 79/15
79/21 80/7 80/7 80/9 80/23 80/23 80/24 81/2
81/2 81/4 81/7 81/7 81/9 81/13 82/8 83/18
85/14 85/18 85/19 85/21 85/21 85/22 88/18
88/25 89/2 89/3 92/11 92/19 94/12 95/3
95/24 99/7 104/10 104/19 104/24 105/4
107/8 114/8 114/13 114/19 114/20 116/13
116/22 119/4 119/5 119/7 119/21 120/18
124/13 125/18 125/20 127/10 127/15 128/2
128/11 129/12 129/14 130/3 131/3 131/19
132/1 132/15 134/5 135/25 139/4 141/15
142/2 142/8 144/25 145/6 145/20 148/9
151/10 152/17 154/22 155/5

**interest-bearing [2]** 17/22 18/18
**interested [2]** 74/11 162/18
**interesting [4]** 116/20 119/3 132/5 147/9
**internal [9]** 68/2 93/12 93/18 93/24 94/3
96/11 98/8 117/14 126/9
**internally [2]** 140/5 140/6
**internet [2]** 48/9 63/9
**interrupt [1]** 65/20
**intervention [1]** 90/3
**introduced [2]** 30/17 136/2
**introduction [1]** 140/20
**inversion [1]** 89/13
**inverted [12]** 40/20 40/22 41/11 89/18 89/21
89/25 90/5 90/9 90/11 90/20 90/22 91/11
**invest [4]** 53/20 87/10 87/21 88/3
**invested [5]** 36/19 37/8 88/22 97/25 98/1
**investigate [3]** 48/11 49/5 60/15
**investigated [2]** 35/4 52/7
**investigation [11]** 18/4 33/25 39/24 40/7
40/14 57/19 63/2 63/11 70/14 70/18 88/9
**investing [6]** 94/16 96/3 96/15 96/21 151/1
152/25
**investment [20]** 31/4 38/2 42/24 44/1 44/13
52/19 53/13 92/25 93/3 94/10 95/23 96/13
96/22 96/23 96/24 97/9 97/12 111/10 145/5
153/5
**investments [9]** 38/19 44/21 87/22 94/6
94/13 95/19 96/11 98/1 109/22
**invoices [2]** 59/16 59/17
**involved [6]** 9/2 10/21 114/4 119/9 149/11
149/16
**irrespective [1]** 155/3
**is [424]**
**Island [1]** 9/10
**isn't [4]** 48/3 49/22 85/1 149/7
**issue [22]** 8/2 11/17 11/17 18/15 22/22 23/18
24/12 26/11 26/19 26/22 27/17 29/15 110/9
111/9 138/9 140/21 150/20 154/19 155/8
155/8 159/21 161/15
**issued [12]** 11/10 12/4 12/5 13/22 14/6 14/12
14/16 14/25 16/19 16/19 66/16 133/20
**issues [8]** 18/14 64/11 76/6 91/17 101/6
120/24 137/13 145/10
**it [370]**
**it's [84]** 5/9 9/19 9/21 9/25 14/14 23/10
26/13 26/18 27/5 27/10 27/10 28/6 29/9 31/9
35/2 35/12 36/18 39/19 40/5 40/6 41/19 43/8
44/19 46/8 46/10 46/10 46/13 47/15 48/3
48/21 53/21 54/12 55/16 55/16 55/17 55/17
56/14 62/10 66/11 66/15 73/24 74/7 78/1
78/3 78/17 80/6 82/5 83/14 84/1 84/14 85/7
89/14 92/2 93/15 96/14 98/4 99/1 99/23
100/9 101/12 104/2 104/21 111/1 111/13
114/4 116/19 117/7 120/2 123/10 132/12
133/25 135/20 139/5 139/6 141/12 142/2
142/4 146/9 146/17 150/23 153/25 156/19
161/25 163/2
**item [6]** 35/1 38/2 39/4 43/8 57/16 104/9
**itemized [1]** 103/15 103/18 104/20
**items [3]** 34/24 48/9 57/18
**its [18]** 46/4 46/6 77/15 77/16 100/8 101/16
104/5 114/18 115/12 121/7 122/22 128/13
129/21 139/8 139/11 139/12 144/21 160/10
**itself [5]** 27/22 32/25 44/2 124/7 154/17

**J**

**j.bonassar [1]** 1/21
**James [1]** 121/12
**January [18]** 37/19 44/23 50/6 50/10 51/3
79/20 81/21 83/2 83/2 83/15 84/1 84/6 84/20
85/6 94/18 94/23 94/24 117/1
**January 1 [2]** 84/20 85/6

**January 1st [8]** 50/6 50/10 51/3 79/20 81/21 83/2 83/15 84/1
**January 28 [1]** 117/1
**January 31st [5]** 37/19 44/23 94/18 94/23 94/24
**job [3]** 125/7 157/8 158/17
**join [1]** 7/9
**joined [1]** 71/23
**Joint [1]** 24/18
**Joseph [1]** 1/19
**Jr [1]** 117/1
**judge [5]** 1/11 84/16 91/17 99/14 111/21
**judge's [1]** 73/3
**judgment [3]** 64/2 85/10 157/11
**July [4]** 120/1 121/11 123/6 138/13
**July 1996 [1]** 138/13
**July 21st [1]** 123/6
**jumped [1]** 73/11
**June [1]** 126/10
**June 8 [1]** 126/10
**just [103]** 4/25 13/21 14/14 16/10 18/17 18/20 20/11 20/12 20/15 22/11 22/13 24/14 24/15 26/15 27/4 27/9 29/2 29/15 35/4 35/10 35/17 35/18 39/25 42/3 43/13 43/20 46/13 48/3 48/6 48/13 49/6 51/11 58/7 58/21 63/19 64/8 64/21 64/22 68/12 73/22 73/23 75/16 76/24 77/6 81/10 81/24 82/7 82/16 84/13 85/7 88/7 88/15 88/22 90/4 90/20 93/15 97/6 98/2 103/1 105/13 105/15 105/23 106/3 106/7 106/17 111/8 111/9 113/7 116/14 116/25 120/6 122/8 123/4 125/14 126/12 127/8 127/18 127/19 127/21 128/21 129/17 131/15 136/18 137/19 137/16 137/19 137/24 137/25 138/7 139/12 140/21 142/21 142/21 143/21 151/14 151/14 152/7 152/10 157/2 159/20 160/1 161/15 162/2
**Justice [1]** 68/1
**juxtaposed [1]** 99/5

**K**

**Kearney [11]** 57/24 58/6 58/9 128/5 137/4 137/8 137/21 137/22 151/14 154/4 154/5
**keep [2]** 31/20 64/17
**keeping [3]** 54/1 82/6 162/18
**Kennedy [42]** 3/7 4/20 5/2 5/9 5/10 11/1 11/6 14/21 15/23 16/2 18/9 19/11 19/18 26/16 27/20 30/3 30/8 30/11 31/18 31/18 31/19 31/22 39/15 42/10 57/18 60/4 60/5 60/24 62/18 66/6 70/20 72/15 77/13 78/14 80/17 85/13 88/14 92/9 111/19 112/10 112/11 156/2
**Kennedy's [12]** 20/22 21/13 22/14 24/15 25/13 26/13 28/22 32/16 33/18 57/25 58/12 156/6
**kept [2]** 82/4 147/23
**Kerr [3]** 2/8 163/10 163/16
**kibosh [1]** 65/10
**kind [8]** 35/9 146/5 146/6 146/24 149/11 153/19 153/22 154/7
**kinds [2]** 8/7 98/12
**knew [2]** 15/21 149/20
**know [113]** 4/10 9/12 9/17 9/25 10/6 10/16 10/17 11/23 17/14 19/4 20/24 23/20 28/17 28/20 28/20 28/21 28/23 29/3 35/1 36/1 37/2 40/13 40/25 41/1 41/15 42/18 44/4 49/15 50/13 53/18 53/19 53/21 58/8 62/4 63/24 65/1 67/8 67/24 68/24 70/15 70/18 71/9 71/11 71/16 72/3 72/25 76/11 76/12 76/21 77/6 83/24 84/8 84/21 85/5 85/8 86/22 88/14 89/10 89/21 90/24 90/25 91/4 91/5 91/13

**L'Enfant [2]** 2/2
**label [1]** 32/7
**labeled [2]** 15/10 38/19
**labeling [1]** 16/24
**labors [1]** 144/16
**lack [5]** 63/4 69/9 69/24 78/1 158/14
**laid [4]** 33/19 54/21 54/23 54/25
**language [7]** 77/20 86/1 142/23 143/10 151/18 151/19 156/17
**large [5]** 12/2 120/14 124/3 130/23 157/1
**larger [2]** 9/24 129/6
**largest [1]** 129/6
**last [25]** 4/18 10/23 12/12 16/1 18/7 21/15 28/22 38/17 41/23 50/11 52/23 74/5 79/23 99/16 101/2 117/25 120/4 120/21 122/7 125/25 134/5 134/14 136/2 136/4 136/9
**lastly [1]** 26/21
**late [3]** 18/25 19/7 129/21
**later [10]** 24/22 28/19 51/5 123/16 124/18 124/19 130/3 155/25 155/25 159/7
**LAUGHTER [4]** 112/6 157/19 160/20 163/5
**law [12]** 84/9 84/11 84/13 113/4 140/25 156/21 158/21 159/10 159/10 160/10 160/14 161/21
**lawful [1]** 146/25
**lawsuit [1]** 138/6
**lawyers [2]** 24/11 68/22
**lay [3]** 32/17 33/14 140/21
**leadership [1]** 8/15
**leads [2]** 29/6 42/9
**leasing [1]** 74/18
**least [13]** 9/8 16/23 36/1 58/2 61/7 73/9 78/24 81/18 103/5 137/2 152/22 158/4 158/6
**leave [2]** 19/18 23/20
**lecture [1]** 40/21
**ledger [1]** 88/21
**left [1]** 32/7
**legal [6]** 62/21 83/23 84/11 85/1 135/2 135/9
**legitimate [1]** 158/3
**length [1]** 37/11
**lengthy [1]** 25/19
**less [6]** 38/13 39/12 82/3 83/3
**let [22]** 5/21 9/3 13/12 19/11 19/15 20/24 23/5 27/3 43/22 49/8 49/25 57/5 58/9 78/21 80/3 91/1 101/13 123/12 142/21 142/21 144/1 154/7
**let's [37]** 16/2 16/12 16/16 30/3 36/20 45/16 51/16 53/1 60/1 60/7 66/8 74/14 74/14 75/15 77/9 77/9 77/21 86/13 88/25 102/13 106/3 107/11 109/4 109/9 116/24 117/4 123/4 123/13 123/14 124/8 126/7 129/8 132/11 135/12 144/2 145/9 158/22
**letter [6]** 127/20 147/12 150/3 151/6 151/8 153/22
**letters [5]** 54/6 110/17 110/18 140/15 140/18
**level [6]** 38/25 70/15 96/7 96/8 138/23

**liabilities [1]** 47/6
**liable [1]** 139/11
**licensed [1]** 6/5
**licenses [1]** 6/4
**licensing [2]** 130/18 130/21
**lift [3]** 20/7 20/21 21/3
**lifted [4]** 18/25 19/5 19/9 19/13
**lifting [3]** 18/16 20/23 21/3
**light [2]** 61/16 149/3
**like [16]** 8/5 12/3 37/23 64/10 64/12 87/5 91/21 97/1 98/16 115/19 116/3 128/21 133/15 140/24 154/9 162/10
**liked [3]** 60/14 60/16 94/8
**likelihood [2]** 110/11 110/12
**likely [5]** 67/14 67/17
**limine [1]** 18/10
**limit [5]** 9/15 29/19 58/2 58/15 131/13
**limitation [3]** 18/16 22/19 29/25
**limited [5]** 20/22 25/9 152/24 155/12 155/20
**limiting [4]** 18/11 19/9 28/13 28/15
**limits [1]** 27/6
**line [24]** 20/10 20/12 25/15 25/18 32/2 32/7 33/7 34/24 35/1 36/15 38/2 38/18 38/19 39/4 43/8 50/17 55/20 104/9 108/22 129/20 130/17 132/11 134/3 145/17
**lined [1]** 110/20
**lines [2]** 114/6 146/3
**lingo [1]** 46/10
**linking [1]** 57/15
**list [12]** 9/16 31/2 31/3 34/3 60/10 69/2 102/21 104/21 105/8 157/22 158/22
**listed [4]** 31/9 31/15 59/14 108/10
**listen [1]** 141/25
**listening [1]** 73/18
**literally [1]** 10/10
**literature [1]** 46/21
**litigation [5]** 5/19 7/5 7/8 7/15 9/23 10/4 10/7
**litigation-type [1]** 9/23
**little [16]** 9/24 16/17 38/12 52/4 64/22 94/19 101/12 103/21 116/16 130/5 132/25 161/1 161/12 161/22 162/20 162/21
**living [2]** 5/10 5/12
**local [1]** 114/2
**lockbox [1]** 126/20
**long [26]** 6/11 9/10 40/23 41/4 41/13 41/22 42/6 64/17 64/19 65/6 65/18 65/21 67/8 73/24 83/10 87/21 88/8 101/15 109/11 113/21 133/10 151/2
**long-term [6]** 40/23 41/13 41/22 42/6 101/15 151/2
**longer [15]** 39/18 57/7 57/7 59/5 59/10 59/20 83/18 89/11 114/1 150/25 151/1 151/1 161/25 162/21 162/21
**look [39]** 19/21 25/1 35/14 48/16 48/22 49/9 74/14 74/15 77/9 77/10 84/3 85/13 87/5 87/7 90/24 91/4 96/17 99/4 100/8 100/10 102/21 103/14 103/20 104/17 106/3 108/14 109/17 109/24 111/10 111/19 117/13 120/22 137/14 141/9 142/1 143/5 148/7 156/5 156/24
**looked [15]** 1/2 26/3 47/2 47/3 48/8 48/10 48/13 48/15 49/4 52/4 63/9 88/16 96/25 120/23 148/8
**looking [10]** 10/9 10/12 10/15 10/21 19/19 21/15 38/4 38/17 49/5 147/11
**looks [2]** 97/1 98/16
**lose [2]** 153/24 154/2
**loss [3]** 36/10 126/6 151/25
**losses [1]** 150/9
**lost [13]** 15/12 17/9 33/25 34/2 44/24 50/9 51/19 51/25 79/16 84/18 98/2 106/1 120/15

91/14 94/8 96/18 96/23 97/9 97/12 97/18 97/19 98/5 98/4 98/7 98/15 105/10 121/3 123/11 127/8 128/12 131/11 134/5 136/1 136/3 136/6 136/7 136/24 138/14 138/19 138/21 144/3 146/15 146/17 147/10 148/15 149/13 149/15 151/16 152/12 154/7 155/22 156/1 158/4 158/14 159/18 161/17 161/20 162/5 162/5 162/7 162/7 162/20
**knowing [2]** 33/6 37/24
**knowledge [1]** 148/17
**known [1]** 156/3
**knows [1]** 156/4
**KPMG [1]** 6/19
**Krantz [1]** 127/21

**L**

**138/21**

**L**

**lot [6]** 10/4 70/16 81/15 86/1 138/21 151/23
**Louis [6]** 6/1 7/3 7/6 10/2 71/18 71/24
**low [4]** 45/21 55/14 55/15 106/9
**lower [22]** 40/12 40/17 40/17 41/6 41/10 41/11 41/12 41/16 41/21 42/6 83/12 83/14 88/7 89/3 89/10 90/1 90/6 90/10 91/2 91/8 98/4 98/12
**lunch [5]** 64/13 64/19 65/2 65/17 92/5
**lunchtime [1]** 64/12

**M**

**made [25]** 12/8 17/21 22/24 31/17 38/8 40/13 41/2 49/6 63/18 70/2 76/4 76/13 78/6 84/24 99/3 104/6 125/25 131/18 136/23 141/18 143/15 144/3 149/3 149/25 160/1
**Mahlstedt [1]** 153/21
**mail [7]** 20/15 87/12 129/22 131/7 134/16 134/22 151/9
**mailers [3]** 119/5 124/3 124/25
**MAILING [1]** 1/3 4/4 74/9
**mails [1]** 20/16
**main [2]** 122/12 137/5
**maintain [5]** 74/20 74/25 75/2 124/22 138/19
**maintained [1]** 124/15
**maintaining [3]** 33/9 125/5 125/7
**maintains [1]** 17/5
**maintenance [5]** 34/4 34/11 34/17 103/17 105/2
**major [3]** 16/11 16/11 146/20
**majority [1]** 91/7
**make [33]** 11/20 15/4 24/9 29/14 37/10 37/13 39/24 40/6 40/9 40/11 59/7 59/8 63/15 65/13 69/12 84/7 84/22 85/2 90/4 96/18 100/23 105/13 109/18 111/4 115/8 134/12 135/22 138/17 139/9 142/21 151/11 152/17 162/2
**makes [9]** 22/20 65/23 84/25 93/20 115/5 128/18 130/3 131/11 146/19
**makeup [1]** 9/17
**making [10]** 35/15 36/25 45/6 45/7 46/14 49/3 71/7 84/3 97/19 149/24
**managed [4]** 106/10 106/16 110/10 110/14
**management [30]** 7/18 31/6 34/10 34/11 52/17 53/11 54/18 56/11 61/2 104/15 105/1 106/21 106/22 107/6 108/1 108/7 109/10 109/21 111/10 111/11 117/8 119/15 122/9 122/19 140/2 142/13 142/14 150/20 154/21 155/9
**manager [3]** 53/20 123/18 126/21
**managing [1]** 5/13
**manpower [1]** 114/5
**mantra [1]** 138/5
**Manual [2]** 74/9 87/12
**manufacturer [11]** 57/8 74/18 74/25 75/4 75/12 87/13 129/5 129/6 129/6 141/14 142/6
**manufacturer's [2]** 61/18 128/6
**manufacturers [39]** 19/3 26/24 59/6 75/6 113/25 114/6 114/21 121/17 128/14 128/17 129/4 129/18 129/23 130/20 130/21 130/25 131/5 131/9 131/13 133/17 133/23 134/7 134/13 134/17 134/24 135/13 137/18 138/18 139/4 139/21 142/16 144/10 144/13 144/14 144/25 145/2 145/18 150/8 154/22
**many [9]** 93/9 97/9 112/26 122/1 126/25 127/11 145/1 155/19
**March [5]** 1/4 67/6 67/16 74/10 117/23
**Mark [1]** 2/5
**mark.t.corbly [1]** 2/7
**marked [10]** 12/11 13/12 14/2 14/22 28/24 30/22 74/4 115/2 117/21 136/8
**market [20]** 46/2 49/23 100/11 115/17 122/12 123/24 124/1 124/1 128/15 128/18 129/4 129/24 130/9 130/14 132/2 145/18 146/9 147/12 147/15 147/18
**marketing [2]** 147/23 148/2
**Master [2]** 108/22 109/4
**master's [1]** 5/24
**match [1]** 39/21
**matched [1]** 40/14
**matches [1]** 39/22
**material [2]** 13/9 157/3
**materially [2]** 50/5 50/9
**math [3]** 56/19 81/15 102/5
**mathematical [1]** 102/2
**matter [25]** 11/6 13/23 14/7 14/9 25/9 26/12 26/14 26/17 27/5 27/6 27/9 27/10 28/16 29/16 30/11 40/2 43/23 62/15 63/15 82/2 113/21 126/1 133/8 155/22 163/12
**matters [5]** 4/14 10/4 64/1 64/2 140/20
**maturities [1]** 89/23
**may [39]** 18/10 20/25 23/21 24/10 29/11 29/14 35/1 40/16 40/17 46/5 58/13 58/14 60/25 64/8 65/9 65/9 66/18 68/4 68/4 68/24 73/10 73/10 82/25 88/12 90/19 92/9 113/18 117/17 121/22 131/16 134/25 146/23 158/3 158/7 158/8 158/19 159/22 160/25 161/2
**maybe [12]** 19/22 29/9 57/23 57/23 60/12 68/24 107/1 107/12 107/14 158/18 158/19 160/17
**McDonald [1]** 123/17
**me [57]** 5/21 8/7 9/3 13/12 14/14 14/15 15/22 16/7 19/12 23/2 23/5 23/13 23/14 24/8 24/9 24/25 27/3 31/20 32/2 36/17 37/7 38/7 38/15 43/22 48/18 49/8 50/22 56/1 57/5 64/12 67/23 68/7 71/14 71/15 71/16 78/21 80/3 80/18 82/8 82/13 88/7 91/1 93/16 95/14 101/13 105/7 112/14 123/12 133/3 142/21 142/21 158/7 158/8 159/2 159/3 159/14
**mean [29]** 9/13 9/20 16/15 18/6 19/5 23/17 26/13 35/10 36/24 52/13 53/9 53/18 59/9 78/9 79/3 86/22 94/21 95/7 95/9 102/2 109/14 110/11 110/23 125/20 128/9 137/21 156/18 158/3 162/11
**meaning [2]** 135/2 135/9
**means [9]** 27/15 33/13 33/16 40/22 41/4 44/17 45/11 53/23 162/8
**meant [4]** 44/6 44/7 44/23 106/12
**measure [1]** 96/12
**mechanical [1]** 2/12
**Medical [1]** 7/25
**meet [1]** 21/20
**meeting [4]** 6/11 117/22 118/7 118/18
**Mellon [1]** 152/4
**member [5]** 7/11 7/13 7/15 7/16 7/17
**members [1]** 8/14
**memo [8]** 117/5 120/2 120/2 123/17 124/10 124/20 126/18 155/4
**memorandum [2]** 126/10 138/2
**memory [2]** 30/20 71/15
**mention [2]** 127/5 148/17
**mentioned [4]** 47/1 105/15 110/17
**menu [2]** 31/5 108/21
**mere [1]** 140/1
**merely [10]** 12/6 35/17 36/25 39/25 47/18 63/19 81/6 82/8 102/4 146/11
**merger [2]** 8/23 9/2
**meter [65]** 19/3 25/15 26/24 28/3 32/22 36/5 57/8 59/6 61/18 72/23 75/6 76/9 113/24 113/25 114/5 114/21 116/6 116/16 116/17 116/18 117/1 117/16 117/17 121/15 121/17 122/10 122/11 123/19 124/24 124/25 125/4
**128/12 125/23 127/9 128/6** 128/16 128/14
**128/19 129/3 129/25** 130/8 130/21 130/24
**131/5 131/9 131/13 133/17 133/22 134/7
134/12 134/17 134/23 135/13 138/17 139/20
142/6 142/16 145/18 147/25 150/8 150/17
150/19 150/21 153/6 155/1
**metered [1]** 119/5
**meters [13]** 74/19 74/22 114/1 118/15 118/16 120/17 123/25 147/2 147/4 150/7 150/15 150/16 150/17
**methodologies [1]** 16/11
**methodology [6]** 13/10 15/2 64/2 69/6 105/14 105/18
**methods [2]** 15/6 45/20
**Michael [2]** 151/6 152/15
**Michelle [1]** 1/14
**michelle.schaefer [1]** 1/17
**microphone [1]** 4/25
**mid [3]** 7/3 7/4 12/12
**middle [5]** 19/7 117/2 121/4 132/13 161/2
**midlevel [1]** 140/2
**midlife [1]** 6/23
**might [10]** 12/22 61/25 71/15 81/10 82/23 85/2 119/8 120/10 130/13 135/9
**Milford [1]** 1/20
**million [12]** 39/8 47/11 52/9 52/10 54/8 54/9 54/20 54/21 110/19 110/21 110/25 138/13 155/5
**millions [3]** 114/14 139/22 150/9
**mind [8]** 23/16 23/21 23/22 64/20 114/18 152/19 157/20 159/17
**Minkler [1]** 71/18
**minus [3]** 53/16 54/20 83/16
**minute [5]** 15/22 71/14 107/21 112/12 112/15
**minutes [12]** 59/22 64/21 64/22 65/1 65/15 65/16 65/25 66/2 66/8 112/17 113/5 136/18
**mirror [1]** 87/3
**mismatching [1]** 93/21
**missed [1]** 57/20
**Missouri [1]** 9/9
**misusing [1]** 93/21
**model [1]** 86/20
**modeling [1]** 86/23
**modified [1]** 78/17
**Moghadam [5]** 1/14 19/23 20/10 22/4 155/20
**moment [7]** 42/14 43/14 51/11 58/16 106/4 122/8 152/7
**monetary [1]** 47/25
**money [41]** 36/19 40/3 43/24 45/1 46/13 46/14 47/22 48/1 48/2 48/4 48/4 48/20 53/11 54/18 55/2 55/8 82/4 82/6 92/23 97/22 97/24 106/16 107/6 107/16 107/17 108/11 109/21 110/3 110/9 119/6 150/25 151/1 152/17 152/20 153/3 153/5 153/9 155/2 155/8 159/13
**monies [7]** 18/18 79/20 94/4 94/12 95/19 96/21 124/12
**monopoly [6]** 117/9 118/15 120/6 120/24 123/21 128/15
**month [2]** 8/25 117/17
**monthly [7]** 37/6 37/7 42/19 88/18 92/20 92/23 94/4
**months [6]** 83/17 85/9 94/25 122/23 126/12 154/8
**more [30]** 10/3 12/7 15/5 23/5 40/12 42/4 53/21 56/14 58/22 59/3 63/25 65/23 67/14 67/16 70/16 76/21 96/7 98/5 101/4 110/15 111/8 118/25 126/13 137/22 138/12 142/19 146/4 152/17 161/1 161/22
**morning [12]** 4/10 5/6 5/7 53/15 54/12 66/6

**M**    Case 1:00-cv-02089-PLF   

**morning... [6]** 66/7 89/21 109/9 109/11 109/22 111/2
**morphed [1]** 153/19
**most [2]** 74/22 158/13
**motion [16]** 18/10 18/21 26/14 29/18 67/5 67/15 67/15 136/24 137/1 159/21 159/23 159/25 160/1 160/4 160/22 160/24
**move [19]** 4/25 10/25 16/3 18/7 41/18 50/11 51/14 80/3 86/13 86/14 92/9 99/9 117/4 117/20 119/10 123/4 123/13 133/11 148/16
**moved [6]** 7/6 17/24 53/13 107/2 111/1 111/16
**movement [1]** 52/18
**movements [1]** 110/13
**moves [1]** 110/9
**moving [2]** 80/15 122/4
**Mr [21]** 1/13 1/22 1/23 2/2 2/5 3/2 3/3 3/4 3/7 3/8 16/4 26/16 72/4 72/18 91/16 97/16 115/23 126/7 127/2 146/5 155/19
**Mr. [143]** 5/10 19/23 22/2 22/24 24/9 28/11 28/18 30/6 32/16 64/7 64/25 66/7 68/7 68/9 72/9 77/25 92/6 98/24 112/17 113/20 115/7 115/16 116/5 118/17 118/23 119/4 119/25 120/3 120/12 121/4 121/12 121/14 122/5 122/6 122/16 122/17 122/19 123/19 124/10 124/20 124/20 125/1 125/16 125/16 125/24 126/15 126/17 127/20 127/21 128/5 128/25 129/9 130/16 130/22 131/13 131/16 131/19 131/22 132/1 132/6 132/6 132/9 132/10 132/10 132/13 132/14 132/18 132/21 133/5 133/12 133/14 133/15 133/16 134/2 134/25 135/21 136/3 136/22 136/24 137/4 137/6 137/8 137/18 137/21 138/2 138/2 138/7 138/7 139/16 139/17 141/6 141/18 141/23 141/25 142/1 145/14 145/16 146/5 147/1 147/6 147/6 147/8 147/9 147/9 147/12 147/17 147/17 147/21 147/22 148/15 149/5 149/11 149/12 149/13 149/23 151/5 151/7 151/9 151/14 151/18 152/19 154/4 154/5 155/3 155/4 155/10 155/11 155/13 155/14 155/16 155/19 155/20 156/9 156/19 156/22 157/1 157/2 157/3 157/14 158/5 161/1 162/17
**Mr. Abramson [3]** 98/24 155/10 155/19
**Mr. Abramson's [1]** 156/9
**Mr. Allocca [1]** 149/13
**Mr. Altergott [1]** 119/4
**Mr. Altergott's [1]** 118/23
**Mr. Bonassar [1]** 113/20
**Mr. Boyd [11]** 64/7 66/7 92/6 113/13 139/16 145/16 146/5 155/13 155/20 158/5 161/1
**Mr. Charles [1]** 68/7
**Mr. Cotter [1]** 120/12
**Mr. Darwin [1]** 124/16
**Mr. Del [2]** 124/20 125/16
**Mr. Eden [1]** 122/6
**Mr. Fairbaugh [1]** 126/17
**Mr. Ganley [43]** 115/7 115/16 118/17 123/19 127/20 128/25 129/9 130/16 130/22 131/13 131/16 131/19 132/1 132/6 132/10 132/13 132/18 132/21 133/12 133/13 133/14 133/15 133/16 134/25 135/21 136/3 136/22 137/18 137/21 141/6 141/18 141/23 142/1 145/14 147/1 147/8 147/9 147/17 147/22 149/5 149/23 155/14 157/3 157/14
**Mr. Ganley's [3]** 134/2 155/11 157/1
**Mr. Gardener [1]** 132/14
**Mr. Glassco [6]** 124/10 124/20 125/1 125/16 125/24 126/15
**Mr. Goggin [3]** 131/22 136/24 148/15

**Mr. Goldman [1]** 147/12
**Mr. Gould [3]** 124/14 121/14 122/5
**Mr. Grant [1]** 137/6
**Mr. Grant's [2]** 151/9 155/4
**Mr. Hillegass [7]** 141/25 147/6 147/6 147/17 149/11 149/12 155/16
**Mr. Hillegass' [3]** 132/10 147/9 147/21
**Mr. James [1]** 121/12
**Mr. Kearney [6]** 128/5 137/4 137/8 151/14 154/4 154/5
**Mr. Kennedy [1]** 5/10
**Mr. Kennedy's [1]** 32/16
**Mr. Krantz [1]** 127/21
**Mr. Nicholson [1]** 122/6
**Mr. Pedersen [1]** 155/3
**Mr. Pedersen's [1]** 157/2
**Mr. Riley [2]** 138/2 138/7
**Mr. Ross [2]** 68/9 72/9
**Mr. Sharp [3]** 119/25 122/17 122/19
**Mr. Valdez [18]** 19/23 22/2 22/24 24/9 28/11 28/18 30/6 64/25 77/25 112/17 132/6 132/9 132/5 139/17 156/19 156/22 157/2 162/17
**Mr. Wayne [1]** 150/13
**Mr. Wilkerson [4]** 138/2 138/7 151/7 151/18
**Mr. William [1]** 120/3
**Ms [3]** 1/14 1/14 151/17
**Ms. [5]** 19/23 20/10 22/4 150/10 155/20
**Ms. Moghadam [4]** 19/23 20/10 22/4 155/20
**Ms. Pam [1]** 150/10
**msn.com [1]** 2/11
**much [19]** 9/17 9/22 10/20 10/23 40/21 41/9 41/10 59/14 59/20 122/15 139/16 148/23 149/2 151/10 152/9 154/8 155/19 157/13 162/3
**must [8]** 8/21 23/16 75/12 87/13 129/11 140/3 145/11 145/12
**mutual [1]** 53/19 53/21 141/1
**mutually [2]** 131/8 134/17
**my [95]** 6/18 9/13 10/1 10/10 10/11 10/13 10/23 11/23 14/17 16/20 18/3 20/4 22/19 23/12 23/12 26/14 29/18 29/25 31/10 31/15 33/23 35/12 39/1 40/6 41/15 44/4 48/20 49/18 56/19 58/19 59/3 62/14 63/4 64/3 64/5 64/7 64/20 70/4 71/15 71/24 73/16 77/21 77/24 79/18 79/19 80/5 81/8 81/17 82/18 82/24 85/16 86/1 86/12 87/7 88/2 88/12 88/13 88/14 88/23 89/9 89/20 91/6 93/3 95/16 95/17 97/21 97/24 98/7 99/3 101/1 101/12 103/19 103/21 104/19 104/22 106/25 107/11 107/11 107/17 107/24 111/7 111/17 113/19 125/10 129/21 134/2 136/13 136/21 136/25 152/19 156/17 156/17 156/20 157/20 159/17
**myself [4]** 113/7 123/12 130/6 144/1

# N

**N.W [2]** 1/15 1/23
**name [3]** 5/8 31/21 68/5
**named [1]** 72/9
**narrative [1]** 104/22
**necessarily [4]** 48/3 67/18 73/11 93/1
**necessary [4]** 63/12 114/14 127/12 139/6
**need [5]** 9/16 15/20 35/6 35/7 46/17 47/17 65/13 65/22 84/12 95/16 96/15 99/20 109/17 109/24 122/2 136/3 136/7 147/15 147/25 148/5 152/1 158/15 160/13 161/22
**needed [12]** 12/22 70/3 70/10 70/23 114/3 114/18 128/14 147/18 147/18 151/4 151/4 151/15
**negotiate [2]** 162/20 162/21
**negotiated [2]** 27/17 127/7
**negotiating [2]** 27/19 115/20

**negotiation [1]** 23/14
**negotiations [6]** 18/14 115/22 117/2 128/13 129/8 140/15
**negotiators [1]** 23/20
**Neil [1]** 153/21
**NEOPOST [31]** 1/7 1/18 4/5 22/16 23/25 37/3 37/6 37/19 38/5 38/23 42/15 42/17 44/15 47/20 55/14 61/13 94/17 95/2 96/24 131/18 132/15 133/7 133/14 138/18 139/5 144/20 145/1 147/13 152/23 154/1 154/3
**Neopost's [3]** 43/4 139/10 144/24
**neopost.com [1]** 1/21
**net [2]** 97/7 138/11
**network [1]** 118/13
**never [22]** 18/19 18/19 21/2 26/3 68/5 68/8 68/11 68/13 137/17 137/20 141/2 144/23 145/15 146/2 147/1 147/7 149/6 149/6 151/24 151/25 155/16 155/16
**new [9]** 5/16 6/22 9/9 19/10 26/22 85/6 114/6 114/6 125/3
**news [1]** 157/16
**next [26]** 4/18 8/25 15/4 24/5 31/20 53/15 54/12 54/12 56/2 58/19 81/17 88/19 100/7 109/2 109/9 109/11 112/25 116/14 116/19 117/20 118/23 157/21 157/23 161/7 162/24 162/25
**NH [1]** 56/3
**NH002754 [2]** 31/12 32/2
**NH2754 [1]** 34/13
**Nicholson [1]** 122/6
**night [1]** 16/1
**no [158]** 1/3 1/7 11/2 13/18 14/3 15/3 15/9 15/16 16/12 16/20 21/6 21/7 21/16 24/15 24/17 25/16 25/21 26/24 26/25 27/14 27/15 27/23 28/7 28/16 28/22 29/22 31/7 31/9 31/12 31/13 31/14 31/15 32/2 32/15 33/23 33/25 36/9 36/20 36/21 38/22 38/22 39/24 41/24 42/9 42/23 45/13 45/16 48/15 50/15 51/16 55/22 57/7 57/7 57/15 59/5 59/10 60/7 61/9 61/12 61/23 62/2 63/2 63/2 65/4 65/4 65/4 65/4 65/4 67/1 67/18 67/18 67/23 68/10 68/15 68/20 68/25 70/2 70/6 70/10 70/14 70/18 70/19 72/9 72/12 72/8 72/11 72/13 74/1 75/6 76/13 76/18 77/2 77/3 82/2 82/12 83/18 85/12 86/15 87/9 88/9 88/11 89/16 93/1 93/21 94/18 95/5 96/14 101/19 102/6 102/9 102/18 103/11 103/19 103/19 104/6 107/19 112/1 112/3 112/4 112/4 114/1 117/13 118/7 118/14 123/9 124/4 131/12 131/20 132/11 133/8 133/12 133/24 137/11 140/13 140/16 141/3 141/21 141/21 143/6 144/9 145/24 147/3 148/11 148/11 148/12 148/12 148/13 148/14 148/16 148/18 149/22 150/3 154/9 155/22 156/12 156/13 160/3 162/9
**No. [4]** 14/22 30/21 30/23 53/2
**No. 147 [3]** 30/21 30/23 53/2
**No. 188 [1]** 14/22
**nobody [3]** 58/6 112/24 149/20
**nobody's [2]** 159/14 159/14
**noise [1]** 149/4
**non [2]** 10/4 10/7
**non-litigation [2]** 10/4 10/7
**none [7]** 4/15 4/16 71/4 128/4 149/2 153/2 154/15
**noninterest [4]** 28/4 28/16 29/2 29/23
**noninterest-bearing [2]** 28/4 28/16
**noon [1]** 64/10
**normal [4]** 47/8 64/12 64/16 68/20
**normally [1]** 65/7
**North [1]** 2/6
**not [158]** 11/21 12/14 13/11 15/16 17/22 18/2 19/2 21/6 21/18 22/17 22/17 23/10

**N**

**not... [146]** 23/13 23/14 25/12 26/17 26/19 27/21 28/4 28/6 28/18 29/5 30/2 33/15 36/9 37/14 40/8 40/12 40/21 41/2 43/24 45/15 46/13 49/4 49/21 50/3 50/18 54/21 54/22 55/16 55/17 55/24 56/4 60/8 60/9 60/13 60/25 61/7 61/10 61/21 62/10 62/11 62/15 65/11 66/15 67/1 67/3 67/18 68/4 68/10 68/12 68/12 68/15 68/20 70/24 72/3 72/13 73/5 73/10 73/12 73/24 75/2 75/12 76/14 77/1 77/19 78/7 78/11 78/13 78/14 80/14 80/17 82/9 82/19 83/21 84/14 84/17 85/2 86/22 86/24 87/13 87/20 87/23 88/3 88/20 88/22 90/23 93/1 93/2 93/16 94/11 95/2 95/3 96/18 99/2 101/18 101/24 102/11 102/20 104/3 104/13 104/20 104/21 104/23 106/15 107/25 108/5 110/9 111/13 111/24 114/7 118/9 118/14 119/9 120/2 121/25 123/2 124/25 125/7 125/11 125/19 127/5 127/25 128/8 128/9 130/19 130/20 136/2 136/8 136/13 136/15 138/8 143/22 144/13 145/15 146/17 147/16 148/25 150/1 152/1 155/2 155/7 156/18 157/2 158/3 158/6 159/22 160/1

**notably [1]** 50/12
**notation [2]** 32/7 56/7
**notations [1]** 34/25
**note [12]** 43/17 47/6 54/8 99/13 102/14 116/20 117/23 118/2 118/17 123/5 127/21 130/6
**noted [7]** 44/3 66/11 68/1 75/20 101/7 133/14 148/20
**notes [2]** 117/22 118/24
**nothing [12]** 16/25 17/10 17/11 43/20 64/6 75/23 104/5 113/15 113/16 127/15 149/4 149/4
**noticed [1]** 30/12
**notified [1]** 21/2
**notwithstanding [2]** 21/9 21/17
**now [54]** 4/11 7/19 8/10 9/24 12/25 18/20 18/23 19/1 19/10 26/16 28/13 31/16 33/6 36/20 37/13 39/15 42/3 43/13 51/10 51/16 51/24 54/22 55/23 59/24 62/18 64/13 64/21 68/12 75/25 86/19 91/20 92/2 98/2 114/3 116/14 117/4 119/18 123/15 124/19 124/24 126/25 132/24 136/19 137/16 141/9 141/12 143/22 145/9 146/15 153/25 154/10 158/2 158/9 159/2
**nowhere [2]** 22/19 69/23
**Num [1]** 75/15
**number [24]** 9/11 30/18 32/5 32/6 56/15 57/12 58/5 58/5 58/9 58/21 59/9 63/25 73/20 79/5 82/3 82/3 82/20 82/25 83/6 83/7 83/8 83/10 83/14 97/19
**numbers [9]** 15/3 17/1 24/20 31/6 35/8 52/24 58/7 61/17 102/4

**O**

**o'clock [2]** 64/16 65/19
**O'Neill [3]** 115/23 126/7 127/2
**object [4]** 32/14 57/14 159/4 159/5
**objected [3]** 22/18 27/8 73/12
**objection [21]** 11/2 22/14 22/19 25/16 25/21 29/25 50/20 62/14 64/24 65/4 68/3 69/11 77/23 84/16 89/12 133/11 133/13 140/19 158/4 158/12 158/13
**objections [3]** 113/3 158/12 158/23
**objective [3]** 21/10 21/19 48/22
**objectivity [3]** 8/8 35/13 63/5
**obligate [1]** 145/24
**obligated [3]** 7/23 8/4 145/22

**obligation [8]** 8/2 28/6 33/1 33/16 35/13 39/7 60/14 75/8
**observation [1]** 41/20
**observations [1]** 62/22
**obvious [1]** 105/9
**obviously [3]** 30/4 143/15 159/10
**occasions [1]** 50/12
**occur [2]** 17/2 89/25
**occurred [4]** 45/23 81/20 140/5 148/18
**occurring [2]** 89/19 89/20
**October [1]** 124/9
**October 18th [1]** 124/9
**off [5]** 9/15 77/15 152/2 154/20 157/3
**offer [14]** 114/11 121/21 121/23 131/8 132/19 134/17 135/3 135/8 141/18 141/20 141/23 146/7 148/12 157/6
**Offer's [1]** 141/21
**offered [4]** 32/15 115/14 132/15 154/3
**offering [2]** 135/23 157/23
**offeror [1]** 130/13
**offers [2]** 115/8 144/3
**office [8]** 1/22 5/14 7/10 71/24 114/2 122/9 129/22 143/25
**officer [1]** 6/21
**offset [4]** 104/18 119/22 126/20 127/12
**oftentimes [1]** 128/13
**oh [5]** 66/11 97/4 135/19 148/6 152/19
**okay [137]** 4/11 5/21 6/14 9/12 11/3 12/25 13/7 13/24 14/18 15/14 16/12 17/6 19/17 21/17 21/21 23/11 24/17 24/24 26/7 27/3 27/13 30/6 31/1 31/16 32/9 32/25 33/3 33/6 33/10 34/12 34/19 35/19 36/3 36/6 36/20 39/15 39/15 41/7 42/8 44/25 46/24 48/17 49/13 49/13 50/2 50/20 50/22 51/21 51/24 53/24 54/3 54/12 54/16 55/2 55/7 55/13 55/19 56/15 57/5 57/12 59/13 60/1 60/4 61/9 62/7 62/12 62/17 62/25 64/5 65/15 65/24 66/21 68/13 69/1 69/8 70/7 71/9 71/19 71/22 72/9 73/2 74/14 75/11 75/15 76/15 76/22 77/9 77/22 80/1 80/8 81/8 81/17 82/18 82/24 83/13 83/24 85/4 85/4 85/13 89/8 92/2 92/6 95/17 96/1 96/10 96/23 97/4 101/1 101/22 102/21 103/7 104/5 105/23 107/11 107/24 108/7 109/3 109/8 109/14 109/16 110/2 110/6 111/7 111/19 112/24 112/16 113/17 135/7 135/12 136/1 136/5 136/11 142/19 143/19 145/3 150/10 161/17
**omitted [2]** 47/18 56/22
**omnidirectional [1]** 123/8
**once [6]** 42/11 85/10 92/12 107/1 154/7 154/10
**one [98]** 9/9 9/19 10/1 11/13 15/3 15/22 16/12 20/20 20/20 23/8 24/14 24/19 24/22 26/22 26/24 26/25 27/7 27/14 27/15 29/14 34/9 34/23 36/1 37/9 38/24 39/20 40/1 40/7 47/18 47/21 48/9 49/3 52/5 53/13 57/9 57/11 60/12 60/12 64/3 66/15 73/25 75/10 77/15 77/19 79/19 80/3 80/21 81/18 82/9 88/8 89/3 89/24 90/5 90/10 90/15 91/1 91/5 91/14 91/16 92/19 98/7 103/3 103/5 104/13 104/24 106/22 107/1 107/3 107/12 107/14 107/15 107/17 107/24 108/11 110/3 110/3 110/10 110/10 110/14 110/15 111/8 114/7 116/11 118/2 122/7 122/24 137/24 146/18 148/25 150/16 150/17 152/13 152/14 154/3 157/21 159/1 159/2 160/17 161/14
**one-day [1]** 53/13
**one-third [1]** 10/1
**one-time [1]** 122/24
**one-year [7]** 39/20 40/7 88/8 89/3 90/5 90/10 91/1
**ones [1]** 157/24

**only [44]** 14/15 14/16 15/7 19/2 23/7 24/4 27/1 29/8 42/7 48/7 48/13 49/4 50/18 58/5 61/21 62/3 62/8 71/5 92/12 107/15 107/17 110/3 111/12 117/9 130/12 141/5 141/16 141/22 146/18 147/2 147/8 148/6 148/25 151/20 152/24 154/22 154/22 155/6 155/12 155/15 156/10 156/11 159/20 161/15
**open [3]** 4/2 23/21 24/2
**operate [11]** 114/14 122/21 129/10 131/9 131/23 132/22 133/7 133/23 134/18 135/5 135/14
**operated [5]** 29/4 114/11 114/24 115/12 120/9
**operating [9]** 36/14 44/9 93/15 94/16 96/3 119/22 123/1 126/25 128/12
**operation [11]** 10/17 93/10 110/24 114/17 115/22 121/8 122/12 123/2 127/17 129/20 131/6
**operational [3]** 127/12 129/13 152/12
**operations [10]** 44/1 44/8 44/21 92/24 93/13 94/5 94/13 95/20 96/5 123/18
**opining [1]** 45/14
**opinion [14]** 13/4 18/20 21/24 22/11 40/6 57/25 62/24 62/25 63/24 64/3 69/24 70/7 73/4 156/9
**opinions [8]** 26/17 69/10 69/14 69/16 70/4 70/6 70/7 70/11
**opportunities [1]** 129/5
**opportunity [9]** 12/10 36/19 117/18 131/9 134/18 134/23 135/4 135/14 146/8
**opposing [1]** 158/11
**opposite [2]** 29/6 41/5
**opposition [2]** 160/21 160/23
**option [1]** 154/6
**oral [1]** 160/24
**orally [1]** 160/1
**oranges [1]** 99/1
**order [20]** 8/22 18/11 18/16 18/22 18/24 19/9 19/13 20/7 20/21 20/24 21/3 27/6 27/8 27/11 29/18 70/4 70/10 70/22 129/9 145/10
**organization [2]** 130/11 150/12
**organizations [7]** 7/12 7/19 8/11 8/16
**organize [1]** 113/7
**original [15]** 10/12 12/5 12/7 14/6 15/5 15/9 24/13 45/5 60/17 60/19 61/20 61/20 65/10 84/19 106/1
**originally [2]** 52/9 71/16
**other [78]** 10/15 10/17 11/14 14/11 17/23 19/2 19/2 21/2 25/16 26/15 30/14 34/24 37/13 37/18 43/19 47/25 52/4 60/7 60/13 65/5 75/7 76/7 80/2 83/14 88/16 91/5 91/14 98/7 100/9 101/6 101/25 106/24 107/14 110/10 110/14 115/4 119/8 121/17 121/22 124/4 125/8 128/14 128/17 129/18 129/23 130/19 130/21 131/5 131/8 131/13 133/17 133/22 134/7 134/17 135/13 136/7 137/12 137/13 137/15 137/18 141/2 144/10 144/12 144/14 144/24 145/2 147/10 147/20 149/10 149/22 153/4 155/22 156/6 159/18 159/21 161/4 161/6 161/23
**others [2]** 36/13 158/7
**otherwise [1]** 53/22
**ought [3]** 59/23 159/13 159/19
**our [20]** 20/16 20/17 22/10 23/2 41/12 64/15 65/1 65/10 119/9 121/23 121/24 126/21 140/19 142/11 144/18 147/14 151/25 153/9 153/9 153/24
**ours [1]** 161/15
**ourselves [1]** 131/12
**out [58]** 17/25 23/1 23/18 24/6 32/8 33/19 43/24 51/6 51/7 51/8 54/13 54/21 54/23 54/25 56/7 62/5 64/1 64/23 65/21 66/8 70/13

**O** Case 1:00-cv-02089-PLF    Filed 02/13/13    Page 180 of 188

**out... [37]** 71/24 80/7 80/9 89/24 92/19 94/9 94/12 98/12 99/22 118/3 118/8 127/22 128/6 131/16 134/12 134/23 135/22 137/7 138/7 138/11 140/3 142/11 145/23 146/6 146/11 146/23 147/19 150/8 151/9 152/18 152/20 152/22 153/16 157/6 157/7 157/9 161/5
**outlay [1]** 130/23
**outlays [1]** 144/15
**outset [1]** 144/17
**over [17]** 18/14 36/3 36/7 36/8 38/12 45/9 54/21 90/12 90/14 90/14 90/24 133/11 136/8 138/10 153/20 154/8 155/4
**overall [2]** 116/9 116/10
**overdrawn [1]** 42/11
**overnight [8]** 52/11 52/19 53/13 55/8 109/1 109/5 109/22 111/2
**overrule [1]** 50/20
**overstated [5]** 18/3 45/22 50/9 51/17 64/4
**overstates [2]** 42/12 92/13
**overstating [4]** 42/1 42/2 45/15 88/12
**own [16]** 11/23 23/4 50/15 117/15 117/16 118/6 118/12 118/13 120/7 121/7 126/16 131/1 132/3 134/8 141/7 144/6
**owned [2]** 120/8 126/22
**ownership [1]** 120/16

# P

**P-R-O-C-E-E-D-I-N-G-S [1]** 4/1
**P.M [1]** 163/7
**page [99]** 16/3 20/9 20/10 20/12 21/16 25/7 25/18 25/19 28/22 31/1 31/5 31/8 31/10 31/11 31/15 32/1 32/3 33/23 34/12 34/15 36/20 41/23 43/17 45/16 51/17 53/1 53/3 56/3 60/6 60/6 61/9 62/16 69/3 74/7 74/10 75/16 86/13 92/9 99/9 99/14 99/14 99/16 101/1 101/13 101/23 103/19 104/9 106/3 108/2 108/4 108/21 108/24 109/6 109/11 116/7 116/14 116/19 117/23 118/4 118/10 118/11 118/13 118/23 119/13 120/4 120/5 120/8 120/20 120/22 122/7 122/14 122/18 123/14 123/20 125/23 128/23 129/8 129/19 130/5 130/6 130/15 130/17 131/15 131/16 131/21 132/9 132/24 133/1 133/6 133/11 134/3 134/4 134/5 134/6 145/16 146/1 146/1 146/3 146/6
**pages [7]** 19/21 25/14 27/22 31/3 74/6 103/4 159/6
**paid [8]** 33/4 36/6 47/8 59/18 79/7 92/19 153/8 155/1
**Pam [1]** 150/10
**paper [5]** 31/23 63/20 70/15 70/16 102/7
**papers [2]** 97/10 97/13
**paragraph [32]** 21/15 28/22 33/23 41/24 55/20 68/25 74/15 74/24 87/8 88/19 99/9 99/16 101/13 102/13 102/14 102/14 111/10 116/21 119/14 121/4 121/15 123/21 125/2 125/11 126/14 126/17 130/18 132/11 132/13 134/14 144/21
**paragraphs [4]** 25/12 26/12 76/17 102/20
**parallel [1]** 106/1
**Pardon [2]** 112/14 133/3
**paren [6]** 144/22 144/23 144/24 144/25 145/3 145/5
**part [38]** 11/19 18/13 19/20 22/8 33/24 37/16 43/21 44/8 45/8 46/7 46/10 46/11 63/6 75/10 78/18 78/25 79/13 93/10 93/15 93/18 110/23 114/23 124/16 127/14 129/1 130/10 140/22 141/3 144/19 146/5 146/12 146/20 146/20 146/21 147/14 147/9 149/22
**partial [1]** 12/21

**particular [19]** 19/17 26/19 33/21 36/12 50/23 54/10 67/24 74/24 80/22 94/17 100/7 102/15 104/13 107/22 107/18 122/16 123/23 136/7 158/16
**particularly [4]** 37/3 94/9 159/12 161/23
**parties [6]** 23/22 25/2 72/17 76/19 127/16 128/9
**parties' [1]** 20/13
**partly [2]** 17/18 17/20
**partner [4]** 7/7 10/2 71/17 138/16
**parts [1]** 19/13
**party [2]** 23/14 141/3
**past [6]** 15/10 61/21 62/10 81/21 136/16 137/3
**patents [1]** 118/22
**PAUL [1]** 1/11
**PAUSE [4]** 24/23 43/15 51/15 91/18
**pay [6]** 36/3 53/19 75/8 75/8 143/22 143/22
**paying [1]** 59/15
**payment [1]** 87/15
**payments [2]** 44/19 44/20
**PB [16]** 118/14 118/25 128/11 128/15 129/9 129/11 129/12 129/14 129/20 130/9 131/1 131/24 134/9 134/19 135/15 137/17
**PDFs [1]** 12/3
**Pedersen [4]** 137/21 137/22 152/15 155/3
**Pedersen's [2]** 58/6 152/19
**peg [1]** 84/12
**pending [2]** 138/6 159/22
**people [3]** 138/3 147/10 154/15
**per [19]** 52/18 52/20 54/16 55/4 55/9 55/15 55/15 106/13 106/16 106/17 107/6 107/8 108/24 109/6 109/8 109/12 111/13 111/17 117/17
**percent [18]** 56/19 86/6 86/9 97/3 97/4 98/14 98/21 98/22 99/1 100/3 100/20 100/25 102/4 106/16 109/23 111/4 123/24 147/2
**percentage [1]** 94/1
**perception [1]** 146/24
**perform [3]** 12/15 12/18 21/18
**performed [5]** 21/20 36/21 63/2 77/6 86/15
**performing [1]** 10/13
**perhaps [5]** 64/9 94/7 125/22 128/8 162/6
**period [20]** 7/2 37/8 39/22 39/23 39/25 40/5 40/10 40/15 40/19 62/6 66/22 89/11 89/20 90/12 91/3 91/11 94/21 96/24 109/6 131/12
**permit [1]** 87/17
**person [6]** 67/25 117/25 142/1 145/12 146/19 150/14
**personally [1]** 125/4
**persons [1]** 117/24
**perspective [2]** 38/9 116/9
**Ph.D [2]** 6/1 6/23
**phone [1]** 114/3
**phrase [1]** 32/18
**phrased [1]** 22/5
**physicians [1]** 8/1
**pick [2]** 84/9 85/24
**picked [1]** 85/6
**picking [1]** 81/19
**picture [1]** 116/15
**pieces [4]** 63/8 63/19 70/15 70/16
**PIPER [1]** 1/13
**pitch [1]** 162/2
**Pitney [60]** 62/14 115/12 115/21 116/5 116/8 116/21 117/2 117/6 117/10 117/11 118/18 118/21 119/12 119/16 119/21 121/19 121/24 122/9 122/18 123/2 123/12 124/13 124/16 125/19 125/19 126/9 126/15 126/18 127/6 127/8 127/25 127/7 129/7 130/12 130/14 131/10 131/14 131/25 132/4 132/23 133/8 134/19 135/6 135/24 139/2

**138/25 140/4 140/6 140/9 140/10 140/12 141/7 141/21 142/16 143/11 144/20 147/13 151/10 157/7**
**Pitney-Bowes [55]** 62/14 115/12 115/21 116/5 116/8 116/21 117/2 117/6 117/10 117/11 118/18 118/21 119/12 119/16 119/21 120/6 121/19 121/24 122/9 122/18 123/2 124/13 124/16 125/19 126/9 126/15 126/18 127/6 127/21 127/23 127/25 129/7 130/12 130/14 131/10 131/14 131/25 132/4 132/23 133/8 134/19 135/6 135/24 139/2 139/25 140/6 140/10 140/12 141/10 142/16 144/20 147/13 151/10 157/7
**Pitney-Bowes' [5]** 120/16 122/11 125/19 140/4 143/11
**place [8]** 19/20 48/23 61/25 61/25 84/6 106/18 107/18 117/22
**placed [2]** 140/12 142/5 154/23
**places [1]** 110/4
**placing [1]** 119/6
**plain [1]** 115/5
**plaintiff [10]** 1/3 1/7 4/15 9/18 47/5 77/22 78/6 78/18 92/21 115/13
**plaintiff's [1]** 9/20
**Plaintiffs [38]** 1/13 34/2 37/16 42/22 43/1 47/3 47/10 59/14 69/20 70/4 70/24 77/20 79/1 83/18 83/21 84/3 84/22 87/20 103/17 113/15 113/19 114/12 114/25 114/25 115/8 115/13 115/17 119/10 139/12 139/19 140/4 141/6 149/9 149/24 156/11 157/12 158/24 159/4
**Plaintiffs' [50]** 13/25 13/25 14/3 14/19 14/22 14/23 15/15 15/17 15/18 15/19 15/19 15/23 25/23 27/25 28/3 45/24 46/17 47/5 50/3 55/21 57/1 57/3 57/4 72/19 72/22 76/9 77/12 77/14 79/13 87/10 88/20 101/5 114/10 115/17 115/24 116/25 117/4 117/21 120/1 121/12 122/5 123/4 123/13 125/15 126/9 127/3 127/19 138/1 140/14 156/10
**plan [2]** 65/10 127/16
**planned [1]** 130/19
**planning [3]** 10/7 64/8 64/22
**plans [1]** 128/7
**played [1]** 138/25
**playing [2]** 138/24 139/22
**Plaza [1]** 2/2
**please [14]** 4/7 4/20 4/21 4/24 5/8 5/22 6/14 50/22 66/9 80/19 99/10 113/18 124/14 127/2
**pleasure [1]** 163/2
**plus [1]** 83/16
**POC [1]** 105/2
**podium [1]** 4/7
**point [61]** 9/14 17/7 24/4 26/10 39/1 51/3 55/4 58/23 58/25 70/20 71/4 72/15 73/13 76/16 79/19 80/5 81/8 81/17 82/24 83/9 83/11 87/7 88/13 88/14 89/1 89/9 97/19 97/21 97/24 98/7 101/1 101/12 101/13 103/21 104/18 104/19 106/25 107/2 107/11 107/11 107/17 107/18 107/24 109/19 109/19 110/3 111/8 111/21 114/24 118/3 118/14 120/5 121/1 122/2 125/25 126/5 131/16 136/7 138/7 142/10 148/6
**pointed [4]** 64/1 70/13 138/11 140/3
**pointing [1]** 146/11
**points [9]** 49/2 52/14 52/14 71/4 71/8 75/17 86/7 100/14 115/21
**policy [2]** 128/5 139/20
**pops [1]** 149/8
**portion [5]** 22/17 58/14 73/4 106/11 145/5
**portions [3]** 28/5 28/16 116/2
**POS [1]** 30/18
**position [7]** 35/18 90/23 117/11 121/23

**P**

**position... [3]** 124/1 124/2 135/3
**positions [1]** 8/15
**possibly [1]** 98/17
**post [2]** 30/2 114/2
**postage [20]** 19/3 57/5 58/1 60/11 61/13 62/1 73/21 74/21 75/8 87/15 114/2 117/11 122/11 123/25 129/11 143/24 150/8 153/7 153/9 155/1
**Postage-on-call [2]** 61/13 62/1
**postal [97]** 1/5 1/8 2/1 2/5 4/5 4/6 4/20 17/5 28/1 32/4 32/18 32/24 33/4 33/12 34/14 35/21 35/25 36/7 52/6 56/6 56/14 57/10 59/15 59/18 60/12 72/20 73/21 74/15 74/20 74/22 76/8 86/25 87/12 104/10 104/19 104/24 105/4 113/25 113/25 114/4 114/12 114/17 115/1 115/2 115/21 116/5 116/8 117/14 117/19 118/6 118/24 119/24 120/9 120/12 120/15 121/6 121/16 121/20 122/15 124/23 125/3 125/7 125/11 126/1 126/5 127/7 127/25 128/5 128/12 128/16 128/19 138/16 138/17 138/20 138/23 138/25 139/11 140/6 140/7 140/12 143/14 143/25 144/12 144/23 145/22 145/25 147/5 149/14 150/3 150/6 150/10 150/11 151/3 152/1 153/6 153/8 155/1
**Postalia [2]** 124/4 150/17
**Postmaster [6]** 117/7 120/3 120/13 121/2 139/25 154/18
**pot [1]** 107/7
**potential [2]** 58/2 120/16
**potentially [8]** 37/8 50/5 50/8 50/14 50/14 52/7 60/10 60/21
**practicality [2]** 124/15 148/3
**practice [7]** 7/5 7/8 8/2 8/24 49/9 68/21 145/3
**practiced [1]** 7/4
**practicing [3]** 6/12 8/25 10/1
**pre [1]** 140/15
**pre-SOU [1]** 140/15
**preamble [1]** 145/7
**preceded [1]** 95/5
**precedent [1]** 119/7
**preceding [3]** 39/9 42/23 94/25
**preclude [2]** 18/22 121/10
**precludes [1]** 28/10
**predeposit [2]** 124/25 125/12
**prefer [1]** 64/14
**preference [1]** 64/15
**preliminary [1]** 4/14
**premature [1]** 157/15
**premise [2]** 47/15 96/14
**premiums [4]** 86/11 86/12 104/16 105/1
**prepare [1]** 11/9
**prepared [8]** 14/17 16/17 33/22 64/9 69/1 75/22 77/19 122/8
**prepayments [1]** 125/4
**preponderance [2]** 139/7 139/10
**present [6]** 50/23 62/8 62/9 128/20 138/11 140/16
**presented [2]** 21/1 116/12
**preserve [2]** 62/14 140/19
**president [3]** 147/13 147/13 149/17
**pressure [1]** 119/8
**presumably [1]** 4/18
**presume [1]** 108/11
**presumptuous [1]** 20/6
**Pretrial [1]** 24/18
**pretty [4]** 10/23 25/19 160/8 162/3
**prevail [1]** 139/8
**prevent [1]** 26/15

**previously [2]** 8/18 14/7
**pricing [3]** 97/2 98/7 98/19
**prior [8]** 39/3 47/12 68/17 68/25 71/12 125/12 140/7 144/21
**private [1]** 88/6
**pro [1]** 27/19
**probably [9]** 9/25 41/16 48/2 118/25 133/22 141/7 148/1 152/13 159/8
**problem [4]** 19/4 135/8 140/11 160/3
**problems [5]** 105/14 117/12 123/9 125/13 137/11
**proceed [5]** 4/17 15/6 28/18 28/19 64/9
**proceeding [9]** 9/10 64/25 148/22
**proceedings [3]** 2/12 163/7 163/11
**process [3]** 11/19 61/5 73/19
**produce [2]** 39/10 39/11
**produced [4]** 2/13 25/11 59/14 139/7
**Product [1]** 117/7
**profession [3]** 35/12 48/21 49/18
**profession's [1]** 7/24
**professional [12]** 6/3 6/15 6/15 7/11 7/20 7/22 8/4 8/8 8/11 35/13 46/20 63/5
**professor [2]** 6/24 7/1
**proffering [1]** 113/2
**profit [7]** 36/10 93/25 94/1 119/2 121/9 129/11 132/16
**profit-and-loss [1]** 36/10
**program [1]** 124/17
**programmer's [1]** 152/10
**project [2]** 96/17 96/19
**projected [1]** 122/22
**projects [2]** 93/25 98/9
**promise [5]** 114/12 133/6 146/10 146/10 146/19
**promised [3]** 25/11 138/24 144/12
**promises [2]** 115/8 150/2
**promote [1]** 129/1
**promulgated [1]** 141/24
**promulgation [1]** 144/22
**proper [3]** 40/10 48/23 87/1
**property [2]** 121/14 139/12
**proportion [2]** 9/24 56/9
**proposal [4]** 117/6 119/11 125/1 126/22
**proposals [2]** 118/9 122/17
**proposed [8]** 27/8 29/7 113/4 116/21 158/20 159/6 159/9 161/21
**proposing [1]** 117/18
**protected [1]** 153/3
**protection [1]** 137/12
**protections [1]** 152/3
**proved [1]** 139/14
**proven [1]** 149/6
**provide [16]** 11/9 34/3 37/1 43/16 43/18 99/13 99/17 101/19 102/23 103/23 111/20 116/8 119/21 129/3 134/23 135/3
**provided [17]** 12/19 14/15 16/21 20/18 36/13 36/16 45/4 68/17 70/24 98/5 99/5 102/6 102/9 103/11 105/8 118/7 119/4
**providing [7]** 52/16 52/17 52/18 52/22 70/24 119/7 123/8
**provision [1]** 142/13
**public [7]** 5/17 6/5 6/10 7/21 49/15 100/12 100/12
**publicly [1]** 49/15 99/25
**published [1]** 104/18
**purity [1]** 126/19
**purpose [3]** 16/7 20/15 29/18
**purposes [7]** 28/2 35/25 64/9 72/22 76/8 77/24 83/8
**pursuant [1]** 107/4
**pursuing [1]** 160/6
**push [1]** 156/5

**put [20]** 11/14 15/21 16/16 19/23 20/5 35/21 43/24 44/13 58/9 70/3 74/7 75/7 84/13 92/24 106/20 106/22 109/1 109/9 115/23 116/24 142/14 155/20 155/22 157/23 161/13 161/14
**puts [2]** 20/10 35/18
**putting [3]** 63/14 148/4 153/5

**Q**

**qualitatively [1]** 36/18
**quality [1]** 104/5
**quantitatively [1]** 36/18
**quarter [2]** 35/25 74/23
**quarterly [1]** 53/19
**question [44]** 17/8 23/5 23/12 23/12 23/21 23/21 23/22 24/2 33/15 33/17 40/9 49/22 50/17 58/19 59/6 59/13 69/12 76/4 76/25 78/13 78/14 78/15 80/2 82/13 82/18 83/23 84/11 84/20 88/2 89/11 89/14 95/17 107/19 109/16 110/8 122/1 132/20 133/1 133/5 133/10 133/12 145/17 150/19 160/13
**questionable [1]** 121/9
**questioning [2]** 77/24 132/10
**questions [10]** 10/18 17/13 22/4 25/14 28/6 28/11 56/2 82/7 88/15 133/21
**quibble [1]** 85/10
**quick [3]** 56/19 144/2 144/8
**quickly [1]** 51/14
**quid [1]** 27/19
**quite [5]** 42/14 77/19 93/16 151/20 156/24
**quo [1]** 27/19
**quote [3]** 87/13 87/21 87/22

**R**

**raise [3]** 4/21 23/3 125/13
**raised [8]** 31/23 33/7 71/4 71/5 72/16 88/15 111/9 123/21
**range [6]** 9/25 31/9 31/15 39/8 86/5 100/19
**rank [1]** 7/1
**rate [80]** 36/22 37/2 39/20 39/22 41/25 42/1 45/3 45/17 45/18 45/21 48/7 48/8 49/11 49/14 50/6 50/7 50/8 50/23 50/25 51/3 51/4 52/12 79/9 79/15 80/7 80/23 81/2 81/4 81/7 81/9 81/13 82/8 83/5 83/8 83/10 85/14 85/18 85/21 85/21 85/24 86/2 86/16 88/5 89/1 89/2 89/3 89/3 89/10 89/11 90/1 90/6 90/6 90/7 90/8 90/10 91/8 93/12 93/18 93/24 94/3 96/12 96/20 97/16 97/21 98/1 98/2 98/24 99/2 99/10 99/14 99/17 100/15 101/4 102/5 102/6 102/10 105/14 105/15 111/17
**rates [19]** 40/23 40/23 40/24 40/25 41/3 41/5 41/12 41/13 41/21 42/6 42/6 63/9 87/23 91/1 91/2 98/6 98/8 98/23 98/25
**rather [7]** 26/23 35/4 41/25 79/21 85/8 86/20 114/21
**rating [1]** 40/16
**rationale [2]** 35/3 35/15
**rationalization [1]** 30/2
**reach [3]** 70/10 78/5 162/22
**reached [4]** 18/14 23/7 23/8 78/4
**reaching [1]** 145/21
**read [17]** 11/23 20/15 24/14 24/15 35/19 63/1 68/24 69/22 77/19 78/10 118/15 122/10 123/9 123/14 130/17 134/5 145/7
**readily [1]** 48/24
**reading [52]** 16/13 20/11 20/21 21/13 21/17 55/10 72/25 74/18 87/8 87/19 92/10 101/3 106/17 108/20 121/5 121/19 122/19 123/6 123/23 124/6 124/12 124/21 125/2 125/10 125/25 126/19 129/2 129/9 129/20 130/9 131/4 132/11 132/19 132/21 133/6 133/13 133/16 134/6 134/15 134/21 135/2 135/7 135/11 135/12 135/17 135/19 144/9 144/21

reading... [4] 145/17 145/24 146/7 156/11
ready [2] 64/11 154/10
real [3] 86/20 144/2 144/8
reality [1] 87/3
realize [1] 155/5
realized [2] 87/23 128/15
really [12] 24/1 69/13 78/15 93/21 99/2 137/7 137/16 138/18 155/7 156/25 158/14 162/13
reap [1] 144/15
reason [12] 17/20 48/18 50/14 83/20 83/24 116/24 118/8 131/12 131/20 138/14 142/4 155/2
reasonable [10] 43/8 55/3 55/6 55/7 101/8 123/2 130/20 138/10 138/15 155/17
reasonably [1] 87/4
reasons [3] 118/7 118/9 118/12
rebuttal [5] 11/10 14/17 65/9 65/12 156/21
recalculate [1] 101/3
recalculated [2] 41/15 101/24
recall [23] 18/10 54/23 55/1 57/10 67/3 67/4 67/6 67/10 68/2 68/20 68/25 70/24 72/6 97/10 97/13 98/16 98/19 105/7 130/17 131/16 134/25 136/20 152/6
recalling [2] 30/18 73/24
receipt [2] 125/19 144/25
receipts [3] 38/7 44/18 56/9
receive [4] 54/24 95/3 97/2 125/19
received [8] 8/10 12/20 44/19 95/4 122/17 128/11 131/14 162/4
receives [1] 120/14
receiving [2] 83/18 131/14
recently [3] 8/24 23/7 74/22
recess [5] 60/3 66/2 66/3 92/5 113/12
recipient [1] 117/6
recognize [4] 13/18 14/5 14/22 15/23
recognized [1] 11/3
recollect [1] 129/7
recollection [10] 66/15 66/23 67/12 67/13 67/18 67/21 72/2 72/8 72/11 74/1
record [11] 4/8 19/23 20/5 20/11 20/15 28/9 58/11 58/17 58/22 150/4 163/11
recorded [1] 2/12
records [8] 11/18 12/21 60/15 67/20 67/23 70/17 125/6 125/8
recoup [3] 131/5 132/16 144/15
recouping [1] 145/5
recover [1] 144/18
recross [2] 3/6 112/5
recruited [2] 7/6 7/9
redirect [4] 3/6 112/1 112/3 112/4
redirected [1] 143/24
redone [1] 35/24
reduced [2] 81/24 128/1
reduction [1] 96/7
refer [2] 94/20 126/19
reference [3] 94/24 102/18 128/7
referenced [1] 136/16
referencing [1] 61/12
referral [1] 71/20
referred [4] 28/2 29/1 72/21 103/4
referring [2] 52/23 103/1
refilled [1] 114/2
reflects [2] 21/24 101/5
refresh [2] 67/21 71/15
refund [1] 75/8
refunding [1] 87/14
refusal [1] 141/20
regard [8] 20/4 20/7 20/21 22/21 26/10 111/9 145/17 145/19

regarding [9] 16/14 16/8 32/16 31/24 35/20 87/10 110/8 149/15 156/25
regardless [2] 78/16 129/4
regional [2] 7/3 7/6
regular [1] 116/18
regulated [2] 36/5 151/21
regulation [13] 39/4 39/9 42/23 47/4 47/13 62/4 95/6 137/4 143/7 154/21 154/23 154/24 154/25
regulations [34] 33/1 75/10 83/17 84/5 84/23 85/7 85/11 87/20 114/22 127/22 133/9 133/18 133/19 133/20 141/13 141/24 142/2 142/5 142/8 142/15 142/18 142/23 143/6 143/10 143/11 143/16 143/21 144/22 148/5 148/7 149/18 151/16 151/18 157/7
relate [3] 23/25 56/9 59/10
related [11] 10/18 20/17 20/19 20/23 34/7 34/17 43/5 60/22 115/4 122/18 131/6
release [1] 118/21
relevance [2] 62/10 68/3
relevant [7] 11/21 19/13 19/19 20/20 39/16 39/19 99/3
reliability [9] 13/4 17/1 35/17 38/25 62/22 63/17 63/24 75/24 76/25
reliable [2] 63/4 76/1
reliance [1] 148/11
relies [1] 159/12
relieved [2] 19/3 22/9
relook [1] 151/11
reluctant [1] 135/1
rely [3] 20/4 140/4 159/3
relying [3] 73/23 158/22 159/14
remain [1] 38/1
remains [1] 20/25
remember [8] 19/6 29/8 35/21 61/19 67/7 78/5 89/15 136/4
remembered [1] 147/7
remote [7] 116/6 116/17 121/7 121/14 122/9 123/19 147/25
removed [1] 143/23
removing [1] 125/18
render [1] 13/10
renting [1] 123/25
repeated [1] 128/13
rephrase [1] 94/18
replaced [2] 53/15 109/23
reply [3] 160/24 160/24 160/25
rpo [5] 52/11 53/6 54/11 54/13 153/4
report [140] 11/10 11/10 11/23 12/1 12/2 12/4 12/6 12/7 13/1 13/5 13/8 13/13 13/22 14/6 14/8 14/11 14/13 14/14 14/15 14/16 14/17 14/24 15/4 15/5 15/7 15/9 15/15 16/2 16/3 16/5 16/9 16/16 16/18 16/19 16/20 16/21 17/2 17/11 18/11 18/15 18/19 21/5 21/7 21/12 21/14 22/12 22/19 24/16 25/13 25/25 26/4 26/6 26/13 26/18 27/6 27/7 27/19 27/19 28/22 29/16 29/22 29/24 31/2 31/20 33/19 33/20 33/22 33/23 36/20 39/5 41/23 42/10 43/17 45/5 45/16 45/19 46/17 48/11 50/17 50/19 51/16 51/21 59/4 60/6 61/9 61/10 61/16 61/19 61/20 61/24 66/9 66/16 66/18 68/16 68/17 68/19 69/1 69/5 69/8 69/10 69/14 69/17 69/19 69/22 69/23 70/1 70/3 70/7 71/6 72/19 75/15 75/22 75/23 77/10 78/22 78/23 85/14 85/16 85/21 86/1 86/12 87/9 88/3 88/13 91/6 92/10 92/11 97/16 99/3 99/4 101/23 103/9 103/15 104/7 104/13 104/18 111/19 122/8
reported [7] 37/22 38/13 38/14 38/22 47/6 47/7 47/12
reporter [4] 2/8 91/19 133/12 163/9
REPORTER'S [1] 3/5

reporters [1] 62/5
reporting [5] 16/6 39/4 39/14 42/23 43/2 43/12
reports [3] 11/8 11/10 77/18
represent [6] 17/10 18/18 68/6 72/19 76/7 81/12
representation [1] 78/6
represented [2] 82/21 82/23
representing [1] 27/25
represents [3] 32/16 74/21 81/3
repurchase [10] 53/7 106/18 107/8 107/13 108/23 108/23 108/25 109/4 109/5 111/16
repurchased [1] 54/4
repurchasing [1] 55/8
request [6] 11/15 124/21 124/21 149/25 153/15 157/11
requesting [1] 160/5
require [1] 83/25
required [5] 32/13 35/22 122/24 130/24 140/24
required this [1] 32/13
requirement [3] 35/20 73/9 143/23
requirements [1] 32/22
requires [1] 140/25
rereads [1] 133/12
research [2] 90/8 161/2
reservations [1] 125/5
reserve [2] 40/24 90/2
reset [1] 121/7
resetting [30] 17/24 22/1 23/1 25/16 25/20 25/24 26/4 26/23 28/3 32/23 35/20 35/23 36/1 72/23 73/9 73/10 73/20 74/19 76/10 113/24 116/6 116/17 120/17 121/15 122/10 123/20 127/10 128/4 130/2 147/25
resettings [1] 125/22
resources [1] 122/22
respect [23] 20/14 23/6 27/20 31/3 37/3 46/25 53/24 54/4 56/10 62/22 69/16 70/13 124/22 140/3 146/16 147/4 147/6 148/15 150/4 153/15 155/15 156/8 157/3
respond [1] 26/8
response [6] 44/2 50/12 61/2 61/19 115/19 126/18
responses [1] 118/5
responsibility [1] 147/3
responsible [1] 8/21
rest [1] 116/17
restrictions [1] 144/24
result [2] 19/1 150/20
resulted [4] 41/16 45/21 118/21 150/9
resume [1] 9/14
Retail [1] 123/18
retained [24] 9/19 11/7 11/8 12/14 14/9 37/15 38/15 38/20 42/20 46/8 46/9 47/9 66/14 66/21 66/23 67/2 67/8 67/9 67/14 67/19 67/22 71/12 71/17 95/23
return [35] 87/24 88/5 93/12 93/13 93/14 93/17 93/19 93/24 93/24 93/25 93/25 94/2 94/3 96/12 96/13 96/20 96/24 96/25 96/24 97/2 97/3 97/6 97/9 97/12 98/2 98/5 98/9 98/10 98/11 98/14 98/21 98/23 98/24 100/2 119/20
returned [1] 111/5
returns [1] 55/3
rev [1] 47/25
revamping [1] 151/4
revenue [28] 5/17 32/9 32/11 79/16 80/5 81/4 81/10 81/12 81/23 82/21 82/23 106/2 114/6 114/8 114/18 114/19 120/10 120/15 120/16 126/6 127/6 127/12 128/7 130/1 137/9 137/12 152/3 155/7
revenues [4] 36/14 47/25 47/25 151/25
review [24] 11/8 11/25 12/10 13/1 13/3 13/7

**R**

**review...** [18]  17/6 30/10 30/11 37/10 41/1
42/21 43/10 44/10 88/19 92/16 93/9 94/15
95/25 111/21 115/5 124/14 124/21 139/9
**reviewed** [13]  14/8 31/2 31/7 33/21 37/13
69/2 69/3 69/5 102/22 104/12 127/9 129/17
137/16
**reviewing** [3]  10/8 42/15 122/8
**revised** [2]  101/7 119/11
**rewards** [1]  144/15
**Richard** [1]  121/2
**right** [61]  4/13 4/17 4/22 6/3 8/10 23/9 24/21
32/6 33/18 48/5 54/22 56/1 56/20 58/5 59/3
59/24 64/21 65/21 74/10 74/14 74/24 75/5
77/5 77/7 79/4 82/18 85/12 91/2 91/15 91/25
92/17 94/21 95/14 100/1 102/17 104/8
104/15 108/14 111/11 112/22 117/13 118/13
129/12 131/2 131/18 131/25 132/15 132/19
133/13 134/9 137/23 137/24 141/8 143/17
143/25 144/14 145/20 146/8 148/9 160/17
163/2
**right-hand** [4]  32/6 74/10 74/14 108/14
**rigorous** [1]  6/10
**Riley** [5]  137/22 138/2 138/7 151/6 152/15
**ripped** [1]  152/2
**rise** [5]  60/2 66/1 92/4 113/11 163/6
**risk** [6]  86/10 86/12 100/17 151/2 152/9
152/20
**RMRS** [11]  121/21 122/18 123/8 123/9
123/25 124/16 124/22 126/2 126/3 126/20
147/14
**Road** [2]  1/19 2/6
**roadmap** [2]  103/14 103/19
**Robert** [2]  131/17 152/15
**room** [3]  2/9 19/12 19/16
**rose** [1]  7/1
**Ross** [6]  1/23 3/3 67/25 68/7 68/9 72/9
**Roughly** [1]  162/19
**RPR** [1]  2/8
**rule** [10]  9/13 23/3 27/14 27/15 62/4 142/20
156/13 158/16 159/5 160/14
**rules** [3]  10/6 126/14 149/1
**rumors** [1]  157/14
**run** [5]  118/6 118/13 119/1 119/2 120/25

**S**

**S.W** [1]  2/2
**said** [76]  19/8 28/2 29/21 31/16 35/12 35/19
36/25 38/2 39/4 40/18 42/4 44/22 45/1 45/5
46/16 48/8 50/4 50/13 50/14 54/7 57/24
70/12 72/22 76/9 77/5 80/14 82/9 83/7 84/17
84/19 85/3 85/6 91/6 95/18 95/21 96/2
104/15 106/15 107/21 110/19 119/18 127/14
130/9 131/4 132/1 132/18 133/16 133/24
134/13 134/20 136/24 136/22 137/5 141/8
141/9 141/19 142/4 143/22 146/2 146/7
147/1 147/7 147/24 148/4 148/6 148/8
149/11 152/6 152/6 152/15 152/16 153/16
153/23 154/9 155/16 157/2
**sale** [1]  73/21
**sales** [1]  94/1
**same** [22]  15/6 38/3 43/8 58/8 62/10 89/17
105/13 107/14 115/14 118/11 129/5 131/1
131/10 131/14 132/3 134/8 134/18 135/5
135/15 135/23 155/11 157/6
**sanctions** [1]  159/23
**sandbag** [1]  160/25
**Sara** [1]  1/14
**sara.moghadam** [1]  1/17
**sat** [3]  68/7 154/4 159/15
**save** [1]  156/20

**sayes** [1]  114/5
**saw** [11]  16/20 16/22 38/4 52/5 118/15
148/20 151/6 155/16 155/16 155/18 158/4
**say** [60]  17/20 22/22 28/11 28/14 29/21
29/22 30/3 31/14 41/23 44/10 45/18 48/22
55/16 60/18 61/8 63/23 65/3 69/23 70/1 75/2
78/12 87/8 87/19 88/7 89/6 90/10 92/10 94/4
98/15 100/18 101/2 101/14 101/23 104/17
105/25 107/22 108/15 109/4 109/9 111/20
112/20 117/7 119/19 120/6 120/8 133/13
133/15 134/15 134/15 135/1 137/20 137/24
138/3 155/3 156/5 156/18 156/22 158/12
159/4 159/20
**saying** [16]  12/8 43/25 47/19 48/13 58/13
84/15 85/1 88/3 95/8 98/3 135/8 136/13
153/8 155/4 156/16 161/8
**says** [45]  21/5 21/8 32/3 32/8 74/11 74/15
74/18 74/25 75/4 75/14 84/11 84/13 104/10
104/25 106/21 108/7 108/15 109/1 118/25
119/4 119/21 120/12 121/4 121/19 122/11
122/19 123/6 123/11 123/23 124/6 124/12
124/21 125/2 126/18 130/24 132/11 132/21
133/12 134/6 135/1 135/19 141/10 144/17
147/14 148/8
**scenario** [1]  98/17
**scenarios** [1]  98/20
**Schaefer** [1]  1/14
**schedule** [5]  34/24 64/16 113/2 155/24 162/6
**schedules** [6]  12/1 12/12 15/25 16/21 34/25
45/9
**school** [1]  140/25
**scope** [1]  25/21
**scratch** [1]  130/22
**screen** [5]  115/25 116/1 128/24
**sealed** [1]  152/14
**searching** [1]  159/15
**seated** [1]  4/24
**second** [14]  10/13 31/5 47/24 54/22 87/7
91/16 92/20 101/14 108/21 121/1 121/5
126/14 153/15 158/24
**secondhand** [1]  162/6
**secondly** [2]  49/5 151/13
**section** [5]  17/6 15/11 16/8 21/16 21/25
35/22 61/24 88/13 102/17
**secure** [1]  153/1
**securities** [2]  152/25 153/4
**security** [1]  87/23
**see** [68]  17/21 18/3 20/8 32/4 32/5 34/22
35/14 37/9 39/23 41/2 42/21 43/6 45/7 45/12
48/10 51/21 53/5 53/18 54/23 54/23 59/8
59/13 65/6 70/14 70/19 74/16 85/14 86/16
87/17 87/25 92/9 94/4 94/15 94/17 95/21
97/21 98/19 99/4 99/11 101/10 104/10
107/17 108/2 108/6 108/8 108/17 108/21
109/13 116/7 117/8 117/13 118/24 119/10
119/16 120/2 125/20 126/14 126/17 127/13
128/25 132/17 134/19 137/14 142/10 153/14
153/17 158/20 158/21
**seeing** [8]  31/20 39/9 59/4 88/20 88/22 97/9
97/13 98/16
**seek** [1]  144/13
**seem** [3]  23/13 67/14 67/16
**seems** [4]  23/2 28/21 144/5 159/2
**seen** [16]  17/10 30/23 38/1 38/18 43/20 54/6
59/11 59/16 60/14 60/16 73/1 76/11 96/25
97/10 102/23 105/11
**select** [1]  85/20
**selected** [1]  70/15
**selling** [1]  150/23
**sending** [1]  124/10
**sense** [8]  24/9 65/23 69/12 84/24 84/25 85/2
101/18 131/11

**sent** [2]  127/23 150/4
**sentence** [6]  103/7 104/25 132/12 132/17
134/14 142/18
**separate** [10]  40/9 49/2 52/12 52/16 52/21
52/22 96/15 96/16 107/16 108/10
**separating** [1]  96/18
**September** [5]  123/15 123/22 126/11 127/4
127/17
**September 15th** [2]  123/15 123/22
**September 18th** [1]  126/11
**serious** [2]  148/25 150/7
**served** [2]  8/18 8/23
**serves** [1]  30/20
**service** [84]  1/5 1/8 2/1 2/5 4/5 4/6 4/20 17/5
28/1 32/24 35/25 36/7 52/17 57/10 59/15
59/18 60/11 72/20 73/21 74/16 74/20 74/22
86/25 87/12 113/25 114/4 114/12 114/17
115/1 115/2 115/21 116/6 116/8 117/14
117/19 118/6 118/24 119/24 120/9 120/12
120/15 121/6 121/17 121/20 121/21 122/16
124/24 125/3 125/7 125/11 126/1 126/5
127/7 127/25 128/5 128/12 128/16 128/19
130/12 130/13 138/16 138/17 138/20 138/23
138/25 139/11 140/6 140/7 140/12 143/15
144/12 144/23 145/22 145/25 147/5 149/14
150/3 150/6 150/10 150/11 151/3 152/1
153/8 155/1
**Service's** [1]  76/8
**services** [9]  8/6 9/23 52/16 52/21 55/11 55/12
121/23 122/9 123/7
**set** [29]  18/19 20/11 20/12 26/17 26/19 29/19
32/23 35/1 35/23 69/10 69/14 72/18 73/9
73/13 74/21 75/12 78/7 78/11 97/22 101/19
110/16 117/17 119/7 127/13 127/19 130/16
137/16 139/14 154/11
**sets** [1]  103/11
**setting** [7]  8/1 98/12 102/15 124/24 124/25
125/12 134/11
**settings** [1]  125/4
**settlement** [1]  62/14
**seven** [1]  52/14
**several** [3]  118/5 118/21 141/23
**shall** [4]  74/19 74/25 75/2 160/25
**share** [3]  123/24 129/4 130/13
**shared** [2]  119/17 119/19
**shareholder** [10]  46/7 46/11 47/7 47/7 47/11
48/4 48/16 48/19 97/8 99/21
**shareholders** [1]  46/6
**shareholders'** [2]  48/2 48/14
**shares** [1]  53/21
**Sharp** [5]  116/5 117/5 119/25 122/17 122/19
**she** [5]  22/4 22/5 22/7 123/23 124/6
**she's** [1]  123/19
**sheet** [4]  38/2 38/13 38/18 39/11
**sheets** [6]  42/16 47/2 47/5 47/6 100/22
100/23
**Shirley** [1]  123/17
**shock** [1]  150/11
**short** [12]  40/22 40/25 41/3 41/5 41/12 41/21
42/6 65/12 90/2 90/3 91/2 105/13
**short-term** [9]  40/22 40/25 41/3 41/5 41/12
41/21 42/6 90/2 91/2
**shortcomings** [1]  46/24
**shorter** [9]  37/9 39/18 40/15 42/1 88/9 89/2
89/2 89/10 91/7
**shortest** [1]  40/5
**shortly** [2]  66/16 158/10
**should** [43]  17/14 18/22 19/21 21/19 35/3
38/1 40/13 56/23 57/18 57/23 58/1 58/15
58/20 59/4 76/4 79/1 79/7 87/3 87/4 88/9
89/1 89/5 95/4 103/12 114/20 117/15 118/6
118/13 120/8 120/25 121/22 121/24 123/25

**should... [10]** 124/1 124/7 126/22 141/7 149/2 156/13 158/9 158/9 159/15 161/25
**shouldn't [1]** 160/25
**show [8]** 13/12 24/25 110/13 116/25 122/14 123/15 151/19 151/20
**showed [1]** 54/24
**showing [1]** 116/14
**shown [3]** 26/1 114/10 139/6
**shows [5]** 57/20 115/14 116/21 139/10 150/1
**side [11]** 9/20 9/20 21/3 25/17 26/15 88/21 116/16 157/22 158/11 159/18 161/4
**sides [1]** 23/16
**sideways [1]** 74/6
**sign [1]** 138/8
**signal [1]** 95/12
**signature [1]** 117/25
**signatures [1]** 126/12
**signed [2]** 126/13 127/4
**significant [2]** 13/9 44/25
**similar [6]** 121/18 121/23 122/1 132/23 136/21 136/22
**simple [8]** 51/7 55/16 79/11 79/12 80/6 80/25 82/18 102/2
**simpler [1]** 48/2
**simplify [1]** 111/18
**simply [5]** 79/14 79/21 81/1 81/8 84/13
**since [10]** 6/6 18/13 26/4 33/21 40/9 101/22 119/1 159/12 161/1 161/23
**Singer [2]** 118/20 124/4
**single [5]** 142/13 142/17 149/25 150/1 150/15
**sir [15]** 5/6 6/3 6/14 8/10 11/5 12/25 13/12 14/2 16/3 16/4 16/15 45/16 68/6 81/16 92/1
**sit [13]** 27/23 74/2 76/24 77/1 83/13 83/20 89/9 90/25 94/11 98/22 145/20 151/17 161/5
**sitting [1]** 36/7
**six [4]** 56/8 123/16 141/24 154/8
**sixty [1]** 56/8
**sixty-six [1]** 56/8
**size [2]** 100/8 100/16
**skip [2]** 126/7 127/2
**slated [1]** 52/9
**slightly [1]** 161/25
**slowly [1]** 45/18
**small [2]** 86/6 100/9
**smaller [4]** 100/8 100/13 100/17 139/3
**smallest [2]** 100/11 129/5
**snapshot [1]** 89/22
**so [224]**
**Society [1]** 7/17
**software [3]** 118/6 118/13 118/13
**solve [1]** 125/13
**some [63]** 15/3 22/17 22/21 22/25 27/20 28/7 30/14 33/14 38/19 38/25 41/13 44/9 52/3 52/4 52/20 53/13 53/14 55/22 55/23 56/5 58/7 58/14 64/11 70/7 73/3 73/4 73/4 73/4 77/6 78/6 78/10 79/7 87/3 96/6 96/25 98/16 98/18 106/11 106/21 106/22 107/13 110/17 115/20 119/20 125/5 126/24 128/21 132/7 137/2 142/17 150/7 150/8 157/16 158/6 158/8 161/3 161/3 161/4 161/12 161/15 161/18 161/23 163/4
**somebody [2]** 72/9 160/2
**somehow [2]** 18/18 147/8
**someone [1]** 110/21
**something [17]** 23/3 27/17 30/14 31/16 31/23 37/23 57/12 57/25 58/10 58/16 86/20 151/16 159/22 160/2 160/12 162/24
**sometime [4]** 23/7 23/8 66/15 67/11
**sometimes [3]** 49/21 49/21 91/10

**somewhat [1]** 135/14
**somewhere [1]** 162/7
**soon [1]** 65/14
**sorry [37]** 5/11 7/3 12/5 13/13 13/19 20/9 25/4 27/4 31/19 33/10 43/13 43/22 44/24 50/7 51/21 56/10 57/4 60/6 73/5 82/14 84/16 87/19 90/14 97/4 101/23 103/6 112/9 118/16 124/18 125/24 144/7 144/20 149/12 152/6 152/8 153/11 155/5
**sort [12]** 23/2 33/14 64/12 65/13 65/19 73/4 81/19 103/23 127/19 136/17 137/16 158/14
**SOU [14]** 126/11 126/13 127/3 127/13 127/14 128/4 130/19 137/15 140/15 142/12 142/18 142/23 143/3 143/11
**sought [4]** 78/7 78/11 78/16 144/23
**sounded [1]** 155/17
**source [4]** 34/20 49/18 86/5 120/15
**sources [10]** 46/4 46/13 46/18 46/19 47/14 47/17 47/19 48/22 49/3 49/16 86/3
**south [1]** 153/6
**span [1]** 90/24
**spare [1]** 112/23
**speak [1]** 7/14
**speaking [2]** 72/12 161/20
**speaks [1]** 27/22
**specialty [2]** 6/12 8/22
**specific [12]** 22/14 22/18 29/24 41/14 66/23 67/18 73/1 86/10 86/12 97/2 97/6 109/17
**specifically [16]** 9/21 37/19 42/17 43/4 43/6 44/12 45/5 61/12 63/25 71/11 96/19 101/18 110/19 124/11 131/2 153/2
**specified [1]** 35/24
**speculation [4]** 32/15 41/19 50/18 57/15
**speculative [1]** 62/5
**spelled [1]** 152/18
**spend [1]** 117/16
**spending [6]** 93/4 93/7 93/8 93/8 93/25 96/5
**spends [1]** 93/13
**spent [12]** 6/19 6/20 9/22 15/3 94/5 94/5 94/13 95/19 96/10 96/10 114/14 159/12
**split [1]** 107/16
**spoken [1]** 72/13
**spot [3]** 16/22 17/16 86/7
**spring [1]** 10/18
**St [6]** 6/1 7/3 7/6 10/2 71/18 71/24
**staff [1]** 150/14
**stage [1]** 127/19
**stamp [4]** 31/6 31/12 31/14 32/2
**stamps [3]** 12/21 31/15 150/23
**stand [2]** 4/20 148/22
**standard [4]** 8/1 11/14 96/14 145/2
**standards [5]** 7/20 8/2 8/3 8/6 21/20
**stands [1]** 160/3
**starred [2]** 155/21 156/1
**start [10]** 16/12 20/9 48/23 64/9 85/10 92/3 100/22 130/22 132/12 162/9
**started [8]** 7/5 38/10 44/16 148/1 148/3 148/3 153/16 154/20
**starting [11]** 16/22 17/15 20/9 24/4 25/15 25/18 51/3 72/1 86/7 129/19 162/9
**starts [2]** 120/23 134/3
**state [8]** 5/8 9/11 9/12 10/6 33/3 51/17 69/8 86/14
**stated [8]** 12/25 36/21 70/22 98/18 129/9 130/18 131/2 131/17
**statement [24]** 3/2 3/3 3/4 8/5 24/19 29/14 36/11 38/4 39/6 39/10 39/14 41/2 77/21 90/4 94/15 96/2 101/2 133/8 133/19 140/4 140/8 140/13 142/11 142/12
**statements [36]** 10/9 10/15 10/19 37/18 37/18 38/23 38/24 39/2 42/16 42/22 43/11 44/11 44/12 44/12 47/2 47/3 53/18 61/4 61/4

**88/20 92/17 93/21 93/9 85/22 95/25 96/9 131/16 131/20 134/22 139/23 137/18 142/1 146/2 155/17 155/18 160/10**
**states [17]** 1/1 1/5 1/11 2/1 2/5 4/4 4/19 7/23 20/16 28/1 72/20 76/8 87/12 101/23 116/8 119/17 144/21
**stating [1]** 22/14
**status [1]** 158/19
**stay [2]** 107/14 109/11
**staying [1]** 128/6
**stenography [1]** 2/12
**step [3]** 79/19 81/18 100/7
**still [13]** 21/12 22/11 27/10 56/18 70/17 76/3 86/13 90/5 104/1 123/16 126/15 138/16 141/17
**stipulated [7]** 17/4 22/15 23/15 23/23 62/11 72/17 72/24
**stipulation [20]** 17/17 21/9 21/18 22/10 23/6 23/13 23/18 24/2 24/3 24/13 26/20 27/21 28/9 29/1 72/25 73/1 75/21 76/18 76/21 161/7
**stipulations [4]** 23/13 23/15 24/8 24/18
**stock [5]** 5/16 6/22 47/8
**stocks [3]** 49/17 86/3 99/23
**stolen [1]** 152/9
**stop [7]** 15/7 64/13 65/22 74/24 91/20 91/20 105/3
**strategies [1]** 98/17
**stream [6]** 79/14 80/6 81/23 82/21 114/20 139/3
**streams [5]** 114/7 114/8 114/13 127/6 127/12
**Street [2]** 1/15 1/23
**strictly [1]** 46/13
**strike [13]** 18/7 41/18 41/20 41/21 50/11 110/1 111/3 136/24 159/21 160/1 160/4
**stripping [3]** 51/6 51/7 51/8
**strong [2]** 66/15 67/12
**struck [1]** 148/16
**structure [2]** 47/16 100/21
**study [1]** 154/4
**stuff [1]** 159/7
**subject [15]** 21/7 25/9 25/17 26/12 26/14 26/17 27/5 27/6 27/9 27/10 29/16 50/13 59/24 75/21 118/19
**submit [2]** 157/22 160/21
**submitted [5]** 11/19 68/19 105/10 119/12 160/5
**subsection [3]** 86/14 87/8 92/10
**subsequent [4]** 17/2 17/3 43/7 51/21
**subsidizing [1]** 44/8
**subsidy [1]** 96/7
**substantial [4]** 114/19 144/15 146/21 147/4
**substantially [8]** 37/9 39/12 43/2 48/19 98/12 100/24 125/22 156/24
**subtly [1]** 82/6
**successful [2]** 126/3 126/3
**such [13]** 10/20 38/22 45/20 50/15 85/21 87/22 87/23 118/15 122/24 124/2 125/6 126/5 130/13
**sudden [2]** 148/24 149/7
**suffered [1]** 155/10
**sufficient [2]** 69/9 94/7
**suggest [1]** 68/22
**suggested [2]** 26/21 65/19
**suggesting [1]** 89/5
**suggestion [1]** 118/4
**suggestions [1]** 34/3
**sum [1]** 136/17
**summarize [1]** 16/10
**summary [2]** 16/4 16/8
**summed [1]** 153/22
**summer [1]** 162/7

## S

**superiors [3]** 129/21 135/22 157/6
**supplement [4]** 11/25 12/4 12/5 15/15
**supplemental [7]** 14/24 17/11 24/14 24/20 77/10 78/22 78/23
**supplementary [1]** 45/5
**supplied [2]** 16/1 68/16
**support [6]** 5/19 28/9 35/15 43/16 43/19 45/13
**supportable [1]** 13/11
**supporting [5]** 11/25 16/21 34/22 35/2 60/20
**supposedly [2]** 141/18 141/25
**suppress [1]** 138/12
**sure [22]** 27/21 33/15 46/3 51/13 54/22 58/8 63/16 65/12 65/18 73/12 80/14 82/9 84/17 86/22 93/16 94/11 96/18 113/8 142/21 149/24 157/18 159/22
**surety [3]** 56/11 104/16 105/1
**surprise [1]** 148/23
**sus [1]** 133/22
**suspect [1]** 133/17
**sweep [5]** 52/7 53/9 53/10 54/4 110/24
**sweeping [1]** 53/22
**swept [5]** 52/11 53/12 54/10 55/8 109/1
**swoop [1]** 154/4
**sworn [2]** 4/23 5/3
**system [48]** 17/5 22/16 28/4 73/19 75/6 113/24 114/23 115/12 115/23 116/6 116/11 116/13 116/17 117/10 117/16 118/6 119/1 120/7 120/13 121/7 121/15 121/21 122/10 122/21 122/24 123/8 123/20 124/7 124/14 124/22 126/20 126/24 126/25 129/10 131/10 132/22 133/23 141/10 149/17 151/4 151/21 151/25 152/5 152/9 152/11 152/24 154/20 154/21
**systems [9]** 1/3 4/4 72/23 76/10 114/17 121/18 122/1 122/20 124/3

## T

**table [2]** 33/17 57/2
**take [36]** 8/21 23/18 35/11 41/6 49/13 56/4 57/23 59/23 61/10 61/25 62/8 64/18 65/1 65/15 65/16 65/25 77/21 79/14 81/1 81/9 81/10 91/4 95/12 97/2 98/20 100/8 109/17 112/12 112/15 113/5 115/19 124/5 131/11 132/24 136/20 160/8
**taken [15]** 17/15 28/25 54/13 60/3 60/8 66/3 66/24 68/13 92/5 94/12 99/22 113/12 139/12 142/14 152/21
**takes [4]** 56/1 56/2 65/6 79/19
**taking [10]** 6/10 20/14 51/1 61/25 80/6 84/6 106/18 120/18 138/13 156/17
**takings [2]** 154/19 156/13
**talk [13]** 33/18 33/20 44/5 64/10 65/13 86/2 106/3 106/7 120/10 145/8 158/19 161/6 162/17
**talked [18]** 21/25 22/4 22/7 26/3 44/2 58/6 58/7 68/8 82/7 89/13 90/15 92/18 97/13 100/21 104/9 137/17 137/20 153/21
**talking [16]** 25/8 32/12 33/16 42/15 50/12 58/9 84/24 91/11 103/18 110/18 116/15 123/19 126/15 130/17 142/1 142/22
**talks [2]** 21/6 21/8
**targeting [1]** 97/3
**task [2]** 8/24 128/17
**taught [1]** 84/2
**tax [1]** 10/7
**taxed [1]** 122/22
**taxes [1]** 101/16
**teaching [1]** 6/25
**technical [1]** 91/17

**technologies [1]** 130/21
**technology [1]** 5/14
**telephone [1]** 20/17
**tell [20]** 5/21 9/7 16/7 24/8 36/15 53/5 90/5 90/6 98/11 101/22 112/17 112/18 120/4 120/22 122/7 126/10 127/18 135/13 146/7 147/22
**telling [2]** 141/6 151/7
**tells [4]** 37/7 38/7 90/7 125/24
**ten [4]** 64/22 89/24 100/11 113/5
**tends [1]** 138/11
**tenure [1]** 7/2
**term [33]** 40/7 40/14 40/15 40/22 40/23 40/25 41/3 41/4 41/5 41/12 41/13 41/21 41/22 42/1 42/6 42/6 87/22 88/8 88/9 88/23 88/24 89/2 89/2 89/10 89/11 90/2 91/2 91/7 96/20 97/6 98/2 101/15 151/2
**terminology [1]** 89/12
**terms [35]** 9/19 12/22 20/13 45/1 60/14 63/1 70/13 84/9 88/10 93/17 97/2 97/9 97/25 103/25 115/6 115/7 115/11 115/14 130/20 131/1 131/10 132/3 134/9 134/19 135/5 135/15 135/23 135/24 140/9 141/1 141/2 141/2 141/21 153/25 157/6
**test [31]** 126/1 126/2 126/3
**tested [2]** 150/14 150/15
**testified [26]** 33/15 33/19 34/24 36/23 42/3 73/7 89/12 128/5 128/25 129/9 129/20 131/17 131/21 131/22 136/23 141/11 145/19 147/21 149/12 149/13 150/10 154/15 157/8 158/2
**testifies [1]** 148/23
**testify [9]** 9/18 21/23 40/2 43/23 140/14 147/1 150/3 151/14 156/2
**testimonies [1]** 9/14
**testimony [71]** 17/11 18/17 18/23 19/9 20/19 20/22 20/22 21/6 22/11 22/18 22/21 26/2 29/6 29/8 29/19 39/24 40/18 44/3 48/11 52/24 57/6 57/9 57/15 57/16 57/17 58/3 58/6 58/12 58/16 59/5 59/12 60/25 63/2 66/21 67/11 68/8 73/2 73/18 73/22 73/22 75/20 77/5 83/16 89/18 90/19 90/21 105/21 106/8 118/19 128/22 130/4 135/21 136/20 137/6 137/7 141/25 145/14 145/16 146/9 147/10 147/21 148/1 151/8 151/13 151/21 153/4 154/14 156/23 157/1 158/5 159/12
**tests [1]** 118/9
**than [59]** 26/23 35/4 37/9 38/13 39/13 40/23 41/4 41/12 41/21 41/25 42/6 48/19 49/20 49/24 58/23 63/19 70/16 75/7 76/7 78/20 79/21 80/2 82/3 82/6 82/10 83/3 83/10 83/14 85/8 86/20 89/3 89/10 90/1 90/6 90/7 91/2 94/3 97/15 98/4 98/5 98/24 99/2 100/8 100/24 110/15 114/21 125/13 133/24 136/7 137/13 137/15 138/12 142/19 156/19 159/18 161/2 162/1 162/21 162/23
**thank [19]** 11/5 30/7 65/24 71/25 78/19 83/7 85/3 91/13 112/11 113/9 113/10 113/20 139/15 139/16 156/15 156/16 157/10 163/1 163/3
**thankful [1]** 113/22
**that [1179]**
**that then [1]** 6/12
**that's [134]** 5/17 8/20 8/20 10/23 16/2 16/24 19/8 20/3 22/5 22/18 24/4 28/17 38/11 40/15 43/8 44/1 45/8 45/16 46/7 46/14 46/20 47/15 47/16 47/23 49/7 49/21 49/23 51/17 53/22 53/23 54/18 54/20 54/21 55/10 55/25 56/13 56/17 56/21 56/22 56/24 56/25 57/1 57/3 58/2 58/3 58/15 59/10 60/13 69/2 69/13 69/21 73/16 75/10 75/14 75/21 76/20 77/19 78/12 79/3 79/11 79/18 80/25 82/9 83/2 84/7

84/17 84/23 84/24 85/16 85/23 87/5 88/12 88/23 88/6 91/5 91/25 92/14 92/10 92/24 93/19 94/2 95/24 96/16 96/7 98/9 99/2 99/8 100/4 100/5 100/15 102/5 102/8 102/11 102/13 103/3 103/4 103/7 104/4 104/8 104/15 104/22 106/24 107/7 108/13 110/5 111/1 111/24 111/25 112/24 116/22 117/21 118/9 119/14 121/11 126/10 127/3 127/17 128/10 129/16 135/11 142/7 143/1 143/24 144/18 146/1 146/3 147/20 148/25 151/22 155/7 159/8 161/16 161/22 161/24 162/12
**that's laid [1]** 54/21
**the Accredited [1]** 6/8
**the doc [1]** 30/10
**their [68]** 5/13 7/5 7/8 7/9 8/4 8/5 18/21 18/25 18/25 19/23 22/16 23/22 38/13 39/5 39/14 44/1 44/21 47/20 47/21 83/22 88/21 98/8 98/9 98/10 98/20 99/24 110/1 110/1 114/1 114/14 117/15 119/20 121/21 129/4 131/1 131/10 132/3 132/22 133/7 134/8 134/18 135/5 135/14 138/5 138/22 140/22 142/7 144/6 144/14 144/15 144/16 145/5 145/7 145/19 146/12 146/20 146/21 146/21 150/14 151/10 152/5 152/9 152/11 152/23 153/2 153/7 153/15 154/24
**theirs [1]** 138/16
**them [59]** 9/1 9/16 11/20 12/21 15/22 19/15 22/5 25/12 29/23 41/15 48/23 52/3 52/20 63/10 64/3 75/8 79/22 81/6 82/8 94/14 100/23 104/7 114/2 116/1 119/6 121/21 132/19 132/22 135/4 135/13 136/23 138/21 138/24 139/21 140/18 141/4 141/6 141/11 141/17 141/18 146/7 146/7 146/8 146/12 148/8 149/5 150/3 151/15 153/2 153/8 154/5 154/5 154/15 154/16 154/16 155/19 158/22 161/14 162/4
**themselves [1]** 117/19
**then [114]** 4/17 6/12 6/23 7/5 10/6 11/22 12/10 17/25 23/3 24/17 24/17 25/14 26/21 27/9 27/17 28/19 38/1 38/17 44/8 48/5 52/3 52/10 52/13 54/3 54/3 54/3 54/3 54/12 54/12 54/13 55/8 55/9 56/7 59/23 64/14 64/20 64/22 65/1 65/5 65/6 65/7 65/8 65/16 65/16 71/23 73/1 73/20 78/21 80/8 81/17 83/9 84/5 84/6 84/19 86/10 87/19 88/11 96/11 100/18 101/16 101/18 101/22 104/16 106/10 107/25 108/14 108/19 109/1 109/9 109/23 110/20 110/21 110/25 111/2 111/5 112/4 112/22 112/25 113/1 113/5 116/19 118/17 119/3 119/6 119/20 120/23 122/12 133/13 134/6 143/9 143/14 144/5 146/6 148/4 149/21 153/11 153/18 153/24 157/7 157/14 158/5 158/10 158/18 159/4 159/7 159/9 160/18 160/24 161/24 161/25 162/21 162/23
**theories [1]** 49/23
**theorize [1]** 147/8
**theory [2]** 77/14 77/21
**there [133]** 4/14 7/7 13/9 15/1 17/14 22/19 22/21 22/25 24/6 25/14 25/16 26/25 27/24 28/7 28/8 28/16 29/5 29/5 29/9 29/16 29/22 30/4 30/12 30/13 30/14 30/17 31/16 33/6 35/7 38/22 38/25 42/4 42/23 44/13 47/6 47/6 48/21 49/3 52/5 52/16 54/20 57/15 58/16 60/7 60/12 61/23 63/4 63/17 63/25 68/17 69/8 70/12 70/17 73/8 74/13 74/24 76/2 78/6 79/7 80/3 80/20 81/15 90/22 91/11 94/18 100/2 102/18 103/20 105/3 108/10 110/21 111/2 117/17 118/4 118/5 118/12 121/25 122/14 123/12 124/3 128/1 128/2 128/9 130/8 130/10 130/23 131/12 133/14 134/1 137/1 137/8 137/11 137/11

**there... [38]** 141/21 142/2 142/4 146/8 146/15 147/12 148/9 148/11 148/11 148/12 148/12 148/16 148/18 149/8 149/20 149/21 149/22 150/1 150/1 150/3 150/7 150/8 151/19 151/23 151/24 152/4 155/4 156/12 156/20 157/20 157/25 157/25 158/1 158/7 159/1 159/21 161/23 162/11

**there' [1]** 104/1

**there's [52]** 9/14 10/4 10/7 21/8 24/19 25/9 28/17 28/18 28/25 31/22 32/2 32/5 48/20 49/25 52/8 52/11 58/10 58/22 63/16 86/1 86/6 94/16 96/2 97/21 100/14 102/18 102/20 106/24 108/4 108/18 119/3 119/11 125/21 132/25 133/10 136/6 136/24 138/14 141/3 141/21 142/17 143/6 143/6 146/18 148/12 156/4 156/4 156/13 158/16 159/23 160/14 161/11

**thereabouts [2]** 16/1 56/19

**thereafter [1]** 158/11

**therefore [3]** 42/2 50/17 110/11

**therein [3]** 26/19 70/8 78/11

**these [83]** 7/19 8/7 15/25 17/22 28/23 30/13 32/22 33/9 33/21 34/6 34/9 34/23 34/23 36/12 43/11 44/7 47/13 49/2 49/15 53/5 54/10 54/11 55/10 57/18 58/8 64/2 74/22 75/10 76/17 76/20 79/6 80/6 80/9 81/9 83/25 85/14 85/19 87/20 93/9 94/4 94/4 94/9 95/19 96/4 96/21 103/22 103/23 104/12 104/24 105/16 105/19 105/25 106/8 106/19 107/10 108/11 109/1 110/10 110/14 110/15 116/9 117/21 118/8 120/24 127/8 128/7 135/22 148/24 150/2 152/17 152/20 152/21 153/4 155/17 156/6 158/13 159/5 159/19 161/6 161/8 161/18 161/23 162/22

**they [213]**

**they'd [2]** 110/1 153/8

**they'll [1]** 29/7

**they're [24]** 9/2 9/15 44/25 52/18 53/25 88/17 95/3 107/1 107/3 107/9 107/12 107/24 107/25 109/3 109/4 109/9 119/19 123/16 138/10 138/16 151/14 151/14 152/2 160/6

**they've [1]** 18/19

**thing [17]** 19/8 24/5 38/17 65/5 80/21 137/8 137/24 141/5 141/6 147/20 151/22 152/13 152/14 152/14 155/11 158/24 159/9

**things [17]** 11/13 27/20 28/7 77/5 78/10 95/21 110/10 110/14 156/22 157/20 159/17 159/19 161/3 161/6 161/8 161/18 161/23

**think [96]** 4/9 4/17 8/13 14/14 18/8 18/20 21/4 24/11 26/18 28/9 29/20 35/24 38/12 42/14 48/9 50/25 51/6 52/4 52/9 55/16 56/5 57/22 57/24 58/3 58/4 58/23 59/7 60/10 60/12 60/13 61/22 63/14 64/22 68/5 73/13 76/4 79/23 84/11 84/19 84/21 89/1 89/5 89/14 92/18 101/2 103/3 103/20 106/21 107/9 107/19 107/21 115/10 115/24 116/16 116/19 120/4 123/7 130/10 130/17 135/3 135/20 136/9 136/14 136/15 137/5 137/8 138/10 141/11 146/4 146/5 146/21 147/8 147/20 148/24 149/1 152/6 153/6 153/2 153/25 155/10 156/8 156/19 156/23 156/25 157/21 158/17 160/7 160/8 160/11 160/12 161/10 161/11 161/12 161/13 161/15 162/6

**third [11]** 10/1 32/1 40/20 41/3 89/19 90/9 90/12 90/21 90/25 125/2 126/17

**thirds [3]** 10/1 32/3 41/4

**this [256]**

**thoroughly [3]** 160/11 160/16 160/19

**those [110]** 7/14 8/15 10/18 11/10 11/11 12/3 17/1 17/4 17/10 17/12 17/13 17/15 17/25

**thought [15]** 13/9 15/21 16/10 28/13 28/15 50/13 94/20 95/10 95/17 105/8 105/21 132/5 132/7 135/1 160/9

**thousand [13]** 52/18 52/21 55/4 106/14 106/16 106/17 107/6 107/8 108/24 109/6 109/8 109/12 111/17

**threat [1]** 147/14

**three [14]** 6/17 6/20 6/21 9/13 12/7 15/5 35/14 47/1 54/21 71/5 76/17 157/20 159/17 159/19

**three million [1]** 54/21

**threshold [1]** 110/25

**through [39]** 10/9 11/20 11/22 12/3 15/12 19/22 19/22 19/24 23/4 25/7 25/12 25/19 25/24 26/1 26/13 27/22 51/2 51/14 60/10 68/24 71/20 71/21 75/15 75/16 79/15 100/11 107/20 110/20 115/20 124/8 125/1 125/15 136/14 136/19 137/8 144/4 146/3 150/12 153/17

**throughout [3]** 29/4 130/10 148/22

**thus [2]** 87/23 110/15

**tie [2]** 108/23 149/4

**tied [1]** 122/2

**till [3]** 144/8 158/20 159/6

**time [89]** 6/24 7/2 9/15 9/22 10/25 14/16 15/3 16/16 16/18 18/13 18/23 25/22 33/22 37/7 37/11 40/19 40/20 41/3 41/4 41/10 44/24 47/4 62/6 62/13 64/12 66/22 67/2 67/24 69/1 70/2 75/22 83/9 83/11 88/23 89/19 89/19 90/9 90/12 90/22 90/24 91/1 91/3 91/7 91/10 96/24 104/7 104/23 105/5 105/8 107/2 107/15 107/18 107/25 109/5 109/19 110/3 110/17 113/6 113/20 115/1 116/12 116/16 117/9 117/14 118/25 119/16 121/16 122/24 124/2 127/22 131/12 133/17 133/19 133/19 136/11 136/13 140/13 140/16 141/22 149/17 149/18 150/18 153/20 154/11 157/10 161/1 161/22 162/16

**timeline [3]** 51/5 51/6 80/16

**times [8]** 9/3 9/7 9/12 9/13 9/18 76/17 127/1 127/11

**tiny [1]** 146/16

**TMS [1]** 36/15

**today [14]** 25/11 27/23 67/21 74/2 76/24 77/1 83/13 83/20 89/9 90/25 94/11 98/22 145/19 145/21

**together [8]** 11/23 46/21 100/19 100/23 144/3 146/3 161/13 161/15 161/16

**told [17]** 18/19 38/15 72/9 91/19 132/21 135/13 138/8 141/11 143/5 144/18 146/8 147/22 154/5 155/6 155/15 155/21 157/9

**too [9]** 40/21 45/21 59/25 82/15 88/8 88/12 96/19 134/1 157/18

**took [12]** 19/20 44/4 63/10 64/21 81/18 110/23 117/22 138/21 139/24 143/10 148/2

**18/1 18/5 18/5 19/7 29/2 32/5 26/5 28/5 31/6 37/7 37/25 38/20 38/25 39/1 39/7 39/12 39/19 44/14 46/12 46/19 46/21 47/17 52/21 60/23 61/3 61/5 61/6 61/7 62/5 62/10 70/11 73/5 73/7 75/24 76/12 76/25 77/3 80/23 81/1 81/3 81/5 81/11 81/13 83/18 88/15 88/20 95/2 95/5 95/25 96/8 96/16 96/18 98/12 98/19 100/13 100/20 100/23 102/20 102/24 103/8 104/6 105/11 106/11 109/8 109/18 109/19 109/25 111/5 114/7 114/16 115/9 115/14 115/18 115/18 116/11 120/18 127/11 128/13 131/20 131/20 134/12 135/24 140/9 140/15 140/17 140/18 140/20 141/2 143/9 148/19 150/16 153/4 153/6 154/15 155/18 159/17 161/13

**though [7]** 15/7 34/15 72/13 80/2 104/7 110/2 151/22

**tools [19]** 29/25

**top [15]** 20/8 74/12 86/11 99/9 101/1 106/21 108/2 111/11 115/15 120/8 122/14 122/18 133/1 133/6 146/1

**topic [1]** 34/13

**total [2]** 80/9 81/7

**totality [1]** 60/13

**touchstone [1]** 85/11

**trace [2]** 94/8 94/9

**traded [3]** 5/16 6/22 99/25

**trading [1]** 90/1

**trained [1]** 84/8

**training [1]** 62/19

**transaction [5]** 107/9 109/2 111/1 111/13 111/15

**transactions [1]** 107/10

**transcript [9]** 2/12 19/13 19/20 19/25 20/1 132/9 159/16 160/18 163/11

**transcripts [2]** 20/2 162/3

**transferred [1]** 107/12

**transferring [1]** 87/15

**transformational [1]** 113/24

**treasurer [5]** 124/10 124/19 125/17 125/24 126/15

**treasurers [1]** 57/10

**Treasuries [2]** 87/11 88/4

**treasury [18]** 36/22 37/2 39/17 40/4 41/24 86/16 87/22 89/23 89/23 97/16 97/21 98/4 98/6 98/23 98/25 99/2 108/22 109/5

**treat [1]** 131/24

**treated [1]** 154/13

**treating [1]** 139/20

**treatises [1]** 48/20

**treatment [7]** 129/3 153/17 153/18 153/18 153/19 153/22 153/24

**treatments [1]** 130/2

**trial [11]** 1/10 4/10 19/8 29/5 57/6 71/5 84/14 102/22 149/7 161/2 162/9

**tried [1]** 146/12

**true [6]** 41/2 41/3 41/5 47/15 91/7 162/12

**trust [74]** 16/23 16/24 23/1 26/23 30/16 33/9 34/5 34/8 34/10 34/11 34/17 37/5 37/22 43/5 54/1 54/5 54/13 54/17 54/19 55/3 55/5 56/11 62/1 72/16 73/14 73/14 75/7 77/15 79/2 79/7 79/17 80/20 81/14 83/18 85/20 86/24 87/10 87/14 87/21 88/6 95/14 102/9 103/17 106/20 114/9 119/5 119/8 119/14 120/19 124/12 124/23 124/24 125/8 126/16 126/21 127/14 128/2 129/14 131/3 134/10 141/14 141/15 142/3 142/5 142/14 143/23 148/10 152/17 153/24 154/8 154/23 154/25 155/23

**trustee [2]** 87/14 124/11

**try [11]** 45/17 64/25 65/18 78/21 80/3 80/18 84/22 85/22 91/20 92/2 160/9

**trying [10]** 41/13 51/14 79/5 80/4 95/14 97/25 107/19 107/20 111/17 111/21

**Tuesday [2]** 16/1 20/19

**turn [6]** 75/16 116/7 126/18 129/8 129/19 133/14

**turned [2]** 74/5 128/19

**turning [1]** 132/8

**turns [3]** 152/22 157/1 157/13

**two [53]** 6/18 6/21 7/9 9/8 9/13 10/1 15/9 15/10 24/19 31/3 32/3 37/25 39/3 39/8 39/12 41/4 42/22 43/1 43/1 46/21 47/1 47/12 47/13 47/19 47/19 48/9 49/2 49/3 52/16 52/21 52/22 55/11 55/11 55/12 57/10 60/13 71/7 71/7 77/20 92/18 92/21 95/5 96/16 102/20 103/15 106/25 107/16 110/4 110/17 124/18 124/18 126/11 159/1

**two-thirds [3]** 10/1 32/3 41/4

**T**

**type [8]** 9/23 10/7 36/10 47/25 53/13 96/17 122/22 140/22

**typed [3]** 32/5 54/8 110/20

**U**

**U.S [15]** 1/8 1/22 2/9 4/6 9/5 9/8 17/5 36/22 41/24 73/21 86/16 87/11 87/22 89/23 155/11

**ultimately [3]** 45/14 121/20 129/13

**unable [1]** 69/23

**unaudited [1]** 39/2

**under [19]** 32/9 32/11 54/18 56/6 73/3 75/5 76/18 81/13 87/8 107/6 109/21 111/10 115/11 120/9 120/15 121/5 132/3 133/7 160/12

**underlying [9]** 16/14 21/11 21/19 35/17 36/16 63/16 75/19 109/24 109/25

**understand [35]** 4/13 14/16 17/3 20/13 21/8 46/1 46/1 48/25 58/24 66/19 72/17 72/23 72/24 75/5 75/8 75/11 76/2 76/23 76/23 77/13 78/24 80/11 82/12 83/14 86/19 88/2 88/25 91/9 105/23 107/19 116/10 135/10 145/21 147/14 151/21

**understanding [15]** 11/15 32/16 73/19 79/18 90/20 115/18 131/4 131/7 133/8 133/20 134/16 140/4 140/8 140/13 141/1

**understandings [1]** 145/4

**understated [2]** 50/5 56/21

**understatement [1]** 56/22

**understating [2]** 50/7 50/8

**understood [9]** 25/23 73/7 105/25 130/23 130/25 131/17 131/22 131/22 134/7

**undertake [2]** 121/6 144/11

**undertakes [1]** 124/7

**undertook [2]** 37/10 39/24

**unethical [1]** 126/4

**unilaterally [1]** 143/16

**UNITED [12]** 1/1 1/5 1/11 2/1 2/5 4/4 4/19 7/23 28/11 72/20 76/8 87/12

**University [4]** 5/24 5/25 6/1 6/6

**unless [10]** 41/13 57/23 58/10 58/16 58/22 119/4 126/4 136/6 155/20 160/2

**unlikely [1]** 119/1

**unopposed [4]** 18/10 18/21 26/15 29/18

**unrebutted [2]** 115/13 115/14

**unreliable [1]** 45/21

**until [8]** 64/9 68/12 124/2 143/11 147/23 148/22 149/7 152/2

**unwanted [1]** 119/7

**up [34]** 7/5 12/7 13/13 22/23 22/23 26/11 26/22 27/1 27/20 27/21 44/8 48/8 62/8 63/9 64/12 73/1 81/3 81/6 81/11 82/8 84/13 92/3 107/17 114/24 115/24 123/21 124/5 127/14 136/18 148/22 149/8 150/11 153/22 154/7

**upon [8]** 63/21 81/20 113/2 116/10 140/11 144/6 144/24 161/3

**urged [1]** 129/21

**us [29]** 5/21 6/15 9/7 16/21 18/20 20/24 27/8 42/9 46/1 53/5 56/2 64/23 82/9 90/5 90/6 90/7 90/9 91/21 112/17 112/18 112/23 117/12 117/18 143/22 144/1 144/18 148/19 152/16 162/19

**USA [1]** 1/18

**usdoj.gov [2]** 1/25 1/25

**use [20]** 7/14 22/16 23/4 28/3 39/17 40/4 40/5 41/24 44/4 45/2 48/3 48/6 64/11 72/22 76/9 90/19 91/9 96/20 97/25 103/22

**used [37]** 16/14 17/15 44/8 45/17 45/18 48/7 48/7 48/8 49/14 50/23 54/4 56/15 56/16 75/19 82/2 86/3 89/1 89/2 89/4 89/5 93/10 97/16 98/2 98/4 98/6 98/24 98/25 99/2

**V**

**Valdez [20]** 1/22 3/7 19/23 22/2 22/24 24/9 28/11 28/18 30/6 64/25 77/25 112/17 132/6 132/9 133/5 139/17 156/19 156/22 157/2 162/17

**valid [4]** 63/4 63/24 75/25 139/10

**validating [1]** 49/24

**validity [8]** 13/4 17/1 35/16 55/13 62/22 63/17 75/24 76/25

**valuation [6]** 6/8 7/5 7/8 8/18 8/19 10/4 10/24 11/1 11/6 62/20 84/2 99/24

**value [7]** 10/5 50/23 82/17 83/5 83/9 97/7 138/11

**variables [1]** 87/2

**varies [1]** 148/21

**variety [1]** 49/22

**various [2]** 60/20 103/16

**vehicles [1]** 153/5

**verbatim [1]** 143/10

**verdict [2]** 157/11

**verify [2]** 16/13 75/18

**version [1]** 54/8

**versus [6]** 4/4 4/6 9/18 90/15 90/16 100/17

**very [33]** 40/22 43/10 45/5 46/20 47/13 48/22 61/5 65/12 81/17 88/19 94/2 94/19 95/24 105/8 109/23 110/19 113/22 116/4 116/12 117/14 125/7 136/21 136/22 138/10 139/16 148/21 149/2 151/22 152/5 152/9 155/19 157/16 161/11

**via [1]** 145/6

**viability [1]** 147/14

**view [5]** 39/1 63/4 64/15 123/1 125/10

**violate [2]** 127/14 27/15

**violation [2]** 139/13 148/25

**virtual [1]** 118/15

**virtually [1]** 143/10

**volume [1]** 106/18

**vulnerable [1]** 152/5

**W**

**WACC [2]** 101/14 101/20

**wait [3]** 152/2 158/20 159/6

**wake [1]** 150/11

**wake-up [1]** 150/11

**Walter [1]** 2/2

**walter.c.alesevich [1]** 2/4

**want [44]** 4/25 29/15 29/21 34/22 39/21 57/18 58/21 65/15 72/15 73/22 74/6 78/22 80/17 91/23 106/7 106/7 113/5 118/3 118/12 119/9 122/2 122/14 123/15 125/23 126/13 127/18 130/6 131/15 136/20 137/24 138/7 139/19 139/20 153/9 153/23 154/9 154/10 156/22 158/8 158/18 158/20 159/3 160/4 162/13

**wanted [9]** 20/11 20/12 58/18 103/7 111/8 120/6 153/14 155/2 156/11

**wants [2]** 158/7 160/2

**warp [1]** 44/24

(column)

**100/25 102/23 103/2 103/2 103/12 105/16 110/24 111/9 151/19**

**users [1]** 129/11

**using [17]** 35/8 36/22 44/20 44/25 47/21 47/24 48/1 48/1 52/1 62/11 63/16 63/18 86/15 87/3 88/4 101/4 104/6

**USP [1]** 87/16

**USPS [17]** 117/3 119/1 119/1 120/7 121/21 122/1 123/2 124/7 124/16 124/22 126/25 127/11 129/2 129/11 129/13 129/22 131/24

**USPS' [1]** 126/16

**usps.gov [2]** 2/4 2/7

**usually [1]** 41/21

**was [364]**

**Washington [6]** 1/24 1/24 1/24 2/3 2/10 71/20

**wasn't [15]** 36/16 38/15 39/5 42/19 43/5 43/11 44/6 44/21 82/13 85/16 97/22 103/7 138/6 155/8 158/1

**wasting [2]** 136/11 136/13

**waves [1]** 150/11

**waving [1]** 80/15

**way [33]** 25/19 32/3 44/6 45/25 46/20 48/2 55/10 55/16 64/25 73/19 79/12 80/3 80/11 80/11 80/14 80/14 91/5 91/14 98/7 107/14 111/17 113/21 114/23 115/10 133/23 133/25 141/12 141/12 146/9 147/3 149/7 160/3 160/17

**Wayne [1]** 150/13

**ways [3]** 137/12 159/1 163/4

**we [177]**

**we'd [2]** 19/6 109/17

**we'll [9]** 4/9 49/25 65/23 75/16 92/2 127/2 142/10 158/4 162/13

**we're [26]** 19/1 25/8 32/12 33/18 60/5 73/23 84/2 84/8 86/13 86/14 91/1 103/18 113/22 119/19 123/16 136/1 136/3 141/9 142/22 154/10 159/7 161/18 161/19 161/19 162/5 162/15

**we've [14]** 26/1 27/16 59/2 60/10 74/4 103/3 103/4 104/9 113/21 116/15 127/4 129/17 159/15 162/4

**Wednesday [1]** 162/24 162/25

**week [7]** 12/12 73/24 136/2 136/4 136/9 136/16 162/9

**week-and-a-half [1]** 73/24

**weekends [1]** 162/11

**weeks [2]** 71/5 124/18

**weighted [3]** 46/22 49/10 99/18

**welcomed [1]** 30/4

**well [105]** 4/14 11/13 13/12 16/12 16/16 17/8 20/9 21/4 21/23 22/12 23/10 27/12 30/4 32/17 33/17 34/15 34/22 34/25 35/6 35/12 36/25 37/16 39/15 39/19 40/6 41/10 44/3 46/20 46/21 47/1 48/7 49/15 49/25 54/6 56/5 57/22 59/7 60/24 61/3 61/19 62/24 63/23 64/15 70/12 71/14 75/14 75/25 76/2 77/9 77/21 78/3 78/9 79/18 79/19 82/6 82/13 82/15 82/17 84/2 85/3 85/9 86/23 87/1 87/7 88/7 88/16 90/18 93/3 93/18 93/21 94/6 94/15 99/1 99/18 103/14 103/25 104/23 105/16 105/17 106/12 108/20 109/3 109/16 109/23 110/2 111/15 112/24 117/17 120/2 120/18 122/5 123/10 129/19 135/7 135/11 135/12 136/17 140/17 154/2 154/13 156/2 156/5 157/13 160/7 160/17

**went [10]** 45/9 84/23 85/7 142/23 150/21 151/9 153/6 153/18 153/19 157/9

**were [174]**

**weren't [6]** 38/9 39/19 44/13 61/7 64/1 95/22

**what [248]**

**what's [15]** 10/16 21/25 26/16 32/6 40/20 45/15 46/22 73/17 77/3 79/18 86/8 100/16 141/23 142/19 157/21

**whatever [18]** 19/25 27/14 28/10 38/7 39/21 53/16 53/16 81/10 82/19 82/25 106/17 107/4 109/17 144/7 147/16 151/15 151/5 161/4

**whatsoever [3]** 22/20 28/25 37/1

**Wheelers [1]** 1/19

**when [63]** 10/1 11/13 12/25 14/8 19/6 22/4 22/24 23/6 23/15 23/23 24/2 25/8 42/15 43/24 43/25 47/19 48/23 49/10 50/12 53/9 54/6 54/9 65/5 65/7 66/14 66/23 67/19 67/22 69/22 71/17 76/21 81/23 83/17 84/5 85/13 89/13 89/25 96/17 100/18 103/8 103/15 104/12 108/14 109/18 110/1 111/3 111/19

**W**

**when... [16]** 112/16 137/20 138/5 141/8
141/14 141/17 143/3 143/14 143/20 151/15
152/15 153/21 154/4 155/18 156/24 161/5
**whenever [2]** 91/21 144/3
**where [45]** 4/13 6/24 9/14 10/14 15/21 19/4
19/13 21/7 31/2 33/20 33/24 51/17 52/8 53/5
53/10 53/25 56/16 58/18 67/4 67/15 69/8
72/1 73/3 74/1 82/7 84/9 86/2 86/14 88/20
92/10 97/21 99/10 99/24 125/23 126/14
130/7 130/15 146/2 146/18 147/13 148/2
151/24 153/6 153/23 160/18
**whether [35]** 12/14 17/14 17/22 27/23 27/23
28/23 37/14 39/16 40/7 40/11 43/24 44/19
58/8 63/3 65/8 76/24 78/13 78/14 78/17
90/25 94/11 95/18 96/4 96/5 96/6 98/4 98/5
110/8 110/9 117/15 120/24 124/7 147/16
158/20 160/13
**which [66]** 6/8 8/6 12/6 12/11 12/20 15/15
16/23 19/22 20/16 25/3 25/10 25/11 26/15
29/17 29/18 30/13 31/3 31/5 31/11 32/2
37/20 38/7 38/13 42/25 44/17 45/12 48/5
51/22 57/11 62/3 70/21 73/7 73/25 74/21
75/22 77/11 78/15 81/20 82/9 86/3 90/14
90/14 90/15 94/8 99/23 100/5 100/21 115/11
116/10 117/4 124/8 125/3 138/1 143/10
143/17 151/2 152/11 152/24 153/22 158/10
158/11 158/12 159/10 159/19 161/8 162/19
**whichever [1]** 64/14
**while [4]** 19/19 36/6 123/8 124/12
**who [26]** 4/10 5/15 36/3 68/1 72/10 72/12
72/13 117/5 118/2 120/4 120/23 121/3 122/7
122/17 126/18 127/9 127/10 128/16 141/25
145/12 146/19 149/14 149/16 150/14 150/15
150/23
**who's [2]** 121/13 123/18
**whoa [1]** 149/7
**whole [14]** 19/10 84/4 84/7 84/22 105/17
148/22 151/4 151/21 152/14 152/14 152/16
155/23 158/16 160/8
**whose [1]** 137/6
**why [22]** 19/11 19/15 23/17 23/20 24/3 27/7
30/3 32/11 35/5 35/10 48/25 83/14 83/20
84/20 84/23 93/2 96/16 111/1 118/12 138/14
142/4 161/17
**wide [1]** 120/14
**widely [1]** 48/21
**Wilkerson [5]** 138/2 138/7 150/13 151/7
151/18
**will [34]** 8/25 10/5 44/8 51/1 53/13 53/19
53/20 58/12 64/23 88/22 93/11 100/15 107/7
112/17 112/18 116/9 119/21 122/2 122/2
122/7 124/5 124/13 136/17 142/10 156/18
156/20 156/24 157/23 158/10 158/11 158/12
159/10 161/11 162/17
**William [5]** 3/7 4/20 5/2 5/9 120/3
**willing [2]** 117/16 124/5
**Wilson [1]** 121/13
**Windsor [1]** 2/6
**with those [1]** 131/20
**withdrawn [3]** 92/12 92/23 94/4
**within [17]** 8/25 21/12 22/10 22/11 25/24
26/5 26/13 26/18 27/5 27/10 27/10 31/7 31/9
31/14 47/8 72/1 129/2
**without [7]** 20/7 41/15 45/6 63/10 64/17
125/15 139/12
**witness [9]** 4/18 4/23 9/4 19/12 19/15 29/11
157/24 158/2 159/16
**witnesses [12]** 3/6 65/8 112/18 112/19
112/21 112/21 112/23 112/25 136/16 140/14
144/6 156/23

**won't [6]** 41/21 122/10 123/14 130/16
138/13 153/9
**wonderful [1]** 162/4
**word [6]** 35/11 44/4 135/13 142/15 142/15
146/21
**word-for-word [1]** 142/15
**words [5]** 17/23 73/3 100/9 135/1 147/7
**work [8]** 6/15 10/7 16/22 49/15 81/15 146/13
148/3 162/8
**working [9]** 40/24 71/23 71/24 93/10 93/13
93/17 96/4 98/18 98/11
**workload [1]** 121/9
**workloads [1]** 122/23
**works [6]** 73/20 115/10
**world [6]** 86/21 86/24 87/2 87/3 87/4 93/3
**worth [2]** 42/24 155/7
**would [207]**
**wouldn't [9]** 18/21 39/20 68/20 79/13 88/11
106/12 109/3 133/24 153/7
**write [2]** 13/13 95/16
**writer [4]** 120/12 120/21 120/23 122/7
**writes [5]** 121/14 124/19 124/20 125/16
125/17
**writing [6]** 113/3 128/1 145/11 145/11 159/3
160/5
**written [8]** 13/13 22/12 48/21 61/19 76/18
76/20 122/16 133/21
**wrong [2]** 151/24 156/18
**wrote [9]** 70/2 103/9 103/15 104/7 104/12
118/2 120/23 126/18 138/7

**Y**

**yeah [14]** 26/9 29/13 50/8 65/18 80/19 89/17
90/17 99/12 102/2 112/16 135/11 135/16
148/7 162/10
**year [73]** 10/10 12/6 14/25 15/12 36/22 37/2
37/9 37/19 37/23 37/24 38/5 38/5 38/6 38/8
38/8 38/10 38/10 38/12 38/21 39/17 39/20
39/20 40/1 40/4 40/7 40/20 40/22 40/25
41/11 41/24 42/12 43/7 44/15 44/16 44/16
44/19 44/23 45/8 46/8 51/2 56/7 56/12 56/17
61/23 71/21 72/1 76/21 85/8 85/9 85/9 86/16
87/11 87/22 88/4 88/8 88/22 89/3 89/24
89/24 89/24 90/1 90/5 90/8 90/10 90/15 91/1
92/1 94/18 94/25 95/24 97/15 97/23 140/25
**yearbook [3]** 49/18 86/4 99/23
**years [33]** 6/7 6/20 6/21 7/7 7/9 10/2 10/23
12/7 15/5 37/21 37/25 39/3 39/9 39/12 40/17
42/22 42/25 43/1 47/12 90/15 90/16 94/23
95/1 95/2 95/5 103/15 123/16 138/19 141/23
141/24 145/1 155/4 155/6
**years' [1]** 42/24
**yes [68]** 4/12 5/9 5/23 6/5 6/17 7/13 8/17 9/6
12/17 13/2 13/6 13/14 13/17 13/22 14/4
14/10 14/20 14/24 15/25 16/6 22/3 25/6
25/20 31/9 32/1 32/20 33/2 33/5 49/7 49/12
51/20 51/23 52/25 54/2 56/22 58/18 59/1
59/19 61/14 66/13 66/20 67/7 69/4 69/21
71/1 71/3 73/16 74/13 75/1 77/8 79/4 79/11
80/25 81/15 81/22 87/18 92/1 92/15 95/9
103/10 108/6 108/13 109/8 112/2 112/8
112/11 134/13 143/4
**yesterday [7]** 20/16 30/17 40/18 44/3 45/10
51/4 105/22
**yet [6]** 60/9 103/11 128/4 149/17 150/1
156/5
**yield [11]** 89/18 89/21 89/25 90/3 90/4 90/8
90/11 90/20 90/22 90/24 91/11
**yields [2]** 89/22 151/2
**York [3]** 5/16 6/22 9/9
**you [629]**
**you'd [6]** 4/12 64/14 91/21 133/15

**you'll [3]** 123/5 153/17 162/21
**you're [85]** 10/14 19/24 19/21 35/8 43/25
45/11 46/16 47/19 48/13 48/23 49/2 51/1
52/23 57/23 61/12 63/14 63/18 72/25 78/13
78/15 81/6 83/5 83/7 84/4 85/12 87/3 93/16
93/21 94/11 96/18 96/18 96/21 98/12 99/19
100/7 136/13 137/1 153/14 157/14 158/21
159/14 161/5 162/7
**you've [16]** 22/3 28/24 28/24 63/18 76/13
77/2 80/20 83/11 90/20 102/9 102/22 102/22
105/11 105/14 145/19 161/20
**you-all [6]** 19/12 28/13 28/14 28/23 78/4
78/5
**Young [1]** 6/19
**your [308]**
**yourself [3]** 28/15 63/15 94/20
**yourselves [2]** 4/8 28/14

**Z**

**zero [6]** 38/5 38/6 38/10 44/16 44/17 83/10